Bradley J. Dixon, ISB No. 6167
Kersti H. Kennedy, ISB No. 9064
GIVENS PURSLEY LLP
601 W. Bannock Street
PO Box 2720
Boise, ID  83701-2720
Telephone (208) 388-1200
Facsimile (208) 388-1300
bradleydixon@givenspursley.com
kerstikennedy@givenspursley.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC,<br><br>         Plaintiff,<br>V.<br><br>JOHN K. BALDWIN; BRIDGE CAPITAL, LLC,<br><br>         Defendants. | Case No.:  1:20-cv-195<br><br>**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS** |

Plaintiff The Government of the Lao People's Democratic Republic ("Plaintiff," "Lao PDR," or "Government"), by and through its counsel of record Givens Pursley LLP, and for the causes of action against Defendants, pleads, alleges, and complains as follows:

**<u>INTRODUCTION</u>**

1.     Lao PDR files this Complaint for enforcement of two foreign arbitration awards and entry of judgment pursuant to the Convention on the Recognition and Enforcement of

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 1**

Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (June 5, 1958) (the "New York Convention"), Chapter 2 of the Federal Arbitration Act (the "FAA") (9 U.S.C. Sec. 201, *et seq.*), and Idaho law.

2.      The first foreign award was arbitrated pursuant to Articles 9 and 13 of the Agreement on Encouragement and Reciprocal Protection of Investments between the Lao People's Democratic Republic and the Kingdom of the Netherlands, a true and correct copy of which is attached as **Exhibit A**.

3.      The second foreign award was arbitrated pursuant to pursuant to Article 8(3) of the Agreement Concerning the Encouragement and Reciprocal Protection of Investments between the Government of the People's Republic of China and the Government of the Lao People's Democratic Republic, a true and correct copy of which is attached as **Exhibit B**.

4.      The Plaintiff seeks judgment against the Defendants John K. Baldwin ("Baldwin") and Bridge Capital, LLC ("Bridge") as the *alter egos* of Lao Holdings N.V. ("LHNV") and Sanum Investments Ltd., ("Sanum"), the arbitral award debtors.

## PARTIES

5.      The Plaintiff Lao PDR is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611.

6.      The defendant Baldwin is a native and resident of Idaho and has, for several decades, operated a "distressed lending" business in the Pacific Northwest, generally under the umbrella of Bridge.

7.      The defendant Bridge is a Nevada limited liability company. Its current business address is Micro Beach Road, Saipan, The Commonwealth of the Northern Mariana Islands.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 2**

8.     Non-party Sanum is an arbitral award debtor in a Permanent Court of Arbitration ("PCA") arbitration, PCA Case No. 2013-13.  Sanum was incorporated in Macau SAR in 2005. Baldwin established Sanum to use as a corporate vehicle for his gaming investments in Asia. Sanum's registered office is in a law office in Macau SAR, but it has no employees there.  Sanum has no assets in the United States.

9.     Non-party LHNV is an arbitral award debtor in an International Centre for Settlement of Investment Disputes ("ICSID") arbitration, ICISD Case No. ARB(AF)/12/6. LHNV is a corporation formed under the laws of Aruba, the Netherlands Antilles. Its office is in Aruba. Baldwin directed an officer of Bridge, in 2011/2012, to form LHNV in Aruba for the sole purpose of using the Netherlands Bi-Lateral Investment Treaty with the Lao PDR to make an investment treaty claim for alleged damage to a Sanum investment in the Thanaleng slot club in the Lao PDR. Baldwin then inserted LHNV into the chain of ownership between himself and Sanum, so that LHNV owns 100% of Sanum.  LHNV has no assets anywhere in the world.

10.    Defendants Baldwin and Bridge are *alter egos* of arbitral award debtors LHNV and Sanum.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

11.    This Court has subject matter jurisdiction over this proceeding pursuant to 9 U.S.C. §§ 203 and 207.  See *Glencore Grain Rotterdam B.V.* v *Shivnath Rai Harnarain Co.*, 284 F.3d 1114 (9th Cir. 2002).

12.    This Court further has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332, as the suit is between a foreign state and citizens of the United States, and the amount in controversy is in excess of $75,000.00.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 3**

**Personal Jurisdiction**

13.     Baldwin and Bridge are subject to *quasi in rem* jurisdiction in this Court because they each own real and/or personal property in Idaho. See, *Glencore Grain Rotterdam B.V.*, *supra*.

14.     Baldwin's real property in Idaho includes, *inter alia*, real estate residences at 7355 E. Cumberland Ct., Hayden, Idaho, 83835, and at 7021 E. Syringa Rd., Hayden, Idaho 83835. Baldwin also owns a bank account at the First Interstate Bank in Idaho, including account number xxxxxx3769.

15.     Bridge also owns bank accounts at the First Interstate Bank in Idaho, including account number xxxxxx7611.

16.     Under the New York Convention, as codified in 9 U.S.C. Secs. 203 and 207, it is proper to proceed to enforce these foreign arbitral awards in a Complaint against only the *alter ego* defendants. *CBF Industria De Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2d Cir. 2017).

**Venue**

17.     Venue is proper in the District of Idaho. 28 U.S.C. § 1391. Baldwin is a resident of Idaho. Bridge is also a resident of Idaho by virtue of being subject to the Court's personal jurisdiction. Further, the Defendants' property described above is located in this state.

<u>ALLEGATIONS</u>

<u>Baldwin's Investments in Laotian Gaming</u>

18.     For many years, Baldwin has controlled many companies engaged in the business of gambling.

19.     In 2007, Baldwin learned of an opportunity to invest in new gaming projects in the Lao PDR.  Baldwin used Sanum to hold his interests in the Lao PDR gaming businesses. He

funded the investments through loans from Bridge to Sanum. Using Bridge funds, Baldwin developed a casino, the Savan Vegas Casino at Savannakhet, Laos and slot clubs. Baldwin agreed with a local Laos partner, the ST Group, to invest in gaming businesses in Laos and he also obtained a contractual interest in a slot club controlled by ST Group at Thanaleng, Laos.

20.    Between 2007 and 2016, Baldwin's two major interests in Laos were the Savan Vegas casino and the Thanaleng slot club. The Lao PDR owned 20% of the Savan Vegas casino but had no interest in the Thanaleng slot club.

21.    In 2012, the Lao PDR initiated an audit by Ernst & Young of the books and records of the Savan Vegas casino.

22.    That same year, Baldwin had a dispute with his local partner, the ST Group, which had initiated a court case concerning Sanum's contractual rights to Thanaleng.

### BIT Claims Against Lao PDR

23.    Fearing the audit would expose bookkeeping irregularities at the Casino and having lost the ST Group court case, on August 14, 2012, Baldwin filed two Bi-Lateral Investment Treaty ("BIT") claims against Lao PDR.

24.    The treaty between the People's Republic of China and Laos, which Sanum could invoke as a Macau SAR corporation, provided investors a narrow range of rights, limited to expropriation. Intending to use newer international law claims, including "unfair and inequitable treatment," and "denial of justice," Baldwin, using a well-established treaty-shopping plan, used LHNV to take advantage of the more favorable Netherlands/Lao PDR Bi-Lateral Investment Treaty in its arbitration over the Thanaleng slot club against Lao PDR. As noted *supra*, Baldwin had inserted LHNV into the corporate ownership chain between himself and Sanum for this purpose.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 5**

25.     On August 14, 2012, pursuant to Articles 9 and 13 of the Agreement on Encouragement and Reciprocal Protection of Investments between the Lao People's Democratic Republic and the Kingdom of the Netherlands ("Lao-Dutch BIT"), ("the LHNV Proceeding"), Baldwin initiated *Lao Holdings N.V. v. The Lao People's Democratic Republic,* ICISD Case No. ARB(AF)/12/6, an arbitration under the ICSID Additional Facility Rules.

26.     The arbitral tribunal invested to hear the LHNV claims included Professor Bernard Hanotiau, Professor Brigitte Stern, and the President of the Tribunal, the Honorable Ian Binnie.  Professors Hanotiau and Stern are two of the most prominent ICSID arbitrators in the world, sitting on a combined total of more than 85 investment tribunals.  President Binnie was a Justice on the Supreme Court of Canada from 1998 through 2011.

27.     Also, on August 14, 2012, pursuant to Article 8(3) of the Agreement Concerning the Encouragement and Reciprocal Protection of Investments between the Government of the People's Republic of China and the Government of the Lao People's Democratic Republic ("China-Lao BIT"), Baldwin initiated *Sanum Investments Limited v. The Lao People's Democratic Republic*, PCA Case No. 2013-13, an *ad hoc* arbitration according to UNCITRAL ("United Nations Commission on International Trade Law") Rules against the Government ("the Sanum Proceeding").

28.     The arbitral tribunal invested to hear the Sanum claims included Professor Bernard Hanotiau, Professor Brigitte Stern, and the President of the Tribunal, Mr. Andres Rigo Sureda.  President Rigo Sureda is the former Acting Vice President and General Counsel of the World Bank, of which ICSID is affiliated.

29.     In both arbitrations, LHNV and Sanum brought claims against Lao PDR for alleged violations of their international responsibilities to protect foreign investors under the

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 6**

relevant treaties.   The collective total of the claims asserted against Lao PDR amounted to $1,000,000,000.00 (One Billion Dollars).

30.     In the two treaty arbitrations which LHNV and Sanum filed in August 2012, each claimant made various claims against Lao PDR, including alleged expropriations of several gaming licenses and unfair and inequitable treatment involving certain investments.

31.     In the LHNV case, LHNV claimed *inter alia* that Lao PDR provided unfair and inequitable treatment to LHNV, as owner of Sanum, in Sanum's court case against ST Group.

32.     In the Sanum case, Sanum claimed *inter alia* that Lao PDR had expropriated three gaming licenses, at the towns of Paksong, Paksan, and Thakhet.

33.     The BIT Tribunals were tasked with several preliminary issues relating to jurisdiction and requests for preliminary relief.   There was comprehensive discovery conducted by American counsel. The merits hearings were scheduled for June 2014 in Singapore.

34.     A few days before those hearings, Baldwin, facing an onslaught of proof of his criminal behavior, conducted negotiations with the Lao PDR and agreed that LHNV and Sanum would enter into a Deed of Settlement ("Deed").

35.     In the Deed, Baldwin agreed to dismiss all LHNV and Sanum claims and to sell the Savan Vegas casino within ten months and exit Laos. The Lao PDR did not pay any compensation in exchange for the dismissal of the arbitrations by the Deed.

36.     Baldwin, however, within two weeks, reneged on the Deed and refused to comply with its terms, including the term to sell the Savan Vegas casino within ten months. If he failed to sell the casino within ten months, Baldwin had agreed in the Deed to allow the Lao PDR to take possession and to sell the casino, distributing the sale proceeds according to the ownership shares.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 7**

37.     Baldwin had also agreed in the Deed to allow a government monitor to review all transactions during the ten-month sale period.  Importantly, Baldwin agreed to pay tax on gross gaming revenue in an amount to be set by an independent committee.

38.     However, within two weeks of signing the Deed, Baldwin refused to allow the government monitor on the casino premises, refused to participate in creating the tax committee, and refused to attempt to sell the casino.

39.     Even though the Deed stated that during the ten-month sale period, from July 1, 2014 through April 15, 2015, Savan Vegas would pay tax to the Lao PDR, Baldwin directed his CFO not to pay any tax to the Government.

### SIAC Arbitration to Compel Performance of BIT Arbitration Settlement Deed

40.     The Lao PDR was forced in August 2014 to initiate a commercial arbitration under an arbitration clause in the Deed to compel performance of the Deed.

41.     That arbitration was conducted under the auspices of the Singapore International Arbitration Centre ("SIAC"). That SIAC Tribunal president was the Honorable Rosemary Barkett, formerly a judge on the United States Court of Appeals for the Eleventh Circuit.

42.     Under the guidance of the SIAC Tribunal, on the tenth month after the Deed's execution, April 15, 2015, the Lao PDR took control of the casino and sold it by auction sixteen months later, on August 31, 2016.

43.     The SIAC's final award was issued on June 27, 2017. That tribunal held the Lao PDR had fully performed its duties under the Deed. It also stated, "it is undisputed that Sanum failed to have Savan Vegas pay any taxes to Laos…." In addition, that Tribunal found that the Government auction sale process had produced the maximum sale price for the casino. The sales proceeds were then distributed according to the terms of the Deed.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 8**

44.     The amounts the SIAC Tribunal awarded to the Lao PDR were paid from an escrow account which had been established under the Tribunal's review and was funded from the sale price of the casino.

45.     In August 2019, that award was confirmed as a Judgment by the High Court of Singapore and is not an issue in this proceeding.

### Reinstatement of Original BIT Proceedings and Final Awards

46.     The original BIT Tribunals, however, in December 2017, allowed LHNV and Sanum to reinstate their 2012 original treaty arbitration claims by finding the Deed had been breached by, *inter alia*, the type of tax the Lao PDR had adopted for the sale of the casino—the Deed called for a "flat tax"—the Lao PDR's expert set the tax at 28%.

47.     The BIT Tribunals said that 28% was an "ad valorem tax," not a "flat tax," and thus a breach of the Deed.

48.     The original August 2012 claims in both cases were then set for a hearing in September 2018. Both tribunals sat together, but the cases were not consolidated.

49.     The arbitral proceedings were complex and extensive.  The parties engaged in extensive discovery, and the arbitrators heard arguments on procedural issues and issued several interim orders.

50.     The BIT Tribunals conducted a final merits hearing in Singapore in September 2018. At the hearing, the parties relied upon hundreds of documentary exhibits, each submitted opening and closing arguments, and each presented witnesses who testified and were cross-examined.

51.     After those hearings in September 2018, the tribunals closed the record and both tribunals issued their Final Awards on August 6, 2019.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 9**

52.     The Final Award in *Lao Holdings N.V. v. The Lao People's Democratic Republic,* ICISD Case No. ARB(AF)/12/6 was entered and became final on August 6, 2019, when it was issued to the parties by the Secretariat of ICSID, a true and correct copy of which is attached as **Exhibit C.**

53.     The Final Award in *Sanum Investments Limited v. The Lao People's Democratic Republic*, PCA Case No. 2013-13 was entered and became final on August 6, 2019, when it was issued to the parties by the Secretariat of the PCA, a true and correct copy of which is attached as **Exhibit D.**

54.     The Lao PDR had defended the BIT claims, *inter alia*, on the grounds that Baldwin had engaged in corrupt and criminal behavior in the Lao PDR. By agreeing to the Deed in June 2014, Baldwin avoided having to meet those defenses in a merits hearing. In the renewed hearing on the merits, however, in September 2018, the issues of Baldwin's criminal conduct were made central parts of the Lao PDR's defense.

55.     In their Final Awards, the BIT Tribunals agreed that Baldwin had committed serious crimes in Laos.  Both tribunals held that the Lao PDR's evidence proved it was "more likely than not" that in July 2012, Baldwin had paid "consultants" *circa* $500,000, which was used to bribe Lao PDR officials, *inter alia*, to stop the Ernst & Young audit of the Savan Vegas casino and to interfere in the Thanaleng ST Group court proceeding.

56.     In addition, both tribunals found as fact that Baldwin had paid a material witness, Madam Sengkeo, [1] $575,000 to prevent her from testifying in the cases.  The tribunals found this payment was an "obstruction of justice."

---

[1] Madam Sengkeo is a Laotian national who worked with Baldwin on several projects starting in 2007. Baldwin called her a friend and a "lobbyist," whom he retained to "lobby" Lao PDR officials.  In 2014, Madam Sengkeo was identified as a material witness in the arbitration cases.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 10**

57.     The BIT Tribunals held that these facts meant Baldwin acted in bad faith in his dealings with the Lao PDR and was not entitled to treaty protection under public international law.

58.     The BIT Tribunals then dealt with the merits of each claim LHNV and Sanum had raised in their two August 2012 notice of arbitrations, *i.e.*, the alleged expropriation of gaming licenses at Paksong, Paksan, and Thaket, and the alleged lack of "fair and equitable treatment" in the Thanaleng court case with ST Group.

59.     The BIT Tribunals dismissed each claim because LHNV and Sanum had failed to meet the burden of proof that there had been an expropriation or a denial of justice or unfair and inequitable treatment.

60.     Finally, the BIT Tribunals awarded the Lao PDR its fees, expenses, and costs of the arbitrations.

61.     The total sum awarded to Lao PDR in the two arbitrations is $3,727,358.98. As noted above, the LHNV Tribunal awarded the Lao PDR $1,949,106.67 and the Sanum Tribunal awarded the Lao PDR $1,778,252.21 (collectively, "Final Awards").

62.     LHNV and Sanum have not made any payment to the Lao PDR under the Final Awards, despite the requirements set forth in the rules that each party undertake to carry out the awards without delay.

63.     Instead, in further evidence of their bad faith, on November 6, 2019, LHNV and Sanum have filed an action in the High Court of Singapore to "set aside" the two awards.

---

Her role is described in the Final Awards. In particular, the tribunals found that Baldwin paid a bribe of $575,000 to Madam Sengkeo to prevent her from testifying for the Government in the arbitration hearings, which the BIT Tribunals held was an "obstruction of justice." ICSID Award, para. 157; PCA Award, 156.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 11**

64.     The Arbitral Seat for both arbitrations was the Republic of Singapore. The Final Awards are thus "foreign" awards, under 9 U.S.C. §207.

### *Alter Ego* Liability of Defendants

**A.     There is a Unity of Interest and Ownership Between Baldwin and His Companies.**

65.     Baldwin completely dominates and controls Bridge, LHNV, and Sanum.

66.     The BIT Tribunals each found as fact that Baldwin was the "directing mind" of LHNV and Sanum: "Mr. Baldwin is the directing mind of both Claimant companies. His conduct throughout was to advance their corporate interests. His bad faith conduct is their conduct."

67.     The BIT Tribunals' finding that Baldwin is the "directing mind" of LHNV and Sanum was based upon a close evaluation of Baldwin's conduct and testimony.

68.     Baldwin submitted eight witness statements to the BIT Tribunals in which Baldwin made clear he alone made all decisions relating to the "corporate" investments in Laos.

69.     In these statements, Baldwin never once attributed any decision he made during his eight years of operations in Laos to a Bridge or an LHNV or a Sanum corporate board of directors, or to any other officer or director.

70.     Rather, Baldwin made clear to the arbitral tribunals that "I," Baldwin, made every decision.

71.     In his third witness statement, he described how on his first visit to Laos in 2007, he met the officials of the ST Group and signed the "Master Agreement" governing his investments in Laos within a five-day visit—thus committing Bridge and Sanum to invest over $50 million in Laos without any consideration by any corporate body.

72.     In all eight witness statements, Baldwin does not once refer to the participation of his partner, Mr. Scott, in any decisions affecting these Laos investments.

73. Baldwin's witness statements make clear he alone made all business decisions for Bridge, LHNV, and Sanum.

**B.      Bridge is the Hub of Baldwin's Wheel.**

74. Bridge is the center of Baldwin's wheel. Baldwin forms dozens and dozens of corporations, and Bridge owns many of them, but often Bridge does not exert control by share ownership.

75. Such is the case here.  Baldwin kept ownership of the LHNV and Sanum shares in his and his partner's name but the money is controlled by Baldwin's tentacles in Bridge.

76. When Baldwin signed the Laos '"Master Agreement"' in 2007 to invest in Laos, he used Sanum as the signatory on the Laos contracts; but the funds all came through loans from Bridge.

77. In addition to the Sanum loan that Bridge controlled, Baldwin created another source of funds for Bridge to take out of Laos—a Bridge Management Contract to manage Sanum, for which Bridge received additional fees, but Bridge had no management personnel supervising the management of the casino in Laos.

78. Baldwin also had used Bridge to create LHNV solely to use as a vehicle to sue the Government under a different Bi-Lateral Investment Treaty than the one Sanum could use.

79. Baldwin's decision to create LHNV in 2011 and to use it to initiate the LHNV arbitration in August 2012 illustrates his total control over Bridge and LHNV.

80. In late 2011, when it became apparent to Baldwin that he might have disputes with the Government, Baldwin instructed Richard Pipes, Bridge Vice President and General Counsel, to form LHNV in Aruba.  Pipes had recognized that investment treaty tribunals have

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 13**

routinely allowed foreign investors to create new companies to change their nationality to take advantage of treaties with broader relief.

81.     When Pipes made the recommendation to form LHNV, Baldwin alone instructed him to proceed.

82.     Pipes began contact with counsel in Aruba in 2011. In all correspondence with Aruba counsel, Pipes identified himself as Bridge's "Vice President and Chief Legal Officer," used his Bridge email account, and sent all the required funds to Aruba from a Bridge bank account located in Idaho at the Idaho Independent Bank. In sum, at Baldwin's direction, Bridge's Pipes created LHNV and then inserted that new company into the corporate chain as the 100% owner of Sanum.

83.     Likewise, Baldwin does not make reference to any action or decision by the Bridge, LHNV, or Sanum Board of Directors.

84.     Seven months after creating LHNV, for the sole purpose of suing the Government, Baldwin initiated the BIT Claims in August 2012—calling himself the "authorized representative" of LHNV. Baldwin alone approved LHNV's filing these cases against the Government.

85.     In September 2012, Baldwin directed Crawford, the Savan Vegas CFO, to pay all money Savan Vegas owed to Sanum directly to Bridge accounts in Idaho. Baldwin wrote to Crawford: "Please send $220,000 to Bridge today.  We've assigned the Sanum note to Bridge so you can pay Bridge direct."

86.     Therefore, from September 12, 2012 through April 15, 2015, all Savan Vegas loan payments were made to Bridge, skipping Sanum.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 14**

87.     This sum exceeded $40 million. Baldwin issued his instruction one month after he initiated these two arbitrations, proceedings in which awards of attorney's fees are routine.

88.     Baldwin's assignment of the Sanum loan to Bridge had the effect of removing assets from Sanum that should have been available in an Idaho bank account to satisfy these costs awards. It is thus clear that Baldwin's motivation in skipping Savan Vegas payments to Sanum was to remove an asset from the Government's direct reach to satisfy these current costs awards.

89.     Further, from July 2014 through April 2015, while Baldwin wrongfully maintained exclusive control of the Savan Vegas casino, when pursuant to the July 2014 Deed he was required to pay tax to the Government, Baldwin refused to do so. During that  ten month period, instead of paying tax to the sovereign Government, Baldwin directed Crawford to send $430,000 each month to a Bridge account in Idaho. Baldwin told the BIT Tribunals that he was "escrowing" a tax payment.

90.     But when the Government took control of the casino on April 15, 2015, Baldwin and Bridge did not pay the $4,300,000 in escrowed funds to the Government as back taxes—Bridge kept the money in its Idaho bank account. Now it is time to pierce the Bridge veil and have Bridge pay the Government its costs awards.

91.     In addition, when LHNV and Sanum were asked by the tribunals to submit their arbitration fees and expenses at the end of the proceedings, in March 2019, LHNV and Sanum submitted requests for more than $20 million—none of which had come from their own business accounts.  As the parties had discussed before the arbitrators in the October 2016 hearing noted above, all of the fees, which over the years from 2012 through 2018 had been paid to LHNV's

and Sanum's counsel, were authorized and funded by Baldwin and Bridge. Baldwin used Bridge's funds to sue the Government.

92.     In another benefit to Bridge, the Savan Vegas CFO Crawford testified he wired Savan Vegas funds due to Sanum directly to a third-party company in Hawaii which Baldwin owned, Bridge Aina. Crawford testified Baldwin directed him to transfer the funds directly to Bridge Aina "so the cash would just cut across the companies to make the wiring instructions easier."

93.     Both BIT Tribunals found as fact that Baldwin acted in bad faith in his reign of corruption in Laos that, and using Bridge as the fulcrum of his Laos investment, harmed the Government in the material ways described above.

**C.    LHNV and Sanum are Managed by Bridge Officers from Bridge Offices in Saipan**.

94.     In evaluating whether there is *alter ego* liability, courts also consider the practical issue of the whether the companies use the same offices and personnel.

95.     LHNV[2] has no employees. Baldwin did not even bother to become a director or officer of LHNV—he filed the treaty arbitrations after declaring himself LHNV's "authorized representative."

96.     Sanum is a Macau SAR company, and keeps a Macau SAR address, but it has no employees in Macau.  To the extent Sanum has employees, they are Bridge employees, and their office is Bridge's office in Saipan. Bridge's CFO, Crawford, is also Sanum's CFO. Crawford testified: "The work I do for Sanum is done out of the Bridge Capital office [in Saipan]; there are no Sanum employees in Macau."

_____

[2] LHNV was set up by a company in Aruba that creates such vehicles for use in investment arbitrations, and for Dutch tax reasons, that company appoints its members as the LHNV directors. These "directors" take no actions for the business of the corporation.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 16**

**D.    Baldwin Used "Loan Payments" from the Savan Casino for Personal Use and Use by Related People and Entities.**

97.    In 2009-2012, Baldwin routinely directed the CFOs of the Savan Vegas and Casino Co. to send millions of dollars to entities unrelated to Sanum or the Sanum loan.

98.    After the BIT Tribunals allowed the Government to take control of the casino on April 15, 2015, as noted above, the Lao PDR retained the services of BDO Global ("BDO") to conduct an audit of the Savan Vegas casino.

99.    The BDO audit reports established that the "Sanum Loan" was itself a fraud on Savan Vegas and Casino Co., the company owned 20% by the Government and 20% by ST Group. Baldwin had loaded the Credit Facility Agreements ("CFAs") with high interest rates and "late fees." The loan was a demand loan and yet each time Baldwin made a demand for payment, his CFO would add a late fee.

100.    First, BDO determined that Baldwin had sent, at a maximum, $44 million to Sanum for use in building the Savan Vegas casino complex.

101.    Second, BDO determined that Baldwin had caused Savan Vegas to transfer $85.29 million as payments to Sanum and Bridge on the "Sanum Loan" without applying any amount to the principal of the loan. To be clear—when the Government took control of the Savan Vegas and Casino Co. on April 15, 2015, Baldwin's books and records showed that Savan Vegas continued to owe $89 million on the loan.

102.    BDO found that Baldwin was personally involved in these transfers and that they did not comply with the terms of the CFAs.

103.    BDO found that Baldwin directed the Savan Vegas CFO to send hundreds of thousands of dollars of the casino's money, and thus 20% the Lao PDR's money, directly to: himself, ($8,044,099); Jim Baldwin, John Baldwin's brother ($13,286,508); Creative

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 17**

Entertainment, a new online gaming business Baldwin started ($2,529,000); Ha Tien Casino, a new casino Baldwin developed in Cambodia ($2,127,916); and other Baldwin-related parties ($5,164,172).

104.    All of these payments BDO identified were a fraud on the company and the minority shareholders, the Lao PDR, and ST Group.

**E.    Baldwin Engaged in Criminal Behavior.**

105.    In July 2012, Baldwin was concerned that the audit of the Savan Vegas casino undertaken by Lao PDR would lead to adverse audit findings and allow the Lao PDR to intervene and sanction the casino operation.  At the same time, Baldwin was concerned that a court case in Vientiane with his local partner, ST Group, would result in the loss of his role with the Thanaleng slot club.

106.    Baldwin resorted to bribes to stop the audit and the court case.

107.    On July 5, 2012, Baldwin sent an email to CFO Crawford informing him that he needed $500,000 in cash to be sent from the casino to Vientiane in the next week. Crawford asked why and Baldwin told him the funds would be used to pay a "lobbyist." Crawford could only gather $197,000 in U.S. dollars and he wired that sum to the account of Mr. Annousith, Madam Sengkeo's son-in-law[3].

108.    Stymied but not defeated, Baldwin contacted the manager of a bank he owns in Phnom Penh, Cambodia, the Angkor Capital Bank, and demanded the manager withdraw

_____

[3] Mr. Annousith was identified as Madam Sengkeo's son-in-law.  Baldwin later testified he was a "lobbyist" in Vientiane who was free to spend the $193,000 Crawford wired to his account in any manner he wished.  Baldwin was unable to further describe Madam Sengkeo's son-in-law or his activities.  The BIT Tribunals accepted that these funds were used to bribe government officials: "…the Tribunal concludes that it is more likely than not that a bribe was paid to an unidentified Government official or officials in an unsuccessful effort to advance [LHNV's] agenda at the Thanaleng slot club." ICSID Award, para 148; PCA Award 147.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 18**

$300,000 in cash and have his personal assistant fly the cash across the border that day to Vientiane. The manager did so and the next day, Baldwin's personal assistant deposited the full $300,000 into the bank account of Madam Sengkeo.

109.    The same day, a government official instructed Ernst & Young to terminate the audit.

110.    The BIT Tribunals found as a fact that Baldwin's "lobbyist" paid the money to a government official to intervene in Baldwin's disputes. Baldwin admitted there was no contract with the lobbyist, and no record of what he had done with $193,000.  Baldwin said:  "We paid him a fee . . . it was his money and he could do with it as he wishes."

111.    The Final Awards also concluded that Baldwin directed the payment of "US $575,000 for the obstruction of the due process of this arbitration by paying Madame Sengkeo not to testify."

112.    Baldwin's manifest disregard for the rule of law is evident on the facts of this issue as well.  As noted in the ICSID and PCA Final Awards, "Madam Sengkeo [held a] central role in dealings between the [LHNV/Sanum] and the Government over many years." Thus the course of dealing between Baldwin and Madam Sengkeo taints all of Baldwin's investments in Laos, and her testimony would have "shed crucial light on the legality or illegality of many of the disbursements at issue."

113.    Baldwin's scheme to silence Madam Sengkeo arose after May 7, 2014, when the Lao PDR proffered Madame Sengkeo a letter offering immunity for her cooperation in developing "information and documents related to offering of bribery to government officials."

114.    On May 14, 2014, Baldwin's counsel applied to the ICSID Tribunal "to allow Mr. Baldwin to make a 'personal loan' to Madam Sengkeo of US $575,000." As the tribunal

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 19**

noted, "[g]iven the importance and sensitivity of Madam Sengkeo's evidence potentially to be given at the merits hearing, the Tribunal declined to give its permission for a US $575,000 loan to her from Mr. Baldwin."

115.    Thereafter, Madam Sengkeo rejected the offer of immunity and refused to provide evidence to the Lao PDR, thus depriving the BIT Tribunals of vital evidence.

116.    Despite the ICSID Tribunal's explicit decision not to allow the payment, the tribunals found that Mr. Baldwin arranged for Madam Sengkeo to be paid the US $575,000. The tribunals concluded that "Mr. Baldwin clearly intended to sidestep the Tribunal's denial of permission by arranging for the US $575,000 loan from a third party."

117.    On the balance of evidence, both BIT Tribunals held that "Mr. Baldwin and Madam Sengkeo were involved in channeling funds illicitly to Lao Government officials, and further that she was paid to secure her loyalty and to avoid her testifying on behalf of the Government, *thereby obstructing justice*."

118.    The BIT Tribunals have held the Defendants' deliberate decision to deceive the Government, to defraud the tribunals, and pay off critical witnesses in order to defraud the tribunals or impede the Government's defense is an unconscionable and egregious breach of their obligation to arbitrate in good faith.

119.    Baldwin's criminal conduct in Laos, confirmed in the BIT Tribunals' findings of fact, directly harmed the Government in several ways: (i) the Government was a 20% shareholder in the Savan Vegas casino—by sending $193,000 of the casino's funds to Madam Sengkeo through her son-in-law's bank account, Baldwin used $38,000 of the Government's share of casino revenues to pay criminal bribes to stop the Government's audit of the casino books and records; (ii) the tribunals found that the audit would have revealed significant

financial irregularities, which harmed the Government as a shareholder—having the audit terminated by bribery prevented the Government from taking corrective action, including recovery of its funds; and (iii) the criminal activity increased the very fees the Government seeks to collect under the awards by increasing counsel's work in unraveling the criminal schemes with evidence.

120.    Baldwin alone directed the CFO to use corporate funds to pay these criminal bribes. There was no notice to or action by the Board of Directors of Savan Vegas or Sanum or Bridge to approve these actions. Bridge/Sanum CFO Crawford testified: "When John Baldwin instructs me to make a payment, I make a payment."

121.    These criminal acts are compelling proof that Baldwin views the corporations and their funds as his personal tools and his personal funds which he can use for whatever reason, including committing criminal acts.   He has no regard for the corporate form or corporate purposes.

122.    Importantly, Baldwin diverted corporate assets for personal use to avoid criminal exposure. The $575,000 payment Baldwin made to Madam Sengkeo, a material witness in Laos, was to protect himself by preventing the witness from testifying in the arbitration that Baldwin had paid bribes to Laos government officials, thus preventing her from providing proof he had violated the U.S. Foreign Corrupt Practices Act.

123.    There is an additional bribe Baldwin paid in Cambodia to obtain a gaming license that reflects upon his *modus operandi* that "corporate funds" are his personal funds.

124.    In August 2012, just a month after paying bribes in Laos as described by the BIT Tribunals, Baldwin instructed his employees in Cambodia to pay a bribe of $120,000 to General Sen, a Cambodian official. Baldwin had incorporated a bank in Phnom Penh, the Angkor Capital

Bank. On August 27, 2012, Baldwin directed the bank's managing director to withdraw $40,000 in cash to pay to General Sen at a meeting scheduled for that afternoon. In authorizing his employees to use the bank's funds to pay a bribe to a Cambodian official to secure a gaming license, Baldwin told them: "You can use my money, you can make a Bridge payment from the bank, or just advance an amount and hold it in suspense until I get there and decide what to do."

125.    Again, this is another proof that to Baldwin, corporate form means nothing—it is all his money to do as he pleases. Corporate records are an afterthought.

**F.      There is Additional Evidence of Fraud in Corporate Operations.**

126.    Sanum received funds in 2008/2009 from Baldwin through Bridge to build the Savan Vegas casino in Savanakhet, Laos. The financial result was a "Sanum Loan," which the casino company, Savan Vegas and Casino Company Ltd., owed to Sanum, which in turn owed to Bridge.

127.    The funds were advanced largely during construction in 2008, and the Savan Vegas casino opened for business in mid-2009.  Baldwin then belatedly created two loan agreements between Sanum and Savan Vegas, the CFAs.

128.    From 2009 through September 2012, the Savan Vegas CFO paid all cash from casino operations above expenses to Sanum at Baldwin's sole direction, and then routed the funds to Bridge.

129.    The "Sanum Loan" itself was a fraud on the Savan Vegas and Casino Co. and its shareholders—the Government owned 20% of the Savan Vegas company and the local partner, ST Group owned 20% (through 2012). From the inception of the casino's business in 2009 through the transfer of control under the Deed in April 2015, Baldwin controlled the flow of Savan Vegas funds to repay the loan so that neither minority shareholder ever received any

payments from the casino. Baldwin, however, made continual withdrawals under the loan that amounted to $85 million.

130.    The process of the withdrawals has been well documented by discovery and testimony in the arbitration cases. From 2012 through 2015, Clay Crawford was the CFO of Savan Vegas. He then became CFO of Bridge and Sanum. He has testified in the arbitrations that he transferred cash from the casino operations solely in response to Baldwin's instructions, usually made in telephone calls: "The majority of loan payments would be initiated by Baldwin; I would check the cash and then make the payment."

131.    The Sanum Loan agreements, the CFAs, required Sanum to document each request for payment from Savan Vegas. Before Crawford became CFO, in 2012 Baldwin hired a new Bridge CFO, David Jensen.  Jensen noted the appropriate documentation under the CFAs to authorize loan repayments from Savan Vegas to Sanum *was missing for two years*. His "solution" was to create false documents, backdate them and have a former general manager sign them, even though at the time of signature, he was no longer general manager.

132.    Jensen's fraudulent process was then executed by the Savan Vegas CFO, Crawford, who admitted the scheme in his testimony.

133.    The Government then retained BDO, international auditors based in Hong Kong to testify in the arbitrations. BDO confirmed that Sanum caused Savan Vegas to back-date the loan documentation and to have it signed by an employee no longer responsible for that activity.

134.    In another example of outright fraud which also cost the Government 20% of $2.42 million, Baldwin directed Crawford to pay Debevoise & Plimpton's invoices during the arbitration cases.  At the outset of the treaty arbitrations, in 2012, Baldwin retained Debevoise & Plimpton, New York ("Debevoise") to represent his interests. Under their agreement,

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 23**

Debevoise's clients were Bridge, LHNV, and Sanum.  Debevoise routinely addressed and sent its legal invoices to Bridge's offices in Saipan, addressed to Bridge, LHNV, and Sanum.   But Baldwin directed Crawford, his CFO, to use Savan Vegas funds to pay Debevoise.

135.    This scheme was a fraud on the Government. Baldwin had Crawford use the funds of the Savan Vegas and Casino Co., 20% owned by the Government, and 20% owned by ST Group, to pay 100% of Debevoise invoices. Baldwin took the invoices Debevoise sent to its clients Bridge, LHNV, and Sanum in Saipan, and sent them to Crawford at Savan Vegas located in Savanakhet, Laos.  Baldwin instructed Crawford to use Savan Vegas cash to pay Debevoise for work for Bridge, LHNV and Sanum.   To create this fraud, Crawford created fake, false invoices. Crawford copied the Debevoise letterhead, added the addressee as Savan Vegas and Casino Co., added the amount of the original invoice, and thus created a "Debevoise" invoice addressed to Savan Vegas.

136.    Crawford testified that he created the false "Debevoise" invoices because when he sent wire instructions to the Laos bank, they required a copy of the invoice that was being paid; not wanting the bank to see he was paying a Bridge/LHNV/Sanum invoice with Savan Vegas funds, he created the fake invoices to deceive the bank and ultimately the Government.

137.    The CFO then sent these fraudulent invoices to Savan Vegas' Laos bank, which duly wired the casino's funds to Debevoise. In this fraud and abuse of the corporate form, Baldwin paid his legal bills to sue the Government using 20% of the Government's casino funds.

138.    But as noted above, CFO Crawford did as he was told by Baldwin to make these wrongful payments of $2.42 million, 40% of which belonged to the two minority shareholders.

139.    In addition, at no time during Baldwin's control of the Savan Vegas casino, from January 2008 through April 2015, did Baldwin make or allow any payments from the Savan

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 24**

Vegas casino to the other shareholders, the Government, and ST Group. Over that period, Baldwin directed the CFO to transfer over $85 million from Savan Vegas to Sanum and to Bridge without a single payment to Lao PDR.

**G.     Baldwin and Bridge Entered Into Contracts With the Intent to Avoid  Performance**.

140.    In 2007, when Baldwin was negotiating with ST Group over the terms of an investment in the Laos gaming sector, he learned that the Government had made two grants for casino licenses, one at Savanakhet and one at Paksong.  They were linked—the license holder had to build both, even though the site at Paksong was remote and not as valuable as the site at Savanakhet, on the Mekong River at a bridge crossing to Thailand.

141.    Baldwin agreed, but he never had any intention to build the required $25 million casino at Paksong. Instead, he kept misleading ST Group and the Government so that he could keep a monopoly on gaming businesses in three Laos provinces that were contingent upon the Paksong license.

142.    The PCA Tribunal made express findings of fact that Baldwin entered into the Paksong contract with no intention of performing it, but maintained his bad faith behavior to control monopoly rights in three Laos provinces to prevent another investor from entering the Laos gaming market.

**H.     Enforcement of these Costs Awards Against LHNV and Sanum is Impossible.**

143.    LHNV is a shell company and a corporate investment vehicle with no assets other than its nominal interest in Sanum. It was formed purely for utilizing the Lao-Netherlands BIT; it is and has always been a corporate entity without any business, employees, or retained assets.

144.    Likewise, Clay Crawford, CFO of Bridge and Sanum, testified that Sanum had minimal remaining assets consisting of outstanding loans to two small Baldwin gaming operations in Cambodia.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 25**

145.    Neither arbitral award debtor has any assets in the United States.

146.    The *alter ego* issue was in fact discussed by the parties before the LHNV Tribunal in October 2016 at a hearing on the Lao PDR's motion for security for costs. The Lao PDR argued that since LHNV and Sanum were shell companies, were it to prevail and receive an award for fees and costs, LHNV and Sanum would be judgment proof, hiding behind Baldwin, not a named party. In arguing against the motion, LHNV's counsel argued that the tribunals should not order security for costs, but should recognize that if the Lao PDR received an award for costs, it could pursue an *alter ego* claim against Baldwin.  LHNV's counsel stated:

> Mr. Branson [Lao PDR's counsel] knows how all these companies are sort of linked together and if he wants to try to enforce Awards for costs later on against a company that is not LHNV, he has everything he might need to be able to do that. This is just simply not the same situation as if they were sat across the table not knowing where the assets lie on our side of the table. . . . But the fact is, it is not an unknown third-party funder who you can't even bring an alter ego claim against, if they want to try to claim money over against Mr. Baldwin that's not paid by LHNV, they know who he is and they know they can make that attempt."

147.    And so it has come to pass. The Lao PDR must make that attempt "to claim money over against Mr. Baldwin that's not paid by LHNV" because LHNV and Sanum have refused to pay the costs awards.

## CAUSES OF ACTION

## COUNT I---ENFORCEMENT OF THE ARBITRAL AWARDS AND ALTER EGO LIABILITY

148.    The Final Awards are binding and subject to enforcement.

149.    Article 34.2 of the UNCITRAL Rules, pursuant to which Sanum agreed to have the arbitration conducted, states that "[t]he award shall be . . . final and binding on the parties. The parties undertake to carry out the award without delay."  Likewise, Article 52(4) of the

ICSID(AF) arbitration rules, which LHNV consented to use, provides that "[t]he award shall be final and binding on the parties."

150.    Notwithstanding their commitment to undertake "to carry out the [A]ward without delay," Sanum and LHNV have failed to pay the amounts awarded to the Lao PDR in the Final Awards.

151.    The United States implemented the New York Convention pursuant to Chapter 2 of Title 9 of the U.S. Code. *See* 9 U.S.C. § 201, *et seq*. Section 207 of that Chapter provides: "The court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."

152.    The New York Convention provides that covered awards must be enforced, absent very specific and limited grounds. 9 U.S.C. § 207 provides that confirmation is mandatory "unless [the Court] finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.  Accordingly, US courts have little discretion to refuse to enforce an award under the FAA.

153.    Under the New York Convention, this Court is a "secondary court," with authority only to confirm and to enforce the awards, unless one of the express grounds listed in the Convention justifies refusal.

154.    No grounds listed in the Convention to justify refusal to enforce the awards exists in this case.

155.    Thus, pursuant to 9 U.S.C. § 207, the Lao PDR is entitled to immediate recognition and enforcement of the Award under the New York Convention.

156.    Equity demands that the Defendants be held liable to pay the full amount of the two awards in these arbitration cases.

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 27**

157.    The "issues of *alter ego* and veil piercing are equitable questions." *Lunneborg v. My Fun Life, E. Edwards, and C. Edwards*, 163 Idaho 856, 421 P. 3d 187, 202 (Idaho 2018) (citing *Wandering Trails LLC v Big Bite Excavation, Inc.*, 156 Idaho 586, 594, 329 P.3d 368, 376 (Idaho 2014).

158.    There is no litmus test to determine when the corporate veil will be pierced; the result will depend on the circumstances of each particular case. But, "(1) there must be a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that if the acts are treated as those of the corporation alone, an inequitable result will follow." *Lunneborg*, *supra* at 200.

159.    The two foreign arbitral tribunals each made findings of fact that Baldwin is the "directing mind" of LHNV and Sanum. LHNV Award, ¶ 236; Sanum Award, ¶ 174. There is clear proof that Baldwin dominated and controlled the operations and finances of Bridge, LHNV, and Sanum, so that the separate corporate personalities of each ceased to exist.

160.    Bridge, although a non-shareholder in the award debtors, LHNV and Sanum, is liable under the *alter ego* legal doctrine as an intimately intertwined company in Baldwin's web that was involved in the creation of LHNV and Sanum and was the beneficiary of Baldwin's misconduct in utilizing these corporate vehicles for his and its benefit. *See Lunneborg, supra* (piercing the veil of a related party, not a shareholder).

161.    The multiple facts which compel the conclusion that the Court must pierce the veil and hold Defendants John K. Baldwin and Bridge liable for the debts asserted here by the Lao PDR, include*, inter alia,*  (i) multiple facts proving the assertion that Baldwin conducted the affairs of these companies with a unity of interest such that the separate identities of the companies ceased to exist, (ii) fraud upon the Government, (iii) fraud upon the tribunals, where

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 28**

both (ii) and (iii) made the conduct of the arbitration cases more complex and thus more expensive, adding materially to the Lao PDR's costs which the Plaintiff is seeking to recover in this proceeding, as well as (iv) multiple facts proving disregard of the corporate forms, and (v) multiple misuses of corporate funds. In essence, Baldwin treated any money in any Baldwin owned company as "his money" and he directed his employees to send it to any person or corporate entity as he alone decides.

162.    The Lao PDR has equity on its side and piercing the LHNV and Sanum corporate veils is necessary to prevent hardship to the Lao PDR. Baldwin ran a criminal enterprise in Laos, bribing Government officials, paying a witness not to testify, stealing funds from the Government's co-owned investment, the Savan Vegas casino, and dealing in all phases of his operations with the Government in bad faith.

## ATTORNEY FEES

163.    It has been necessary for Lao PDR to retain counsel to bring this action. The Plaintiff hereby requests that the Court award the Plaintiff the costs and fees it incurs in this matter pursuant to, among other provisions, Idaho Code §§ 12-120, 121, and 123, and any other applicable provision of law.

164.    The Plaintiff further requests attorney fees and costs against the Defendants as *alter egos* of the arbitral award debtors due to their refusal in bad faith to pay the Final Awards.

165.    In the event of a default judgment, the Plaintiff requests that the Court award it its reasonable fees incurred in bringing this matter, in the amount of $10,000.00.

## PRAYER FOR RELIEF

Whereas the Plaintiff prays:

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 29**

(a) That the Court enter an order pursuant to 9 U.S.C. § 207 enforcing the Final Awards against all Defendants;

(b) That on the basis of the enforced Final Awards, the Court enter judgment that all Defendants are jointly and severally liable to Lao PDR in the amount of $3,727,358.98; and

(c) That Plaintiff be awarded such other and further relief as may be proper, including pre- and post- judgment interest, attorney fees, costs, and expenses of this action.

DATED:  April 21, 2020.

                              GIVENS PURSLEY LLP


                              _/s/ Bradley J. Dixon_____
                              Attorneys For the Applicant The Government
                              of the Lao People's Democratic Republic

**COMPLAINT TO ENFORCE FOREIGN ARBITRATION AWARDS - 30**

# EXHIBIT A

ANNEX

# Agreement on encouragement and reciprocal protection of investments between
the Lao People's Democratic Republic
and
the Kingdom of the Netherlands

The Lao People's Democratic Republic
and
the Kingdom of the Netherlands,

hereinafter referred to as the Contracting Parties,

Desiring to strengthen their traditional ties of friendship and to extend and intensify the economic relations between them, particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party,

Recognising that agreement upon the treatment to be accorded to such investments will stimulate the flow of capital and technology and the economic development of the Contracting Parties and that fair and equitable treatment of investment is desirable,

Have agreed as follows:

Article 1

For the purposes of this Agreement:

(a) the term "investments" means every kind of asset and more particularly, though not exclusively:

   (i)    movable and immovable property as well as any other rights <u>in rem</u> in respect of every kind of asset;

   (ii)   rights derived from shares, bonds and other kinds of interests in companies and joint ventures;

   (iii)  claims to money, to other assets or to any performance having an economic value;

   (iv)  rights in the field of intellectual property, technical processes, goodwill and know-how;

   (v)   rights granted under public law or under contract, including rights to prospect, explore, extract and win natural resources.

(b) the term "nationals" shall comprise with regard to either Contracting Party:

   (i)    natural persons having the nationality of that Contracting Party;

   (ii)   legal persons constituted under the law of that Contracting Party;

   (iii)  legal persons not constituted under the law of that Contracting Party but controlled, directly or indirectly, by natural persons as defined in (i) or by legal persons as defined in (ii).

(c) The term "territory" means:

the territory of the Contracting Party concerned and any area adjacent to the territorial sea which, under the laws applicable in the Contracting Party concerned, and in accordance with international law, is the exclusive economic zone or continental shelf of the Contracting Party concerned, in which that Contracting Party exercises jurisdiction or sovereign rights.

Article 2

Either Contracting Party shall, within the framework of its laws and regulations, promote economic cooperation through the protection in its territory of investments of nationals of the other Contracting Party. Subject to its right to exercise powers conferred by its laws or regulations, each Contracting Party shall admit such investments.

Article 3

1)   Each Contracting Party shall ensure fair and equitable treatment of the investments of nationals of the other Contracting Party and shall not impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals. Each Contracting Party shall accord to such investments full physical security and protection.

2)   More particularly, each Contracting Party shall accord to such investments treatment which in any case shall not be less favourable than that accorded either to investments of its own nationals or to investments of nationals of any third State, whichever is more favourable to the national concerned.

3)   If a Contracting Party has accorded special advantages to nationals of any third State by virtue of agreements establishing customs unions, economic unions, monetary unions or similar institutions, or on the basis of interim agreements leading to such unions or institutions, that Contracting Party shall not be obliged to accord such advantages to nationals of the other Contracting Party.

4)   Each Contracting Party shall observe any obligation it may have entered into with regard to investments of nationals of the other Contracting Party.

5)   If the provisions of law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement contain a regulation, whether general or specific, entitling investments by nationals of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such regulation shall, to the extent that it is more favourable, prevail over the present Agreement.

Article 4

With respect to taxes, fees, charges and to fiscal deductions and exemptions, each Contracting Party shall accord to nationals of the other Contracting Party who are engaged in any economic activity in its territory, treatment not less favourable than that accorded to its own nationals or to those of any third State who are in the same circumstances, whichever is more favourable to the nationals concerned. For this purpose, however, any special fiscal advantages accorded by that Party, shall not be taken into account:

a)      under an agreement for the avoidance of double taxation; or

b)      by virtue of its participation in a customs union, economic union or similar institution; or

c)      on the basis of reciprocity with a third State.

Article 5

1) The Contracting Parties shall guarantee that payments relating to an investment may be transferred. The transfers shall be made in a freely convertible currency, without restriction or delay. Such transfers include in particular though not exclusively:

a) profits, interests, dividends and other current income;

b) funds necessary

  (i)   for the acquisition of raw or auxiliary materials, semi-fabricated or finished products,
        or
  (ii)  to replace capital assets in order to safeguard the continuity of an investment;

c) additional funds necessary for the development of an investment;

d) funds in repayment of loans;

e) royalties or fees;

f) earnings of natural persons;

g) the proceeds of sale or liquidation of the investment;

h) payments arising under Article 7.

2) A Contracting Party may require that, prior to the transfer of payments relating to an investment, tax obligations in relation to such an investment have been fulfilled by the investors, provided that such obligations shall be non-discriminatory and shall not be used to defeat the purpose of paragraph 1) of this Article.

Article 6

Neither Contracting Party shall take any measures depriving, directly or indirectly, nationals of the other Contracting Party of their investments unless the following conditions are complied with:

a) the measures are taken in the public interest and under due process of law;

b) the measures are not discriminatory or contrary to any undertaking which the Contracting Party which takes such measures may have given;

c) the measures are taken against just compensation. Such compensation shall represent the genuine value of the investments affected, shall include interest at a normal commercial rate until the date of payment and shall, in order to be effective for the claimants, be paid and made transferable, without delay, to the country designated by the claimants concerned and in the currency of the country of which the claimants are nationals or in any freely convertible currency accepted by the claimants.

Article 7

Nationals of the one Contracting Party who suffer losses in respect of their investments in the territory of the other Contracting Party owing to war or other armed conflict, revolution, a state of national emergency, revolt, insurrection or riot shall be accorded by the latter Contracting Party treatment, as regards restitution, indemnification, compensation or other settlement, no less favourable than that which that Contracting Party accords to its own nationals or to nationals of any third State, whichever is more favourable to the nationals concerned.

Article 8

If the investments of a national of the one Contracting Party are insured against non-commercial risks or otherwise give rise to payment of indemnification in respect of such investments under a system established by law, regulation or government contract, any subrogation of the insurer or re-insurer or Agency designated by the one Contracting Party to the rights of the said national pursuant to the terms of such insurance or under any other indemnity given shall be recognised by the other Contracting Party.

Article 9

Each Contracting Party hereby consents to submit any legal dispute arising between that Contracting Party and a national of the other Contracting Party concerning an investment of that national in the territory of the former Contracting Party to the International Centre for Settlement of Investment Disputes for settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington on 18 March 1965, in the event that both Contracting Parties have become Contracting States to the said Convention. In case a Contracting Party is not a Contracting State to the said Convention, the disputes referred to above shall be submitted to the International Centre for Settlement of Investment Disputes under the Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (Additional Facility Rules). A legal person which is a national of one Contracting Party and which before such a dispute arises is controlled by nationals of the other Contracting Party shall, in accordance with Article 25 (2) (b) of the Convention, for the purpose of the Convention be treated as a national of the other Contracting Party.

Article 10

The provisions of this Agreement shall, from the date of entry into force thereof, also apply to investments, which have been made before that date, but they shall not apply to any claim concerning an investment, which arose before its entry into force.

Article 11

Either Contracting Party may propose to the other Party that consultations be held on any matter concerning the interpretation or application of the Agreement. The other Party shall accord sympathetic consideration to the proposal and shall afford adequate opportunity for such consultations.

## Article 12

1)  Any dispute between the Contracting Parties concerning the interpretation or application of the present Agreement, which cannot be settled within a reasonable lapse of time by means of diplomatic negotiations, shall, unless the Parties have otherwise agreed, be submitted, at the request of either Party, to an arbitral tribunal, composed of three members. Each Party shall appoint one arbitrator and the two arbitrators thus appointed shall together appoint a third arbitrator as their chairman who is not a national of either Party.

2)  If one of the Parties fails to appoint its arbitrator and has not proceeded to do so within two months after an invitation from the other Party to make such appointment, the latter Party may invite the President of the International Court of Justice to make the necessary appointment.

3)  If the two arbitrators are unable to reach agreement, in the two months following their appointment, on the choice of the third arbitrator, either Party may invite the President of the International Court of Justice to make the necessary appointment.

4)  If, in the cases provided for in the paragraphs (2) and (3) of this Article, the President of the International Court of Justice is prevented from discharging the said function or is a national of either Contracting Party, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is prevented from discharging the said function or is a national of either Party the most senior member of the Court available who is not a national of either Party shall be invited to make the necessary appointments.

5)  The tribunal shall decide on the basis of respect for the law. Before the tribunal decides, it may at any stage of the proceedings propose to the Parties

that the dispute be settled amicably. The foregoing provisions shall not prejudice settlement of the dispute <u>ex aequo et bono</u> if the Parties so agree.

6)   Unless the Parties decide otherwise, the tribunal shall determine its own procedure.

7)   The tribunal shall reach its decision by a majority of votes. Such decision shall be final and binding on the Parties.

8)   Each Contracting Party shall bear the costs of the member appointed by that Contracting Party, as well as the costs of its representation in the arbitration proceedings; the costs of the Chairman, as well as the remaining costs, shall be borne in equal parts by the two Contracting Parties. The tribunal may, however, in its decision direct that a higher proportion of costs shall be borne by one of the two Contracting Parties.

Article 13

As regards the Kingdom of the Netherlands, the present Agreement shall apply to the part of the Kingdom in Europe, to the Netherlands Antilles and to Aruba, unless the notification provided for in Article 14, paragraph (1) provides otherwise.

Article 14

1)   The present Agreement shall enter into force on the first day of the second month following the date on which the Contracting Parties have notified each other in writing that their constitutionally required procedures have been complied with, and shall remain in force for a period of fifteen years.

2)   Unless notice of termination has been given by either Contracting Party at least six months before the date of the expiry of its validity, the present Agreement shall be extended tacitly for periods of ten years, whereby each Contracting Party reserves the right to terminate the Agreement upon notice of at least six months before the date of expiry of the current period of validity.

3)   In respect of investments made before the date of the termination of the present Agreement, the foregoing Articles shall continue to be effective for a further period of fifteen years from that date.

4)   Subject to the period mentioned in paragraph (2) of this Article, the Kingdom of the Netherlands shall be entitled to terminate the application of the present Agreement separately in respect of any of the parts of the Kingdom.

IN WITNESS WHEREOF, the undersigned representatives, duly authorised thereto, have signed the present Agreement.

DONE in two originals at .........................................., on..........................................., in the Lao, Netherlands and English languages, the three texts being authentic. In case of difference of interpretation the English text will prevail.

For the Lao People's                          For the Kingdom of
Democratic Republic:                         the Netherlands:

# EXHIBIT B

# AGREEMENT

between
The Government of the People's Republic of China
and
The Government of the Lao People's Democratic
Republic
Concerning the Encouragement and Reciprocal Protection
of Investments

The Government of the People's Republic of China and the Government of the Lao People's Democratic Republic(hereinafter referred to as Contracting States),

**Desiring** to encourage, protect and create favorable conditions for investment by investors of one Contracting State in the territory of the other Contracting State based on the principles of mutual respect for sovereignty, equality and mutual benefit and for the purpose of the development of economic cooperation between both States,

Have agreed as follows:

## Article 1

For the purpose of this Agreement,

1.  The term "investments" means every kind of asset  invested by investors of one Contracting State in accordance with the laws and regulations of the other Contracting State in the territory of the Latter, including mainly.

    (a)  movable and immovable property and other property rights;

    (b)  shares in companies or other forms of interest in such companies;

    (c)  a claim to money or to any performance having an economic value;

    (d)  copyrights, industrial property, know-how and technological process

    (e)  concessions conferred by law, including concessions to search for or to exploit natural  resources.

2.  The term "investors" means:

    in respect of both Contracting States:

    (a)  natural persons who have nationality of each Contracting State;

    (b)  economic entities established in accordance with the laws and regulations of each contracting State.

3.    The term "return" means the amounts yielded by investments, such as profits. dividends. interests. royalties or other .legitimate income.

## Article  2

1.    Each Contracting State shall encourage investors of the other Contracting State to make investments in its territory and admit such investments in accordance with its laws and regulations.

2.    Each contracting State shall grant assistance in  and provide facilities for obtaining visas and work permits to nationals of the other Contracting State to or in the territory of the Former in connection with activities associated with such investments.

## Article  3

1.    Investments and activities associated with investments of investors of either Contracting State shall be accorded fair and equitable treatment and shall enjoy protection in the territory of the other Contracting State.

2.    The treatment and protection as mentioned in Paragraphs 1 of this Article shall not be less favorable than that accorded to investments and activities associated with such investments of investors of a third State.

3.    The treatment and protection as mentioned in paragraphs 1 and 2 of this Article shall not include any preferential treatment accorded by the other Contracting State to investments of investors of a third State based on customs union, free trade zone, economic union, agreement relating to avoidance of double taxation or for facilitating frontier trade.

## Article  4

1.    Neither Contracting State shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against investments of investors of the other Contracting state in its territory, unless the following conditions are met:

        a.    as necessitated by the public interest;
        b.    in accordance with domestic legal procedures;
        c.    without discrimination;
        d.    against appropriate and effective compensation;

2. The compensation mentioned in paragraph 1 (d) of this Article shall be equivalent to the value of the expropriated investments at the time when expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay.

3. Investors of one Contracting State who suffer losses in respect of their investments in the territory of the other Contracting State owing to war, a state of national emergency, insurrection, riot or other similar events, shall   be accorded by the latter Contracting State, if it takes relevant measures, treatment not less favorable than that accorded to investors of a third State.

## Article  5

1. Each Contracting State shall, subject to its laws and regulations, guarantee investors of the other Contracting State the transfer of their investments and returns held in the territory of the one Contracting State, including :
   (a)   profits, dividends, interests and other legitimate income;
   (b)   amounts from total or partial liquidation of investments;
   (c)   payments made pursuant to a loan agreement in connection with investment;
   (d)   royalties resulting from Article 1;
   (e)   payments of technical assistance or technical service fee; management fee;
   (f)   payments in connection with projects on contract;
   (g)   earnings of nationals of the other Contracting State who work in connection with an investment in the territory of the one Contracting State.

2. The transfer mentioned above shall be made at the prevailing exchange rate of the Contracting State accepting investment on the date of transfer.

## Article  6

If a Contracting State or its Agency makes payment to an investor under a guarantee it has granted to an investments of such investor in the territory of the other Contracting State, such other Contrating State shall recognize the transfer of any right or claim of such investor to the former Contracting State of its Agency and recognize the subrogation of the former Contracting State of its Agency to such right or claim. The subrogated right or claim shall not be greater than the original right or claim of the said investor.

## Article 7

1. Any dispute between the Contracting States concerning the interpretation or application of this Agreement shall, as far as possible, be settled by consultation through diplomatic channel.

2. If a dispute cannot thus be settled within six months, it shall, upon the request of either Contracting State, be submitted to an ad hoc arbitral tribunal.

3. Such tribunal shall be comprised of three arbitrators. Within two months from the date on which either Contracting State receives a written notice requesting arbitration from the other Contracting State, each Contracting State shall appoint one arbitrator. Those two arbitrators shall, within further two months, together select a third arbitrator who is a national of a third State which has diplomatic relations with both Contracting States. The third arbitrator shall be appointed by the two Contracting States as Chairman of the arbitral tribunal.

4. If the arbitral tribunal has not been constituted within four months from the date of the receipt of a written notice for arbitration, either Contracting State may, in the absence of any agreement, invite the President of the International Court of Justice to appoint the arbitrator(s) who has or have not yet been appointed. If the President is a national of either Contracting State or is otherwise prevented from discharging the said function, the next most senior member of the International Court of Justice who is not a national of either Contracting State shall be invited to make the necessary appointment(s).

5. The arbitral tribunal shall determine its own procedure. The tribunal shall reach its award in accordance with the provisions of this Agreement and the principles of international law recognized by both Contracting States.

6. The tribunal shall reach its award by a majority of votes. Such award shall be final and binding on both Contracting States. The tribunal shall, upon the request of either Contracting Sate, explain the reasons of its award.

7. Each Contracting State shall bear the cost of its appointed arbitrator and of its representation in arbitral proceedings. The relevant costs of the Chairman and the tribunal shall be borne in equal parts by the Contracting States. The tribunal may, however, in its decision, direct that a higher proportion of costs shall be borne by one of the two Contracting States.

## Article 8

1. Any dispute between an investor of one Contracting State and the other Contracting State in connection with an investment in the territory of the other Contracting State shall, as far as possible, be settled amicably through negotiation between the parties to the dispute.

2. If the dispute cannot be settled through negotiation within six months, either party to the dispute shall be entitled to submit the dispute to the competent court of the Contracting State accepting the investment.

3. If a dispute involving the amount of compensation for expropriation cannot be settled through negotiation within six months as specified in paragraph 1 of this Article, it may be submitted at the request of either party to an ad hoc arbitral tribunal. The provisions of this paragraph shall not apply if the investor concerned has resorted to the procedure specified in the paragraph 2 of this Article.

4. Such an arbitral tribunal shall be constituted for each individual case in the following way : each party to the dispute shall appoint an arbitrator, and these two shall select a national of a third State which has diplomatic relations with the two Contracting States as Chairman. The first two arbitrators shall be appointed within two months of the written notice for arbitration by either party to the dispute to the other, and the Chairman be selected within four months. If within the period specified above, the  tribunal has not been constituted, either party to the dispute may invite the  Secretary General of the International Center for Settlement of Investment Disputes to make the necessary appointments.

5. The tribunal shall determine its own procedure. However, the tribunal may, in the course of determination of procedure, take as guidance the  Arbitration Rules of the International Center for Settlement of Investment Disputes.

6. The tribunal shall reach its decision by a majority of votes. Such decision shall be final and binding on both parties to the dispute. Both Contracting States shall commit themselves to the enforcement of the decision in accordance with their respective domestic laws.

7. The tribunal shall adjudicate the dispute in accordance with the law of the Contracting State accepting the investment including its rules on the conflict of laws, the provisions of this Agreement as well as the generally recognized principles of international law accepted by both Contracting States.

8.    Each party to the dispute shall bear the cost of its appointed member of the tribunal and of its representation in the proceedings. The cost of the appointed Chairman and the remaining costs shall be borne in equal parts by the parties to the dispute. The tribunal may, however. in its decision. direct that higher proportion of costs shall be borne by one of the two parties.

### Article 9

If the treatment to be accorded by one Contracting State in accordance with its laws and regulations to investments or activities associated with such investments of investors of the other Contracting State is more favorable than the treatment provided for in this Agreement. the more favorable treatment shall be applicable.

### Article 10

This Agreement shall apply to investments which are made prior to or after its entry into force by investors of either Contracting State. Such investments shall be approved in accordance with the laws and regulations of the Contracting State in the territory of the Latter.

### Article 11

1.    The representatives of the two Contracting States shall hold meeting from time to time for the purpose of;
(a)    reviewing the implementation of this Agreement;
(b)    exchanging legal information and investment opportunities;
(c)    resolving dispute arising out of investments;
(d)    forwarding proposals on promotion of in vestment;
(e)    studying other issues in connection with investments.

2.    Where either Contracting State requests consultation on any matters under paragraph 1 of this Article, the other Contracting State shall give prompt response and the consultation shall be held alternatively in Beijing and in Vientiane.

### Article 12

1.    This Agreement shall enter into force on the first day of the following month after the date on which both Contracting States have notified each other in writing that their respective

internal legal procedures have been fulfilled, and shall remain in force for a period of ten years.

2. This Agreement shall continue in force if either contracting State fails to give a written notice to the other Contracting State to terminate this Agreement one year before the expiration specified in paragraph 1 of this Article.

3. After the expiration of the initial ten-year period, either Contracting State may at any time thereafter terminate this Agreement by giving at least one year's written notice to the other Contracting State.

4. With respect to investments made prior to the date of termination of this Agreement, the provisions of Article 1 to 11 shall continue to be effective for a further period of ten years from such date of termination.

IN WITNESS WHEREOF, the duly authorized representatives of their respective Governments have signed this Agreement.

Done in duplicate at Vientiane on January 31, 1993 in the Lao, Chinese and English languages, the three texts being equally authentic. In case of divergency, the English text shall prevail.

For the Government of the
People's Republic of China

For the Government of the
Lao People's Democratic Republic

# EXHIBIT C

 **ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

August 6, 2019

By courier
(*advance copy by email*)

Lao Holdings N.V.
c/o Ms. Deborah Deitsch-Perez
Mr. Jeffrey T. Prudhomme
Mr. Alexander Hinckley
**Stinson LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
United States of America
 and
Dr. Todd Weiler
Barrister & Solicitor
#19 – 2014 Valleyrun Blvd.
London, Ontario N6G 5N8
Canada
 and
Mr. Ken Kroot
Chief Litigation Officer
**Lao Holdings N.V.**
L.G. Smith Boulevard 62,
Miramar Building, Suite 304,
Oranjestad, Aruba

Lao People's Democratic Republic
c/o Mr. David J. Branson
Beijing
People's Republic of China
 and
Mr. John D. Branson
Ms. Emily Doll
Mr. Russ Ferguson
**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
301 South College Street
Suite 3500
Charlotte, NC 28202
United States of America

**Re:  Lao Holdings N.V. v. Lao People's Democratic Republic**
(ICSID Case No. ARB(AF)/12/6)

Dear Mesdames and Sirs,

Please find enclosed a certified copy of the Tribunal's Award dated August 6, 2019, which incorporates the Tribunal's (i) Decision on Jurisdiction dated February 21, 2014; (ii) Decision on the Merits on the First Material Breach of June 10, 2015; (iii) Decision on Costs of November 5, 2015, and (iv) Decision on the Second Material Breach of December 15, 2017.

Pursuant to Arbitration Rule 48, I have authenticated the original text of the Award and deposited it in ICSID's archives. In accordance with Arbitration Rule 48, the Award is deemed to have been rendered on the date of dispatch, which is indicated on the original text of the Award and on all copies.

As recorded in Section 18 of Procedural Order No. 1, the parties have consented to the publication of the Award. We will therefore proceed to publish the Award on the ICSID website.

Yours sincerely,

Meg Kinnear
Secretary-General

Enclosure

cc (with enclosure) (*advance copy by email*): Members of the Tribunal

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON, D.C.

In the arbitration proceeding between

## LAO HOLDINGS N.V.

Claimant

and

## THE LAO PEOPLE'S DEMOCRATIC REPUBLIC

Respondent

## ICSID Case No. ARB(AF)/12/6

---

# AWARD

---

*Members of the Tribunal*

The Honourable Ian Binnie, C.C., Q.C.
Professor Bernard Hanotiau
Professor Brigitte Stern

*Secretary of the Tribunal*

Ms. Catherine Kettlewell

*Date of dispatch to the Parties:* 6 August 2019

## REPRESENTATION OF THE PARTIES

**Representing Lao Holdings N.V.:**

Ms. Deborah Deitsch-Perez
Mr. Jeffrey T. Prudhomme
Mr. Alexander Hinckley
**Stinson LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
United States of America

and

Dr. Todd Weiler
Barrister & Solicitor
#19 – 2014 Valleyrun Blvd.
London, Ontario N6G 5N8
Canada

and

Mr. Ken Kroot
Chief Litigation Officer
**Lao Holdings N.V.**
L.G. Smith Boulevard 62,
Miramar Building, Suite 304,
Oranjestad, Aruba

**Representing The Lao People's Democratic Republic:**

Mr. David J. Branson
Beijing
People's Republic of China

and

Mr. John D. Branson
Ms. Emily Doll
Mr. Russ Ferguson
**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
301 South College Street
Suite 3500
Charlotte, NC 28202
United States of America

FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| BIT or Treaty | *Agreement on Encouragement and Reciprocal Protection of Investments* between the Lao People's Democratic Republic (PDR) and the Kingdom of the Netherlands, signed on 16 May 2003, in force since 1 May 2005 |
| BIT II Proceedings | Proceedings between *Lao Holdings N.V. v. Lao People's Democratic Republic* (ICSID Case No. ARB(AF)/16/2)/ *Sanum Investments Limited v. Lao People's Democratic Republic* (ICSID Case No. ADHOC/17/1) |
| C(B)-[XX] | Claimants' Exhibits |
| C(S)-[XX] | Sanum's Exhibits in PCA Proceeding |
| C(LH)-[XX] | LHNV's Exhibits |
| CLA(B)-[XX] or CLA-[XX] | Claimants' Legal Authorities |
| CLA(LH)-[XX] | LHNV Legal Authorities |
| Claimant's Memorial | Claimant's Memorial dated 22 July 2013 |
| Claimant's Reply | Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 |
| Claimant | Lao Holding NV |
| Claimants | Lao Holding NV and Sanum Investments Limited |
| Decision on the Second Material Breach | Tribunal's Decision on the Merits of the Claimants' Second Material Breach Application, dated 15 December 2017 |
| E&Y | Ernst & Young |
| First Material Breach Application | Claimant's First Material Breach Application dated 4 July 2014 |
| FTA | Flat Tax Agreement between Laos and Savan Vegas dated 21 September 2009 |
| Gaming Assets | Savan Vegas Casino, Lao Bao Slot Club and Savannakhet Ferry Terminal Slot Club |
| Government or Respondent | Respondent Government of The Lao People's Democratic Republic |
| Hearing | Hearing on the Merits of Second Material Breach Application held 3 to 7 September 2018 in Singapore |

| | |
|---|---|
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID-AF Rules | Arbitration Rules (Additional Facility) of the International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| Laos-China BIT | *Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning the Encouragement and Reciprocal Protection of Investments,* dated 31 January 1993. |
| LHNV or Claimant | Lao Holdings NV |
| LHNV's Reply | Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 |
| LHRE-[XX] | Respondent's Exhibits |
| LHRA-[XX] | Respondent's Legal Authorities |
| MaxGaming | MaxGaming Consulting Services Limited (Macau) |
| MIC | Ministry of Information and Culture |
| Paksong PDA | Project Development Agreement by and between The Lao People's Democratic Republic, Sanum Investments, Nouansavanh Construction Co. Ltd., and Mr. Sittixay Xaysana dated 10 August 2007 |
| Paksong Vegas | Paksong Vegas Hotel and Casino |
| Participation Agreement | Participation Agreement for Thanaleng by and between Sanum and ST Holdings dated 4 October 2008 (Exhibit (CB)-6) |
| PCA | Permanent Court of Arbitration |
| PCA Proceeding | PCA proceeding between *Sanum Investments Limited (People's Republic of China) v. the Government of the Lao People's Democratic Republic* – PCA Case No. 2013-13, chaired by Dr. Andrés Rigo Sureda |
| PDA | Savan Vegas Project Development Agreement |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits dated 20 February 2014 |
| Respondent's Rejoinder | Respondent's Rejoinder (Amended) dated 4 June 2014 |

| RMC | RMC Gaming Management LLC |
| Sanum | Sanum Investments |
| Savan Vegas | Savan Vegas Hotel and Casino |
| Settlement | Deed of Settlement dated 15 June 2014 and Side Letter dated 18 June 2014 |
| SIAC | Singapore International Arbitration Centre |
| SRE-[XX] | Respondent's Exhibits in PCA Proceeding |
| ST | ST Holdings |
| Thanaleng | Thanaleng Slot Club |
| Amended Transcript, [Day], p. [page], [lines] | Transcript of the Hearing |
| UNCAC | United Nations Convention Against Corruption |
| VCLT | Vienna Convention on the Law of Treaties |

## TABLE OF CONTENTS

1.    OVERVIEW .................................................................................................10

2.    PROCEDURAL HISTORY.........................................................................12

3.    OVERVIEW OF THE FACTS ....................................................................23

      3.1.   Laos: Claimants' Investments in Laos ................................................23

      3.2.   The Original Treaty Claims ................................................................24

      3.3.   Claims and Counterclaims .................................................................25

      3.4.   The Settlement and its Aftermath ......................................................25

      3.5.   Delimitation of the Relief Presently Sought by the Claimants ............26

4.    RELEVANT ARTICLES OF THE BIT ......................................................27

      4.1.   The Recitals ......................................................................................27

5.    OTHER MATTERS ....................................................................................30

      5.1.   Other Legal Provisions ......................................................................30

      5.2.   Tribunal's Analysis ...........................................................................31

      5.3.   Clarification on the Nature of the Respondent's Illegality Claims.......31

6.    THE RESPONDENT'S THRESHOLD POSITION IS THAT THE CLAIMS OUGHT
      NOT TO BE ENTERTAINED BY REASON OF THE CLAIMANTS' BRIBERY AND
      CORRUPTION ...........................................................................................32

      6.1.   Evidence of Bribery and Corruption is Relevant in Respect of Criminality Both at
             the Time of Investment and During Subsequent Performance .........................35

      6.1.1.  The Respondent's Argument ..............................................................35

      6.1.2.  The Claimant's Argument...................................................................36

      6.1.3.  The Tribunal's Ruling........................................................................37

      6.2.   The Applicable Standard of Proof ......................................................38

      6.2.1.  The Respondent's Argument ..............................................................38

      6.2.2.  The Claimant's Argument...................................................................39

6.2.3.   The Tribunal's Ruling ........................................................................40

6.3.   Failure of the Respondent to Investigate and Prosecute Persons who Allegedly Accepted Bribes ............................................................................41

6.3.1.   First Allegation – Bribes to Obtain the 2009 Flat Tax Agreement ......................41

6.3.1.1.   The Respondent's Argument ........................................................41

6.3.1.2.   The Claimant's Argument...........................................................44

6.3.1.3.   The Tribunal's Ruling...............................................................45

6.3.2.   Second Allegation – Bribes to Extend the Flat Tax Agreement After Expiry of the 5-Year Term............................................................................................45

6.3.2.1.   The Respondent's Argument .......................................................45

6.3.2.2.   The Claimant's Argument...........................................................47

6.3.2.3.   The Tribunal's Ruling...............................................................47

6.3.3.   Third Allegation – The Claimants Paid US $500,000 in Bribes in 2012 to (i) Shut Down the E&Y Audit of Savan Vegas and (ii) to Cause the Government to Shut Down the Thanaleng Slot Club to the Disadvantage of ST Holdings ..............................47

6.3.3.1.   The E&Y Audit.......................................................................48

6.3.3.1.1.   The Respondent's Argument ....................................................49

6.3.3.1.2.   The Claimant's Argument.......................................................50

6.3.3.1.3.   The Tribunal's Ruling...........................................................50

6.3.3.2.   Payment of About US $200,000 in Bribes to Shut Down the Thanaleng Slot Club   51

6.3.3.2.1.   The Respondent's Argument ....................................................52

6.3.3.2.2.   The Claimant's Argument.......................................................53

6.3.3.2.3.   The Tribunal's Ruling...........................................................54

6.3.4.   Fourth Allegation – The Claimants Arranged for a Further US $575,000 Transfer to Madam Sengkeo to Prevent Her from Testifying in These Proceedings......................55

6.3.4.1.   The Respondent's Argument .......................................................56

6.3.4.2.   The Claimant's Argument...........................................................57

6.3.4.3.     The Tribunal's Ruling ...........................................................................58

6.3.5.  Fifth Allegation – Bribery Scheme in June 2015 to Restore Control of Savan Vegas to the Claimants ........................................................................................................60

6.3.5.1.     The Respondent's Argument .........................................................................61

6.3.5.2.     The Claimant's Argument.............................................................................61

6.3.5.3.     The Tribunal's Ruling ...................................................................................61

6.3.6.  Sixth Allegation – Miscellaneous Acts of Bribery and Corruption ......................62

7.     THE CLAIM FOR EXPROPRIATION ...........................................................................63

7.1.     Thanaleng Slot Club ..............................................................................................63

7.1.1.  Background ............................................................................................................63

7.1.2.  The Parties' Arguments ........................................................................................64

7.1.3.  Tribunal's Ruling ..................................................................................................67

7.2.     Paksong Vegas Hotel and Casino ..........................................................................69

7.2.1.  Background ............................................................................................................70

7.2.2.  Location of Paksong ..............................................................................................70

7.2.3.  The Tribunal's Analysis ........................................................................................74

7.3.     Paksan Slot Club ...................................................................................................74

7.3.1.  Background ............................................................................................................75

7.3.2.  The Tribunal's Analysis ........................................................................................76

7.4.     Thakhet Casino and Hotel Resort ..........................................................................76

7.4.1.  The Tribunal's Analysis ........................................................................................79

8.     VIOLATION OF OTHER TREATY RIGHTS ................................................................80

8.1.     The Claimant's Allegations of Unfair and Inequitable Treatment ........................80

8.2.     The Onus of Proof .................................................................................................82

8.3.     The Claimant's Lack of Good Faith ......................................................................82

8.4.     Alleged Wrongful Treatment of the Thanaleng Investment ..................................85

8.4.1.   The Claimant's Argument.................................................................85

8.4.2.   The Respondent's Argument .............................................................87

8.4.3.   The Tribunal's Ruling......................................................................89

8.5.   Did The Respondent's Treatment of Savan Vegas Breach Articles 3(1) and 3(4) of the Treaty? ...................................................................................................90

8.5.1.   The Claimant's Argument.................................................................91

8.5.2.   The Respondent's Argument .............................................................91

8.5.3.   The Tribunal's Ruling......................................................................92

8.6.   Alleged Violations of Treaty Rights in Respect of the Paksan Slot Club, Lao Bao and the Savannakhet Ferry Dock .............................................................93

8.7.   Allegation that the Respondent Violated Article 3(4) of the Treaty (Umbrella Clause Claims)...........................................................................................93

8.8.   Allegations of Discriminatory and Less Favourable Treatment With Respect to Investments pursuant to Article 3(2) and Article 4 of the Treaty ......................94

8.9.   Bad Faith ..................................................................................95

9.   DISPOSITION ON COSTS.................................................................96

9.1.   Expenses ..................................................................................98

9.1.1.   Travel Expenses .............................................................................98

9.1.2.   Miscellaneous Services and Expenses ................................................98

9.2.   Arbitration Costs .........................................................................99

10.   DISPOSITION.............................................................................99

## 1. OVERVIEW

1.  Mr. John Baldwin and Mr. Shawn Scott, two U.S. entrepreneurs who were experienced in
    a number of businesses including gambling facilities, became involved in casinos and slot
    machines in Laos in 2007.  For this purpose, they caused two companies to be incorporated
    in Aruba, the Netherlands Antilles, Lao Holdings NV ("**LHNV**"), and a subsidiary Sanum
    Investments ("**Sanum**") in Macau (collectively referred to as "**the Claimants**").  Mr.
    Baldwin and Mr. Scott, using various corporate structures partnered with a Laotian
    conglomerate ("**ST Holdings**") in two casino projects and three slot machine clubs in Laos
    positioned near its border with Thailand.  One of the casinos, the Savan Vegas Hotel and
    Casino ("**Savan Vegas**"), was built and operated successfully.  The second casino, Paksong
    Vegas Casino ("**Paksong Vegas**"), was never built.

2.  Within three years there was a falling out between the Claimants and their local partner.
    ST Holdings ceased cooperation with Sanum, initiated litigation against it and shut Sanum
    out of Thanaleng, the most profitable of the slot clubs.  Mr. John Baldwin testified that ST
    Holdings was closely connected to leading politicians in the Respondent Government.  He
    said that ST Holdings orchestrated a series of wrongful Government acts against LHNV
    which led to the result, designed by the Government, of driving LHNV out of Laos and
    appropriating for the Government the wealth created by the investment and expertise of
    Mr. Baldwin and his associated companies.

3.  The Claimants initiated arbitrations by LHNV under the bilateral investment treaties
    between Laos and the Netherlands,[1] and by Sanum pursuant to a similar investment treaty
    between Laos and Macau (now China).[2]  These arbitrations have consumed multiple
    proceedings and years of litigation.  Eventually Sanum obtained an award against ST
    Holdings from the Singapore International Arbitration Centre ("**SIAC**") for over US $200
    million.  Sanum is not a claimant before this Tribunal, and the Tribunal does not purport

---

[1] *Agreement on Encouragement and Reciprocal Protection of Investments between Laos and the Kingdom of the Netherlands*, signed on 16 May 2003, in force since 1 May 2005.
[2] *Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning the Encouragement and Reciprocal Protection of Investments*, dated 31 January 1993, as amended on 10 April 2006.

to address its claims.  However, much of the evidence of Mr. John Baldwin is related to both companies, and as he was the directing mind of both companies, and their principal witness, references will be made to Sanum from time to time (or collectively to "**the Claimants**" in the plural) as part of the background to the disposition of the LHNV claims. Moreover, counsel for the Claimant advised that it did not withdraw "any factual allegations, as the **totality of the facts remain relevant to certain treaty breaches** for which the Claimants will seek relief."[3]

4.      The Respondent Government's position is that it has been dragged into a business dispute between private parties, the Claimants and ST Holdings for whose conduct it has no responsibility.  In any event, the Government says, the Claimants' business efforts in Laos were characterized by bribery and corruption, and their claims ought to be dismissed because of the absence of "clean hands" as well as on the merits.  The Claimants point out correctly, that the Government has failed to demonstrate any substantial pursuit of the officials who, in the Government's view, *took* the bribes.

5.      The Tribunal concludes that the LHNV claims must be dismissed.  The dispute grew out of a commercial fight between private businesses.  The Respondent Government became involved in aspects of the dispute as a regulator of the gambling business in Laos, as a shareholder in Sanum, and through its responsibility for the administration of justice in Laos, but the Claimants have failed to establish the facts necessary to ground liability in international law under the BIT in those respects.

6.      The Tribunal has carefully considered each element of LHNV's myriad Treaty claims, including the claim of expropriation of Thanaleng and the allegations of breaches of Articles 3(1), 3(2) and 4 with respect to Thanaleng, Savan Vegas and the slots clubs at Lao Bao and Ferry Terminal, and Article 3(4) of the BIT with respect to Savan Vegas, and concludes for the reasons that follow that there is no merit in any of the claims and allegations brought before this Tribunal.

---

[3]  Letter dated 26 March 2018 from Claimant to the Tribunal.

7.     At the same time, the Tribunal finds that the Respondent has not established bribery and corruption against the Claimants on "clear and convincing evidence".  Nevertheless, the evidence of multiple financial transactions by Mr. John Baldwin with Madam Sengkeo, the Claimants' local consultant in Laos and conduit to Government officials, taken cumulatively, establishes gross financial impropriety to the lesser standard of a balance of probabilities in respect of some investments as well as bad faith.  While the Government has not always behaved appropriately (as found by the Tribunal in the Second Material Breach Application), and politics undoubtedly played a role in the worsening relations between the Government and the Claimants, LHNV has failed to demonstrate any legitimate expectations or establish other violations of the BIT including fair and equitable treatment.  The evidence of their principal witness and directing mind, Mr. John Baldwin is not consistent with much of the documentation and is not reliable.  Payments on Mr. Baldwin's instructions to a key witness, Madam Sengkeo, to purchase her refusal to testify at the merits hearing, go to the root of the integrity of the arbitration.

8.     In all instances LHNV has failed to meet its burden of proof.

9.     The claims of LHNV are dismissed with costs.

## 2.  PROCEDURAL HISTORY

10.    The Tribunal has issued the following decisions during the proceeding: (i) Decision on Jurisdiction of 21 February 2014; (ii) Decision on the Merits on the First Material Breach of 10 June 2015, (iii) Decision on Costs of 5 November 2015 and (iv) Decision on the Second Material Breach of 15 December 2017 ("**Decision on the Second Material Breach**").  The full procedural history of this case is described in these decisions.  These Decisions, and the Decision on the Second Material Breach, are an integral part of the Award and are appended hereto as follows: i) Decision on Jurisdiction of 21 February 2014 (**Annex A**); (ii) Decision on the Merits on the First Material Breach of 10 June 2015 (**Annex B**), (iii) Decision on Costs of 5 November 2015 (**Annex C**) and (iv) Decision on the Second Material Breach (**Annex D**).

11.    The procedural details of this arbitration following the Decision on the Second Material Breach are summarized below.

12.     In the Decision on the Second Material Breach, the Tribunal ruled as follows:

> 227. The Second Material Breach Application is allowed.
>
> 228. Pursuant to Section 32 of the Settlement, the Treaty arbitration is revived on the basis jointly and severally of the Government's breaches of:
>
> (a) Section 8, which promised a "new flat tax", but instead the Government imposed a 28% ad valorem tax on gross gaming revenues;
>
> (b) Section 23, which promised the Claimants relief from "current criminal investigations", which nevertheless have been revived.
>
> 229. Both of these breaches constitute material breaches that deprived the Claimants of the intended benefits (or "bargain") promised by each of Section 8 and Section 23.
>
> 230. Except as aforesaid, the grounds of revival relied on by the Claimants are rejected.
>
> 231. The parties are instructed to confer and propose to the Tribunal a timetable for the renewed Treaty arbitration within 30 days of the date of this decision.
>
> 232. A pre-hearing teleconference to resolve any outstanding issues will be held within 45 days of the date of this decision.
>
> 233. The issue of costs of this application is reserved to be dealt with at the conclusion of the hearing on the merits.

13.     As instructed by the Tribunal in its Decision on the Second Material Breach, on 14 January 2018, the Claimant LHNV [being the sole Claimant in the ICSID proceeding] submitted its proposal regarding the timetable and requested the Tribunal to hold the hearing on the merits for this case after the scheduled hearing of related but separate proceedings identified as *Lao Holdings N.V. v. Lao People's Democratic Republic* (ICSID Case No. ARB(AF)/16/2)/ *Sanum Investments Limited v. Lao People's Democratic Republic* (ICSID Case No. ADHOC/17/1) (the "**BIT II Proceedings**").  The Claimant also requested an in-person pre-hearing conference with the objective of exploring with the Tribunal how to proceed and for the Parties to receive any further instructions.

14.     On 18 January 2018, the Respondent filed its response objecting to Claimant's proposal to schedule a hearing after the BIT II Proceedings. The Respondent requested that the Tribunal schedule the hearing in this case within sixteen weeks as to not further delay the

proceeding. Further exchanges by the Parties on this matter were submitted by Claimant on 26 January 2018 and 16 February 2018 and by Respondent on 29 January 2018.

15.     On 19 February 2018, having heard the Parties' positions, the Tribunal decided the date for the hearing on the merits. The Tribunal invited the Parties to confer on a schedule for the exchange of written submissions and other logistical matters.

16.     On 2 March 2018, the Parties informed the Tribunal that they had been unable to reach an agreement on the scope and nature of the Tribunal's instructions from 19 February 2018. As a result, each Party sent its proposal separately for the Tribunal's consideration.

17.     On 7 March 2018, the Tribunal decided to schedule a pre-hearing conference and provided the Parties the corresponding agenda of the items to be discussed in the pre-hearing conference.  On 19 March 2018, the Claimant LHNV submitted its positions regarding the items in the agenda for the pre-hearing conference as well as a proposed procedural order. On 20 March 2018, the Respondent submitted its comments to Claimant's communication of 19 March 2018 and corresponding proposals.  On 21 March 2018, the Tribunal held a pre-hearing organizational meeting with the Parties by teleconference.

18.     On 26 March 2018, as discussed during the pre-hearing organizational meeting, the Claimant LHNV provided the list of claims for which it no longer would seek specific relief.

19.     On 29 March 2019, the Tribunal issued Procedural Order No. 10 on the organization of the hearing.

20.     On 23 April 2018, the Tribunal, through the Secretary of the Tribunal, reminded Respondent of the deadline provided in Procedural Order No. 10 for it to inform whether the Respondent would withdraw any defences in light of Claimant's withdrawal of claims of 26 March 2018.  On 24 April 2018, the Respondent confirmed that it maintained its defences.

21.     On 15 May 2018, pursuant to paragraph 8 of Procedural Order No. 10, the Respondent filed an Application for Additional Evidence, together with an index of supporting

documentation and Exhibits R-001-002, R-004, R-028-029, R-034-036, C-1053, and R-054-055 and three additional documents not identified for the record.

22.    On 16 May 2018, each Party submitted the preliminary list of witnesses for cross-examination at the hearing.

23.    On 30 May 2018, the Claimant filed its response to the Respondent's Application for Additional Evidence together with Exhibits C-1225 to C-1227, and Legal Authorities CL-379 to CL-389.

24.    By letter of 31 May 2018, the Respondent requested the Tribunal to order the Claimant to inform it on the order of presentation of the witnesses to be examined at the scheduled hearing. Additionally, the Respondent requested the examination from Lao PDR *via* video-link of the following witnesses: Minister Kmabay Damlath, Dr. Sinlavong Khoutphaythoun, and Minister Chaleune Yiapaoheu.

25.    On 6 June 2018, the Tribunal provided further instructions to the Parties regarding the submissions on the list of witnesses for cross-examination at the scheduled hearing.  On 8 June 2018, the Claimant filed its response opposing the Respondent's request for the witnesses' video-link testimony, together with Exhibits C-1224, C-1235 and Legal Authority CL-390.

26.    On 12 June 2018, the Centre informed the Parties that Ms. Catherine Kettlewell, ICSID Legal Counsel, would serve as Secretary of the Tribunal, replacing Ms. Anneliese Fleckenstein.

27.    On 15 June 2018, the Respondent filed its reply to its Application for Additional Evidence. On this same date, the Claimant filed its objection to the Respondent's preliminary witness list, together with Exhibit C-1237.

28.    On 22 June 2018, the Respondent filed its response to the Claimant's opposition to the examination of witnesses *via* video-link.

29.    On 25 June 2018, the Tribunal issued Procedural Order No. 11, on the Respondent's Application for Additional Evidence.

30.   On 26 June 2018, the Tribunal issued Procedural Order No. 12, on the Respondent's request for the examination of witnesses *via* video-link.

31.   On 27 June 2018, the Respondent filed a request for clarification of Tribunal's Procedural Order No. 11. On this same date, it stated its agreement to the full consolidation of this proceeding with the Permanent Court of Arbitration ("**PCA**") proceeding *Sanum Investments Limited (People's Republic of China) v. the Government of the Lao People's Democratic Republic* – PCA Case No. 2013-13 (the "**PCA Proceeding**").

32.   On 28 June 2018, the Tribunal issued an amended Procedural Order No. 11, correcting certain typographical errors.

33.   By letter of 28 June 2018, the Tribunal informed the Parties that the Claimant's request objecting to the Respondent's witness list was approved and invited the Parties to submit their final witness lists.

34.   On 5 July 2018, the Tribunal addressed the Respondent's communication of 27 June 2018, concerning the full consolidation of this proceeding with the PCA Proceeding. The Tribunal informed the Parties that it did not consider the consolidation as "practical or necessary at this late stage of the proceeding".

35.   On 6 July 2018, each Party submitted its final witness lists.  The Claimant excluded one witness in accordance with the Tribunal's decision contained in its letter of 28 June 2018.

36.   On 9 July 2018, the Parties jointly requested the Tribunal for a one-day extension for the further deadlines in the organization of the hearing.  On 11 July 2018, the Tribunal took note of the Parties' agreed extensions.

37.   On 17 July 2018, the Claimant submitted a request for additional evidence to rebut the Respondent's additional evidence pursuant to the Tribunal's Procedural Order No. 11.

38.   On 18 July 2018, the Claimant submitted a request to substitute Dr. Thomas Zitt for Mr. Steven Rittvo for examination on the Innovation Group's Expert Report at the scheduled hearing, together with Exhibit C-1267 and Exhibits A to F. On the same date, the Respondent submitted its objection to the Claimant's request together with Exhibits 1

through 12.  On 19 July 2018, the Tribunal invited the Claimant to submit its comments to the Respondent's objection.   On 25 July 2018, the Claimant filed its response to the Respondent's objection of 24 July 2018, together with Exhibits G through L.

39.     On 25 July 2018, the Respondent filed its observations to the Claimant's request for additional evidence of 17 July 2018. The Claimant's filed its reply on support of its request on 26 July 2018.

40.     On 26 July 2018, the Respondent filed additional observations to the Claimant's request for the substitution of experts of 18 July 2018.

41.     On 31 July 2018, the Tribunal issued Procedural Order No. 13, deciding that the scheduled hearing would proceed on all issues except for damages and quantum and ruled on the Claimant's request for the substitution of experts to give testimony at the hearing. Simultaneously, the Tribunal issued Procedural Order No. 14 on the Claimant's request for additional evidence as follows:

> "1. The following documents submitted by the Claimants are admitted on consent:
>
> Exhibits R-049, C-1240, R-046, C-1241, C-1242, C-0928, C-1243, C-1131, C-1244, C-1245, C-1246, C-774, C-755, C-1226, C-1248, C-1249, C-1250, C-1251, R-026, C-1238 A, C-1238 B , C-1239, C-1256, C-1257, C-1258, C-1259, C-1260, C-1261, C-1262, C-1263, C-1264, C-1265, C-1266 .
>
> 2. The Tribunal admits the extracts of the Witness statements of John Baldwin, Angus Noble, William Greenlee and Clay Crawford submitted by the Claimants, but permits the Government to provide additional extracts from the same witness statements which the Government contends are necessary to give "balance" to the extracts submitted by the Claimants, as per the ruling in item 1 above.
>
> 3. The Baldwin Statement (Exhibit C-1244) and the Kurlantzick Report (Exhibit C-1247) are not admitted into evidence.
>
> 4. The Government's Opening Memorial in SIAC Arb 143/14/MV (Exhibit C-971) is admitted into evidence.
>
> 5. The interlocutory correspondence in ICSID Case No ARB (AF)/16/2 (Exhibits C-1252, C-1253, C-1254 and C-1255) are not admitted into evidence.

> 6. The admissibility of the further report of Professor Joseph Kalt is deferred pending a decision following the merits hearing as to whether a hearing on damages and quantum is required."

42. On 10 August 2018, the Respondent filed a request to strike the witness statement of Mr. William Greenlee, together with Appendices 1 through 4. By communication of the same date, the Respondent requested leave from the Tribunal to include new evidence into the record (Exhibit LHRE-164 and LHRE-165).

43. On 17 August 2018, the Claimant filed its response opposing the Respondent's request to strike Mr. Greenlee's witness statement from the record, together with the following supporting documentation: Exhibit C(B)-434, C(B)-492, C-1242, R-001 and R-036. On the same date, the Claimant filed its observations, partially agreeing with the Respondent's request to include new evidence into the record. On 20 August 2018, the Tribunal invited the Respondent to comment on the Claimant's observations.

44. On 20 August 2018, the Claimant filed a request to increase their examination time at the hearing and sent a proposed hearing schedule for the Tribunal's consideration. On 22 August 2018, the Tribunal invited the Respondent to comment on Claimant's proposal.

45. On 23 August 2018, the Respondent filed a reply to the Claimant's response concerning its request to strike Mr. Greenlee's witness statement and its observations to the Claimant's position towards its request to include new evidence into the record. This submission was filed together with Appendices 1 through 5.

46. On this same date, the Claimant submitted additional observations to the Respondent's comments on Mr. Greenlee's witness statement and requested the Tribunal to strike from the record an exhibit of 291 pages filed by the Respondent together with BDO's expert report as part of the Respondent's additional evidence submitted pursuant to Procedural Order No. 11.  The Tribunal invited the Respondent to comment on these two submissions by the Claimant.

47. On 23 August 2018, the Respondent submitted its opposition to the Claimant's request for an enlargement of the examination time, together with Appendices 1 through 3.

48.   On 24 August 2018, the Respondent filed its observations on the Claimant's objection to the introduction of the exhibit to BDO's expert report, and its rejoinder on Mr. Greenlee's witness statement.

49.   On the same date, the Claimant informed the Tribunal and the Respondent of its decision to withdraw their request to cross-examine Sivath Sengdouangchanh at the hearing.

50.   On 25 August 2018, the Claimant requested the Tribunal's clarification on paragraph 3.ii of Procedural Order No. 10, concerning the witnesses' examination. On 26 August 2018, the Respondent filed its observations to this request.

51.   On 28 August 2018, the Respondent withdrew the witness statement of Mr. Vanheung (Vanheuang) Nanthachak from the record.

52.   On 29 August 2018, the Tribunal issued Procedural Order No. 15, on (1) Respondent's request to strike from the record Mr. William Greenlee's witness statements; (2) Respondent's request to introduce exhibits LHRE-164 and LHRE-165; (3) Claimant's request to extend the time assigned at the hearing; (4) Claimant's request to exclude the BDO Report submitted by the Respondent, and (5) Claimant's request for advance notice for witness examination.  These issues were decided as follows:

> "1. The Respondent's request to strike from the record Mr. William Greenlee's witness statements is premature.
>
> 2. Exhibits LHRE-164 and LHRE-165 are to be admitted into evidence.
>
> 3 Each party shall have equal time and is to determine the order in which its own cross-examinations proceed as well as time allocation.
>
> 4. The Claimants' request to exclude from the record the 291 additional pages attached to the BDO Report contained in Exhibit LHRE-161 is granted.
>
> 5. The Parties are not required to provide advance notice of topics to be covered in cross-examination."

53.   By letter of the same date, the Tribunal requested the Parties to confer and provide to the Tribunal a final hearing schedule.

54.   On 30 August 2018, the Claimant submitted the Parties' final and agreed hearing schedule.

55.     A hearing on the merits was held at Maxwell Chambers in Singapore, from 3 to 7 September 2018 (the "**Hearing**").  As on previous occasions, the Tribunal conducted the hearing jointly with the Tribunal in the PCA Proceedings.  At no time were the ICSID proceedings and the PCA proceedings consolidated.  The following persons were present at the Hearing:

*Tribunal*:
  The Honorable Ian Binnie, QC                    President
  Prof. Bernard Hanotiau                          Arbitrator
  Prof. Brigitte Stern                            Arbitrator

*ICSID Secretariat*:
  Ms. Cathy Kettlewell                            Secretary of the Tribunal

*PCA Tribunal*:
  Mr. Andrés Rigo                                 President
  Prof. Bernard Hanotiau                          Arbitrator
  Prof. Brigitte Stern                            Arbitrator


*PCA*:
  Ms. Fedelma Claire Smith                        Secretary of the Tribunal
  Attending Video Conferencing from Lao:
  Ms. Gaëlle Buchet                               Case Manager

*For the Claimant*:
  Ms. Deborah Deitsch-Perez                       Stinson Leonard Street
  Mr. Jeff Prudhomme                              Stinson Leonard Street
  Mr. Alexander Hinckley                          Stinson Leonard Street
  Mr. Todd Weiler
  Mr. Ken Kroot                                   In house counsel-Sanum
  Mr. Jorge Menezes (also attending Video        FCLaw
  Conferencing from Lao)
  *Parties:*
  Mr. Shawn Scott
  Mr. Tucker Baldwin
  *Other:*
  Ms. Benjawan Poomsan Terlecky
  Ms. Diana Paraguacuto

*Claimant's Expert*:
  Mr. Gerard Ngo

*For the Respondent*:
Mr. David Branson
Mr. Kurt Lindquist II                    Womble Bond Dickinson (US) LLP
Mr. John Branson                         Womble Bond Dickinson (US) LLP
Ms. Emily Doll                           Womble Bond Dickinson (US) LLP
Mr. Russ Ferguson                        Womble Bond Dickinson (US) LLP
Mr. John Dackson                         Womble Bond Dickinson (US) LLP
*Parties*:
Outakeo Keodouangsinh
Phothilath Sokhotchounlamaly
*Other*:
Ms. Xaynari Chanthala (Attending Video
Conferencing from Lao)
Mr. K.P. Santivong (Attending Video
Conferencing from Lao)

*Respondent's Expert*:
Prof. Hervé Ascensio

*Court Reporters*:
Goh Chee Jian                            Epiq
Tan Chee Keeng                           Epiq
Tan Liang Chiah Sharon                   Epiq
Tay Ai Poh                               Epiq
Chua Hong Guan (Damien)                  Epiq

*Interpreters*:
Mr. John Johnston                        Laotian/English
Ms. Maly Siribounthong                   Laotian/English
Mr. Samuel Mattix                        Laotian/English
Ms. Ana Ooms                             French/English
Mr. Jean-Christophe Kuzniak              French/English


56.    During the Hearing, the following persons were examined:

       *On behalf of the Claimant*:
       Mr. John Baldwin
       Mr. Clay Crawford
       Mr. Angus Noble

       *On behalf of the Respondent*:
       Mr. Phimphone Sengthong
       Judge Soulideth Souvannasaly
       Minister Chaleune Yiapaoheu
       (Video Conferencing from Lao)

Minister    Sinlavong    Khoutphaythoun
(Video Conferencing from Lao)
Governor Kambay Damlath
(Video Conferencing from Lao)

57.   On 18 September 2018, the Respondent requested the Tribunal to provide further instructions concerning the submission of further pleadings or applications.

58.   On 19 September 2018, the Claimant filed a submission addressing the Respondent's closing arguments made at the Hearing.

59.   By communication of 20 September 2018, the Tribunal informed the Parties that it would not admit into the record the Claimant's submission of 19 September 2018 and that any further submissions but for those related to transcript issues, would require the Tribunal's approval.   The Tribunal invited the Parties to submit their corrections to the Hearing transcript by 28 September 2018.

60.   Following the Tribunal's instructions, on 28 September 2018, the Claimant submitted the Parties' agreed transcript corrections to be included by the Court Reporters. Amended transcripts were received from the Court Reporters on 22 October 2018.

61.   On 22 February 2019, the Respondent filed its submission on costs and on 7 March 2019, the Claimant filed its submission on costs.   On 12 March 2019, the Tribunal invited the Parties to comment on the other Party's submission on costs, if they wished to do so.   On 15 March 2019, the Respondent submitted its comments to Claimant's submission on costs.

62.   On 2 May 2019, the Tribunal requested the Parties to confirm the Tribunal's understanding that the Award shall be deemed to be made at the place of arbitration, irrespective of where it is signed.   Both Parties confirmed the Tribunal's understanding on 6 May 2019.

63.   The proceeding was closed on 17 July 2019.

### 3.  OVERVIEW OF THE FACTS

#### 3.1. Laos: Claimants' Investments in Laos



64.    As mentioned earlier, the Claimant, LHNV, owned directly and indirectly through its subsidiary, Sanum, gambling assets in Laos including the Savan Vegas Hotel and Casino Complex in Savannakhet Province.  The Casino is strategically located near the Friendship Bridge which spans the Mekong River between Laos and Thailand.  The Claimants also had an investment in "slot clubs" located at the Thai border at Lao Bao and Savannakhet Ferry Terminal (located at the Savannakhet/Mukdahan checkpoint), all in the Savannakhet Province and at Thanaleng to the Northwest.   LHNV and its subsidiary Sanum, claim to have invested many millions of dollars in these projects.[4]

---

[4] The Claimants' principal, Mr. John Baldwin, testified as follows:

Q. … Can you tell us when Sanum first invested in Laos and what kind of money it invested, at what time period?

24

### 3.2. The Original Treaty Claims

65.   The Claimants allege expropriation without compensation and Treaty breaches in respect of their investment in gambling projects described in the Project Development Agreement ("**PDA**") dated 10 August 2007 in respect of the Savan Vegas Casino, as well as the three slot clubs, Thanaleng, Lao Bao and Savannakhet Ferry.  The claims also relate to the expected expansion of the Savannakhet Airport and opportunities for development in the Special Economic Zone at Thakhet.

66.   LHNV initiated its ICSID proceedings on 14 August 2012 against the Respondent, before the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") pursuant to the *Agreement on Encouragement and Reciprocal Protection of Investments between Laos and the Kingdom of the Netherlands*,[5] and the *Arbitration Rules (Additional Facility)* of ICSID ("**ICSID-AF Rules**").[6]

67.   On 14 August 2012, Sanum Investments Limited, a LHNV subsidiary which operated the Savan Vegas Hotel and Casino, initiated its claim before the PCA for alleged violations of the *Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning the Encouragement*

---

A. We – we started investing in Laos in 2007.  Our initial commitment was a total of seven and a half million dollars – my recollection is seven and a half million dollars paid to ST Group in various stages, and then the next thing we invested in was getting new plans drawn and studies done for Savan Vegas and Paksong Vegas.
Q. And in what year was that done?
A. That was done in 2008 primarily.
Q. When was the first monies paid?  2007 or 2008?
A. First monies, 2007.
Q. And then the money that was in 2008, can you say during roughly what month?
A. Well, the largest amount of money was paid prior to the Savan – was paid in probably the last six months of 2008.
Q. During all of that time in 2007 and 2008, did you have a flat tax agreement yet?
A. Yes.
Q. Prior – let me show you some documents.  Let me show you –
A. Well, we had an agreement to get the flat tax agreement.  The flat tax was approved – the flat tax was approved by Prime Minister Bouasone in [29 December 2008].
Transcript, 5 September 2018, p. 134, l. 10 to p. 135, l. 12, date corrected p. 135, ll. 9-12.
[5] Signed on 16 May 2003, in force since 1 May 2005.
[6] As amended on 10 April 2006.

*and Reciprocal Protection of Investments,* dated 31 January 1993 and the UNCITRAL Arbitration Rules as revised in 2010.

68.   While the proceedings before the two Tribunals are distinct and separate, the proceedings were the subject of joint Hearings in Singapore and elsewhere.  Accordingly, for ease of reference only, LHNV and Sanum will be referred to as "the Claimants", as the facts of the cases are intermingled.  This terminology is not to suggest, however, that the two arbitral proceedings are consolidated or otherwise conjoined.

### 3.3. Claims and Counterclaims

69.   The Claimants' original Treaty claims were based on a multiplicity of alleged treaty breaches by the Government including (but not limited to) an 80% tax on casino revenues and what the Claimants contended were unfair and oppressive audits of the Savan Vegas Hotel and Casino.  In addition, the Claimants alleged that the Government abused its sovereign authority to assist ST Holdings to acquire other assets which belonged in whole or in part, to the Claimants.  In the Treaty proceedings, the Claimants eventually valued their investment loss as of 31 August 2016 at between US $690 million and US $1 billion.[7]

### 3.4. The Settlement and its Aftermath

70.   The Treaty claims were thought to have been resolved by a Deed of Settlement concluded between the Parties during the merits Hearing in Singapore on 15 June 2014 (to be read together with a Side Letter dated 18 June 2014) (herein referred to collectively as "**the Settlement**").

71.   Shortly after the Settlement, the Claimants alleged that the Government had committed a material breach of its terms, which entitled them to a revival of the Treaty arbitrations ("**the First Material Breach Application**").  The Government contested jurisdiction.  On 11 August 2014, the Government filed a Notice of Arbitration with the SIAC pursuant to

---

[7] See Reports of Joseph P. Kalt dated 14 October 2016, 2 December 2016, 22 December 2016 and 15 March 2017.

paragraphs 35 and 42 of the Settlement, seeking an order directing Sanum to comply with its obligations under the Settlement.

72. The ICSID and PCA Tribunals held a hearing on 14 October 2014 in Washington, D.C. on the objections to jurisdiction, which were dismissed.  However, on 20 January 2015, the High Court of the Republic of Singapore held that the PCA Tribunal did not possess subject matter jurisdiction under the Laos-China BIT because of the status of Macau and issues of state succession not here relevant, as well as the limitation in the BIT, according to which "only disputes over the amount of compensation for expropriation can be submitted to arbitration."[8]  The First Material Breach Application was dismissed on the merits by the ICSID Tribunal on 10 June 2015.  Subsequently, the judgment of the Singapore High Court was reversed by the Court of Appeal of Singapore on 29 September 2016.[9]

### 3.5. Delimitation of the Relief Presently Sought by the Claimants

73. The Claimants' Second Material Breach Application was successful, and on 15 December 2017, the Hearing on the merits of the "revived" claim was ordered to proceed.  On 26 March 2018, the Claimants advised the Tribunal that they no longer sought relief in respect of "Article 6 expropriation claim regarding the [Savan Vegas], its Article 6 expropriation claim regarding Ferry Terminal or Lao Bao slot clubs […], or its claims regarding Respondent's seizure of its bank account in breach of Articles 3(2), 3(4), 4, 5, and 6."[10]

74. The Claimants' letter of 26 March 2018 notionally divided and separated their surviving claims concerning LHNV (Thanaleng, Savan Vegas and the Ferry Terminal and Lao Bao slots) and Sanum (Thanaleng, Paksan, Thakhet and Paksong Vegas Hotel and Casino).  As mentioned, however, counsel for the Claimants asserted in the same letter that "the totality of the facts remain relevant to certain treaty breaches for which the Claimants will seek relief."  Equally, the Respondent conjoined its "clean hands" defence to all claims by both Claimants at issue in the ICSID and PCA proceedings involving Mr. John Baldwin and the

---

[8] *Government of the Lao People's Democratic Republic v. Sanum Investments Ltd.*, [2015] SGHC 15 at para. 128.
[9] *Sanum Investments Ltd. v. Government of the Lao People's Democratic Republic*, [2016] SGCA 57.
[10] Letter dated 26 March 2018 from Claimant to the Tribunal.

various interrelated allegations of bribery and corruption.  Accordingly, it will be necessary for the Tribunal to address "the totality" of the factual circumstances of the listed projects of both Claimants insofar as they are relevant to the position of LHNV.

75.    The Claimant maintained the expropriation claim pursuant to Article 6 of the Treaty as well as the following Treaty claims:

(a)    denial of fair and equitable treatment and prohibitions on impairment by unreasonable and discriminatory measures in respect of Savan Vegas, Thakhet, Paksan, Thanaleng, Ferry Terminal and Lao Bao (Article 3(1) of the Treaty);

(b)    breach of contractual obligations regarding Savan Vegas and Paksong Hotel and Casino (Article 3(4) of the Treaty);

(c)    national treatment regarding Savan Vegas, Lao Bao and Ferry Terminal (Articles 3(2) and 4 of the Treaty);

(d)    Most Favoured Nation claims regarding Savan Vegas, Thanaleng, Ferry Terminal and Lao Bao concerning full protection and security, most constant protection and security and access to justice (Article 3(2) of the Treaty).

## 4.  RELEVANT ARTICLES OF THE BIT

### 4.1. The Recitals

76.    The Preamble to the Treaty provides, in its relevant part:

> Desiring to strengthen their traditional ties of friendship and to extend and intensify the economic relations between them, particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party, recognizing that agreement upon the treatment to be accorded to such investments will stimulate the flow of capital and technology and the economic development of the Contracting Parties and that fair and equitable treatment of investment is desirable.

77.    Article 2 of the Treaty provides:

> Either Contracting Party shall, within the framework of its laws and regulations, promote economic cooperation through the protection in its

territory of investments of nationals of the other Contracting Party. Subject to its rights to exercise powers conferred by its laws or regulations, each Contracting Party shall admit such investments.

78.     Article 3(1), 3(2), 3(4), and 3(5) of the Treaty, in its relevant part, provide:

1) Each Contracting Party shall ensure **fair and equitable treatment** of the investments of nationals of the other Contracting Party and shall not impair by **unreasonable or discriminatory measures**, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals.  Each Contracting Party shall accord to such investments **full physical security and protection**.

2) More particularly, each Contracting Party shall accord to such investments treatment which in any case shall **not be less favourable** than that accorded either to investments of its own nationals or to investments of nationals of any third State, whichever is more favourable to the national concerned.

3) …

4) Each Contracting Party shall **observe any obligation it may have entered into** with regard to investments of nationals of the Other Contracting Party.

5) If the provisions of law of either Contracting party or obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement contain a regulation, whether general or specific, entitling investments by nationals of the other Contracting Party to a treatment **more favourable** than is provided for by the present Agreement, **such regulation shall, to the extent that it is more favourable, prevail over the present Agreement**.

(emphasis added)

79.     Article 4 of the Treaty provides:

With respect to taxes, fees, charges and to fiscal deductions and exemptions, each Contracting Party shall accord to nationals of the other Contracting Party who are engaged in any economic activity in its territory, treatment **not less favourable** than that accorded to its own nationals or to those of any third State who are in the same circumstances, whichever is more favourable to the nationals concerned.  For this purpose, however, any special fiscal advantages accorded by that Party, shall not be taken into account:

(a) under an agreement for the avoidance of double taxation; or

(b) by virtue of its participation in a customs union, economic union or similar institution; or

(c) on the basis of reciprocity with a third State.

   (emphasis added)

80.    Article 6 of the Treaty provides:

>Neither Contracting Party shall take any measures **depriving, directly or indirectly**, nationals of the other Contracting Party of **their investments** unless the following conditions are complied with:
>
>(a) the measures are taken in the **public interest** and under **due process** of law;
>
>(b) the measures are **not discriminatory** or contrary to any undertaking which the Contracting Party which takes such measures may have given;
>
>(c) the measures are taken against **just compensation**.  Such compensation shall represent the genuine value of the investments affected, shall include interest at a normal commercial rate until the date of payment and shall, in order to be effective for the claimants, be paid and made transferable, without delay, to the country designated by the claimants concerned and in the currency of the country of which the claimants are nationals or in any freely convertible currency accepted by the claimants.
>
>(emphasis added)

81.    Article 9 of the Treaty provides:

>Each Contracting Party hereby consents to submit any legal dispute arising between that Contracting Party and a national of the other Contracting Party concerning an investment of that national in the territory of the former Contracting Party to the International Centre for Settlement of Investment Disputes for settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington on 18 March 1965, in the event that both Contracting Parties have become Contracting States to the said Convention. In case a Contracting Party is not a Contracting State to the said Convention, the disputes referred to above shall be submitted to the International Centre for Settlement of Investment Disputes under the Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (Additional Facility Rules). A legal person which is a national of one Contracting Party and which before such a dispute arises is controlled by nationals of the other Contracting Party shall, in accordance with Article 25 (2) (b) of the Convention, for the purpose of the Convention be treated as a national of the other Contracting Party.

## 5.  OTHER MATTERS

### 5.1. Other Legal Provisions

82.     The Respondent argues that, in addition to the BIT, domestic law is relevant to the existence of the Claimants' contractual rights and the legality of the conduct of the foreign investors.   Furthermore, there are international norms such as "[t]he United Nations Convention Against Corruption which defines bribery and money laundering as fundamental criminal offenses that undermine the international system of foreign trade."[11] It is the contention of the Respondent that the Claimants violated the BIT, the laws of Laos and international norms.

83.     According to the Claimant LHNV's Reply, the "[BIT] clearly governs this dispute."[12]  The United Nations Convention Against Corruption ("**UNCAC**") "creates obligations only for the state Parties, to develop anti-corruption policies, practices, and task forces.  It does not bind or purport to bind the conduct of entities such as the Claimant."[13]  The Claimants also question the Respondent's appeal to international public policy and, in particular, the international standard for the gaming industry based on domestic gaming regulations of just four jurisdictions, none of them applicable to the Claimants' projects in Laos.

84.     While the Claimants admit that domestic statutes obviously do determine whether certain alleged acts are legal or illegal for the purposes of domestic law, domestic law does not dictate the consequences for an investor's claims under the Treaty.

85.     The Claimants argue that "once an investor has established its investment in conformity with the host state's laws, that investment falls within the scope of the treaty (assuming all of the other jurisdictional hurdles have been cleared), and the investor is *prima facie* entitled to its protections."[14]   The Claimants further argue that the cases that "consider

---

[11] Respondent's Counter-Memorial, para. 20.
[12] Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 (hereinafter "**Claimant's Reply**"), para. -237.
[13] *Ibid*.
[14] *Ibid*., para. 246.

whether allegations of misconduct constitute a proper defence on the merits do not assist Laos because tribunals have required Respondents to demonstrate that the actions taken in breach of the treaty were actually justified by the misconduct."[15]

86.    The Claimants also dispute the relevance of the "uncontroversial proposition that arbitral tribunals have an inherent power to preserve the integrity of their own process …"[16]  The Claimants equally reject the applicability of the "unclean hands" doctrine and note that the Respondent has not cited any case in which a tribunal has sanctioned post-investment behavior with a full dismissal of the claimant's case.

### 5.2. Tribunal's Analysis

87.    The law to be applied by the Tribunal is determined by the Treaty.  The Treaty is an international instrument that to the extent it requires interpretation will be interpreted by the Tribunal in accordance with the provisions of the Vienna Convention on the Law of the Treaties ("**VCLT**") to which both State parties to the Treaty have acceded.  As the Parties admit in their exchanges, the domestic law of the State may also be relevant.  The extent of its relevance is a matter of dispute between the Parties, particularly on the question of whether to be protected an investment needs to be made *and operated* according to the law of the host State.  This issue and the disputed applicability of international policy relate to the defence of illegal conduct and the Tribunal will address both matters as needed in its consideration of the Respondent's defence.

### 5.3. Clarification on the Nature of the Respondent's Illegality Claims

88.    As part of its defence, the Respondent has pleaded that the Tribunal should dismiss all claims because of the illegal activities in which the Claimants allegedly engaged, including bribery, embezzlement and money laundering.  The Claimants have at times characterized

---

[15] *Ibid.*, para. 249.
[16] *Ibid.*, para. 252.

this defence as a "request for dismissal … for lack of jurisdiction" because at inception or in its operation the investment of the Claimants was illegal.[17]

89.     As the Tribunal understands it, the present submission of the Respondent to dismiss all claims on grounds of illegality is not an objection to the Tribunal's jurisdiction, but an affirmation of the Tribunal's jurisdiction to consider the claims on their merits which, the Government says, ought to be dismissed because of the Claimants' illegal conduct.

## 6.   THE RESPONDENT'S THRESHOLD POSITION IS THAT THE CLAIMS OUGHT NOT TO BE ENTERTAINED BY REASON OF THE CLAIMANTS' BRIBERY AND CORRUPTION

90.     At the threshold of its argument, the Respondent contends that the claims should be dismissed in their entirety, in part because of corruption in the creation of the investments, and in part because of corruption in the course of performance of the various PDAs and unsuccessful initiatives by the Claimants to obtain licences for new gambling facilities.

91.     The Respondent alleges that the principals behind the Claimants, Mr. John Baldwin and Mr. Sean Scott, were quite brazen about how to do business in a culture of corruption. However, Mr. Baldwin says, they steadfastly resisted.  In this respect, Mr. Baldwin testified that:

> Laos can be quite a corrupt country … As I met fellow businessmen in Laos, I came to realize that almost every major business operating in Laos has paid money under the table for their concessions, or their flat tax agreements or other Government approvals.  Sanum, however, has not.[18]

92.     In his re-examination at the Hearing, Mr. John Baldwin made an even more emphatic denial of corrupt activities: "I gave strict instructions always that we weren't paying any bribes."[19]

---

[17] Claimant's Reply, para. 13.
[18] John Baldwin Sixth Witness Statement (ICSID), dated 9 May 2014, para. 5.
[19] Mr. Baldwin testified as follows in re-examination by his counsel:

93.   The allegations of bribery in the course of making the initial investment include:

(a)   an alleged bribe of US $30,000 to Laotian tax authorities to obtain approval of the original 2009 Flat Tax Agreement which the Claimants regarded as essential to their investment in their flagship Savan Vegas Hotel and Casino project;

(b)   payment of US $25,000 to Government officials to procure a licence for the Claimants' proposed Thakhaek Slot Club and Welcome Centre.[20]

94.   The allegations of bribery in the course of performance of the PDAs and related initiatives include:

(a)   payment of US $875,000 to the Claimants' consultant in the Laos private sector, Madam Sengkeo Phimmasone, to bribe Government officials to stop an audit by Ernst & Young ("**E&Y**") of Savan Vegas in order to avoid disclosure of the Claimants' illegal activity[21] and witness tampering (Madam Sengkeo Phimmasone refused to make herself available to testify in these proceedings.  The Respondent alleges she was paid by the Claimants to stay away);

(b)   payment of bribes totalling US $ 21,000 in 2012 to Government officials in an effort to obtain an extension of the 2009 Flax Tax Agreement;[22]

---

Q. Mr. Branson asked you a number of questions about the contracts, the consulting contracts, that Mr. Bouker had that Marty Gersten had written up and you said you hadn't seen them, but now that you've seen them, do they cause you to believe that Mr. Bouker was being dispatched to go and bribe people?
A. No.
Q. And why is that?
A. Well, first and foremost, **I gave strict instructions always that we weren't paying any bribes**.  That's number one.  I just don't do it and I'm a stubborn guy and I just don't – I tell my staff the same thing always, you know, it's a slippery slope and you can't start down it, so that's number one. But number two is, you know, fair value [in terms of a success fee] for result for work given.  I mean, if he [Mr. Bowker] has the contacts to do this, more power to him.  (emphasis added)
Amended Transcript, 5 September 2018, p. 168, 8-19.
[20] Respondent's Rejoinder, paras. 10-11, 15-17.
[21] Respondent's Counter-Memorial, para. 73; Respondent's Rejoinder, para. 9(i) and (vii).
[22] Respondent's Counter-Memorial, paras. 90-93; Respondent's Rejoinder, paras. 10,15, 19.

(c)     offer of a US $7 million bribe to the Prime Minister of Laos for approval of a licence to establish a casino in the capital city of Vientiane;[23]

(d)     a bribe of US $80,000 to the Governor of the Province of Champasak to approve a slot club at Chong Mek;[24]

(e)     bribes totalling US $106,000 to Government officials to close the Paksan Slot Club as a way of bringing pressure on ST Holdings to settle their differences;[25]

(f)     a claim (now abandoned) of payment of unspecified amounts of bribes to Government officials stationed at Savan Vegas to turn a blind eye to unlawful gambling by Lao citizens;[26]

(g)     an allegation (now abandoned) of payment of unspecified amounts to Thai border officials to facilitate Thai gamblers crossing into Laos to gamble and return unhindered with their winnings;[27] and

(h)     additional allegations (now abandoned) that the Claimants engaged in money laundering and embezzled funds from Savan Vegas by use of phoney loans.[28]

95.     In addition, the Respondent alleges that the Claimants paid US $120,000 to Cambodian officials for a Cambodian lottery licence, bribed Cambodian officials to obtain Cambodian diplomatic passports and bribed Cambodian customs officials to ignore unlawful border crossings.  These allegations were designed to demonstrate that the principals of the Claimants are "bad people" with a predisposition to use bribery and corruption to advance their financial interests.  The facts underlying the Cambodian allegations are so far removed from the allegations of corruption in Laos, that the allegations relating to Cambodia are irrelevant and will not be considered further.

---

[23] Respondent's Counter-Memorial, para. 97.
[24] Respondent's Counter-Memorial, paras. 100-101; Respondent's Rejoinder, paras. 21-22.
[25] Respondent's Counter-Memorial, paras. 102-104.
[26] Respondent's Counter-Memorial, para. 110-113.
[27] Respondent's Counter-Memorial, paras. 114.
[28] Respondent's Counter-Memorial, paras. 115-199, 133, 135, 338.

### 6.1. Evidence of Bribery and Corruption is Relevant in Respect of Criminality Both at the Time of Investment and During Subsequent Performance

96.     The Parties agree that investment tribunals are rightly sensitive to allegations of corruption. They agree that the Respondent bears the burden of proof.  They disagree on the standard of proof, *i.e.* whether a balance of probabilities is sufficient or whether corruption must be established to the more demanding standard of "clear and convincing evidence" of corruption.  They also, of course, disagree on the facts.

97.     There is no doubt that bribery and corruption are contrary to the domestic laws of Laos.[29]

#### 6.1.1.   The Respondent's Argument

98.     The Respondent asserts that the Claimants are not legally entitled to maintain any of their claims in these proceedings as a matter of *ordre public international* and public policy.[30] Corruption, the Respondent argues, is relevant to the initial investment but also to the investor's subsequent conduct in relation to the investment in the host country.[31]

---

[29] **Lao Penal Code**

Article 157:

Any person bribing or agreeing to bribe a civil servant shall be punished by six months to two years of imprisonment and a fine equal to the amount or value of the bribe.

    In the event of a substantial bribe, the bribed civil servant, the briber and the person who agrees to give the bribe shall be punished by three to five years of imprisonment and fines equal to twice the amount or value of the bribe.

    Bribe intermediaries shall be punished by six months to two years of imprisonment and fines equal to the amount or value of the bribe.

LHRA-15.

**Lao Law on Investment Promotion**

Article 73:  Prohibited actions for investors:

    Investors are prohibited to perform the following actions:

    1. Give bribes to officers and government officials who have responsibilities for concerned tasks;

LHRA-21**.**

[30] *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award ("**World Duty Free v. Kenya**"), at para. 188(3), LHRA-31.

[31] Referencing ICC Dossier: *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 11, at para. 31, LHRA-155 (citing *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/10/19, Award, 18 November 2014, at paras. 129-132.):

    31. The approach to bribery is different in investment arbitrations, where jurisdiction does not derive from a contract, but rather from an investment treaty.  In these cases, validity of contracts is not the question.  The

99.     The difference is that corruption in the making of the investment will raise issues of jurisdiction for the Tribunal, whereas subsequent acts of corruption will go to a claimant's entitlement for relief under the BIT.[32]

100.    In particular, the Respondent relies on the analysis in *Metal-Tech v. Uzbekistan*:

> While reaching the conclusion that the claims are barred as a result of corruption, the Tribunal is sensitive to the ongoing debate that findings on corruption often come down heavily on claimants, while possibly exonerating defendants that may have themselves been involved in the corrupt acts.  It is true that the outcome in cases of corruption often appears unsatisfactory because, at first sight at least, it seems to give an unfair advantage to the defendant party.  The idea, however, is not to punish one party at the cost of the other, but rather to ensure the promotion of the rule of law, which entails that a court or <u>tribunal cannot grant assistance to a party that has engaged in a corrupt act</u>.[33]  (emphasis added)

101.    The Respondent also relies, more generally, on the doctrine of "clean hands".  The Claimants' misconduct is sufficient, it is said, to deny them the assistance of investor-state arbitration.

### 6.1.2.  The Claimant's Argument

102.    The Claimants point out that the Tribunal's jurisdiction is founded on the BIT and neither the Netherlands nor the Chinese BIT contains a provision authorizing a tribunal to deny the treaty's protection on the basis that the claimant/investor engaged in corruption.  If the BITs provide no authority to dismiss, the Tribunal would have to base its decision on customary international law.  However, the lack of "clean hands" is neither a recognized

---

issue is whether an investor who has incurred in corrupt practices when making <u>or performing the investment</u> can still enjoy protection under the relevant investment treaty.  And the answer is no.  (38)  Investment arbitration has initiated and led the movement of zero tolerance towards corruption.

[32] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, at para. 345, LHRA-29:

> If, at the time of the initiation of the investment, there has been compliance with the law of the host state, allegations by the host state of violations of its law **in the course of the investment**, as a justification for state action with respect to the investment, **might be a defence** to claimed *substantive* violations of the BIT, but could not deprive a tribunal acting under the authority of the BIT of its jurisdiction. (emphasis added)

[33] Respondent's Opening Submission, Slide 143, citing *Metal-Tech Ltd. v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, 4 October 2013, at para. 389, Exhibit LHRA-157.

rule of customary international law nor a general principle of international law and thus affords no authority to dismiss.[34]

103.    The Claimants acknowledge that corruption in **the establishment of an investment** can render a claim inadmissible because treaty protections are only available for valid investments recognized under the treaty (based upon either an explicit or implied legality requirement).[35]   The Claimants deny corruption but in any event deny any causal connection between the acts of *alleged* corruption and these claims.  The Respondent only concocted its corruption allegations **after** the arbitrations were commenced and in any event has failed to govern itself in a manner consistent with its international obligations, including due process and good faith, and the prosecution of bribe-takers as well as alleged bribe-givers.[36]

104.    The Claimants' principal, Mr. John Baldwin, denied the applicability of the "red flags" approach to the investments in issue here:

> Q. Is it possible that when you enter into a consulting contract like this, that if the event is achieved, the consultant is sent the money and the consultant then is instructed to pay it to certain government ministers so that it keeps the company one step removed from proof of the bribe?  Isn't that how it works, Mr. Baldwin?
>
> A. That's a possibility, although it didn't happen here.[37]

### 6.1.3.   The Tribunal's Ruling

105.    The Tribunal considers that proof of corruption at any stage of the investment may be relevant depending on the circumstances.  While the UNCAC applies to States rather than private parties, it embodies what has become a principle of customary international law

---

[34] Citing *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL PCA Case No. AA 227, Award, 18 July 2014, at paras. 1362-1363, CLA(B)-395.
[35] Claimant's Closing Submission, Slide 3.
[36] Claimant's Opening Submission on Respondent's Corruption Allegations, Slide 4.
[37] Amended Transcript, 5 September 2018, p. 91, 16-25.

applicable, according to the OECD, to root out corruption used "to **obtain** or **retain business** or other undue advantage **in relation to the conduct** of international business."[38]

106.    The Respondent also relies on a generalized doctrine of "clean hands" which is a metaphor employed as a defence to equitable relief in common law jurisdictions.  Incorporation of such a general doctrine into investor-State law without careful boundaries would risk opening investment disputes to an open-ended, vague and ultimately unmanageable principle.  However, putting aside the label, serious financial misconduct by the Claimants incompatible with their good faith obligations as investors in the host country (such as criminality in defrauding the host Government in respect of an investment) is not without Treaty consequences, both in relation to their attempt to rely on the guarantee of fair and equitable treatment, as well as their entitlement to relief of any kind from an international tribunal.

### 6.2. The Applicable Standard of Proof

#### 6.2.1.  The Respondent's Argument

107.    The Respondent notes that many international tribunals have recognized the difficulty of "proving" bribery and corruption.  In the nature of things, the parties to such transactions are generally careful to leave no paper trail or other direct or documentary evidence.  As a result, if corruption is to be combatted effectively, it is necessary to rely on inferences from circumstantial evidence.   A reasonable approach is to identify "red flags" which, if

---

[38] *UN Convention Against Corruptio*n, Article 16(1), LHRA-16.  See also *OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions*, Article 1(1), Exhibit LHRA-136:

Each Party shall take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally to <u>offer, promise or give</u> any undue pecuniary or other advantage, whether directly or through intermediaries, to a foreign public official, for that official or for a third party, in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain <u>or retain business</u> or other improper advantage in the conduct of international business. (emphasis added) .

See also ICC Dossier:  *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 11, at para. 34, Exhibit LHRA-155:

It is now undisputed that a finding of corruption when making <u>or performing an investment</u> will lead to <u>dismissal of claimant's claims</u> and to a loss of any protection afforded by the treaty. (emphasis added)

Respondent's Opening Statement, Slide 146.

established, require the alleged perpetrators to provide an exculpatory explanation of otherwise suspicious conduct.  In *Metal-Tech v. Uzbekistan*,[39] for example, the tribunal considered probative of corruption the Government's evidence of substantial payments to a consultant where:

(a)     the consultant lacks experience in the sector,

(b)     the consultant is not a resident of the country where the project is located;

(c)     the consultant has no significant business presence or experience within the country;

(d)     the consultant requests "urgent" payments and/or unusually high commissions;

(e)     the consultant requests payments be made in cash, be made in a third country, to a numbered bank account, or to some other person or entity than the one with whom the agreement was signed;

(f)     the consultant has a close personal/professional relationship to the Government that could improperly influence the decision.[40]

### 6.2.2. The Claimant's Argument

108.     The Claimants contend that the applicable standard of proof of corruption in international law is "**clear and convincing evidence**" which must consist of "substantial facts" not mere "inferences".[41]  Relevance is placed on *Waguih Elie George Siag and Clorinda Vecchi v.*

---

[39] *Metal-Tech v. Uzbekistan*, Exhibit LHRA-157, at para. 293.  See also ICC Dossier *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 5, Exhibit LHRA-160.
[40] *Metal-Tech v. Uzbekistan*, Exhibit LHRA-157, para. 293.
[41] *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, Exhibit CLA(B)-441, at para. 424:

  … It is not sufficient to present evidence which could possibly indicate that there might have been or even probably was corruption.  Rather Claimants have to *prove* corruption…[T]he issue is not one of inference, and the Tribunal considers that Claimants have not met their burden of proof in this regard.

See also *Gustav FW Hamseter GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exhibit LHRA-26, at para. 134.

*The Arab Republic of Egypt*, where the tribunal held that "the applicable standard of proof is greater than the balance of probabilities but less than beyond a reasonable doubt."  The term favoured by the Claimants is "**clear and convincing evidence**." [42]

### 6.2.3.  The Tribunal's Ruling

109.  The Tribunal acknowledges the difficulty of proving corruption as well as the importance of exposing corruption where it exists.  In the nature of the offence, the person offering the bribe and the person accepting it will take care to cover their tracks.  Nevertheless, given the seriousness of the charge, and the severity of the consequences to the individuals concerned, procedural fairness requires that there be proof rather than conjecture.  The standard of "probabilities" requires the trier of fact to stand back and make an overall assessment.  The requirement of "clear and convincing" evidence puts the focus more closely on the building blocks of the evidence to ensure a rigorous testing.

110.  In the Tribunal's view there need not be "clear and convincing evidence" of every element of every allegation of corruption, but such "clear and convincing evidence" as exists must point clearly to corruption. An assessment must therefore be made of which elements of the alleged act of corruption have been established by clear and convincing evidence, and which elements are left to reasonable inference, and on the whole whether the alleged act of corruption is established to a standard higher than the balance of probabilities but less than the criminal standard of beyond reasonable doubt, although of course proof beyond a reasonable doubt would be conclusive. This approach reflects the general proposition that the graver the charge, the more confidence there must be in the evidence relied on.[43]

---

[42] *Waguih Elie George Siag & Clorinda Vecchi v. Arab Republic of Egypt,* ICSID Case No ARB/05/15, Award, 1 June 2009, Exhibit CLA(LH)-069, at para. 326.
[43] *See Libananco v. Turkey* (Exhibit CLA(LH)-168), para. 125*; Rompetrol v. Romania* (Exhibit CLA(LH)-173), para. 182; both relying on the Separate Opinion of Judge Higgins in the Oil Platforms case, ICJ Reports 1996, at 856.

41

### 6.3. Failure of the Respondent to Investigate and Prosecute Persons who Allegedly Accepted Bribes

111.   As the Claimants point out, the Respondent has brought no prosecutions against any Government official said to be on the receiving end of the bribes.  Nor is there before the Tribunal any evidence of a serious criminal investigation of anyone other than the principals of the Claimant, Mr. John Baldwin and Mr. Sean Scott.

112.   Conviction of its own officials would not estop the Government from pursuing the Claimants as bribe-givers.  However, in this case, the Tribunal finds it disturbing that **no** prosecutions have been brought against **any** persons alleged to have accepted bribes, nor has there been evidence of due diligence in any investigation.  These omissions are relevant to the credibility of the Government's allegations, as will be seen.

#### 6.3.1.   First Allegation – Bribes to Obtain the 2009 Flat Tax Agreement

##### 6.3.1.1.   The Respondent's Argument

113.   The Claimants have repeatedly acknowledged that the Flat Tax Agreement ("**FTA**")[44] was essential to the economic profitability of Savan Vegas.  Mr. John Baldwin testified in Singapore that the Claimants would not have built the casino without an FTA:

> Q. And would you have built the Savan Vegas casino for $25 million, $30 million if that was the tax you had to pay, if the government refused to give you a flat tax agreement?
>
> A. No.[45]

114.   It is alleged that to obtain the original 2009 FTA, a bribe of US $30,000 was paid to Ms. Manivone or Mr. Khamphai, senior officials with the Government tax department, through the Claimants' intermediary or consultant, Madam Sengkeo.

---

[44] Flat Tax Agreement between Laos and Savan Vegas, dated 21 September 2009, Exhibit C(B)-007.
[45] Amended Transcript, 5 September 208, p. 89, 12-16.

115.     The FTA was of great value to the Claimants as it limited most types of tax to a flat sum of US $745,000 per year regardless of the profits made by the multi-million-dollar casino operation.

116.     The chronology is as follows:

| DATE | ACTIVITY |
|------|----------|
| 29 December 2008 | Prime Minister approves FTA in principle |
| 21 September 2009 | Flat Tax Agreement signed. |
| 22 September 2009 | Internal Sanum e-mail records that Mr. Khamphai requested wire of "agreed payment" to Madam Sengkeo's account "approved" by Mr. Baldwin.[46] |
| 24 September 2009 | Internal Sanum e-mail records that **the** "**tax people** are requesting […] $30,000 USD […] to get the flat tax approval."[47] |
| 7 October 2009 | Internal Sanum e-mail records that Madam Sengkeo "has provided **her daughter's** bank account" information.[48] |
| 8 October 2009 | Internal Sanum e-mail records that Mr. Baldwin instructed the disbursement of funds "by wire" for "service[s] partially rendered".  Amounts of $10,000 and $20,000 were disbursed from the account "by wire".[49] |

117.     According to the Respondent, the sequence of dates, and the use of the daughter's bank account in lieu of Madam Sengkeo's own account, raise "red flags".

118.     While the FTA had been agreed to in principle in December 2008, Mr. John Baldwin testified that the deal was not done, because "we needed to get the flat tax agreement reduced into a formal document at that specific time."[50]  Accordingly, it would have been

---

[46] Emails regarding Flat Tax, Exhibit LHRE-152.
[47] *Ibid*.
[48] *Ibid*.
[49] *Ibid*.
[50] Mr. John Baldwin testified as follows:
   Q. What was the agreement's substance?  I mean, the agreement with Madam Sengkeo, what was the substance of that agreement?

quite understandable for the payment of a bribe to be delayed until October 2009 when the FTA was signed, as opposed to December 2008 when it was purportedly approved in principle by the Government.

119.    In cross-examination, Mr. John Baldwin denied any illegal payment to Madam Sengkeo but according to the Respondent, Mr. Baldwin's explanation that the reference to payment in October 2009 of US $30,000 to the "**tax people**" meant payment to Madam Sengkeo for her own benefit rather than as a bribe for tax officials is (according to the Respondent) manifestly absurd.  In this respect, Mr. John Baldwin testified as follows:

> Q.  Isn't this a statement to the CFO of Sanum/Savan Vegas to pay a bribe of $30,000 to a tax official in the Ministry of Finance?
>
> A. No.
>
> Q. How do you interpret it? What does it mean?
>
> A. That the $30,000 success fee was supposed to be paid to Madam Sengkeo and her tax people that were with her.
>
> Q. She is "the Tax people"?
>
> A. Yes.
>
> Q. Did she work for the government then?
>
> A. No.
>
> Q. She didn't? She's not an employee of the Ministry of Finance?
>
> A. No.[51]

---

A. I believe – I – I don't know specifically, but I believe that we needed to get the flat tax agreement reduced into a formal document at that specific time, but Madam Sengkeo's engagement went back nearly a year, is my recollection, and that she helped, through that whole period, to get the flat tax agreement.
Q. What was the agreement? Why was she getting 30,000? Why not 50,000?
A. Well, she agreed to take $30,000.
Amended Transcript, 5 September 2018, p.69, 16-25 to 70, 1-3.
[51] Amended Transcript, 5 September 2018, p. 66, 1-15.

120.    The Respondent adds that the US $30,000 may have gone to Madam Sengkeo in the first instance, but in the Respondent's view, the coincidence of timing with Sanum's apparent need to ingratiate itself with Government officials is fatal to Mr. Baldwin's credibility.

### 6.3.1.2.    The Claimant's Argument

121.    The Claimants contend that payment of US $30,000 to Madam Sengkeo was a "success fee" for obtaining the FTA where previous intermediaries had failed.[52]  Mr. Baldwin strongly denied any impropriety:

>    Q. Down at the bottom of the page it says:
>
>    "Dear Billy and Team, Mr Khamphai of the Tax Department and Mdm Sengkeo had just informed us that Joe had picked up the flat tax document at his office [meaning Mr Khamphai's] since 9AM this morning...
>
>    However, he has asked us to wire the agreed payment to Madam Sengkeo's account as followed..."
>
>    And then they give the account number. So isn't this interesting, that the day that the flat tax agreement is delivered to your employee, he asked that $30,000 is wired that day?
>
>    A. Well, my reading of this is that "he" is Joe.
>
>    Q. And who is he saying that the money should be paid to?
>
>    A. Madam Sengkeo.[53]  (emphasis added)

---

[52] Mr. Baldwin testified in his Second Witness Statement in the SIAC case of 8 June 2015 as follows:

  15. The Government alleges that I authorized payments totaling US $30,000 to Madame Sengkeo Phimmasone, as a bribe to obtain the flat tax agreement issued on 1 September 2009 for Savan Vegas.  This too is false.  **The payments represented a success fee to Madam Sengkeo** for her efforts to help Savan Vegas negotiate a Flat Tax Agreement with the Lao Government – a project on which she had worked since at least July 2008.
  16. Initially, it was the ST Group – then our local partner in Laos – that was responsible for obtaining a flat tax agreement for Savan Vegas.  However, it failed to do so, thus by mid-2008, we took it upon ourselves to negotiate such an agreement with the Lao Government.  In order to have local Lao expertise to assist us, **Savan Vegas offered a success fee to Madam Sengkeo** to lobby for a satisfactory Flat Tax Agreement for Savan Vegas.  Madam Sengkeo was a partner of ST, which is how I came to know her.  I discovered that she had many high-level connections in the Lao Government.  This made her a natural choice for this consulting engagement.  (emphasis added)

John Baldwin Second Witness Statement, 8 June 2015, paras. 15-16, Exhibit LHRE-159.
[53] Amended Transcript, 5 September 2018, p. 67, 2-18.

122.    Mr. John Baldwin testified that there was no reason to bribe any Government employee in September 2009 as the Prime Minister had already agreed to a flat tax agreement in December 2008.[54]

### 6.3.1.3.    The Tribunal's Ruling

123.    The Respondent's case is speculative rather than substantial.  Madam Sengkeo was in the consulting business.  Consultants are paid.  While the Claimants never produced a "consulting agreement" with Madam Sengkeo, the evidence is that it is not unusual for consultants to insist on a success fee as part of their remuneration.  The effort to obtain an FTA was successful.  It was likely worth millions of dollars to the Claimants in reduced taxes.  In that context, payment of US $30,000 in 2009 is not a disproportionate "success fee".  Moreover, no one was prosecuted in this affair.  Even if Madam Sengkeo did not cooperate with the Government, why was her daughter (the owner of the bank account) not investigated?  What is the daughter's explanation?  The evidence of corruption in this instance is neither clear nor convincing.  The bribery allegation in connection with the FTA is not established to the necessary standard for such a serious charge.

### 6.3.2.    Second Allegation – Bribes to Extend the Flat Tax Agreement After Expiry of the 5-Year Term

#### 6.3.2.1.    The Respondent's Argument

124.    On 18 March 2011, Savan Vegas submitted its proposal to extend the FTA, which was due to expire on 31 December 2014.  Six days later, on 24 March 2011, the Claimants paid US $21,000 to Mr. Bouker Noutharath, a retired hospital worker from Olympia, Washington State, United States of America, who had returned to live in Laos.  He had no

---

[54] Mr. Baldwin testified:

    Q. Would there be any reason to have to bribe anyone when the Prime Minister had already approved your flat tax?
    A. You know, there's no reason to and, plus, obviously, the Prime Minister's office was watching this.  The local tax people were watching this, the finance department's watching this.  This was a significant project and lots of people were watching it and there's no way.  You just wouldn't – couldn't happen.

Amended Transcript, 5 September 2018, p. 151, 2-11.

experience as a "consultant" but had good contacts within the Government.  On 4 March 2011, he was retained by Savan Vegas[55] as a consultant to lobby in favour of an extension of the FTA.  Mr. Baldwin says Mr. Bouker was promised a success fee substantially in excess of US $21,000, but Mr. Bouker, who agreed to cooperate with the Government, testified that:

> I have seen the entry in the general ledger that I was sent $21,000 on March 24, 2011.  The entry says "prof fee re flat tax acceptance – Brian Nonthavet."  RE-131.  I remember that Sanum was concerned about extending a flat tax agreement, but **I was not involved** in that issue.  **I was sent the $21,000 to deliver it to a government person.**  I remember it was Mr. Paoa [of Savan Vegas] who asked me to make this payment about the tax issue but **I cannot remember the name of the Government person** who I gave this payment too.[56]  (emphasis added)

> * * * * *

> These contracts are for fraud reasons.  They were drafted and sent to me by lawyer Martin Gersten…They were to provide a cover for the bribes Sanum intended to pay to have the Government extend the Flat Tax Agreement and to obtain the Thakhaek slot club licence.[57]

125.   The Respondent believes the unidentified "Government Person" was Ms. Manivone but Mr. Baldwin testified he was "sure" this was not so:

> Q. Do you know that at the time you were negotiating with Madam Manivone in the tax department of the Ministry of Finance?

> A. Well, we were – negotiated with Madam Manivone from 2007 clear through, you know, into 2012.

> * * * * *

> Q. Isn't it true that Mr Paoa asked Bouker to deliver $21,000 [in 2012] to Ms Manivone in the tax department to help in negotiations for the flat tax agreement?

> A. I don't think so.

---

[55] Bouker Nonthavet Third Witness Statement, 23 May 2014, Exhibit 4, Respondent's Opening Submission, Slide 161.
[56] Bouker Nonthavet First Witness Statement, 2 April 2014, at para. 7.
[57] Amended Transcript, 5 September 2018, p. 90, 20-25.

Q. But you're not sure?

A. I'm sure…[58]

### 6.3.2.2.   The Claimant's Argument

126.   Mr. Bouker received a legitimate consulting mandate.  By e-mail dated 21 March 2011, he requested US $21,000 as "an advance".  His bank records do not show a withdrawal of US $21,000 but withdrawals of three different amounts on 28 March (US $9,500 cash), 30 March (US $9,000 to his son) and 4 April (US $2,135 cash).  Mr. Bouker is a dissatisfied former employee whose testimony is not credible.

### 6.3.2.3.   The Tribunal's Ruling

127.   There are inconsistencies in Mr. Bouker's evidence and it is significant that he can remember nothing about (or is otherwise unwilling to identify) "the Government Person" to whom he said he handed US $21,000.  There are too many loose ends to his story.  There is no evidence that Madam Manivone (the presumed recipient) or anyone else was prosecuted.  In the Tribunal's view, the Respondent's evidence does not establish by clear and convincing evidence that a US $21,000 bribe was offered by Mr. Bouker to any Government official as alleged.

### 6.3.3.   Third Allegation – The Claimants Paid US $500,000 in Bribes in 2012 to (i) Shut Down the E&Y Audit of Savan Vegas and (ii) to Cause the Government to Shut Down the Thanaleng Slot Club to the Disadvantage of ST Holdings

128.   On 8 July 2012, Mr. Baldwin wired Sanum's Chief Financial Officer, Mr. Clay Crawford, that "Savan has an extraordinary expense of $500,000 this week.  I've tell you about it when we speak on the phone, but please think about our cash situation."[59]

---

[58] Amended Transcript, 5 September 2018, p. 86, 7-24.
[59] E-mail from Mr. John Baldwin to Clay Crawford, 8 July 2012, Exhibit LHRE-154.

129.   Mr. Baldwin accepts that the sum of US $500,000 was subsequently sent to Vientiane including US $300,000 cash in a backpack delivered to Madam Sengkeo by his personal assistant, Bruce Douglas.[60]

### 6.3.3.1.    The E&Y Audit

130.   Mr. Baldwin acknowledges ordering Mr. Douglas, to fly to Vientiane with US $300,000 cash.  It is established that US $300,000 was subsequently deposited in Madam Sengkeo's bank account.  She subsequently deposited US $30,000 in her bank account in New York.

131.   The Respondent's allegation is that the balance of US $270,000 was paid by Madam Sengkeo to Government officials to stop the E&Y audit of the Savan Vegas which Mr. Baldwin considered part of a Government move to get rid of Sanum and take over the Claimants' gambling assets without compensation.[61]

---

[60] Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, pp. 207-208, Exhibit LHRE-160:

Q. You ordered Mr. Douglas on that day, or the day before, rather, the same day you had to have the 200,000 on 11 July you ordered Mr. Douglas to get into an airplane in Cambodia, fly across the border with USD 300,000 in a suitcase, didn't you?
A. In a backpack.
Q. You have USD 500,000 going into Vientiane in a two-day period in cash?
A. Yes.

[61] John Baldwin testified in his Third Witness Statement, 22 July 2013, at para. 5:

…"Even those few Government officials who will still speak with me have admitted that we have been the target of a deliberate campaign to strip Sanum of its investments in Laos.  The objective of these efforts appears to be to leave the successful businesses, in which we invested so much and which we spent years developing, in the hands of our local commercial partner, the ST Group...and the senior Lao Government officials who have intimate business and familial connections with ST."

### 6.3.3.1.1.    The Respondent's Argument

132.    The Respondent points out that the alleged "loan" to Madam Sengkeo was undocumented.[62]  Only US $15,000 has been repaid.[63]  Mr. Baldwin acknowledges that Madam Sengkeo has not been asked by the Claimants to repay the balance.  The US $30,000 deposit in New York was 10% of the US $300,000 transfer.  Madam Sengkeo was a "ten percenter", and her receipt of US $30,000 indicates that bribes of US $270,000 were paid.

133.    The bribe succeeded, according to the Respondent. On 12 July 2012, Ernst & Young was ordered by unidentified Government officials to stop work on its audit of Savan Vegas.[64]  The E&Y audit would have disclosed the Claimants' illegal activities (subsequently

---

[62] See testimony of Mr. John Baldwin, Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 209, Exhibit LHRE-160:

   Judge Barkett: Can I ask a question?  Would there be loan documents evidencing this loan?
   A. **Not on this loan.  We have made her other loans that there are.  This was – she was part owner of Paksong Vegas and a part owner of Savan Vegas, small pieces.  We had – she helped us with a lot of things, but she and I become very close friends.  When she called us, she said she needed it and I responded to that need.**  (emphasis added)

[63] Testimony of Mr. John Baldwin, Amended Transcript, 5 September 2018 at p. 41, 14-25 to p. 42, 5-10:

   Q. …first of all, your $300,000 loan that you say you gave Madam Sengkeo in 2012, are there any loan documents for that loan?
   A. No, there are not.
   Q. Has she ever repaid it?
   A. She – she paid me 500,000 Thai baht.
   Q. That's US $15,000?
   A. US $15,000.
   Q. Do you have any record of that payment?
   A. I think so – yeah, I do.
   Q. Have you ever produced it? You have been asked….
   * * * * *
   Q. Okay. But the other – let's assume she gave you US $15,000. The other 285,000 that you lent her in 2012 has not been repaid?
   A. It has not been repaid.
   Q. And we're now in 2018?
   A. Yes.

[64] Letter from Ernst & Young to the Ministry of Finance, Exhibit LHRE-53:

   In relation to our final report, we also feel it necessary to remind the Inspection Committee that, since we were instructed by your goodself on 10 July 2012 to cease our fieldwork at Savan Vegas Hotel & Casino (SVC) and to refrain from receiving any additional information and/or documents from SVC on the same day, our final report will only contain our preliminary findings and/or observations for the work performed on documents and information received by us from SVC up till and including 10 July 2012.

uncovered by a BDO audit after the Government ousted the Claimants from the casino) including (the Government alleges) embezzlement and money laundering.

### 6.3.3.1.2. The Claimant's Argument

134.   The Claimants say the US $300,000 was a "loan" to Madam Sengkeo.  The New York deposits are unrelated.  Madam Sengkeo was closely involved with ST Holdings.  There had been a falling out.  She thus had an "urgency" for funds when ST Holdings malevolently cut off Madam Sengkeo's regular source of income.[65]  Mr. Baldwin was a loyal friend.

### 6.3.3.1.3. The Tribunal's Ruling

135.   Mr. Baldwin's explanation of the US $300,000 payment to Madam Sengkeo is not credible. It is clear on the evidence that Mr. Baldwin and his CFO, Mr. Clay Crawford, were concerned about the threat to Sanum's business posed by the E&Y audit.  Mr. Baldwin had every incentive to influence the Government to call off the E&Y audit in the summer of 2012.  It is simply not plausible, as the Claimants argue, that the E&Y audit was stopped because Government officials had concluded that E&Y had *failed* to find incriminating evidence.  If that were true, the obvious instructions from the Government to E&Y would have been to keep digging not to give up and down tools.

136.   On the other hand, the Claimants had a powerful motive to stop the audit as Mr. Baldwin and Mr. Crawford knew (and the Government merely suspected) of the existence of financial skeletons in the Savan Vegas books later uncovered by the BDO audit.  All in all, the Tribunal concludes that the Claimants got a senior Government official to stop the audit

---

[65] Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 207208, Exhibit LHRE-160/SRE-160:
Q. What was going on in Vientiane in July 2012 that you needed all that cash there except the Thanaleng case was happening about 10 days later and the E&Y audit was terminated the day before.  Those are the two events that I can think of that related to Savan Vegas, what can you think of?
A. **ST had cut Madame Sengkeo off from any income from their investments, because she had helped us over him, he had cut her off from any money and she lives primarily on money from him.  She needed money to pay bills on the hotel she was building.  The USD $300,000 is a loan to her.** (emphasis added)

and that the $270,000 was paid through Madam Sengkeo (i.e. $300,000 less 10%) to that Government person or persons.

137.    That said, the Tribunal is troubled by the fact that the Government has apparently not identified any bribe-*takers*.  The order to E&Y to stop the audit came as a surprise to E&Y and must have been issued by a senior Government source, otherwise the audit would have continued.  The Respondent does not suggest that E&Y took the bribe **but E&Y must know who gave its auditors the order to stop work**.  The evidentiary trail could then have been followed up the chain of command from the Government person who gave the order to identify the person who authorized the order, who could then have been required to provide the Government (and subsequently the Tribunal) with an explanation for the stop work order.

138.    The Respondent has not offered any explanation for this gap in the evidence.  In the circumstances, while the evidence of Mr. Baldwin that Madam Sengkeo required the funds for her personal use is deeply unsatisfactory, so too is the Government's apparent failure even to *attempt* (so far the evidence is concerned) to get to the bottom of the matter, not only potentially to punish the wrongdoers, but to provide solid evidence that a bribe was given and taken by Government official(s) to stop the E&Y audit.

139.    The Tribunal concludes that it is more probable than not that Madam Sengkeo was used as a conduit to bribe Government officials to stop the E&Y audit, but that this conclusion is not established to the higher standard of "clear and convincing evidence".  The Tribunal is satisfied, however, on the lesser standard of probabilities, that Mr. Baldwin involved the Claimants in serious financial illegalities in respect of the halt of the E&Y audit.

### 6.3.3.2.    Payment of About US $200,000 in Bribes to Shut Down the Thanaleng Slot Club

140.    In 2012, the Claimants were experiencing tense relations with their then Laotian partner, ST Holdings.  In part, the tensions related to a profitable slot club at Thanaleng, which ST Holdings agreed to joint venture with Sanum.  The joint venture was to commence at a future date awaiting the expiry of an earlier arrangement ST Holdings had contracted with

a different slot machine supplier. However, when the date for the change-over arrived, ST Holdings refused to proceed with its deal with Sanum.

141. Mr. Baldwin is alleged to have then paid bribes to Government officials through a "consultant", Mr. Anousith Thepsimuong, in an effort to shut down the Thanaleng Slot Club as a pressure tactic to force ST Holdings to negotiate a solution rather than continue with litigation (which the Claimants ultimately lost in the Laotian Courts).

### 6.3.3.2.1.    The Respondent's Argument

142. On 28 July 2012, during the corporate struggle over the Thanaleng Slot Club, the Claimants attempted to obtain leverage over ST Holdings by bribing Government Ministries to shut down the Club. The money was channelled through Mr. Anousith. The sum of US $190,000 was deposited in Mr. Anousith's bank account on 11 July 2012 and a cash withdrawal of US $100,000 was made the following day.[66]

143. Mr. Baldwin testified that Mr. Anousith was paid to lobby "the National Assembly" but this explanation is not credible. The National Assembly has no executive function. Only a Government Minister would have operational authority to issue a stop order against the Thanaleng Slot Club.

144. Mr. Baldwin acknowledged that he could not explain how or why the National Assembly would get involved in such an executive action:

> Q. You say that the National Assembly is going to suspend a licence, but did he [the Deputy Prime Minister] ever explain or did you ever find out how the National Assembly would actually do that?
>
> A. No.[67]

---

[66] Extract of ANZ Bank Statement for Mr. Anousith Thepsimoung, Exhibit LHRE-153.
[67] Amended Transcript, 5 September 2018, at p. 9,23-25 to p. 10, 1-4.

### 6.3.3.2.2.  The Claimant's Argument

145. Mr. John Baldwin readily admits that in July 2012 he was doing what was possible to get the Government to close the Thangaleng Slot Club,[68] including by a written submission to the country's President.  The Claimants say there is no reason to disbelieve Mr. Baldwin's evidence that he was told by the Deputy Prime Minister to lobby the country's National Assembly.[69]

146. Mr. Baldwin denied that money was intended for a Government Minister:

> Q. See, that brings us back to July and this $500,000 pot of money that we have sitting in Vientiane in Madam Sengkeo's bank account – her son-in-law's bank account.  Isn't it true that that money was there to stop the court case from having a judgment – the money was there so you could get the slot club shut down and negotiate with Mr Sithat?
>
> A. The money was specifically earmarked to do lobbying with the National Assembly.
>
> Q. Well, we just established that y**ou have a good friend who is the fourth most powerful person in the country**.  Wasn't the money for him to shut down the club so you could stop the court decision?

---

[68] Mr. Baldwin testified that he wrote to President Choummaly Sayasone requesting the Government to shut down the Thangaleng Slot Club:

"Sanum asks that the Government suspend that the slot machine licence at the Vientiane Friendship Bridge. We believe that a temporary suspension will encourage the parties to negotiate and come to terms so they can work together.  Once the parties have reached an agreement, formed a joint venture that is approved by the relevant ministries, and determine that they can operate the Vientiane…Bridge Slot Club together, the licence would be reinstated.  Until then, Sanum requests your assistance in suspending the licence and allowing time and space to work [together] towards peace with [the] ST Group." Correct?  So, as I said, you were trying to get a space to negotiate your way out of this trouble with ST.
A. Yes.
Amended Transcript, 5 September 2018, p. 7, 19-25 to p. 8, 1-11.

[69] In re-examination, Mr. Baldwin testified about the National Assembly as follows:

MS DEITSCH-PEREZ: You spoke with Mr Branson about the Thanaleng lobbying.  Can you tell us where you first got the idea to lobby the assembly with respect to Thanaleng?
A. Yeah.  I was having breakfast with Deputy Prime Minister Somsavath – we were having oatmeal – and he – I said I got – I have to get – make peace with Sithat somehow and I – how do we do it and he said, you know, it's a tough row, because, you know, he's joined at the hip with Bounnhang – you know, with vice-president Vorachith, Bounnhang Vorachith, and he said I – there's not very many people that are going to be able to help you with this, you've got to make peace with Sithat and Vorachith, so I said, "Well, who can help me do that?", and he said, "Well, two places – the politburo and the National Assembly", and he said the politburo, "That's difficult, so I would suggest that you reach out to the National Assembly."
Amended Transcript, 5 September 2018, p. 171, 3-22.

A. No.[70]  (emphasis added)

147.    The Claimants argue that there is no evidence that Mr. Anousith paid money to any Government official.  He received fees as a consultant to lobby the National Assembly to shut down the Thanaleng Slot Club.  He was entitled to spend that money as he wished. Laos is a cash economy.  Payment of large amounts of cash in respect of legitimate transactions is not unusual.[71]  Cash does not signal illegality.

### 6.3.3.2.3.    The Tribunal's Ruling

148.    Once again, the payment to Mr. Anousith is deeply suspicious.  There is no documentation of any consultancy.  There is no explanation of the work for which almost $200,000 were paid to him and deposited in his personal bank account.  The mandate to lobby the "National Assembly" seems far-fetched.  Moreover, despite the alleged payment of bribes, the Thanaleng Slot Club was not shut down.  In the circumstances, the Tribunal is unable to find "clear and convincing evidence" that a bribe was made or even offered through Mr. Anousith.  However, on the lower "probabilities" standard, the Tribunal concludes that it is more likely than not that a bribe was paid to an unidentified Government official or officials in an unsuccessful effort to advance the Claimants' agenda at the Thanaleng Slot Club.

---

[70] Amended Transcript, 5 September 2018, p. 15, 3-18.

[71] Testimony of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, pp. 12667-1268, Exhibit LHRE-163:

> **Q. And then the next day, on July the 12th there was a withdrawal of a hundred thousand, correct, in cash?**
> A. It shows a withdrawal of a hundred thousand.
> **Q. What did you tell Mr. Anousith to do with that hundred thousand?**
> A. I didn't tell him to do anything with that money.
> **Q. I see.  Why did you think he took out a hundred thousand of the 193 you just sent him?**
> A. We paid him a fee, we didn't – it's his money to do with as he wishes.
> * * * * *
> **Q. Was his job to get a government minister to shut down the Thanaleng Slot Club?**
> A. No.
> **Q. What was it to do?**
> A. We had hired, we had hired him to lobby the national assembly to ask them to shut down the Thanaleng slot club.  (emphasis added)

### 6.3.4.  Fourth Allegation – The Claimants Arranged for a Further US $575,000 Transfer to Madam Sengkeo to Prevent Her from Testifying in These Proceedings

149.   In 2014, when the initial phase of these proceedings was pending, the Government sought to have Madam Sengkeo testify.  To that end, she was provided with a written assurance of immunity dated 7 May 2014, if she provided "information and documents related to offering of bribery to government of [sic] official(s) who were performing accounting audit activities at Savan Vegas and Casino Co., Ltd."[72]

150.   At a pre-hearing conference on 14 May 2014, the Claimants (amongst other matters) applied to the Tribunal to allow Mr. Baldwin to make a "personal loan" to Madam Sengkeo of US $575,000.[73]  Given the importance and sensitivity of Madam Sengkeo's evidence potentially to be given at the merits Hearing, the Tribunal declined to give its permission for a US $575,000 loan to her from Mr. Baldwin.

151.   The initial Hearing on the merits proceeded in Singapore in June 2014.  Madam Sengkeo did not attend to testify for the Government.

---

[72] Letter of Immunity from Government's Anti-Corruption Office dated 07/05/2014, Exhibit LHRE-140:

**LETTER OF ASSURANCE**
**Re:  Protection of the rights and best interests of individuals who provide information for anti-corruption purpose**
The President of the Government Inspection Committee issues a Letter of Assurance for protection to Ms. Sengkeo Phimmasone, aged 60, a business person, residing at Xangkhou Village, Xaythany District, of Vientiane Capital.  The assurance of protection is for her contribution in the anti-corruption efforts by providing information and documents related to offering of bribery to government of official(s) who were performing accounting audit activities at Savan Vegas and Casino Co., Ltd.  In accordance with Article 08, Chapter I of the Law on Anti-Corruption, the Government Inspection Committee issues this Letter, and informs the ministries and organizations, provinces and domestic and foreign organizations to acknowledge based on this Letter of Assurance for Ms. Sengkeo Phimmasone, and this Letter serves as legal evidence.

[73] See evidence of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1391, Exhibit LHRE-163, Respondent's Opening Submission, slide 182.

### 6.3.4.1.   The Respondent's Argument

152.   Mr. John Baldwin, having been denied the Tribunal's permission, arranged for a third party, Gary Morris,[74] to make Madam Sengkeo a US $575,000 "loan" which was undocumented and was not in fact a loan,[75] but an inducement to keep Madam Sengkeo from testifying.  There is no evidence that the Claimants' loan of US $300,000 in July 2012

---

[74] Testimony of Mr. John Baldwin, Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 213, Exhibit LHRE-163:

Mr. Branson: Mr. Baldwin, did you ever provide that additional loan guarantee of 575,000 to Ms. Sengkeo?
**A. No.**
Q. What did you do instead?
**A. I asked one of my friends to lend her money on other assets.**
Q. Did you guarantee that loan?
**A. I did not have to.**
Q. Mm?
**A. I did not have to.**
Q. Why not?
**A. The assets that she pledged were of sufficient value that he was content with the loan that was made.**
Q. Okay, so you arranged for her to get another loan?
**A. Yes.**

[75] Amended Transcript, 5 September 2018, p. 43, 12-23:

Q. When did Madam Sengkeo ask you for the $575,000?
A. My recollection is perhaps two weeks before the [ICSID] hearing [in May 2014].  (p. 25, 16-18)
                        * * * * *
Q. I see.  So in May 2014, when your counsel asked this tribunal to allow you to pay her or lend – guarantee, rather, $575,000, what did you do after the tribunal refused to bless that?
A. I started asking mutual friends, people that I know, to lend money, if they would lend – make her a loan.  (p. 27, 19-25)
                        * * * * *
Q. And what loan documentation did he get to secure that loan?
A. My understanding, and my recollection, is that there are mortgages – there were mortgages given by Madam Sengkeo on significant pieces of real estate that she owned in Vientiane.  (p. 28, 8-13)
                        * * * * *
Q. – to ask Madam Sengkeo?
A. No.
Q. How about your good friend, Gary Morris, have you asked him to show you any loan documents that he has?
A. No.
Q. So the two people that, supposedly, are your good friends haven't produced any documents to you to produce to the tribunal?
A. No.
Q. Has she paid back the 575 to Mr Morris?
A. I don't know.

or the third party "loan" of US $575,000 of May 2014, being a total of US $875,000 has been repaid except for US $15,000, leaving US $860,000 not accounted for.[76]

### 6.3.4.2.    The Claimant's Argument

153.    Mr. Baldwin had a long-standing business relationship with Madam Sengkeo which, over time, developed into personal friendship.  It was perfectly normal for Madam Sengkeo to seek a personal loan and for Mr. Baldwin to arrange it.  There is no evidence whatsoever that the loan of US $575,000 or any part thereof was intended by Mr. Baldwin, or understood by Madam Sengkeo, as an inducement not to testify.  Madam Sengkeo,[77] who now lives outside Laos, was being improperly pressured by the Government to give false evidence to support its bribery and corruption case[78] and it is therefore quite understandable

---

[76] Testimony of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1392, Exhibit LHRE-163:

> Q. Has Ms. Sengkeo paid any of that money back?
> A. I don't know.
> Q. It means that, as we sit here today, that you lent her 300,000, Mr. Morris, Mr. McCain's colleagues lent her 575, that's $875,000.  Has she paid you back?
> A. She paid me back 500,000 baht.
> Q. That's 15,000 US?
> A. Baht money.

[77] Mr. Baldwin testified to his friendship as follows:

> …but my friendship with Madam Sengkeo is – is - I mean, Madam Sengkeo and I had a great relationship. I mean, it wasn't - she is my friend.  I mean, she - we went to many, many, many dinners.  I hung out with her family.  We – you know, she's my friend.  I mean, there was nothing untoward about my business relationships with her.

Amended Transcript, 5 September 2018, p. 38, 12-20.

[78] Mr. John Baldwin testified in re-examination:

> Q. What else did you hear from Peep about Madam Sengkeo's situation?
> A. Madam Sengkeo has been under – it's been – what I've been told is that Madam Sengkeo has been under a great deal of pressure by the government of Lao to sign documents making allegations that were not true and she has been very worried about the consequences of this on not only just her economic state, her property holdings and even her personal safety –
> JUDGE BINNIE: When you say you have been told, who told you?
> A. Peep.  Peep told me, and the – madam – Peep [Sanum employee] has expressed to me that Madam Sengkeo has expressed to her that she just feels there's an enormous amount of pressure and an enormous amount of personal harm that she is subject to if she doesn't do everything the government asks her to, whether it's true or not.  It's there – she says it's been stressed to her it doesn't matter that it's true; she needs to help the government of Lao in their efforts.

Amended Transcript, 5 September 2018, p. 161, 4-25.

that she wished to avoid being a witness.  Mr. Baldwin's explanation of the loans to Madam Sengkeo is not rebutted and there is no evidence inconsistent with his version of events.

### 6.3.4.3.   The Tribunal's Ruling

154.   The US $575,000 loan, coming on top of the previous loan of US $300,000, of which only US $15,000 were repaid bristles with "red flags".  Mr. Baldwin clearly intended to sidestep the Tribunal's denial of permission by arranging for the US $575,000 loan from a third party.  Given Madam Sengkeo's central role in dealings between the Claimants and the Government over many years, her testimony would have shed crucial light on the legality or illegality of many of the disbursements at issue in the Respondent's allegations.

155.   Mr. John Baldwin testified:

> Q. So when **Mdm Sengkeo withdrew US $80,000 in cash on July 20**, the day before you went to visit your good friend, the **Deputy Prime Minister**, what do you think she was going to do with those US dollars?
>
> A. It was Mdm Sengkeo's money to do what she wanted.  She represented to me that **she needed the loan to pay construction bills**.[79]  (emphasis added)

156.   It cannot be said that the bare payment of US $875,000 to Madam Sengkeo is "clear and convincing evidence" of bribery.  There is no evidence to contradict Mr. Baldwin's evidence of her need for funds.  There are other possible explanations for their disbursement.

157.   On the whole, however, while the Tribunal is unable to find "clear and convincing evidence" that the money was paid to Madam Sengkeo to bribe Government Ministers, the Tribunal is nevertheless satisfied on the lower standard of balance of probabilities that Mr. Baldwin and Madam Sengkeo were involved in channeling funds illicitly to Lao Government officials, and further that she was paid to secure her loyalty and to avoid her testifying on behalf of the Government, thereby obstructing justice.

---

[79] Amended Transcript, 5 September 2018, p. 23, 4-11.

158.    The coincidence of the timing of "loans" of US $875,000 (less one repayment of US $15,000) to Madam Sengkeo and the Claimants' urgent need for Government intervention on its behalf at critical junctures of its business (the termination of the E&Y audit and the attempt to shut down the Thanaleng Slot Club), together with Madam Sengkeo's role as the Claimants' principal go-between with the Government, which Mr. Baldwin describes as a corrupt Government, compels an inference of Mr. Baldwin's unlawful conduct and through Mr. Baldwin, the culpability and bad faith of both LHNV and Sanum, on whose behalf he acted.

159.    The Government's failure to track down bribe-takers or to provide a convincing explanation of its efforts (even if on occasion unsuccessful) to do so, tells against the Government's case, although the fact that the key witness, Madam Sengkeo, herself refused to cooperate made the Government's task more difficult.

160.    Possibly the Government prefers to spare itself some embarrassment by declining to put whatever it knows about "bribe-*takers*" into the record of the Tribunal.

161.    Be that as it may be, the circumstances disclosed to the Tribunal do not rise to the level of "clear and compelling evidence" of corruption.

162.    However, the Tribunal's conclusion that corruption of Government officials is established to the lower standard of "balance of probabilities" is relevant to the issue of the Claimants' good faith and the legitimacy of the Claimants' alleged "legitimate" expectations of fair and "equitable" treatment.  This issue is dealt with below.

### 6.3.5. Fifth Allegation – Bribery Scheme in June 2015 to Restore Control of Savan Vegas to the Claimants

163. The Respondent seized control of the Savan Vegas and gambling facilities on 15 April 2015.  Its right to do so was eventually confirmed by an arbitral tribunal constituted under the SIAC by its Award dated 29 June 2017.[80]

164. Prior to the SIAC Award, however, the Claimants asserted a right under the 2014 Settlement to take back control[81] on the basis they had managed to sell their investments on the open market prior to the 15 April 2015 deadline imposed as a term of the Settlement with the Government.  The allegedly genuine third-party offer to purchase dated 14 April 2015 was from an entity called **MaxGaming Consulting Services Limited (Macau)** (**"MaxGaming"**).[82]  Its CEO, Mr. Angus Noble, represented in writing that MaxGaming had funds available to complete the transaction and intended to do so.[83]  In testimony before the SIAC tribunal in January 2017, Angus Noble acknowledged that these representations were false.[84]  He repeated this retraction to this Tribunal at the Hearing.  The MaxGaming

---

[80] SIAC Award dated 29 June 2017.

[81] Email from Mr. Gene McCain to Mr. John Baldwin and Mr. Shawn Scott dated 15 May 2015, Exhibit LHRE-156:

The Buyers have also made it clear that Sanum Investments Ltd. must be given back control of the management of the Casino for the Buyers to regain confidence that the Laos government will honor the Deed of Settlement and so that Sanum can be given time to get the revenue and operations back to where they should be.  The Buyers are [sic] require that the Deed of Settlement be reinstated and that the terms of the Deed are followed.

Respondent's Opening Submission, slide 195.

[82] Email and attachment from Mr. Tucker Baldwin to Mr. Gene McCain dated 10 June 2015, Exhibit LHRE-157:

I, the undersigned, hereby acknowledge that Sanum Investments Co., Ltd. is aware of and supportive of Mr. Eugene McCain and Mr. Ben Gersten acting on behalf of Maxgaming Consulting Services, Ltd. in their efforts to resolve the Savan Vegas and Gaming Assets dispute such that the terms of the Deed of Settlement and the original PDA and Land Concession rights are reinstated and implemented on terms which will allow Maxgaming to complete their purchase of Savan Vegas Casino.

[83] Letter from Mr. Angus Noble to Mr. John Baldwin and Mr. Shawn Scott dated 29 April 2015, Exhibit LHRE-155:

I have reconfirmed that our funds are available and allocated for this acquisition.  My partners in the acquisition are eager to complete the purchase and move forward on their plans for expanding and upgrading the facilities.  With the major changes in the Macau gaming industry, our acquisition of Savan Vegas could not be better timed.

[84] Testimony of Mr. Gus Noble, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1484, Exhibit LHRE-163:

Q. **Is any of that true?**
A. No, it is not.
Q. **Wasn't true?**

transaction did not proceed and was found by the SIAC tribunal to be a sham.[85]  Having heard Mr. Noble's evidence, this Tribunal also concludes that the 14 April 2015 offer was a sham.  Indeed Mr. Noble more or less concedes that it was a sham.

### 6.3.5.1.    The Respondent's Argument

165.    The MaxGaming offer was a fraudulent scheme perpetrated by the Claimants in order to regain control of Savan Vegas[86] from the Government.  The Claimants had every interest in pre-empting the Government's seizure of Savan Vegas and putting a halt to the Government's access to the books of Savan Vegas and records targeted by a Government audit into alleged wrongdoing at Savan Vegas including money laundering and embezzlement.

### 6.3.5.2.    The Claimant's Argument

166.    While unrealistic, Mr. Noble genuinely believed he could orchestrate the purchase, which he testified was, for him, "the chance of a lifetime."

### 6.3.5.3.    The Tribunal's Ruling

167.    The MaxGaming offer was indeed a sham but bribery and corruption, as opposed to fraud and chicanery, is not established.

---

A. No.
Respondent's Opening Submission, slide 190.  See also Testimony of Gus Noble, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, pp. 1493-1494, Exhibit LHRE-163:

Q. **They say your financial backers.  At that time you didn't have any financial backers, did you, June 9, 2015?**
A. No, I did not.

Respondent's Opening Submission, slide 199.
[85] SIAC Award dated 29 June 2017.
[86] Email and clean copies of Gersten's Consulting Agreement, Exhibit LHRE-158, Respondent's Opening Submission, slide 186.  Unsavoury consultants were retained to advance the transaction for success fees totaling US $11 million.

62

### 6.3.6.   Sixth Allegation – Miscellaneous Acts of Bribery and Corruption

168.   Other allegations of bribery and corruption were made:

(a)   offer of a US $7 million bribe to the Prime Minister of Laos for approval of a licence to establish a casino in the capital city of Vientiane;[87]

(b)   a bribe of US $80,000 to the Governor of the Province of Champasak to approve a slot club at Chong Mek;[88] and

(c)   bribes totalling US $106,000 to Government officials to enable the opening and continued operation of the Paksan Slot Club.[89]

There is no "clear and convincing" evidence against the Claimants in support of any of these additional claims of bribery and corruption.

169.   As the Claimants point out, the Respondent has identified only two possible Government bribe takers, namely Mr. Bounnong (but there is no indication he has been investigated) and Madam Manivone.  The evidence is that Madam Manivone was put under investigation only after refusing to testify for the Respondent.[90]   The Claimants state that on 29 May 2014, the Respondent promised its Rejoinder would reveal the results of its investigation. It did not.

170.   The Claimants complain, rightly, that the Respondent's failure to offer any credible explanation for not pursuing the investigation of its own employees, or indeed even to attempt to identify the alleged bribe-takers, weighs against the credibility of these miscellaneous allegations.[91]

---

[87] Respondent's Counter-Memorial, para. 97.
[88] Respondent's Counter-Memorial, paras. 100-101; Respondent's Rejoinder, paras. 21-22.
[89] Respondent's Counter-Memorial, paras. 102-104.
[90] See the Respondent's email to the Tribunal dated 29 May 2014, Claimants' Closing Submission, slide 12.
[91] The Claimants cite *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, CLA(LH)-070, which rejected the Government's bribery defence in part for failure to show the implicated Government official was investigated and prosecuted:

171.    Nevertheless, in the Tribunal's view, none of these additional allegations is supported by sufficient evidence to warrant further inquiry or comment.

## 7.   THE CLAIM FOR EXPROPRIATION

### 7.1. Thanaleng Slot Club

#### 7.1.1.   Background

172.    At its origin, the dispute underlying the Thanaleng claim is a contractual dispute between two private parties, Sanum and ST.  They had signed a **Master Agreement** on 30 May 2007, where they agreed "to negotiate and work towards entering into certain joint ventures, represented by necessary agreements, which shall convey 60% of all 2nd Party's [ST] gaming businesses located in the country of Lao PDR … This Agreement is not intended to be a definitive agreement but only provides the Parties' general understandings of their relationship.  The Parties agree to work together **in good faith** to negotiate and finalize all necessary agreement to fully implement the concept and terms set forth in this Agreement."[92]  The Respondent's treatment of the Thanaleng situation is part of the "totality of the facts" said by counsel for the Claimants to be relevant to LHNV's Treaty claims.

173.    On 4 October 2008, Sanum and ST signed a Participation Agreement for Thanaleng ("**Participation Agreement**").  Under this agreement, Sanum agreed to supply to ST certain slot machines, on a "generated revenue sharing/participation basis."[93]    This

---

116. Although the Tribunal believes Minister Sultan's testimony that he was not personally aware that "Mr. Kandil was an agent to Farargy" and that when he did learn about it, "I passed that to the prosecutor requesting a full-fledged investigation", it is undisputed that Mr. Kandil was never prosecuted in Egypt in connection with this agreement.  Regrettably, because Egypt has failed to present the Tribunal with any information about the investigation requested by Minister Sultan, the Tribunal does not know whether an investigation was conducted and, if so, whether the investigation was closed because the prosecutor determined that Mr. Kandil was innocent, because of lack of evidence, or because of complicity by other government officials. Nevertheless, given the fact that the Egyptian government was made aware of this agreement by Minister Sultan but decided (for whatever reasons) not to prosecute Mr. Kandil, the Tribunal is reluctant to immunize Egypt from liability in this arbitration because it now alleges that the agreement with Mr. Kandil was illegal under Egyptian law.

[92] Master Agreement, Exhibit C(B)-1.
[93] Participation Agreement, Exhibit C(B)-6.

64

agreement was meant to expire on 11 October 2011 when an existing contract of ST with another supplier of slot machines expired.  As explained by Sanum, "the expiration of the Participation [Agreement] is only the end of percentage of profit distribution and proportion of shareholding of each party in the business participation of the Slot Club, which shifted from ST Group who used to receive 60% to receive 40% instead, and Sanum who used to receive 40% to receive 60%, and at the same time (after 11 October 2011) there shall change or create a joint venture company of which Sanum holds 60% and ST Group 40%."[94]

174.    The controversy arose because Sanum and ST disagreed on whether the Master Agreement remained in force and was valid and created binding obligations on the parties, despite the expiration of the Participation Agreement. Was the Participation Agreement a temporary agreement just to cover the period of time when other slot machine supplier agreements were in place? Once those slot machine supplier contracts expired, did the Master Agreement and other agreements referenced above remain in effect and control the contractual relationship between Sanum and the ST Group?[95]

### 7.1.2.  The Parties' Arguments

175.    The Claimants argue that they were deprived of their investment by flawed court proceedings tainted by interference by the Respondent and without payment of compensation.  The Claimants summarize the measures for which they seek relief as follows:  "Beginning with premature termination of the OEDR proceedings on orders from the Minister of Justice, and police participation in Sanum's eviction from the Thanaleng Club, and ending with manifestly unreasonable judgments rendered by the courts of Laos, Respondent directed a result in favor of ST that deprived Sanum of its entitlement to 60% of the revenues generated by its investment in the Thanaleng Slot Club.  The entire process was marred by manifest procedural defects, as well as producing a result that was

---

[94] See Sanum's Defense and Counterclaim in the proceedings before the Lao Commercial Court dated 3 July 2012, Exhibit C(B)-181.
[95] *Ibid*.  The term "supplier contract" is used in singular or plural indistinctly in the original text.

substantially unreasonable."[96]  Sanum's loss impacted the value of LHNV's investment in Sanum.

176.  At the closing of the Hearing, the Claimants confirmed that their Thanaleng claim in this proceeding is not based on denial of justice but on the allegation that the totality of the Respondent's treatment substantially deprived the Claimants of the enjoyment of their investment without the payment of compensation.[97]

177.  The Claimants insist that Sanum did have an ownership interest in Thanaleng as established in the Master Agreement, and invested millions of dollars in Thanaleng.  The Claimants argue that the Respondent's interpretation of the Master Agreement is contrary to the understanding and conduct of the parties to this agreement; it was a binding agreement that contemplated future negotiations between Sanum and a would-be supplier of slot machines and not between Sanum and ST.  The fact that the Master Agreement contemplated additional agreements does not detract from its binding character.  The Claimants point out that when ST sought the judicial annulment of the Master Agreement, the document was described as the "basic agreement defining rights in order to manage the relations between both parties."[98]

178.  The Claimants dispute the relevance of the cases relied on by the Respondent because in the instant case the Respondent consistently treated the Master Agreement as legally binding, "[o]nly Laos – for the first time in these proceedings – has ever characterized the Master Agreement as an agreement to agree that did not generate legally enforceable rights."[99]

179.  According to the Claimants, ST refused repeatedly to accept payment in exchange for a contractually-required exchange of rights which did not extinguish the rights of Sanum,

[96] Claimants' Closing Submission, p. 25; Amended Transcript, 7 September 2018, p. 23, 21-25 to p. 25, 8-21.
[97] Claimants' Closing Submission, p. 68.
[98] Claimant's Reply, para. 37.
[99] *Ibid*., para. 39.

"but merely constituted another breach by ST of its obligations to relinquish control of the club to Sanum."[100]

180.   The Respondent submits that the decision of the Lao Courts concerns a private dispute between ST and Sanum and there was nothing untoward in the various judicial proceedings in Laos.  According to the Respondent, the Claimant has committed abuse of process by pursuing contradictory claims in parallel arbitrations against Laos based on the same treaties and the same economic interests.  In this respect, the Respondent, at the Hearing, recounted the time line of the procedure:

> We have in July 2012 the decision of the Lao Commercial Court. Immediately, before they exhausted their local remedies, which they are required to do under international law, they filed this arbitration alleging that the Thanaleng court decision was a denial of justice and an expropriation.  Later they amended to say it's an expropriation.
>
> In June 2015, there was a decision by the LHNV tribunal on the first material, the breach application.  They didn't prevail.
>
> Three months later, they filed the SIAC arbitration against ST on the same contracts, alleging that the Lao court proceedings had no meaning, they were just -- how would one say it?
>
> One would say their view of the Lao court proceedings in Singapore was that they were a voluntary mediation.  If you don't like the result of a mediation, you withdraw and you go to court.  That's how they're treating the Lao court proceeding when they go to Singapore: it didn't matter, is it wasn't definitive.
>
> So, they get an ST SIAC Award in August 2016.  They filed it in the Lao courts in 2017.
>
> Then the Lao courts refused to enforce it in August 2017.  On 1 September 2017, they filed a denial of justice claim in the new ICSID arbitration. Then in December 2017, the second material breach application was granted, reinstating this tribunal to hear the Thanaleng case again.
>
> So they have these conflicting – once you issued the second material breach decision, it revived these two treaty claims that are in conflict with the treaty claims they had filed in September 2017.[101]

---

[100] *Ibid.*, para. 48.
[101] Amended Transcript, 3 September 2018, p. 143, 6-25 to p. 144, 1-17.

181.    The Respondent further explained:

> Sanum said in these cases that the 26 July 2012 decision of the court was expropriation number one. They said their rights were expropriated, that's the claim here, and they filed the first BIT claims in August 2012.
>
> But the second BIT arbitration says that the date of expropriation was August 2017 when the Lao courts refused to enforce the SIAC award, and that's the subject of the second BIT arbitration.
>
> So you have these inconsistent claims made by the same claimant under the same   treaties, based on the same facts. We say that's an abuse of process.[102]

### 7.1.3.  Tribunal's Ruling

182.    The Thanaleng claim relates to a dispute between the Claimants and ST. It concerns the Respondent only to the extent of the Respondent's alleged interference in court proceedings, and only if its actions could be characterized as a violation of international law.

183.    The Claimants have placed the weight of their argument on the alleged interference of the Respondent in the Lao Commercial Court proceedings in 2012. But the dispute resolution provision in the Master Agreement (Article 2.10)[103] provides for a four-stage mechanism. At the fourth stage, after a party to the Master Agreement has exhausted the remedies available in the Lao Courts, it may submit the dispute to arbitration if it is unsatisfied with the result without the need to demonstrate a breach of due process or other violations in the conduct of the court proceedings.

---

[102] *Ibid.*, p. 145, 5-19.
[103] "If any dispute shall arise, the Parties agree to conduct an amicable negotiation. If such dispute cannot be settled by mediation, the Parties may submit such disputes to the Resolution of Economic Dispute Organization or Courts of the Lao PDR according to the provision and law of Lao PDR in accordance with this Agreement. All proceedings of the arbitration shall be conducted in Lao and English languages.
Before settlement by the arbitrator under the Rules of the Resolution of Economic Dispute Organization, the Parties shall use all efforts to assist the dispute resolution in accordance with the laws of Lao PDR.
If one of the Parties is unsatisfied with the results of the above procedure, the Parties shall mediate and, if necessary, arbitrate such dispute using internationally recognized mediation/arbitration company in Macao, SAR PRC." Master Agreement, C(B)-001.

184. The Claimants also explained that the four-step mechanism provided for in the Master Agreement has been found to violate Lao law and, therefore, "any award rendered under the mechanism that differed from the judgment of the Lao Courts would [not] be enforceable in Laos (the only country where the ST's assets are now located) as a matter of Lao 'public policy.'"[104]

185. Sanum has exercised in full the four levels of remedies provided for in the Master Agreement.  After exhausting its recourse to the Lao Courts, Sanum initiated the SIAC arbitration in 2015. In 2016, the SIAC tribunal awarded Sanum the $200 million it had claimed.

186. The Claimants say that they have not been able to enforce the SIAC award and link the inability to enforce it to the alleged interference of the Respondent in the Lao Commercial Court in 2012.  As explained by the Claimants at the Hearing:

> The problem is, looking at the totality of the circumstances, the Lao Court of Appeals – and that's the highest level in an enforcement proceeding – won't allow enforcement of the SIAC award and so the original action that the government took in ramming the original decision through to benefit ST and forcing claimants to have to go to that additional stage, to have to go to the fourth stage, that allowed ST the time to move all of its assets back into Laos and put the claimants in a position where they would be dependent on going to Laos to enforce the award against ST where the same thing, or worse, could happen.  So, there was a distinct consequence at the stage of the measure relating to the Thanaleng proceeding in 2012.
>
> Even if the claimant could then go on to the SIAC proceeding, which it did, there was still a consequence and there was still harm caused by that action, because being able to go to the fourth tier, that didn't right the ship.  That didn't enable Sanum to have a clear path to recovery.  So there's still consequences to what the government did in 2012."[105]

187. The Claimants want to skip over the fact that Sanum has a valid arbitral award against a private party in which it was awarded 200 million dollars after it exhausted the remedies in the Lao Courts for the alleged interference of the Respondent in the Lao Commercial Court back in 2012.  The alleged inability to enforce the award is not before this Tribunal

---

[104] *Ibid*., Slide 69.
[105] Amended Transcript, 7 September 2018, p. 40, 19-25 to p. 41, 1-17.

and it has not been proven by the Claimants that "there was a distinct consequence [of the Government's alleged interference] at the stage of the measure relating to the Thanaleng proceeding in 2012."[106]   There is simply no persuasive evidence that the alleged interference of the Respondent in the proceeding of a lower court interfered with the steps taken by the Claimants to exercise their rights under the Master Agreement and, in particular, their recourse to SIAC arbitration.

188.   The Claimants say their claim in the SIAC arbitration was not for the full amount of the value lost in Thanaleng.   The Claimants explained why Sanum capped its claim for damages:

> in part because ST did not appear and that raised the issue of whether or not they were going to hide assets, such that it was fruitless to seek the full value of Thanaleng.  The full value of Thanaleng, I know we're bifurcated so we're not going to talk very much about those kind of things, but the full value of Thanaleng is more than 400 million in order to not have the fees, and in light of the practical recognition that ST was likely hiding its assets, we capped the SIAC claim at 200 million.  So it won't be possible to recover the full amount from ST to cover the cost of the damage that the government caused by directing the Thanaleng case in Laos.[107]

189.   The Respondent is not responsible for the decision of the Claimants to self-limit the amount of the claim against ST.  The evidence does not establish any improper interference by the Respondent in the court proceedings.

190.   In sum, the Tribunal concludes that the claim for expropriation in respect of the Thanaleng investment lacks any merit.

## 7.2. Paksong Vegas Hotel and Casino

191.   Although the Claimants have in this instance put their focus on Sanum's contractual rights, LHNV is also involved as Sanum's parent, and is equally subject to the Respondent's defence of lack of good faith and lack of clean hands in both the ICSID and PCA proceedings, sufficient to disqualify the Claimants or either of them from any Treaty

---

[106] Amended Transcript, 7 September 2018, p. 41, 7-9.
[107] Amended Transcript, 3 September 2018, p. 125, 3-16.

remedy.   Further, the Tribunal accepts the invitation of counsel for the Claimants to consider "the totality" of the facts as relevant to the Treaty breaches for which LHNV seeks relief, and in particular the presence or absence of good faith in respect of LHNV's direct and indirect investments in Laos.

### 7.2.1.  Background

192.  On 10 August 2007, a Project Development Agreement was concluded between Lao PDR, and Sanum, the Laotian company Nouansavanh Construction Co. Ltd., and Mr. Sittixay Xaysana for the development of the Paksong casino ("**Paksong PDA**").   Under the Paksong PDA, a Laotian entity, Paksong Vegas and Casino Co. Ltd., was set up with Lao PDR holding 20%, Sanum 60% and the ST entities 20%.  The Paksong PDA required the Company to build and operate a $25 million hotel casino and golf resort in the Paksong district of Champasak Province.

### 7.2.2.  Location of Paksong

193.  As explained by the Claimants, the location was challenging:

> "The challenges were both logistical and commercial. Logistically, Paksong's location meant that transportation of construction materials would be more costly than at the Savan Vegas site, as access to the site was more difficult and time consuming, and that other construction costs would be significantly higher than those of Savan Vegas. Also, the concession was located on the side of a large hill which precluded the building of simple, large buildings to house the hotel and casino and other amenities. Commercially, since Paksong was not located on the border with Thailand or even in a population center in Laos that was easy to access, it lacked a readily identifiable customer base. The challenges of attracting customers made it difficult to identify the optimal type of facility to construct on the site."[108]

---

[108] Sanum Statement of Claim, para. 63 (PCA Proceeding) as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* paras. 3 and 191.



*(Respondent's Opening Submission Slide, 96)*

194.    Mr. Baldwin testified about the problem posed by Paksong's distance from the Thai border:

> Another challenge posed by Paksong Vegas had to do with its customer base.  Because Lao citizens generally are restricted from playing table games, the customer base for our casinos consists largely of Thai citizens who live in Northeastern Thailand.  However, because Paksong Vegas would be located deep in Laos's interior, without easy access to the border, we were concerned that it would be difficult to attract customers to the casino. [109]

195.    These challenges notwithstanding, Mr. John Baldwin testified that the Paksong project package "came with very valuable benefits. Chief among these were the monopoly gaming rights in Champasak and Salavan Provinces granted to Paksong Vegas under the PDA."[110]

196.    Due to the challenges posed by the site, on 31 March 2008, Paksong Vegas proposed to the provincial government, *inter alia*, to move the entire project to the area near Chong Mek. On 29 April 2008, the proposal was rejected by the provincial government.

197.    On 21 August 2008, the office of the Prime Minister advised that Paksong Vegas was to return Paksong and pursue only the project at Khone Phapheng (where the Government also favoured development) together with other interested parties.  The notice from the

---

[109] Sanum First Witness Statement of Mr. John Baldwin, 1 October 2013, para. 32, as referred by the Parties before this Tribunal for "the totality" of the facts, see supra paras. 3 and 191.
[110] *Ibid*., para. 64.

Champasak Provincial Office requested Sanum "to follow the agreements already reached by higher authority and only do the work at Kilometer 30 in Paksong. (According to instructions from the Government Secretariat, if the company cannot comply, then the project must be placed on hold for now)."[111]  The notice added that "[i]t is not approved to open casino branches in Paksong and other places, only at Khone Phapheng.  The Paksong land (Kilometer 30) will be returned to the Government."[112]

198.  On 23 October 2008, the Prime Minister's Office issued a notice, purporting to strip Paksong Vegas of its monopoly rights.  The Prime Minister's Office also reiterated that Yingsoksay, the operator of the existing hotel and resort in the area, could look for other foreign investors to develop Khone Phapheng; Paksong Vegas could participate in that development if it chose to do so, but either way, according to the Prime Minister's Office, it no longer had the exclusive right to do so.  Further, on 19 December 2008, Champasak provincial authorities instructed Paksong Vegas to return the land concession it had been granted so it could be used for "another purpose," referencing the Prime Minister's 21 August 2008 notice.[113]

199.  On 30 January 2009, a meeting was held in the MPI's offices.  It was attended by all Lao agencies concerned and Paksong Vegas.  The Paksong Vegas and Casino Development Project and the Khone Phapheng Entertainment Complex Project Development were discussed.  The Tribunal will re-visit this meeting in its analysis.

200.  On 27 April 2010, the MPI terminated the PDA because Paksong Vegas had not signed a land concession agreement in accordance with Article 4 of the PDA, and construction on the project had been delayed for more than two years, which affected the "social-economic

---

[111] Notice from Champasak Provincial Office conveying denial of the proposed relocation of "higher authority" Exhibit C(S)-309, as referred by the Parties before this Tribunal for "the totality" of the facts, see supra paras. 3 and 191
[112] Exhibit C(S)-311, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* paras. 3 and 191.
[113] *Ibid*., para. 76.

development plan of Champasak province."[114]   Termination of the PDA was re-affirmed by the Respondent on 10 April 2012.

201.    The Respondent claims that Sanum was not a ready, willing and able investor for the Paksong project.  The Claimants argue that the Respondent ignores the evidence that Lao authorities had ordered Sanum to cease construction and two years later without prior notice cancelled the PDA on grounds of failing to develop the land.  According to the Respondent, Sanum did not dispute the concession because the location was not commercially acceptable.  The Respondent explains that Paksong and Savannakhet were linked; they were part of a bargain: whoever would develop Savannakhet, an excellent commercial site, must also develop the less attractive Paksong.  The provincial government was keen to develop the remote areas while Sanum was interested only in more profitable sites; the interests of Sanum as a commercial developer and of the provincial government were not aligned.

202.    Mr. Baldwin wanted to develop a site at Chong Mek.  He agreed that the monopoly rights were limited to the Paksong development area and did not include Chong Mek, "unless the government agreed to modify this.  The way it's written right now, it does not include Chong Mek but it doesn't say we can't ask for modifications."[115]   Mr. Baldwin appeared to be following a strategy of bait and switch.

203.    The terms of the notice rejecting the proposal affirm that at the time the Government's intention was not to terminate the PDA, but to request that the existing agreements be respected.

204.    The Claimant admitted, at the meeting of 30 January 2009, that "it has not carried out the Paksong Vegas project as scheduled in the contract and as it was presented to the Province."

---

[114] Statement of Claim, para. 82, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* paras. 3 and 191.
[115] Amended Transcript, 4 September 2018, p. 216, 19-22.

**Mr. Baldwin confirmed at the Hearing that no contract to build a $25 million five-star hotel with a casino and nightclub was ever signed.**[116]

205.     Paksong Vegas had not made the investment it had promised in the PDA within the required timeframe as admitted by Mr. Baldwin and, in the Tribunal's view, never intended to.

### 7.2.3.  The Tribunal's Analysis

206.     On Mr. Baldwin's own admission, the Claimants never believed that the Paksong site could be developed on commercially attractive terms.  The Claimants' argument that work was being done and, if not done, was due to the Government order to stop the work is not credible.    Accordingly,  while  the  issue  of  the  expropriation  of  the  Paksong  Vegas investment is not before this Tribunal as such, and this Tribunal does not purport to decide any issue which is not before it, nevertheless the underlying facts of the Paksong Vegas venture reinforce the Respondent's general defence that Mr. Baldwin's relationship with Laos was throughout characterized by bad faith.  To the extent necessary to determine the bad faith issues, and for that purpose alone, the Tribunal finds on a careful review of the facts that not only has LHNV failed to demonstrate any lack of good faith on the part of the Respondent in respect of Paksong Vegas but, on the contrary, concludes that Mr. Baldwin negotiated throughout his dealings with the Respondent in bad faith and that such bad faith is to be attributed to LHNV on the basis that as the directing mind of LHNV, the parent of Sanum, Mr. Baldwin's conduct was and is its conduct.

### 7.3. Paksan Slot Club

207.     Although the Claimants' primary focus is on Sanum in respect of Paksan, LHNV is also implicated as Sanum's parent, and the Paksan episode is relevant to the Respondent's allegation that the entirety of the Claimants' investments in Laos was tainted from first to last by bad faith.

---

[116] Amended Transcript, 5 September 2018, p. 63, 4-7.

### 7.3.1.   Background

208.   As told by Sanum and not disputed by the Respondent, the relevant facts are that "[s]oon after Sanum agreed to partner with ST, it discovered that there was an existing slot club in operation in the Paksan district of Bolikhamxay Province - one of the provinces in which Savan Vegas has the exclusive right to operate.  To enforce that exclusive right, ST asked the Government of Bolikhamxay Province to shut down the club, and it did so."[117]  The existence of the slot club led Savan Vegas to open its own club at the same location, the Paksan Hotel.

209.   The **Ministry of Information and Culture** ("**MIC**") granted Savan Vegas a one-year license to operate a slot club in the Bolikhamxay Province on 24 October 2007.  The MIC renewed the license on 26 November 2008.

210.   After the lease of the former club expired in October 2008, Savan Vegas signed its own lease on 25 December 2008 and refurbished the space in the Paksan Hotel formerly occupied by the slot club.  The club re-opened on 25 October 2009 and the MIC renewed the slot license for another year on 27 October 2009.

211.   On 18 February 2010, the Prime Minister's Office ordered the slot club license to be cancelled: "The authorization to open an electronic gaming club granted to Savan Vegas Ltd. by the Information and Culture Department of Bolikhamxay Province is not in accordance with regulations in that it exceeds the authority of that office.  Therefore, you should stop operation of electronic gaming at Paksan Hotel.  Further, the company is no longer authorized to erect an advertising billboard in Bolikhamxay Province."[118]

212.   The license was not renewed in 2010.  On 11 March 2011, the Government ordered the MIC and the provincial Governor to close the club within three days.  The club closed on 13 March 2011. Sanum and Savan Vegas petitioned the Prime Minister to re-open the club.

---

[117] Sanum Statement of Claim, para. 89, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* para. 3.
[118] Exhibit C(S)-326, p. 3, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* para. 3.

The petition was denied on 19 May 2011 and Savan Vegas was ordered to comply with Notice No. 305.

### 7.3.2.  The Tribunal's Analysis

213.   The Tribunal concludes that the license granted in 2009 had expired in October 2010 and had not been renewed.  Monopoly rights kept competitors out but did not entitle Savan Vegas to establish and operate other gambling facilities unless those other facilities were specifically authorized.  The Claimants have not shown that Savan Vegas had a right to the license's renewal or even that it attempted to renew the license.

214.   At the time the Paksan slot club closed, the club was operating without a license and there is no documentary evidence that the Respondent had created any legitimate expectation in the Claimants that the license would be renewed or that it may operate *de facto* as if it had a license.  The Claimants' argument about a *de facto* license begs the question of why Sanum had applied for the license's renewal in the preceding years. The Tribunal concludes that the license expired on its own terms and had terminated when the slot club was ordered to be closed.  The Tribunal accordingly concludes, as with the Paksong Vegas expropriation claim, that while the Paksan slot club expropriation claim is not before this Tribunal as such, the underlying facts bear directly on the allegations of bad faith on the part of the Respondent asserted before this Tribunal by the Claimant, LHNV.  The Tribunal finds on a careful review of the facts that LHNV has failed to demonstrate any lack of good faith on the part of the Respondent in respect to Paksan, but on the contrary that Mr. Baldwin's bad faith activity is to be attributed to LHNV, Sanum's parent, on the basis that Mr. Baldwin is the directing mind of LHNV and his conduct is attributable to LHNV.

### 7.4. Thakhet Casino and Hotel Resort

215.   In this situation, as well, the Claimants and the Government accuse each other of bad faith.  Mr. Baldwin, the directing mind of both Claimants, testified at length about the bad faith treatment he received from the Government in respect of Thakhet.  The Government, on the other hand, presents Thakhet as further proof that Mr. Baldwin and LHNV were bad

faith investors who are not entitled to treaty protection.  These cross allegations are relevant to LHNV's Treaty claims.

216.    In 2010, Sanum started negotiations with the Committee for the Laos-Thailand Friendship Bridge III Economic Zone Development (the "SEZ" and the "SEZ Committee") for a land concession at the foot of a planned bridge to cross the Mekong River.  The negotiations resulted in a MOU between Sanum and the SEZ Committee dated 20 October 2010.  The MOU contemplated a land concession to Sanum of about 90 hectares in the SEZ, payment by Sanum of US $900,000 to allow the provincial government to compensate individuals occupying the land, and US $400,000 to be paid upon signature of the MOU.  The MOU required Sanum to sign a land concession within 30 days and secure all necessary approvals from the central and local governments within one year prior to building on the concession land.

217.    On 4 February 2011, Savan Vegas submitted a proposal for a slot club to the Governor of the Khammouane Province and the MIC.  The proposal was supported by the Governor and, on 21 February 2011, the MIC approved the Savan Vegas's Welcome Center and Slot Club.  Shortly thereafter, on 2 March 2011, the Prime Minister's Office directed the MIC to revoke its approval because slot club licenses may only be issued "by the Government" which was interpreted by the Prime Minister to mean the Prime Minister's Office.[119]  On 29 March 2011, Sanum and Savan Vegas petitioned the Prime Minister's Office to grant permission to open the Welcome Center and Slot Club in the SEZ.  The petition was rejected in October 2011.

218.    It was decided in the Tribunal's ruling on the Merits of the Claimant's Second Material Breach Application that, in the Tribunal's view,

> the Claimants have not established a land  entitlement that includes the disputed 16 hectares, and there is no undertaking by the Government in Section 22 to use its powers of eminent domain to expropriate the existing private owners for the financial benefit of the Claimant. Refusal to

---

[119] Notice from the Prime Minister's Office to the of Information and Culture, 2 March 2011, Exhibit C(B)-337.

expropriate private land for the private gain of the Claimant does not constitute evidence of 'bad faith.'[120]

219.    This decision was reached by the Tribunal in the context of whether the Government breached Article 22 of the Deed of Settlement by failing to negotiate the Thakhet related agreements in good faith.  The Tribunal considers that the Claimants have also failed to establish rights to the remainder of the land referred to in the MOU.  Sanum had 365 days from the date of the Land Concession Agreement to seek all the approvals for all investment activities described in the MOU.   In turn, before the Land Concession Agreement could be signed, Sanum needed to complete a Feasibility Study, a Master Plan and a Socio-Economic and Environmental Impact Study for the Land Concession, all to be approved by the Concessioner.  The Land Concession Agreement required by the MOU was never signed; it never went beyond the negotiation stage.   Despite face to face negotiations over the PDA throughout the summer and fall of 2011, Sanum and the SEZ Committee had not finalized the terms of the PDA, including the land concession.[121]   In the overall picture, whether or not Sanum had obtained a licence had no impact on the viability of its Thakhaek project.

220.    In the view of the Tribunal it is clear from the MOU that Savan Vegas could not expand to Thakhaek in the Kammouane Province without the "**final approval from all governmental authorities (central and local)**."[122]  The MOU provides for the eventuality that the approval is forthcoming and also in case it is not.[123]  Furthermore, the MOU subjects the exact location of the Concession Land to a future agreement:  "Once the exact location of the Concession Land has been agreed upon, the Concessionee will confirm its acceptance of the Concession Land in writing to the Concessioner."[124]  There was never any agreement in this respect.

---

[120] Decision on the Merits of Claimants' Second Material Breach Application, 15 December 2017, para. 207.
[121] Sanum Reply, para. 182, see also Exhibit RE-101, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* para. 3.
[122] Exhibit RE-101, clause 2.3(c).
[123] Exhibit RE-101, clauses 2.3(c) and (d).
[124] Exhibit RE-101, clause 3.1.

### 7.4.1. The Tribunal's Analysis

221.    The MOU shows that Savan Vegas' monopoly rights did not encompass a right to establish slot clubs or casinos beyond the area covered by the Savan Vegas PDA:

> If the Concessionee would like to expand the casino or slot business of Savan Vegas, which is an investment project of Sanum Investments Limited according to the Foreign Investment License no. 09507 [not readable], dated 17 August 2007 to the Concession Land to be a branch (Welcome Center) of Savan Vegas *such expansion shall be proposed, approved and agreed in writing from the Government* first before implementing such expansion.  The Khammouane Province wilfully [sic] support the expansion of Savan Vegas to the Land Concession according to the appropriate procedures and regulations.[125]

222.    As regards the slot license, the Tribunal notes that the Respondent's witnesses from the MIC and the Government Secretariat Office have claimed that the license was issued by mistake.[126]  The Respondent has argued that the MIC had no authority to issue the license because of Notice No. 1957 of the Prime Minister and says that the license was procured by a bribe.  Leaving aside the issue of the bribes allegedly paid by the Claimants, the Tribunal observes that the license was effective for less than ten days and that the revocation was justified on the lack of authority of the MIC to grant it.  The Tribunal appreciates that Notice No. 1957 refers to the Government and is not explicitly limited to the Prime Minister's office but by 2011 Sanum was fully aware that the Prime Minister's Office was the essential authority on the Claimants' gambling ventures in Laos.  The Prime Minister's Office never approved the Claimants' gambling project in Thakhaek.  The Claimants had just finished a bruising encounter with the Government over the Claimants' failure to fulfill its obligations in respect of the Paksong Hotel and Casino project.  By 2011, the Claimants had entirely failed to live up to their Paksong commitments, while pretending otherwise.  The Claimants had demonstrated themselves not to be good faith investors.

---

[125] Exhibit RE-101, clause 3.3.
[126] Sanum Reply, para. 316, fn 767, as referred by the Parties before this Tribunal for "the totality" of the facts, see *supra* para. 3.

223.    In the Tribunal's view, the Claimants were seeking in bad faith (even if not by bribes) to manipulate Government officials to obtain approvals to which the Claimants were not entitled.  It is significant that the MIC licence was issued to Sanum in February 2011 by the same Minister who was ordered to cancel the Paksan license for lack of authority one year earlier in February 2010.

224.    Negotiations for the renewal of the Flat Tax Agreement had stalled by March 2011.  The Government was agitating for accountability in respect of its 20% interest in Savan Vegas. The Claimants allege that the 16-hectare parcel on Highway 13 was essential to the success of their Thakhaek project, yet negotiations for the 16-hectare parcel never reached agreement in the Tribunal's view.

225.    The Tribunal concludes that there is insufficient evidence of bad faith on either side in respect of Thakhek.  It was simply a commercial possibility that never reached the stage of agreement.

## 8.   VIOLATION OF OTHER TREATY RIGHTS

226.    The Treaty claims are brought by the Claimant LHNV under the Netherlands-Lao BIT. Nevertheless, the allegations of bad faith and treaty violations extend to the Government's treatment of all of the Claimants' investments, as well as the Government's defence of its treatment of all of the LHNV and Sanum investments.  Again, the Tribunal recalls the submission by counsel for the Claimants that "the totality of the facts remains relevant to certain treaty breaches for which the Claimants will seek relief."[127]  However, in this part 8, where reference is made to the "Claimant" (singular), it refers to LHNV only.

### 8.1. The Claimant's Allegations of Unfair and Inequitable Treatment

227.    LHNV contends that it was denied fair and equitable treatment pursuant to Article 3(1) of the Treaty in respect of Thanaleng.

---

[127] Letter dated 26 March 2018 from Claimant to the Tribunal.

228.   With respect to the fair and equitable treatment claims, the Claimant contends that even if the applicable standard is no higher than the minimum standard of treatment under customary international law as contended by the Respondent, the Claimant should succeed because there has been "a gross denial of justice, manifest arbitrariness, blatant unfairness, a complete lack of due process, evident discrimination, or a manifest lack of reasons."[128]

229.   The Claimant alleges that Respondent also violated Article 3(4) of the Treaty (Umbrella Clause Claims) by repudiating its contractual obligations as follows:

(a)   the Respondent imposed construction and brokerage taxes and overtime fees in violation of the FTA;[129] and

(b)   the audit of Savan Vegas violated provisions in the Shareholders' Agreement and in the PDA that protected Savan Vegas from unreasonable document and information requests.[130]

230.   The Claimant further alleges that Respondent inflicted discriminatory and less favourable treatment on Sanum and its investments (in relation to Articles 3(1), 3(2) and 4 of the Treaty) with the following measures:

(a)   by imposing a 30% tax rate on the Ferry Terminal Slot Club, which was over 100 times more than the 0.22% rate charged to ST;[131]

(b)   by assisting ST in ejecting Sanum from its Thanaleng joint venture investment;[132]

(c)   by pursuing an unlawful audit by E&Y which favoured ST over Sanum by facilitating ST's attack on Sanum's management of Savan Vegas.[133]

---

[128] *Glamis Gold, Ltd. v. the United States of America*, UNCITRAL (1976), Award, 8 June 2009, at para. 616, Exhibit LHRA-73.
[129] Claimant's Memorial, para. 243.
[130] Claimant's Memorial, para. 242.
[131] Claimant's Memorial, para. 249.
[132] Claimant's Memorial, paras. 211-214.
[133] Claimant's Memorial, paras. 192201 and 213.

231.   In respect of the Thanaleng Slot Club (in relation to Article 3(1) and 6 of the Treaty):

(a)   the Respondent deprived the Claimant of the benefit of its investment through arbitrary, unfair and discriminatory court proceedings that lacked any semblance of due process and by the participation of its law enforcement officials in physically evicting Sanum personnel and machines from Thanaleng;[134]

(b)   by the same conduct, the Respondent also violated both the fair and equitable treatment and the unreasonable or discriminatory impairment standards contained in Article 3(1) of the BIT.[135]

## 8.2. The Onus of Proof

232.   The Claimant accepts both the legal onus and the evidentiary onus of establishing one or more treaty breaches on a balance of probabilities.

## 8.3. The Claimant's Lack of Good Faith

233.   Much of the Claimants' case rests on the allegation that it proceeded in all respects in good faith but was thwarted at every turn by a corrupt and devious Government acting in bad faith.  On the contrary, in the Tribunal's view the evidence is clear that the Claimants dealt in bad faith with the Government from the initial signing of the Paksong Hotel and Casino PDA calling for a US $25 million hotel and casino and thereafter included the financial irregularities in the operation of the Savan Vegas Hotel and Casino.  The Claimants never intended to build a US $25 million facility in Paksong.  From the Claimants' perspective, the benefit of the Paksong PDA was a monopoly to block other more serious investors from offering gambling facilities in Champaska and Salavan Provinces.  Having obtained the monopoly, the Claimants attempted to force the Government's hand in relocating the project to what, from the Government's perspective, was a much less attractive site.  The bad faith continued through the disputes over the Savan Vegas Hotel and Casino, which

---

[134] Claimant's Memorial, paras. 61-94, 219-223; Claimant's Reply, paras. 23-109.
[135] Claimant's Memorial, paras. 178-190, Claimant's Reply, paras. 155-160.

was built but operated in defiance of Sanum's reporting obligations to the Government (and, when the books were eventually opened, revealed significant financial irregularities). The bad faith continued with Mr. Baldwin's recent efforts to deter Madam Sengkeo's appearance to testify at the merits proceeding and the sham MaxGaming offer to purchase Savan Vegas in April of 2015.

234.    The principle of good faith arises in investment treaty arbitrations in various contexts. Tribunals, of course, regularly refer to Article 31(1) of the *Vienna Convention* for the rule that treaties shall be interpreted in good faith.  The obligation extends to a duty of parties to arbitrate in good faith.[136] In *Phoenix v. Czech Republic*, the tribunal referred to Phoenix's "initiation and pursuit of this arbitration" as "an abuse of the system of international ICSID investment arbitration."[137]   (The tribunal found an abuse of rights in that case by the "claimant's creation of a legal fiction in order to gain access to an international arbitration procedure to which it was not entitled."[138])

235.    The Tribunal listened carefully to the testimony of Mr. John Baldwin and found him to be an argumentative witness who preferred evasion to candour. Much of his testimony was simply not credible.  He proceeded in bad faith from the outset in assuring the Government that he intended to invest US $25 million at the Paksong site, which by his own account would have been highly unprofitable.

236.    Mr. Baldwin is the directing mind of both Claimant companies.  His conduct throughout was to advance their corporate interests.  His bad faith conduct is their conduct.  While the Government's conduct was at times aggressive and inappropriate in relation to the Settlement (as documented, for example, in the Second Material Breach Application), nevertheless the Claimants failed to establish that the Government acted in bad faith in

---

[136] *Libanco Holdings Co Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Final Award, Exhibit CLA-168, where good faith was discussed in the context of the alleged interception and surveillance by Turkish police of legally privileged communications between the claimant, its counsel and witnesses.  See also Born, *International Commercial Arbitration* at pp. 1008-1014 and *Methanex Corporation v. United States of America*, UNCITRAL (1976), Final Award, Exhibit CLA-259.
[137] *Phoenix Action, Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, at para. 144, Exhibit RA-25.
[138] *Ibid.*, para. 143.

relation to the investors or the investments during the time period covered by this revived arbitration.

237.    It is well established that the bad faith conduct of the investor is relevant to the grant of relief under an investment treaty.[139]

238.    To summarize, the particular acts of bad faith by Mr. Baldwin on behalf of the Claimants of most concern to the Tribunal are:

(A)     misrepresentations made to the Government to obtain Paksong Hotel and Casino PDA on the strength of a promise to make a US $25 million investment on the site which, in the Tribunal's view, the Claimants never intended to pursue;

(b)     likely making illegal payments to Government officials to stop the E&Y audit of the Savan Vegas Hotel and Casino;

(c)     likely attempting to obstruct justice with the payment of US $875,000 to Madam Sengkeo directed, as to US $575,000 to the obstruction of the due process of this arbitration by paying Madam Sengkeo not to testify;

(d)     attempting to mislead the Treaty Tribunals with the sham offer to purchase the Savan Vegas from MaxGaming Consulting.[140]

239.    As will be seen, the Claimant's allegations of the other treaty violations (in addition to expropriation) also fail on the facts.   However, having listened to Mr. Baldwin's

---

[139] See UNCTAD Series on International Agreements III, *Fair and Equitable Treatment* (2012) at pp. 83-85:

Investor conduct has emerged as a relevant factor in the analysis of FET claims by arbitral tribunals.  It may be relevant in two ways.  First, **it may justify the measure taken against the investor by the respondent country**.  Thus in *Genin v. Estonia*, the tribunal found that the Estonian national bank had good reasons to revoke the operating license of the claimant's investment because the claimant had failed to disclose relevant facts.  In such cases, the adverse measure serves as a State's reaction to, or a sanction for the investor's conduct…**Fraud or misrepresentation on the part of an investor may form the basis of a legitimate regulatory interference with its rights.  In such cases, even the outright termination of the investment may be justified, provided it is a proportionate response to the investor's conduct in light of the relevant domestic laws of the host State**...in some situations, an investor's own conduct may be held to be a cause for the harm suffered.

[140] Although the MaxGaming incident occurred after the date of Settlement, it was fully debated at the Hearing and formed part of the corpus of the bad faith allegations.

explanations over several hearings of his dealings with Laos, the Tribunal wishes to leave in no doubt its conclusion that Mr. Baldwin and LHNV exhibited manifest bad faith in various efforts not only to manipulate the Government to advance their gambling initiatives but, in the instance of Madam Sengkeo, to manipulate the arbitration process itself.

### 8.4. Alleged Wrongful Treatment of the Thanaleng Investment

240. At issue are the proceedings before the Courts of Laos between Sanum and ST. The Claimants allege that they were denied due process to a level that constituted a denial of justice.

#### 8.4.1. The Claimant's Argument

241. In respect of the Thanaleng Slot Club, the Claimants contend that:

(a)     the Government deprived the Claimant LHNV of the benefit of its investment in Sanum through arbitrary, unfair and discriminatory court proceedings that lacked any semblance of due process and by the participation of its law enforcement officials in physically evicting Sanum personnel and machines from Thanaleng;[141]

(b)     by the same conduct, the Respondent also violated both the fair and equitable treatment and the unreasonable or discriminatory impairment standards contained in Article 3(1) of the BIT.[142]

242. While the origin of the court case was a "private dispute", the Claimants contend that their Thanaleng claims manifestly implicate the conduct of Lao judicial and executive branch officials including the Minister of Justice and the police on the spot at the time of the seizure.  According to Claimants, the result was wrongful internationally because it was arbitrary, unfair, discriminatory and lacked any semblance of due process.  Moreover, the

---

[141] Claimant's Memorial, paras. 61-94, 219-223; Claimant's Reply, paras. 23-109.
[142] Claimant's Memorial, paras. 178-190, Claimant's Reply, paras. 155-160.

Thangaleng proceedings deprived LHNV of the shareholder value of Sanum's Thanaleng investments without compensation.

243.   The Claimants relied upon the expert opinion of Maitre Gérard Ngo[143] who found due process violations in the Court summons to Sanum, which was made only 48 hours before the trial scheduled for 26 July 2012, the limited duration of the hearing of 26 July 2012 (90 minutes), the brevity of the judges' deliberation and the conclusion set out in the judgment which (the Claimant) argues had been decided before the hearing began.

244.   The Claimants allege that the Courts of Laos were controlled and interfered with by the Government against Sanum and constituted a denial of justice.   The evidence for this allegation comes from Mr. Baldwin[144] and Mr. Richard Pipes.[145]

245.   The Claimants further contend that the Minister of Justice wrongfully intervened in the physical eviction of Sanum from the Thanaleng premises on 29 April 2012, thereby favouring ST, contrary to the laws governing the execution of judgments in Laos and principles of international law.

---

[143] Maitre Gérard Ngo Expert Report, para. 176.
[144] Mr. Baldwin testified in his Third Witness Statement as follows:

> 118. I was eventually able to meet with Minister [Justice] Chaleun on 27 April 2012.  He said that the pressure to rule against us was coming from "high up".  I inquired who was pressuring him, noting that you could not get much higher than the Minister of Justice.  I asked if it was the Prime Minister; he said no.  I asked if it was the President; he said no.  Then I asked if it was the Vice President, Bounnhang Vorachit, and he shrugged his shoulders.  I took this to be an acknowledgement that it was the Vice President of Laos who was pressuring Minister Chaleun. I was surprised and disappointed by this sudden change in Chaleun…

Mr. John Baldwin Third Witness Statement, para. 46.  See also Mr. John Baldwin Sixth Witness Statement, para. 59.
[145] Mr. Pipes testified in his First Witness Statement as follows:

> 29. I should note that in several meetings I had with the Chief Judge handling the case, the Chief Judge told me that he too was under a great deal of pressure to resolve the case quickly, with a predetermined result that would not be to our benefit.  At times, the Judge was almost apologetic and wanted me to understand that, when cases are filed in which powerful people in Laos have an interest, the result is often mandated by high-ranking Government officials.  In fact, the Chief Judge and other Lao attorneys confirmed to me that these types of cases are referred to as "directed ones".  At one point, the Chief Judge told me in his chambers that in our case he was "just the driver" and that he was being told where to go.

Richard Pipes First Witness Statement, para. 29.

### 8.4.2. The Respondent's Argument

246.   The Government contends that Sanum had no cognizable interest in the Thanaleng Slot Club because the operative contract (the Temporary Thanaleng Participation Agreement dated 23 February 2010) expired on its own terms on 11 October 2011 and as the Courts of Laos correctly held, the Master Agreement dated 20 May 2007 did not create enforceable rights.  The Master Agreement itself so states:

> The Parties hereby agree to negotiate and work towards entering into certain joint ventures, represented by necessary agreements, which shall convey 60% of all 2nd Party's gaming business located in the country of Lao PDR (the "Joint Ventures").  This Agreement is <u>not intended to be a definitive agreement but only provides the Parties' general understandings of their relationship</u>.  The Parties agree to work together in good faith to negotiate and finalize all necessary agreements to fully implement the concepts and terms set forth in this Agreement.[146]  (emphasis added)

247.   The trial Court held against Sanum by its decision dated 26 July 2012,[147] affirmed by the Court of Appeal on 11 December 2013[148] and affirmed again by the Supreme Court of Laos on 4 April 2014, whose decision stated:

> The Defendant [Sanum] claimed that once the contract with the electrical slot machine supplier expired, the main contract issued on 30 May 2007, and other contracts, should be effective immediately to cover the obligations between Sanum Investment Company (Defendant) and the HT Vegas Company Limited (Plaintiff).  However, this is not the case, due to the fact that it is stated in the beginning part of the main contract, wherein it is defined, that **this contract has no intent to be a strict contract**, as it is only to support the parties toward having an overall understanding of their relationship.
>
> * * * * *
>
> **This [evidence] shows that the parties cannot consider the main contract as a completed business joint venture agreement** due to this contract determining only general principles on how to develop sub-contracts and agreements between both parties in all gambling joint ventures.  Therefore, the parties need to renew the contract to be in

---

[146] Master Agreement, Exhibit C(B)-1; Respondent's Opening Submission, Slide 20.
[147] Court Decision, 26 July 2012, Case No. 11/PC, VTC, p. 5, Exhibit C(B)-34, Respondent's Opening Submission, slide 21.
[148] Judgment, Commercial Chamber Panel of the People's Court in the Central Region, No. 71/CC.A, p. 9, Exhibit C(B)-486, Respondent's Opening Submission, Slide 22.

compliance with the main contract issued on 30 May 2007.[149]  (emphasis added)

248.   The Government contends that "the proper procedures were applied under the Lao court rules.  Those rules … plainly meet international standards of procedural fairness."[150]

249.   The Respondent's legal expert, Professor Hervé Ascensio, concluded:

> 83. On the basis of the rules of international law, and having considered the legal and factual circumstances of the case, my conclusions are the following ones:
>
> 1) as far municipal legality, the domestic proceedings complied with the standard of international law;
>
> 2) no violation of international law is demonstrated concerning access to an independent and impartial court;
>
> 3) no violation of international law is demonstrated concerning the fundamental procedural guarantees;
>
> 4) the decisions adopted on the merits by Laotian courts on the Thanaleng site do not reveal a substantive denial of justice.[151]

250.   Respondent contends that the Claimants' legal expert, Maitre Gérard Ngo, lacks relevant expertise and that (again according the Respondent), his criticisms were effectively rebutted by the Respondent's expert, Professor Hervé Ascensio, who expressed the view that:

> Taking into account the whole of the legal and factual circumstances, it does not appear manifest that the threshold of arbitrary, applicable under public international law, was crossed.[152]

251.   The Government considers that there is no credible evidence that it interfered with the Court proceedings.

252.   Sanum was afforded due process in knowing the case it had to meet and every opportunity to lead evidence and make submissions in its own defence.

---

[149] Lao Supreme Court Judgment, *ST v. Sanum*, Case 52, Exhibit C-1239.
[150] Respondent's Counter-Memorial, para. 142.
[151] Professor Ascensio Expert Report, 4 June 2014, para. 83; Claimants' Opening Submissions, slide 66.
[152] Professor Ascensio Expert Report, 4 June 2014, at paras. 51-52.

### 8.4.3.   The Tribunal's Ruling

253.   The Tribunal's role is to apply international law, not the domestic law of Laos.  It has no jurisdiction to sit on appeal from the Courts of Laos.  As stated by the *Arif v. Moldova* tribunal:

> The Tribunal is not in a position and has no competence to take sides in this controversy.  If it tried, it would indeed sit as a court of appeal over decisions of the Moldovan judiciary.[153]

254.   The decision of three levels of Laotian courts on the interpretation of the Master Contract went against Sanum, and in the Tribunal's view, neither the interpretation given by those Courts to the agreements nor the judicial process offended international standards.[154]

255.   The Tribunal heard the *viva voce* testimony of Judge Soulideth Souvannasaly, one of the judges who heard the Sanum case at first instance.  He disputed Mr. Pipes' evidence about Government interference[155] and testified that, contrary to Mr. Pipes' Witness Statement, Sanum did not press its earlier request for an adjournment when its case came on for a hearing.[156]

---

[153] *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, at paras. 481, Exhibit CLA(LH)-041.

[154] As stated by the *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, para. 209:

> It is not the role of a tribunal constituted on the basis of a BIT to act as a court of appeal for national courts. The task of the Tribunal is rather to determine whether the Judgment is "clearly improper and discreditable" in the words of the *Mondev* tribunal.

Professor Ascensio Expert Report, Exhibit PJ-24.

[155] Judge Soulideth testified:

> Q. And when you say, "That is not the truth", what were you referring to?
> A. I meant what Mr. Pipes said was untrue.
> Q. Regardless of what Mr. Pipes said to you, it's true that you were under pressure to resolve case 52 between ST and Sanum quickly; correct?
> A. No.

Amended Transcript, 6 September 2018, p. 12, 18-24.

[156] Judge Soulideth further testified:

> Q. You received a request for postponement from Sanum on 25 July 2012.  My question is:  in the courtroom, on 26 July 2012, did you ask anyone representing Sanum if they wished to press their request for a postponement?

* * * * *

256.    The Tribunal considers 48 hours to be an excessively short notice for a trial but Judge Soulideth testified that when the trial was called, Sanum was present in Court and, having failed to press its request for an adjournment, there was nothing to prevent the case from proceeding and it did proceed with the participation of Sanum's representatives.

257.    Moreover, according to Judge Soulideth, Sanum was free to present evidence and make such submissions as it saw fit.  Judge Soulideth denied that the disposition of the case had been decided prior to the hearing (contrary to the witness statement of Richard Pipes).  The narrative portion of the judgment had been drafted beforehand based on the documentation (a customary practice in Laos, according to the Judge), but the "consideration" and "decision" were not written until following the panel deliberations after the hearing.[157]

258.    The Tribunal would have been interested in hearing from the Sanum representatives who were present at the trial but they were not called.  In the circumstances, the Tribunal accepts the evidence of Judge Soulideth and rejects the allegations of the Claimants that this was a "directed case" whose outcome was "mandated by high ranking Government officials" as unproven.  On the evidence, there was no breach of fair and equitable treatment or other Treaty violation, and no wrongful treatment by the judiciary of the Claimant's Thanaleng investment by denial of justice or otherwise.

### 8.5. Did The Respondent's Treatment of Savan Vegas Breach Articles 3(1) and 3(4) of the Treaty?

259.    As mentioned, the Government, which was a shareholder in the Savan Vegas project, initiated an audit by E&Y.

---

A. So, I asked this Sanum personally in the courtroom that, "Do you wish to proceed or do you wish to still have that postponement that you submitted on 25 July 2012?", but they did not – they did not say they did.
Amended Transcript, 6 September 2018, p. 49, 6-21.
[157] Judge Soulideth testified:

It was not until our deliberation that we reached a decision and drafted the remaining part of the "Consideration" and the "Decision" section of the Court Decision (from the last line of page 4 of the Court Decision – "…this act as violation of the agreement according to Article 33 of the Contract Law."  These can be found on pages 5 and 6 of the Court Decision.
Judge Soulideth Witness Statement, para. 14; Claimants' Opening Submissions, slide 72.

### 8.5.1.  The Claimant's Argument

260.  The Claimant says that the Government's audit proceeded in bad faith and constituted one of the wrongful acts orchestrated by the Government to assist ST[158] in its ongoing dispute with the Claimant.  In the result, Article 3(4) of the Treaty was breached because of non-compliance with the Government's contractual obligations.   Moreover, the Claimant argues, Article 3(1) was also breached because:

    (a)    the Government's abusive exercise of authority (as Government not shareholder) was inconsistent with the good faith principle embedded in the FET standard;

    (b)    even if not adopted for an improper purpose, measures that are arbitrary and discriminatory are also inconsistent with the FET;

    (c)    the audit was conducted in an unreasonable manner that impaired the LHNV's enjoyment of its investment;[159]

261.  As a result of the audit and other wrongful conduct, the Government is said to have imposed on Savan Vegas "unlawful and discriminatory tax demands in the amount of US $23.8 million."[160]  Moreover, the Ferry Terminal Slot Club was taxed at a rate grossly in excess of the tax rate imposed on ST and, was therefore discriminatory.[161]

### 8.5.2.  The Respondent's Argument

262.  The Parties settled any and all claims with respect to pre-July 2014 taxes as part of the mutual commitments contained in Article 7 of the Settlement[162] which provided that:

> Laos shall forgive and waive any and all taxes and related interest and penalties due and payable by the Claimants and the Gaming Assets up to 1 July 2014 in respect of the Gaming Assets, provided, however, that taxes shall be due and payable as from 1 July 2014 as provided in Section 8

---

[158] The audit and tax demands were adopted to provide a pretense for ejecting Sanum from Sanum Vegas. Exhibit C(B)-424 and Exhibit C(B)-351, Claimants' Opening Submission, slide 77.
[159] Claimants' Opening Submission, slide 83.
[160] Claimants' Memorial, para. 213.
[161] *Ibid.*
[162] Settlement, Section 7, Exhibit C(B)-774.

> below. The taxes covered herein are all taxes and fees including but not
> limited to those that are specifically indicated in Article 1 of the previously
> signed FTA attached as Annex D hereto.

263. The Claimant accepted the tax waiver as part of the Settlement for which mutual releases
were exchanged, and the Claimant cannot now complain about tax measures which are not
properly part of this arbitration.

264. Equally, any tax issues arising *after* 1 July 2014 are outside the scope of this arbitration.

### 8.5.3.  The Tribunal's Ruling

265. With respect to the E&Y audit, the Respondent had good cause for concern about the
accounts of Savan Vegas.  Sanum had not complied with its reporting obligations.  The
Claimant LHNV has failed to establish bad faith on the part of the Respondent in pushing
for an audit in furtherance of its rights as a significant shareholder in Savan Vegas.

266. Nor was the Government conduct arbitrary.  It had not received information it was owed
by reason of its shareholding interest in Savan Vegas.   The request for an audit was not
abusive, and in the end the Government's suspicions were vindicated by the disclosure of
serious financial irregularities.

267. There is no credible evidence that the E&Y audit was conducted in an unreasonable
manner.   Sanum's CFO, Mr. Clay Crawford, testified that E&Y made excessive
information demands that interfered with the efficient operation of the business but the
Tribunal heard no expert evidence from an independent auditor that E&Y departed from
normal audit practice.

268. Moreover, as earlier stated, the Tribunal is of the view that on a balance of probabilities
Mr. Baldwin dealt in bad faith with the Government in arranging illicit payments to stop
the E&Y audit prior to its completion.

269. The Claimant has not established any breach of contractual (or Treaty) obligations in
respect of Savan Vegas by the Government.

270.   As to the tax issues at Savan Vegas and the Ferry Terminal, it has already been pointed out that the tax waiver was effective up to and including 1 July 2014.[163]  The tax complaints were not revived by the outcome of the **Second Material Breach Application** which did not set aside the Settlement but implemented it.

### 8.6.  Alleged Violations of Treaty Rights in Respect of the Paksan Slot Club, Lao Bao and the Savannakhet Ferry Dock

271.   The Claimant's allegations of wrongful acts and Treaty breaches in respect of these investments have already been reviewed at length in the earlier reasoning of this Award. While the Claimants did not press their complaints in respect of Lao Bao and the Savannakhet Slot Clubs at the Hearing, those complaints relate essentially to tax matters which were resolved with the 2014 Settlement.  To the extent the complaints in this respect were not withdrawn, they are dismissed.

### 8.7.  Allegation that the Respondent Violated Article 3(4) of the Treaty (Umbrella Clause Claims)

272.   The Claimants argue that the Government repudiated its contractual obligations as follows:

(a)   the Respondent imposed construction and brokerage taxes and overtime fees in violation of the FTA;[164] and

(b)   the audit of Savan Vegas violated provisions in the Shareholders' Agreement and the PDA that protected Savan Vegas from unreasonable document and information requests.[165]

---

[163] United Nations International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries (2001), Exhibit CLA(LH)-087:
　　Article 45:  Loss of the right to invoke responsibility:
　　The responsibility of a State may not be invoked if:
　　　(a) the injured State has validly waived the claim;
　　　(b) the injured State is to be considered as having, by reason of its conduct, validly acquiesced in the lapse of the claim.
[164] Claimant's Memorial at para. 243.
[165] Claimant's Memorial at para. 242.

273.    In the Tribunal's view, for the reasons already explained:

(a)      the tax complaints were rendered moot by Article 7 of the Settlement;

(b)      the Claimant has not established that construction and brokerage taxes and overtime fees were wrongfully imposed;

(c)      the Claimant has not established that the Government's document and information requests in respect of Savan Vegas were unreasonable.

### 8.8. Allegations of Discriminatory and Less Favourable Treatment With Respect to Investments pursuant to Article 3(2) and Article 4 of the Treaty

274.    The Claimant alleges discriminatory and less favourable treatment with respect to Sanum and its investments:

(a)      by imposing a 30% tax rate on the Ferry Terminal Slot Club, which was over 100 times more than the 0.22% rate charged to ST;[166]

(b)      by assisting ST in ejecting Sanum from its Thanaleng joint venture investment;[167]

(c)      by pursuing an unlawful audit by E&Y which favoured ST over Sanum by nourishing ST's attack on Sanum's management of Savan Vegas.[168]

275.    The Tribunal has already rejected complaints (b) and (c).  With respect to complaint (a), Article 7 of the Settlement in respect of tax issues foreclosed any liability of the Claimant or the Government with respect to the imposition of such taxes prior to 1 July 2014, including the claim of discrimination.

276.    In any event, the Claimants are in no position to complain of discrimination in the tax system when much of the efforts of the Claimants were directed at obtaining special treatment under an FTA and its extension for a further five years.  To the extent other

---

[166] Claimant's Memorial at para. 249.
[167] Claimant's Memorial at paras. 211-214.
[168] Claimant's Memorial at paras. 196, 200-201 and 213.

corporate entities in Laos also obtained special rates, the fact remains that the Claimant paid less tax than the law would otherwise have required, and, more importantly, whatever it owed was forgiven by the Settlement, so even if there had been breaches (which has not been shown to be the case), there was no loss or damage that could justify compensation.

277. The Claimant LHNV has failed to establish any factual foundation for its complaints of Treaty breaches in respect of Thanaleng and Savan Vegas as previously discussed.

### 8.9. Bad Faith

278. While the Tribunal finds the Respondent's allegations of bribery lack sufficient "clear and convincing evidence" to justify an affirmative finding of specific acts of corruption, nevertheless the probable existence of illicit payments to Madam Sengkeo and through her to Government officials falls to be considered under the general allegation of bad faith.

279. When the Tribunal steps back and views the Claimants' entire course of conduct at issue in these proceedings as particularized above, including the probability of corruption in the Claimants' orchestration of the termination of the E&Y audit (itself an act of bad faith), the manipulation of Government authorities to obtain a gambling licence at Thakhaek and the commitments made in the Paksong PDA without any intention of building the US $25 million hotel and casino which was its basic requirement, thereby eliminating the opportunity for other more serious investors to apply for gaming facilities in the Claimants' monopoly area, all support the conclusion that the Claimants were contemptuous of the commitments that came with the advantages of their Laotian investments.  Mr. Baldwin's testimony only served to confirm the Tribunal in that unfavourable view.

280. While the Tribunal has already rejected the Claimants' allegations for the reasons detailed above, the Claimants' bad faith initiation of some investments and bad faith performance of other investment agreements (as detailed above) and the attempt of Mr. Baldwin to compromise the integrity of this arbitration through an inducement to Madam Sengkeo not to testify provide added reasons to deny the Claimant LHNV the benefit of Treaty protection.

## 9. DISPOSITION ON COSTS

281.   The Respondent Government claims costs for the period from 26 April 2016 through 22 February 2019 in respect of lawyers' fees and expenses in the amount of $1,467,483.72.[169] These fees are exclusive of and apart from the costs sought by the Government arising out of *Sanum Investments Limited v. The Government of the Lao People's Democratic Republic*, PCA Case No. 2013-13, which was not consolidated with this case but for the most part was heard jointly with it. (The Respondent Government claims a total of US $2,780,736.03 in respect of both the ICSID and PCA proceedings). By way of comparison, the Claimants indicated that if successful (and even if not wholly successful) they would be seeking US $ 20,929,951.36 in total in respect of both the ICSID and PCA proceedings. The Claimant's claim, unlike the Respondent's claim, does include the expenses and charges of the respective Secretariats.

282.   Article 58 of the ICSID Arbitration (AF) Rules provides:

> (1) Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne. The Tribunal may, to that end, call on the Secretariat and the parties to provide it with the information it needs in order to formulate the division of the cost of the proceeding between the parties.
>
> (2) The decision of the Tribunal pursuant to paragraph (1) of this Article shall form part of the award.

283.   Article 58 grants the Tribunal broad discretionary power to allocate costs, based on the circumstances of the case. "While there is some variation in tribunals' practices, the prevailing approach of international investment tribunals is to order costs to follow the event."[170] LHNV itself has accepted the application cost-shifting principle in this

---

[169] The Respondent reserved all rights to claim additional attorneys' fees and expenses, in particular if this Tribunal makes any further requests, including requests for further submissions

[170] *Cortec Mining Kenya Limited, Cortec (Pty) Limited and Stirling Capital Limited v. Republic of Kenya*, ICSID Case No. ARB/15/29, Award, 22 October 2018, ¶ 388 (citing *Mr. Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, dated 14 July 2010, ¶¶ 152-155); see, e.g., *Telenor Mobile Communications A.S. v. Republic of Hungary*, ICSID Case No. ARB/04/15, Award, dated 13 September 2006, ¶ 107 ("[T]his Tribunal is among those who favour the general principle that costs should follow the event.").

arbitration—having already submitted its request for "costs and expenses of this proceeding, including attorneys' fees."[171]

284.　According to the Claimants, the quantum of their original claims if wholly successful, might have reached US $ 1 billion.

285.　The costs claim advanced by LHNV and Sanum include US $10,109,872.71 for legal work prior to the Settlement of June 15, 2014.[172]  The Respondent's claim commences post-settlement, specifically from 26 April 2016.[173] Thereafter, until 23 February 2017, the Respondent's claim is made only for the ICSID proceedings, as during that time only the ICSID Tribunal was active – *i.e.*, after the Claimant LHNV filed its Second Material Breach Application, but before the date the Claimant Sanum filed its Second Material Breach Application before the PCA Tribunal.  From and after 23 February 2017 the two cases (ICSID Case No. ARB(AF)/12/6 and PCA Case No. 2013-13) proceeded in parallel although, as mentioned, not consolidated.

286.　Thus, after 23 February 2017, work on all written submissions, evidentiary applications, interim conferences and hearings as well as the Hearing were combined, then evenly divided as between the ICSID proceedings and the PCA proceedings. In the result, the Respondent seeks an order that the Claimant LHNV pay 50% of its legal costs, including lawyers' fees and expenses, incurred from 23 February 2017, through to the present.[174]

287.　The Claimant points out that it was successful on a number of the interlocutory matters including a defeat of the Government's jurisdictional challenges and establishment in the Second Material Breach Application that the Government had failed in two important aspects to honour the Settlement, namely the establishment of a new FTA to assist in the sale of Savan Vegas, and the Government's failure to halt existing and potential criminal proceedings.[175] These were important successes for the Claimants but in the end, they failed

---

[171] Respondent's Submission on Costs, ¶6 (citing Claimant Reply, ¶ 343).
[172] Claimant's Submission on Costs, Schedule A.
[173] Respondent's Submission on Costs, ¶ 16.
[174] *Ibid.*, ¶¶ 6-9.
[175] Claimant's Submission on Costs, ¶ 29.

to establish after years of litigation any liability on the part of the Government in respect of any of the myriad of claims of Treaty violations (as distinguished from two breaches of the 2014 Settlement Agreement, as mentioned). In the circumstances, the Tribunal thinks it appropriate, in its discretion, to award the Respondent its lawyer fees and expenses in the sum of US $1,293,720.27.

## 9.1. Expenses

### 9.1.1.   Travel Expenses

288.   The Respondent's travel expenses represent travel to Brussels and Singapore twice by various witnesses and the Respondent's lawyers and staff, for matters involving the Tribunal. These travel expenses also include travel to Laos, Paris, and Hong Kong for matters such as fact development, evidence gathering and document review.[176]

### 9.1.2.   Miscellaneous Services and Expenses

289.   The remainder of the Respondent's expenses relate to services and expenses required to pursue the arbitrations, some of which were incurred in-house and others by external vendors. Such services include translation services; court reporter and transcript fees; express delivery expenses; research; and trial preparation services in Singapore, such as copying, binding presentations, and creating witness and evidentiary notebooks.

290.   The Respondent's total expenses (other than legal fees and expenses) requested in this arbitration amount to US $173,763.45.[177]  This sum, taken together with legal fees and expenses of US $1,293,720.27 produces a costs award of US $1,467,483.72.

---

[176] Respondent's Submission on Costs, ¶ 18.
[177] Respondent's Submission on Costs, ¶¶ 19-20.
* The arbitrator's fees and expenses of Professor Hanotiau and Professor Stern have been equally divided between the ICSID and PCA proceedings.  The amount shown here represents the ICSID portion.

### 9.2. Arbitration Costs

291.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in US dollars):[178]

|  |  |
|---|---|
| Arbitrators' fees and expenses | |
| Honourable Ian Binnie | US$ 466,076.51 |
| Prof. Bernard Hanotiau* | US$ 393,410.86 |
| Prof. Brigitte Stern* | US$ 358,712.38 |
| | |
| ICSID's administrative fees | US$ 244,000 |
| | |
| Direct expenses (estimated) [179] | US$273,590 |
| | |
| **Total** | **US$ 1,735,789** |

292.    The above costs have been paid out of the advances made by the Parties which were not made in equal parts.  The Claimant made advance payments for a total of US $1,274,969 and the Respondent made advances for a total of US $481,622.95.  The Tribunal orders the Claimant LHNV to bear all the arbitration costs of the ICSID proceeding.  Accordingly, the Tribunal orders the Claimant to pay the Respondent US$ 481,622.95 for the expended portion of the Respondent's advances to ICSID.

## 10. DISPOSITION

293.    In the Tribunal's view, the Claimant LHNV has failed to meet the evidentiary onus of establishing facts necessary to support its legal arguments.  The claims are therefore dismissed.

294.    The Claimant shall pay the Respondent US$ 481,622.95 in arbitration costs and US$ 1,467,483.72 for the Respondent's legal representation costs and expenses.

Made in Singapore, Singapore.

---

[178] The ICSID Secretariat will provide the parties with a Financial Statement of the case account.
[179] This amount includes estimated charges relating to the dispatch of this Award (Courier, printing, and copying).

Professor Bernard Hanotiau
Arbitrator

Professor Brigitte Stern
Arbitrator

Date:    24 July 2019

Date:    27 July 2019

The Honourable Ian Binnie, C.C., Q.C.
President of the Tribunal

Date:    31 July 2019

# Annex A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
WASHINGTON, D.C.


In the arbitration proceeding between

**LAO HOLDINGS N.V.**

Claimant


and


**THE LAO PEOPLE'S DEMOCRATIC REPUBLIC**

Respondent


**ICSID Case No. ARB(AF)/12/6**

---

# DECISION ON JURISDICTION

---


*Members of the Tribunal*
The Honourable Ian Binnie, C.C., Q.C., President
Professor Bernard Hanotiau
Professor Brigitte Stern


*Secretary of the Tribunal*
Mrs. Anneliese Fleckenstein


*Date of dispatch to the Parties: February 21, 2014*

REPRESENTATION OF THE PARTIES

Representing Lao Holdings N.V.:

David W. Rivkin
Catherine M. Amirfar
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
United States of America
and
Christopher K. Tahbaz
Debevoise & Plimpton LLP
21/F AIA Central
1 Connaught Road Central
Hong Kong
and
Dr. Todd Weiler
Barrister & Solicitor
#19 – 2014 Valleyrun Boulevard
London, Ontario N6G 5N8
Canada

Representing The Lao People's Democratic Republic:

Mr. David Branson
King Branson LLC
3 Metro Center
Suite 700
Bethesda, Maryland 20814
United States of America
and
Werner Tsu c/o LS Horizon (Laos)
Unit 4/1.1, 4th Floor
Simoung Commercial Centre
Fa Ngum Road, Phiavat Village
Sistanak District, Vientiane, Lao PDR
and
Professor Jane Willems
3 Metro Center
Suite 700
Bethesda, Maryland 20814
United States of America
and
Professor Don Wallace Jr., Professor of Law
Georgetown University Law Center
Chairman, International Law Institute
1055 Thomas Jefferson St. N.W.
Suite M-100
Washington, D.C. 20007
United States of America

TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ......................................................... 6

II.     ICSID PROCEDURAL HISTORY ......................................................... 6

        A.    The Factual Background to the Dispute ..................................... 10

        B.    The Five Year Flat Tax Agreement ........................................... 11

        C.    The New Tax Code................................................................... 12

        D.    Relations Deteriorate Between Sanum and ST (its Laotian co-venturer) .................. 13

        E.    Public Meetings and Discussion about Amendments to the Tax Code...................... 14

        F.    Negotiations for a Renewal of the Sanum FTA ........................... 15

        G.    Government Notice 1121 .......................................................... 16

        H.    The Sequel to Notice 1121 ....................................................... 16

        I.    Incorporation of the Claimant in Aruba, Netherlands Antilles ................... 19

        J.    The Minister of Finance Rejects Renewal of the Savan Vegas FTA in Document 0772...................................................................................... 19

III.    A GENERAL APPROACH TO THE TRIBUNAL'S JURISDICTION........................... 22

        A.    Prerequisites for the Tribunal's Jurisdiction ........................... 22

        B.    Burden of Proof....................................................................... 24

        C.    Abuse of process distinguished from objection to jurisdiction *ratione temporis*........ 24

IV.     THE TRIBUNAL'S ANALYSIS OF THE OBJECTION TO JURISDICTION *RATIONE TEMPORIS* ...................................................................................... 29

        A.    The Applicable Texts ............................................................... 29

        B.    The Lao Government's Position on its Jurisdictional Objection ................. 30

        C.    The Claimant's Response to the Jurisdictional Objection............................ 32

        D.    The Tribunal's Analysis of the Claimant's First Response to the Objection *Ratione Temporis:* Namely that the Treaty Contains No *Ratione Tempori*s Limitation ........... 37

        E.    The Tribunal's Analysis of the Claimant's Second Response to the Respondent's Objection, Namely that the "Legal Dispute" Over the New Tax Code Did Not Arise Between the Parties Until After the Critical Date of 17 January 2012 ...................... 39

              1.    Definition of a "Legal Dispute"........................................... 39

              2.    When did the dispute arise? The contentions of the Parties and the Tribunal's findings ................................................................. 39

              3.    The Failure of the Lao Government to Produce Satisfactory Factual Evidence on When a "Legal Dispute" Arose with Respect to the New Tax Code................... 45

V.      DISPOSITION BY THE TRIBUNAL OF THE RESPONDENT'S OBJECTION TO JURISDICTION *RATIONE TEMPORIS*...................................................... 49

VI.   DISPOSITION OF APPLICATION FOR COSTS ............................................................. 49

VII.  ISSUES NOT DECIDED BY THE TRIBUNAL ................................................................. 50

FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ICSID-AF Rules | Arbitration Rules (Additional Facility) of the International Centre for Settlement of Investment Disputes |
| BIT or Treaty | *Agreement on Encouragement and Reciprocal Protection of Investments* between the Lao People's Democratic Republic (PDR) and the Kingdom of the Netherlands |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

## I.   INTRODUCTION AND PARTIES

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the *Agreement on Encouragement and Reciprocal Protection of Investments* between the Lao People's Democratic Republic (PDR) and the Kingdom of the Netherlands (the "BIT" or the "Treaty"), which entered into force on 1 May 2005, and the Arbitration Rules (Additional Facility) of the International Centre for Settlement of Investment Disputes, which entered into force on 10 April 2006 (the "ICSID-AF Rules").   The dispute relates to actions by the Respondent the Lao People's Democratic Republic, hereinafter referred to as the "Lao Government", "Laos" or the "Respondent,"  that allegedly deprived Claimant of part or all of its investment in the gaming and tourism industry in Lao PDR.

2.   The Claimant, Lao Holdings N.V., is a company incorporated under the laws of Aruba, The Netherlands Antilles, and is hereinafter referred to as "Lao Holdings" or the "Claimant."  It is important to emphasize at the outset that the Claimant did not become an investor in Laos until 17 January 2012 ("the critical date") at which time it took over ownership of Sanum Investments Ltd., a Macao company, whose principals are John Baldwin and Sean Scott, and which had been investing in Laos since 2007.

3.   The present ruling concerns an objection by the Respondent to the jurisdiction of the Tribunal *ratione temporis* to hear and determine the Claimant's assertion that by reason of the protection of the Treaty it is not subject to a New Tax Code enacted on 11 December 2011.

4.   The Claimant and the Respondent are hereinafter collectively referred to as the "Parties."  Their respective representatives and addresses are listed on page (2).

## II.  ICSID PROCEDURAL HISTORY

5.   On 15 August 2012, ICSID received a Request for Arbitration dated 14 August 2012 from the Claimant against the Respondent, the Lao Government.

6.     On 12 September 2012, the Secretary-General of ICSID registered the Request in accordance with Articles 4 and 5 of the ICSID-AF Rules and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible, in accordance with Article 5(e) of the ICSID-AF Rules.

7.     In accordance with Chapter III of the ICSID-AF Rules, the Parties agreed that the Arbitral Tribunal would be composed of three arbitrators, one to be appointed by each Party and the third presiding arbitrator to be appointed by agreement of the Parties. Professor Bernard Hanotiau, a national of Belgium, was appointed by the Claimant; and Professor Brigitte Stern, a national of France, was appointed by the Respondent.[1] On 22 March 2013, the Parties agreed to the appointment of The Honourable Ian Binnie, a national of Canada, as President of the Tribunal, who accepted the appointment on 23 March 2013.  On 26 March 2013, the Secretary-General, in accordance with Article 13(1) of the ICSID-AF Rules, notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date.

8.     Mrs. Anneliese Fleckenstein, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

9.     The Tribunal held a first session with the Parties on 8 May 2013, in London.  The Parties confirmed that the Members of the Tribunal had been validly appointed.  It was agreed inter alia that the applicable ICSID-AF Arbitration Rules would be those in effect from 10 April 2006, and that the procedural language would be English.  The Tribunal decided, on the application of the Parties, that the place of the proceedings would be Singapore.  The Parties agreed on a schedule for the proceedings, including

---

[1] On 27 February 2013, the Centre sought acceptance from Claimant and Respondent's appointees Professor Bernard Hanotiau and Professor Brigitte Stern as arbitrators. Prof. Stern accepted her appointment on 27 February 2013.  Prof. Hanotiau accepted his appointed on 4 March 2013.

- 8 -

production of documents, and the terms were embodied in Procedural Order No. 1 signed by the President of the Tribunal and circulated to the Parties on 18 June 2013.[2]

10.  On 12 July 2013, the Respondent informed the Tribunal that it would seek bifurcation of the proceeding.  On 2 August 2013, the Claimant objected to the Respondent's request.

11.  A hearing on the Claimant's amended request for provisional measures and the Respondent's request for bifurcation took place in London on 2 September 2013.  In addition to the Members of the Tribunal and the Secretary of the Tribunal, present at the hearing were:

For the Claimant:

| | |
|---|---|
| Mr. David W. Rivkin | Debevoise & Plimpton LLP |
| Mr. Chrispoher Tahbaz | Debevoise & Plimpton LLP |
| Ms. Natalie L. Reid | Debevoise & Plimpton LLP |
| Ms. Leigh E. Sylvan | Debevoise & Plimpton LLP |
| Mr. Andrew Esterday | Debevoise & Plimpton LLP |
| Mr. Todd Weiler | Barrister & Solicitor |

*Witnesses*

| | |
|---|---|
| Mr. John K. Baldwin | Lao Holdings N.V. |
| Mr. Shawn Scott | Vice Chairman Sanum Investments |
| Mr. Richard A. Pipes | Limited Sanum Investments Limited |
| Mr. Clay Crawford | Savan Vegas and Casino Co., Ltd. |

For the Respondent:

| | |
|---|---|
| Mr. David Branson | King Branson LLP |
| Dr. Bountiem Phissamay | Government of The Lao People's Democratic Republic |
| Ambassador Ouan Phommachack | Government of The Lao People's |

---

[2] As agreed at the first session and subsequent modifications, the procedural schedule for the Claimant's provisional measures application was as follows: the Claimant filed an amendment to its request for arbitration including the request for provisional measures on 28 May 2013; the Respondent filed its response on 12 July 2013; the Claimant filed its reply on 2 August 2013; the Respondent filed its rejoinder on 23 August 2013. The procedural schedule for the jurisdiction and merits phase was agreed as follows: the Claimant shall file its memorial on the merits on 22 July 2013; the Respondent shall file its counter-memorial on the merits and its objections to jurisdiction on 22 October 2013; the Claimant shall file its reply on the merits and counter-memorial on the objections to jurisdiction on 22 January 2014; the Respondent shall file its rejoinder on the merits and reply on jurisdiction on 22 April 2014.

|                           | Democratic Republic                         |
| Mr. Sith Siripraphanh     | Government of The Lao People's              |
|                           | Democratic Republic                         |
| Mr. Werner Tsu            | LS Horizon, Singapore                       |
| Mr. K.P. Santivong        | LS Horizon, Vientiane, Lao PDR              |

12.   The following person was examined:

On behalf of the Claimant:

Mr. Clay Crawford                   Savan Vegas and Casino Co., Ltd.

13.   On 9 September 2013, the Tribunal informed the Parties of its decision to bifurcate the proceedings pursuant to Article 45(5) of the ICSID-AF Rules.

14.   A hearing on the Respondent's objection to jurisdiction took place in Paris on 6 January 2014. In addition to the Members of the Tribunal and the Secretary of the Tribunal, present at the hearing were:

For the Claimant:

| Mr. David W. Rivkin       | Debevoise & Plimpton LLP |
| Mr. Chrispoher Tahbaz     | Debevoise & Plimpton LLP |
| Ms. Catherine M. Amirfar  | Debevoise & Plimpton LLP |
| Mr. Corey Whiting         | Debevoise & Plimpton LLP |
| Ms. Sonia R. Farber       | Debevoise & Plimpton LLP |
| Ms. Nadège Jean-Pierre    | Debevoise & Plimpton LLP |
| Mr. Todd Weiler           | Barrister & Solicitor    |

*Parties*
| Mr. John K. Baldwin       | Lao Holdings N.V.   |
| Mr. Shawn Scott           | Bridge Capital LLC  |
| Mr. Tucker Baldwin        | Bridge Capital LLC  |

For the Respondent:

| Mr. David Branson         | King Branson LLP              |
| Dr. Jane Willems          |                               |
| Mr. Werner Tsu            | LS Horizon, Singapore         |
| Mr. K.P. Santivong        | LS Horizon, Vientiane, Lao PDR |

*Parties*

| | |
|---|---|
| Dr. Bountiem Phissamay | Government of The Lao People's Democratic Republic |
| Mr. Sith Siripraphanh | Government of The Lao People's Democratic Republic |
| Dr. Ovan Phommasak | Government of The Lao People's Democratic Republic |
| Dr. Ket Kiettisak | Government of The Lao People's Democratic Republic |
| Mr. Khouanta Phalivong | Government of The Lao People's Democratic Republic |
| Dr. Bounthoury Sisouphanthong | Government of The Lao People's Democratic Republic |
| Mr. Khampheth Viraphondet | Government of The Lao People's Democratic Republic |

## A. The Factual Background to the Dispute

15.    Sanum was incorporated in Macau in 2005 to invest in gambling operations in Asia.  In 2007, as a result of investigations and inquiries by Mr. John Baldwin, Sanum entered into agreements with ST Corporation, a Laotian company with numerous commercial interests in that country, including potentially valuable government concessions for hotel and casino projects.  According to Mr. Baldwin, one of the attractions of ST as a business partner was that it was reputed to be well connected to the Lao Government. The attraction for ST was that Sanum had access to ample foreign funds to invest.

16.    Sanum agreed to establish a joint venture with ST in a series of Laotian hotel and gambling facilities.   Sanum contends that its contribution was more than US$85 million.

17.    Relations between Sanum and ST were governed by a Master Agreement dated 30 May 2007 which resulted in three major projects, The Savan Vegas Hotel and Casino ("Savan Vegas"), The Paksong Vegas Hotel and Casino ("Paksong Vegas") and a third enterprise that invested in slot machine clubs in at least three locations in Lao, namely Thanaleng, Lao Bao and the Ferry Terminal.

18.    Sanum and ST each owned 40% of Savan Vegas and Paksong Vegas, with the Lao Government owning the remaining 20%.

19.     A separate dispute involving Paksong Vegas is being determined by another arbitral tribunal.  It is not before this Tribunal.

20.     The ownership structure of the slot clubs was more complicated and contested, but the details are not germane to the present Jurisdictional Objection.

21.     The Sanum investments did not acquire Dutch nationality for purposes of the Treaty until 17 January 2012, when the Claimant was incorporated in Aruba, in The Netherlands Antilles.

**B.  The Five Year Flat Tax Agreement**

22.     As part of the Lao Government's investment incentive program, and in recognition of its limited capacity to engage in tax audits of a complex cash based business, the Lao Government granted Savan Vegas a five year Flat Tax Agreement ("FTA") dated 1 September 2009, that required it to pay $745,000 per year in taxes each year through 31 December 2013.  The Claimant says that it was promised that when the FTA expired on 31 December 2013, it would be replaced by another flat tax agreement, ideally for the remainder of the 50-year concession. The terms (and in particular the tax rate) were to depend on negotiations arising out of the experience of the initial five year period. As set out below in greater detail, Sanum initiated negotiations for a new flat tax arrangement in March 2011 (which it said was necessary to attract further foreign long term financing for investments).  However, for reasons and in circumstances that are contested in this proceeding, the Lao Government declined to enter into a renewal of the FTA.

23.     According to the Claimant, responsible Laotian government officials induced Savan Vegas to believe (and the Savan Vegas management says it did believe so up until March 2012 and beyond) that the FTA in some form would be renewed.  The New Tax Code was, it says, not a matter of "legal dispute" within the terms of Article 9 of the Treaty until at least March 2012, when negotiations broke down more than two months after the critical date [17 January 2012] of the acquisition of the investment by the investor of Dutch nationality.

- 12 -

24.  The Lao Government says the failure of the Flat Tax negotiations was complete, and must have been obvious to Savan Vegas to be a complete failure no later than November 2011, when the Flat Tax negotiations had clearly been rejected (and the rejection confirmed) by the Laotian Finance Minister.  If Savan Vegas or its investors thought the Lao Government breached any *contractual* right to a renewal, any such contract dispute "crystallized" no later than December 2011 when Sanum received notice of the Finance Minister's decision.  (The Claimant disavows any contractual claim as relevant to the present jurisdictional objection.)

25.  The Lao Government's position is that the FTA extension negotiations and any "legal dispute" over the application of the New Tax Code are inextricably linked.  At whatever point the negotiations for a new flat tax agreement failed (which is a major point of disagreement), the New Tax Code would apply as a matter of law to Savan Vegas.  Any "legal dispute" in respect of the New Tax Code therefore crystallized concurrently with the end of the Flat Tax negotiations which occurred, in the Lao Government's view, well before the critical date of 17 January 2012.  The Claimant therefore has no claim to Treaty protection in respect of the New Tax Code, and this Tribunal has no jurisdiction *ratione temporis* to hear such a dispute.

## C.  The New Tax Code

26.  On 20 December 2011, the Laotian legislature enacted a casino tax of 80% of casino revenues (not profits).  The Claimant contends, and the Lao Government denies, that Sanum was repeatedly assured by high Lao Government officials that this Act was never intended to apply to Savan Vegas.  The purpose of the casino tax, the Claimant says it was assured by high ranking Laotian officials, was to discourage new entrants into the Laotian gambling industry, not to penalize established businesses, such as Savan Vegas.

27.  The Lao Government, for its part, points out that the New Tax Code makes no exception for Savan Vegas.  The New Tax Code, as an exercise of its sovereign power, applies to Savan Vegas according to its terms.  Its potential application was known (and disputed) by Sanum and its principals before the Treaty became applicable to the

Parties.  That is why Sanum was anxious to obtain the FTA extension.  The "legal dispute" therefore predated the entry into force of the Treaty between the Parties.

28.    The Claimant responds that as the Flat Tax negotiations were continuing up to and including March 2012, neither Savan Vegas nor its investors, Sanum and the Claimant, had any reason to believe that there was any prospect of the application of the "confiscatory" casino tax of 80%, plus 10% VAT, to them.  They had been assured otherwise.  There was therefore no legal dispute capable of giving rise to a Treaty claim prior to the acquisition of Dutch nationality in Aruba on 17 January 2012 by the investor.

## D.  Relations Deteriorate Between Sanum and ST (its Laotian Co-venturer)

29.    In the fall of 2011, relations between Sanum and ST deteriorated sharply.  It is the Claimant's position in this arbitration that the Respondent, the Lao Government, took active steps to advance ST's interest at Sanum's expense, including complicity in the closure of the Thanaleng Slot Club and the sequestration of Sanum's slot machines. The position taken by the Claimant in its Notice of Arbitration dated 14 August 2012 was as follows:

> 42.    Here ST has played the role of favored local, while members of the Respondent's justice, culture and revenue ministries, along with its courts and even the Prime Minister's Office, have shared the role of abettor and expropriator.  Indeed, Sanum's story may have been worse, given its discovery of how the President of ST, Sithat Xaysoulivong and the Vice President of the Republic, Bounnhang Vorachith, are in-laws.  [Its] officials are actually related as family to one and possibly more of the very Government officials who have been orchestrating the steady erosion of Sanum's rights and assets within the Lao PDR.

In this context, the Claimant alleges an array of measures initiated by the Lao Government beginning in April 2012, including what the Claimant regards as unfair and oppressive audits of Savan Vegas, resulting in tax claims which the Claimant says are invalid but, being unpaid, led to the freezing of Sanum's bank accounts in Laos. The series of Lao Government measures, the Claimant says, was calculated to deprive Sanum of its investment in Laos.  The application of the New Tax Code rate of 80% on

revenue is part and parcel of the Lao Government's continuing policy of discrimination and oppression, the Claimant says.

30.   The Respondent, for its part, says that Sanum had for years been operating its gambling operations using impenetrable accounting procedures, and in some respects, illegally, making it impossible for the Lao Government to assess their real profitability (and thus, perhaps, to settle on a realistic rate of "Flat Tax" for the future).   As counsel for the Lao Government put it at the 6 January 2014 hearing:

> [The Claimants] decided, for their own reasons, that they would put all their money into Thailand; well, they had been putting their money in Thailand for the last five years.   And it is illegal, it is against the law in Laos for any Lao corporation to have a bank account outside the country, and they had seven bank accounts outside the country for the last five years.   We can tell from some of the documents we received from Ernst & Young that in one of those bank accounts in 2011, a year before the "freezing order", they put $11 million into a Thai bank account.   That's against the law.   (Transcript, pages 19-20).

31.   These extracts provide the flavour of the broader dispute, and the facts will have to be decided in due course, but, for the purposes of the Lao Government's objection to jurisdiction, the only facts that have to be determined are those that relate to the existence and timing of the legal dispute in relation to the application of the New Tax Code to the Claimant's investments.

**E.  Public Meetings and Discussion about Amendments to the Tax Code**

32.   The Lao Government insists, but the Claimant denies, that by the spring of 2011 Sanum must have been aware of proposed amendments to the Tax Code that would increase the tax rate applicable to casinos not covered by an FTA.

33.   In April 2011, the Tax Department sent invitations to the largest businesses in Laos to attend a seminar/public meeting to discuss potential changes to the Tax Code.[3]   The seminar/public meeting actually took place on 11 May 2011 and was attended by approximately 300 people. The handouts included a list of proposed new rates – the excise rate for gaming revenues was proposed to be raised to 25%.

---

[3] Exhibit RE-01, ¶ 6.

- 15 -

34.    Ms. Manivone Insisiengmai, Director of the Laotian Tax Department, was the keynote speaker.  Time was made available for questions and public comment.

35.    The Lao Government says that Sanum and Savan Vegas were invited to the meeting, but cannot state for a fact whether they attended the meeting.[4]

36.    On 20 June 2011, DFDL, a regional law firm with an office in Vientiane, held a seminar to provide information to about 100 clients and potential clients about the proposed New Tax Code, and about investment treaties more generally.  The Claimant says that Sanum was not a DFDL client at the time, had no notice of the meeting and did not attend it.

37.    In June 2011, at its semi-annual meeting, the Laotian National Assembly proposed to amend the excise tax to increase the rate on gambling revenue to 60%.   The amendment was not adopted into law. However, the existence of this proposal was publicly known. The next session of the Laotian National Assembly was to be held in December 2011.[5]

38.    The Claimant says any public discussion of changes to the tax code was not of interest to Sanum or Savan Vegas, which expected to sign a new Flat Tax Agreement.

**F.  Negotiations for a Renewal of the Sanum FTA**

39.    As stated earlier, the FTA between "the Tax Department" and Sanum covers the 5 year period beginning, January 2009 and provides in Article 5 as follows:

> The duration of this contract is for the period of 5 (five) years and valid starting from 01 January 2009 up to 31 December 2013.  The lump sum payment of tax is considered as a trial for the first 5 year period, in case of business growth and income has been increased on the basis of certified existing data, the two Parties will discuss for further improvement of the contract as to comply with the real income of the business and the amount of tax payment will be reconsidered.  (Emphasis added)

---

[4] Exhibit RE-04.

[5] Exhibit RE-01, ¶ 9.

40.   The Claimant says the FTA was not envisaged as a one-time arrangement, but as a 5-year "trial" contemplating "further *improvement* [not termination] of the contract" when "the amount of tax payment will be reconsidered."

## G.  Government Notice 1121

41.   On 10 June 2011, the Lao Government Secretariat in the Prime Minister's office issued what the Respondent calls a "decision," No. 1121 ("Notice 1121"),[6] which refers to the Sanum FTA and the "trial period" and then states the following:

> … After the end of the trial period, the Parties shall comply <u>with principle as prescribed in the main agreement and the laws.</u>" (Emphasis added)

42.   The Lao Government says Notice 1121 manifested a decision that Savan Vegas's FTA would not be extended after the trial period of five years.  It says that "most" of the subsequent documents passing between the Parties and within the Lao Government dealt with Sanum's unsuccessful efforts to have this 10 June 2011 decision reversed.[7] The Claimant says document 1121 is not, and does not pretend to be, a "decision."  The operative part of document 1121 (at least in the English translation) is ambiguous.  The reference to "the principle as prescribed in the main agreement" could be taken as referring to the renewal negotiations explicitly contemplated in Article 5 of the FTA.  Moreover, it seems to misstate the content of Sanum's then current FTA.

43.   When Sanum received a copy of document 1121 on 16 July 2011, the Claimant says it did not understand it to be a "decision."   Discussions with the Lao Government continued in respect of the proposed renewal of the FTA.

## H.  The Sequel to Notice 1121

44.   On 20 June and 22 June 2011, the Ministry of Planning and Investment invited several Ministries and Departments, including the Tax Department of the Ministry of Finance,

---

[6] Exhibit RE-05.
[7] Respondent's Objection, ¶ 29.

to a meeting with Sanum. The meeting was called "in light of the Notice No. 1121 of June 10, 2011."

45.    On 26 July 2011, Sanum itself asked for a meeting with the Tax Department of the Ministry of Finance to discuss the FTA, "following the Notification from the Government's Secretariat No. 1121, dated 10 June 2011."[8]

46.    On 4 August 2011, Ms. Manivone addressed a memo to the Minister of Finance recommending that the Minister seek guidance from the Prime Minister's office on extending the Sanum FTA.  Referring to Notice 1121, she stated the Tax Department's position that the FTA should be extended because the Tax Department lacked the capacity to audit a gambling casino and because two other casinos in Laos had FTAs.[9] Ms. Manivone's 4 August 2011 memorandum to the Minister of Finance states in part in the English translation as follows:

> In response to the request from Savan Vegas and Casino Ltd., the Tax Department is of the view that:
>
>   1.  For Casino and slot machine businesses, the company shall pay Lump Sum Tax as we lack experience in the management and control of this kind of business.  If the company is requested to pay taxes according to its accounting holding, the collection of the revenue might be less than lump sum.  Like LaoYuan Ltd., as mentioned above, casino business is a form of gambling business that uses cash and does not provide receipts as evidence for accounting controls and it is easy for tax evasion.
>
>       For other businesses (besides casino) the taxes shall be paid according to the accounting holding…
>
>   2.  With regard to the request from Savan Vegas for Lump Sum Tax, **we agree with the request but we are of the view that the period for Lump Sum is too long and we cannot make precise predictions for the future.**
>
>   3.  This request is made in a context of business extension with the investment in hotel construction which has reached an advanced stage and will continue to move ahead.  For that reason, the

---

[8] Exhibit RE-09.

[9] Exhibit RE-10.

Company is requesting to pay more taxes than it used to do in the past but we are of the view that the taxes are still not high enough.  Therefore, **the Tax Department suggests that, every 5 years, we should ask for 5% more of what the company is proposing** but the amount should be close to the amount of taxes paid by other companies to the Government with the following breakdown:

*[breakdown set out in Exhibit RE-05 omitted]*

With respect to the request from the company, an **advice from the Prime Minister should be sought** for his further consideration and actions based on the attached report.

This report has been prepared for your information and further guidance.

Director General of Tax Department

Ms. Manivone Insisiengmai  (Emphasis added)

47.   On 5 August 2011, Mr. Baldwin, Mr. Jordahl (then a Sanum VP, and a lawyer) and others from Sanum met with Ms. Manivone and her staff.  Ms. Manivone reported that she and the Tax Department found Notice 1121 to have misconceived at least in part the arrangements with Sanum.  The Tax Department supported the extension of Sanum's FTA on adjusted terms.  Mr. Baldwin was given a copy of the 4 August 2011 memo (supra).  The FTA recommendation is recorded on 16 August 2011 in the minutes prepared by Ms. Manivone of the meeting of 5 August 2011.[10]

48.   On 23 August 2011, Ms. Manivone wrote to the Minister of Finance to "report on the meeting with Savan Vegas to discuss about the directive of the Government Secretariat pursuant to the Notification No. 1121."  After reciting the tax arrangements with other casinos in Laos, Ms. Manivone states:

The tax officers do not have experience in the audit and cannot identify the source of revenue and expenses of this particular type of business. [T]o ensure uniformity throughout the country all casinos are subject to

---

[10] Exhibit RE-11.

FTA because we have no experience.  **Therefore we propose that the FTA be extended.**  (Emphasis added) [11]

## I.   Incorporation of the Claimant in Aruba, The Netherlands Antilles

49.   On 17 July 2011, Mr. Richard Pipes, Vice President of Sanum, recommended to John Baldwin, the CEO, that Sanum undertake a corporate restructuring under a Dutch entity to take advantage of the Dutch/Lao Bilateral Investment Treaty ("BIT") (Pipes II, para. 7).  The Aruba company would become the new owner of Sanum and acquire 100% of Sanum's Lao investment.

50.   The reorganization proceeded at a leisurely pace.  On 29 December 2011, the Sanum organization sent to IMC in Aruba a payment of $5,995 to establish Lao Holdings. [12]

51.   On 17 January 2012, IMC used an off the rack company named Mula Blou Holdings N.V., to form Lao Holdings N.V. in Aruba. [13]

52.   The Respondent says that Sanum did not inform the Lao Government Ministry of Finance or the Prime Minister's office that it had created a Netherlands company to acquire Sanum's investments.

## J.   The Minister of Finance Rejects Renewal of the Savan Vegas FTA in Document 0772

53.   On 24 August 2011, the Minister of Finance informed Ms. Manivone that the Tax Department should hire an expert to advise it on how to audit and tax a casino operation. [14]

54.   On 14 September 2011, the Tax Department published a new draft of the proposed revision of the Tax Code based upon the proposal of the Laotian National Assembly in its June session to raise the excise tax for casinos to 60% of revenue. [15]

---

[11]Exhibit RE-12.

[12] Exhibit RE-16.

[13] Exhibit RE-18.

[14] Exhibits RE-01, ¶ 18; RE-12, notes.

[15] Exhibit RE-13.

55.    **On 28 November 2011, Ms. Manivone sent Sanum a one page letter stating that the Minister of Finance would not approve the extension of the FTA, but that when the present agreement expired on 31 December 2013, "Savan Vegas and Casino Co. Ltd. are to pay tax duties according to the regulated law on tax."**[16] However, the Lao Government acknowledged that any disposition of the Sanum application would be subject to the approval of the Prime Minister's office.[17]

56.    On 20 December 2011, the Laotian National Assembly passed the New Tax Code, raising the excise tax on casino revenue to 80% of revenue.

57.    On 28 December 2011, Mr. Pipes wrote a letter to the Prime Minister requesting an extension of the FTA.  He says his proposal was based on what he understood from Ms. Manivone would be an acceptable schedule of tax payments.[18]  Mr. Pipes was in attendance at the hearing but, by arrangement between counsel, he did not provide oral testimony.

58.    On 11 January 2012, the Prime Minister's office directed the Minister of Finance to deal with the 28 December 2011 request from Mr. Pipes.

59.    On 9 February 2012, the Deputy Minister of Finance was briefed on the latest Savan Vegas FTA proposals:

> Tax Department respectfully request you to review the report draft on the Flat Tax payment requested by Savan Vegas and Casino Co., Ltd. from 2014-2054 **to be reported to Prime Minister for consideration.**  Tax

---

[16] Exhibit RE-14. The Ministry of Finance stated as follows:

> Department of Tax hereby informs you regarding the Flat Tax Payment of Savan Vegas and Casino Co., Ltd. As follows:
>
> 1.    Authorize Savan Vegas and Casino Co., Ltd. to act according to Agreement on Flat Tax Payment until expiration (until 31/12/2013)
> 2.    After the expiration of Agreement on Flat Tax Payment (after 2013) on, the **Savan Vegas and Casino Co., Ltd. to pay tax duties according to the regulated law on tax**.
>
> Therefore, issues this notification for your acknowledgement and to undertake.
>
> Tax Department, Director
>
> Manivone Insisiengmai (Emphasis added).

[17] Mr. Bounnam's First Witness Statement, ¶ 11.

[18] Exhibit RE-15.

> Department has completely amended to such report draft as you
> instructed on 8/2/2012 including the annexes showing the figures of tax
> obligation to be paid from 2014-2054 made by Savan Vegas and Casino
> Co., Ltd. attached herewith. [19] (Emphasis added).

Nothing in the 9 February 2012 document indicates that the Lao Government officials considered the door to be closed to a renewal of the FTA on terms to be agreed to.

60.    On 21 March 2012, there was a high level meeting attended by both the Prime Minister and the Deputy Prime Minister as well as representatives from other Lao Government departments.  The Minutes of the meeting were filed with this Tribunal on 6 January 2014 as Exhibit C-332.   There is no reference in the Minutes to any earlier Lao Government "decision" taken in document 1121 of 10 June 2011 from the Prime Minister's office, or document 0772 of 28 November 2011 from the Minister of Finance.  It appears that there was a discussion in the Prime Minister's office meeting of the merits of the Claimant's proposal, which **according to the Minutes of the 21 March 2012 meeting** was rejected in the following terms:

> Regarding the proposal by Savan Vegas and Casino Company, Ltd. to
> pay a flat tax during the years 2014 to 2054, the meeting agrees as
> follows: 3.1.   Continue to carry out the provisions of the contract
> between the Government of the Lao PDR and Sanum Investments
> Company, Ltd. (Savan Vegas and Casino Company, Ltd.) dated August
> 10, 2007.  **When the period specified in the contract for payment of
> flat tax ends, the contract is to be revised to conform to the Tax
> Laws of the Lao PDR.**
>
> Regarding payment of dividends from casino income, they are to be
> divided by the formula of 30% for the state and 70% for the investors.
> The 70% is to be divided according to the proportion of shares held.[20]

61.    This appears from the file to be the end of the written record of negotiations between the Parties concerning the renewal of the FTA.

---

[19] Exhibit C-319.
[20] Exhibit C-332.

## III. A GENERAL APPROACH TO THE TRIBUNAL'S JURISDICTION

### A. Prerequisites for the Tribunal's Jurisdiction

62.  As was noted above, the Claimant is a company incorporated under the laws of Aruba, The Netherlands.  Article 13 of the BIT provides that in the case of The Netherlands the term "national" under BIT Article 1(b)(ii) shall apply to enterprises incorporated in Aruba.  Hence, Lao Holdings N.V. is a national of The Netherlands, which has been an ICSID Contracting State since October 14, 1966.   Laos is not an ICSID Contracting State.  As such, this dispute was brought under ICSID's Additional Facility Rules.  The Additional Facility establishes that the ICSID Secretariat may administer a proceeding between a State and a national of another State in the following instances, among others:

  a.  "conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State; …"[21]

63.  Article 4 of the ICSID-AF Rules establishes, in relevant part:

"(1) Any agreement providing for conciliation or arbitration proceedings under the Additional Facility in respect of existing or future disputes requires the approval of the Secretary-General. The parties may apply for such approval at any time prior to the institution of proceedings by submitting to the Secretariat a copy of the agreement concluded or proposed to be concluded between them together with other relevant documentation and such additional information as the Secretariat may reasonably request.

(2) In the case of an application based on Article 2(a), the Secretary-General shall give his approval only if (a) he is satisfied that the requirements of that provision are fulfilled at the time, and (b) both parties give their consent to the jurisdiction of the Centre under Article 25 of the Convention (in lieu of the Additional Facility) in the

---

[21] Article 2(a) of the ICSID-AF Rules.

event that the jurisdictional requirements *ratione personae* of that Article shall have been met at the time when proceedings are instituted…"

64.    In the present case the Tribunal must examine its jurisdiction in light of the above Articles of the ICSID-AF Rules and the BIT.  Under this analysis, for the Tribunal to have jurisdiction four conditions must be satisfied:

- first, a condition *ratione personae*: one of the parties to the dispute must be a Contracting State or a national of a Contracting State, while the other must not be a Contracting State or a national of a Contracting State ;
- second, a condition *ratione materiae*: the dispute must be a legal dispute arising directly out of an investment;
- third, a condition *ratione voluntatis*: the parties must consent in writing that the dispute be settled through ICSID-AF arbitration;
- fourth, a condition *ratione temporis*: the ICSID-AF Rules and the instrument including the arbitration clause must be applicable at the relevant time.

65.    No objection is taken to the Tribunal's jurisdiction over the Parties or the subject matter of the claim. Nor is the existence of the consent to arbitration of both Parties contested. The Lao Government's objection is taken solely to jurisdiction *ratione temporis.* According to the Lao Government, the investor was not a national of The Netherlands when the dispute over the New Tax Code arose.  In its view, the "legal dispute" over the application to Savan Vegas of the New Tax Code arose no later than 16 December 2011 when the Claimant received formal notice from the Prime Minister's office that the FTA would not be renewed.  It followed, the Lao Government contends, that the ordinary law governing taxes would apply from and after the expiry of the five year FTA on 31 December 2013.  The "legal dispute" can and did arise before any taxes became due or payable.  It arose more than a month before the Claimant was incorporated in Aruba as an opportunistic device to provide Sanum with access to the rights and remedies afforded by The Netherlands/Laos Treaty.

## B.  Burden of Proof

66.  The Respondent acknowledges that, while "the Tribunal must ascertain that the prerequisites for its jurisdiction are fulfilled and that the facts on which its jurisdiction can be based are proven",[22] in terms of the present jurisdictional objection, the Respondent accepts the burden of proving that the "legal dispute" arose before the critical date.[23]

67.  In particular, the Respondent accepts the onus of establishing (i) that a legal dispute existed and (ii) did so before 17 January 2012 and that the event(s) giving rise to the dispute were (iii) neither continuous nor (iv) composite.

## C.  Abuse of process distinguished from objection to jurisdiction *ratione temporis*

68.  While the Lao Government contends that Sanum's "forum shopping" was an abuse of proper Treaty procedure, it does **not** make the argument that the investor's acquisition of Dutch nationality was an abuse of process that entitles the Lao Government to a dismissal of this entire arbitration.  The Lao Government's objection to the tax element of the claim relies entirely on the general principle of non-retroactivity in the application of international treaties.  The sole asserted basis of denial of the jurisdiction of the Tribunal over the New Tax Code issue is the principle of *ratione temporis.*

69.  The Tribunal wishes to underline the distinction between these two quite different forms of objections.  The *rationale* for the doctrine of abuse of process was succinctly set out in *Phoenix Action Ltd. v. Czech Republic,* ICSID Case No. ARB/06/5 as follows:

> The evidence indeed shows that the Claimant made an "investment" not for the purpose of engaging in economic activity, but for the sole purpose of bringing international litigation against the Czech Republic.  This alleged investment was not made in order to engage in national economic

---

[22] Legal Authority RA-01, *Phoenix Action Ltd. v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009 (hereinafter "*Phoenix*"), ¶ 64.

[23] The Respondent cites *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on Jurisdiction, 1 June 2012 (hereinafter "*Pac Rim*"), ¶ 2.13: "The Tribunal agrees that the burden lies on a claimant who asserts a positive right **and on a respondent who asserts a positive answer to the claimant**." (Emphasis added)

- 25 -

> activity, it was made solely for the purpose of getting involved with
> international legal activity.  The unique goal of the "investment" was to
> transform a pre-existing domestic dispute into an international dispute
> subject to ICSID arbitration under a bilateral investment treaty.  This
> kind of transaction is not a *bona fide* transaction and cannot be a
> protected investment under the ICSID system.

> (…)

> … It is the duty of the Tribunal not to protect such an abusive
> manipulation of the system of international investment protection under
> the ICSID Convention and the BITs.  It is indeed the Tribunal's view that
> to accept jurisdiction in this case would go against the basic objectives
> underlying the ICSID Convention as well as those of bilateral investment
> treaties.  The Tribunal has to ensure that the ICSID mechanism does not
> protect investments that it was not designed for to protect  …[24]

70.  The Tribunal considers that it is clearly an abuse for an investor to manipulate the
     nationality of a company subsidiary to gain jurisdiction under an international treaty at
     a time when the investor is aware that events have occurred that negatively affect its
     investment and may lead to arbitration. In particular, abuse of process must preclude
     unacceptable manipulations by a claimant acting in bad faith who is fully aware prior
     to the change in nationality of the "legal dispute," as submitted by the Respondent.

71.  The Respondent the Lao Government says the award in *Venezuela Holdings B.V. and
     others  v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27 (2010)[25] is
     dispositive in its favour due to the factual similarity with the case at hand, although in
     point of law, the Tribunal's decision in that case turned explicitly on an allegation of
     abuse of right. In fact, the tribunal in that case essentially ruled that it is an abuse to
     change nationality after a dispute has arise, but that no such abuse exists when the
     change of nationality has occurred after the dispute has arisen, in which case the rules
     of *ratione temporis* application of the Treaty aloow the claim to be heard by the arbitral
     tribunal.

---

[24] *Phoenix* ¶¶ 142 and 144.

[25] Legal Authority RA-04, *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela* (formerly *Mobil Corporation and others v. Venezuela*), ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010.

72.   It was shown in that case that Mobil had made substantial investments in Venezuela from 1999 to 2005. In 2004, Venezuela raised the royalty tax rate from 1% to 16.66 %. Mobil said it was "surprised" at that development.   In February and in May 2005, Mobil wrote to the Government complaining of the rise in tax rates.   Then in June 2005, Venezuela raised the rate to 30% by Ministerial decree and introduced a bill into the legislature to raise it further to 50%.   Mobil wrote on 20 June 2005 that the recent raise "has broadened the investment dispute."   It requested negotiations to "reach an amicable resolution of this matter."   The Tribunal concluded that: "It results from those letters that in June 2005 there were already pending disputes between the Parties relating to the increase of royalties and income taxes decided by Venezuela." Thereafter, "on 27 October 2005, Mobil created a new entity under the laws of the Netherlands ..."   That entity then acquired the Mobil companies that had been engaged in Venezuela and "the Dutch Holding Company was thus inserted into the corporate chain for the Cerro Negro and La Ceibo projects."

73.   On these facts, the *Mobil* Tribunal observed:

> 203.   As recalled above, the restructuring of Mobil's investments through Dutch entity occurred from October 2005 to November 2006.  At that time, there were already pending disputes relating to royalties and income tax.  However, nationalisation measures were taken by the Venezuelan authorities only from January 2007 on.  Thus, the dispute over such nationalisation measures can only be deemed to have arisen after the measures were taken.

> 204.   As stated by the Claimants, the aim of the restructuring of their investments in Venezuela through a Dutch holding was to protect those investments against breaches of their rights by the Venezuelan authorities by gaining access to ICSID arbitration through the BIT.   The Tribunal considers that this was a perfectly legitimate goal **as far as it concerned future disputes.** (Emphasis added)

74.   The Tribunal then flagged the important distinction between the abuse of process doctrine and an objection to jurisdiction *ratione temporis.*  As to abuse of process, the Tribunal stated:

> 205.   With respect to pre-existing disputes, the situation is different and the Tribunal considers that to restructure investments only in

order to gain jurisdiction under a BIT for such disputes would constitute, to take the words of the Phoenix Tribunal, "an abusive manipulation of the system of international investment protection under the ICSID Convention and the BITs… (Emphasis added).

75.   However, as to an objection to jurisdiction *ratione temporis*, the *Mobil* Tribunal continued:

… the Claimants seem indeed to be conscious of this, when they state that they "invoke ICSID jurisdiction on the basis of the consent expressed in the Treaty only for disputes arising under the Treaty for action that the Respondent took or continued to take after the restructuring was completed.  (Emphasis added)

76.   The Tribunal in *Pac Rim Cayman LLC v. Republic of El Savador*, ICSID Case No. ARB/09/12, explained clearly that the time frame corresponding to a finding of abuse of process is not the same as the time frame corresponding to an objection *ratione temporis*. **More precisely, if a company changes its nationality in order to gain ICSID jurisdiction at a moment when things have started to deteriorate so that a dispute is highly probable, it can be considered an abuse of process, but for an objection based on *ratione temporis* to be upheld, the dispute has to have actually arisen before the critical date to conform to the general principle of non-retroactivity in the interpretation and application of international treaties.**

77.   As far as abuse of process is concerned, the *Pac Rim* tribunal explained:

2.99 … In the Tribunal's view, the dividing-line occurs when the relevant party **can see an actual dispute or can foresee a specific future dispute as a very high probability** and not merely as a possible controversy. In the Tribunal's view, before that dividing-line is reached, there will ordinarily be no abuse of process; but after that dividing-line is passed, there ordinarily will be. The answer in each case will, however, depend upon its particular facts and circumstances, as in this case. As already indicated above, the Tribunal is here more concerned with substance than semantics; and it recognises that, as a matter of practical reality, this dividing-line will rarely be a thin red line, but will include a significant **grey area**. (Emphasis added)

78.   The solution is different when the issue is based on an objection to jurisdiction *ratione temporis*:

2.101. **Ratione Temporis**: The Tribunal considers that this approach as regards the Abuse of Process issue is materially different from the approach applicable to the Ratione Temporis issue, where both Parties relied on the general principle of non-retroactivity for the interpretation and application of international treaties.

…

2.104. Where there is an alleged practice characterised as a continuous act … which began before 13 December 2007 and continued thereafter, this Tribunal would have jurisdiction ratione temporis over that portion of the continuous act that lasted after that date, regardless of events or knowledge by the Claimant before 13 December 2007. The Tribunal concludes that this solution is different from that reached in its analysis of the Abuse of Process issue, as here explained.

…

2.107. In the Tribunal's view, the relevant date for deciding upon the Abuse of Process issue must necessarily be earlier in time than the date for deciding the Ratione Temporis issue.

79.  In the present case, as in *Phoenix*, it is difficult to discern any fresh economic investment arising out of the restructuring that would advance the purposes of the Treaty which, according to its preamble, exists "to extend and intensify the economic relations between th[e Parties], particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party."[26]

80.  Article 31(1) of the *Vienna Convention on the Law of Treaties*, provides that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context **and in the light of its object and purpose**." The Lao Government says the Claimant has simply taken over the existing investment of Sanum, the Macaon company, and its insertion into the ownership structure was for the purpose of legal tactics, not investment.

81.  However, in this present case, the Lao Government does **not** advance the argument that, as was the case in *Phoenix*, the abuse of process ought to result in a dismissal of the entire arbitration.  Its jurisdictional concern is solely with jurisdiction *ratione*

---

[26] Legal Authority CA-19.

*temporis, i.e.* the attempt to give retroactive effect to the Treaty at the instance of a party not entitled to its protection.  At paragraph 20 of its Objection dated 15 October 2013, the Lao Government states as follows:

> Subsidiarily, Respondent argues that Claimant has proceeded in bad faith in prosecuting its claim in the fashion it has done, and asks the Tribunal to find as a fact that the proceeding with respect to the tax dispute constitutes an abuse of process. **Respondent notes that it does not argue**, as did Respondent in *Pac Rim Cayman LLC v The Republic of El Salvador*,[27] **that "abuse of process" is an independent ground for a finding of a lack of jurisdiction. Rather Respondent urges the Tribunal to make a finding on abuse of process solely for the purpose of allocating fees and costs at the end of the arbitration**, following the guidance of the Tribunal in *Phoenix Action Ltd. v. The Czech Republic,* which awarded all fees and costs to the Respondent in that case based upon a finding of claimant's abuse of the international investment arbitration system. (Emphasis added)

82.   The Lao Government's position was reaffirmed on 6 January 2014 at the hearing on the jurisdictional objection.  The Lao Government seeks only that the Claimant's alleged "forum shopping" be taken into account in the disposition of arbitral costs.

83.   In other words, in the present case, the question could have been discussed whether a dispute was foreseeable before the change of nationality, if an objection had been raised on the basis of an abuse of process. However, as the only objection to jurisdiction was based on *ratione temporis* issues, the only task of the Tribunal is to determine the moment when the dispute arose.  If that moment – "the critical date" – is before the change of nationality, then the Tribunal enjoys no jurisdiction; if, to the contrary, the critical date is after the change of nationality, then the Tribunal can assert jurisdiction.

## IV. THE TRIBUNAL'S ANALYSIS OF THE OBJECTION TO JURISDICTION *RATIONE TEMPORIS*

### A.  The Applicable Texts

84.   Article 9 of the Lao/Netherlands Treaty deals with "legal disputes" and provides as follows:

---

[27] *Pac Rim, supra* note 23.

**Article 9** [legal dispute]

Each Contracting Party hereby consents to submit any ***legal dispute*** arising between that Contracting Party and a national of the other Contracting Party concerning an investment of that national in the territory of the former Contracting Party to the International Centre for Settlement of Investment Disputes for settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States.  (Emphasis added)

85.    While there is no explicit temporal limit written into Article 9, such a time limit does appear in relation to the making of a "claim" under Article 10:

**Article 10** [claim]

The provisions of this Agreement shall, from the date of entry into force thereof, also apply to investments, which have been made before that date, but they shall not apply to **any *claim*** *concerning an investment, which arose before its entry into force.*  (Emphasis added)

86.    The articles relevant to the determination of the present jurisdictional objection draw a distinction between a "legal dispute" and a "claim."  This is not necessarily relevant, as pointed out by the tribunal in *Emilio Agustin Maffezini v. Kingdom of Spain,* ICSID Case No. ARB/97/7, Decision on Jurisdiction, 25 January 2000, 16 *ICSID Review – F.I.L.J.* 1, 33, para. 97 (2001):

While a dispute may have emerged, it does not necessarily have to coincide with the presentation of a formal claim.  The critical date will in fact separate, not the dispute from the claim, but the dispute from prior events that do not entail a conflict of legal views and interests.

## B.  The Lao Government's Position on its Jurisdictional Objection

87.    The Lao Government's objection to the inclusion of the New Tax Code claim in this arbitration may be summarized as follows:

(a)  on 18 March 2011, Sanum made a request to extend its FTA;

    (b)  on 10 June 2011, the Prime Minister's office rejected that request [by Notice 1121], thus requiring Savan Vegas casino to pay taxes after the expiry of the FTA at the rates in the tax code (that is when the tax dispute became a "fact");

    (c)  Sanum tried through five months of subsequent negotiations to have that decision reversed;

    (d)  Sanum was aware from 5 August 2011 that two other casinos in Laos had FTAs;

    (e)  Sanum's negotiations attempting to reverse the Prime Minister's office's decision of 10 June 2011 ended, in any case, on 28 November 2011 when the Finance Department notified Sanum [by Document 0772] that Sanum's investments would be subject to the tax code upon expiry of the current FTA;

    (f)  the New Tax Code was enacted on 20 December 2011, establishing that the new rate for the excise tax on casino revenue would be 80%, thus fixing the "injury" alleged in these proceedings; and

    (g)  the "legal dispute" thus predated the Claimant's acquisition of Dutch nationality;

    (h)  the Claimant thus has no recourse under the Treaty.

88.  In response to the Claimant's contention that the dispute had not crystallized before the change of nationality, counsel for the Lao Government contends that there were no "negotiations" with anyone in a position of authority in 2012. Sanum's letter of 28 December 2011 to the Prime Minister's office, it says, was merely a unilateral offer to negotiate.  It is obvious, counsel for the Lao Government concludes, that a claimant cannot delay the formation of a "legal dispute" by writing unilateral letters of "proposals" that are meaningless.

89.  Be that as it may, the Lao Government contends that, when Lao Holdings was incorporated in Aruba on 17 January 2012, the "legal dispute" over the application of the New Tax Code had plainly been disposed of adversely to Sanum by the Lao Government, and the Treaty therefore has no application. Counsel for the Lao Government put the point as follows:

> The negotiations to attempt to reverse the Prime Minister's Office's June 10, 2011 decision ended on November 28, 2011 when the Tax Department notified Sanum it would be subject to the tax code; and… the new Tax Code was enacted on December 20, 2011, establishing that the new rate for the excise tax on casino revenue would be 80%, thus fixing the "injury" alleged in these proceedings.   The operative "*disagreements on points of law and facts, conflict of legal views or of interests*" all arose before the "crucial date" of January 12 [*sic,* should say 17], 2012.[28]

90.   Hence, the Lao Government says the tax issue not only crystallized prior to the critical date, but was resolved against the Claimant (at that time unprotected by the Treaty) by the Lao Government prior to the critical date.

## C.  The Claimant's Response to the Jurisdictional Objection

91.   The Tribunal notes that the Claimant disavows any *contractual* claim arising out of the Lao Government's refusal to extend the FTA or what the Claimant says are the Lao Government's failures to live up to its alleged promises to renegotiate the FTA.

92.   Equally, the Claimant does not contest the enactment of the New Tax Code, as such. At the enactment stage there was no "legal dispute." [29]

93.   Having said that, the Claimant offers a "cascade" of responses, both legal and factual, to the Lao Government's objection.

94.   **Firstly,** the Claimant says that under the Treaty there is no time limit on when an investor can take a "legal dispute" to arbitration.  Accordingly, it does not matter if the "legal dispute" over the application of the New Tax Code arose in 2011 or 2012.

95.   The Claimant argues that the difference between the wording of Article 9 and 10 shows that the framers of the Treaty put their minds to "temporal" issues, and the absence in Article 9 of an explicit time limit comparable to Article 10 must be given effect.

---

[28] . (Respondent's Objection, ¶ 22)

[29] *ConocoPhillips Petrozuata B.V.,ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits, 3 September 2013 and citing *Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Award, 8 May 2008.

96. The Claimant insists that it does not place any reliance on Article 10.  The Claimant invokes only the "legal dispute" provisions of Article 9.

97. **Secondly,** and in the alternative, if the Treaty is interpreted as containing an applicable temporal limitation, the "legal dispute" over the *application* of the tax law did not arise until after the negotiations for the renewal of the FTA collapsed (at the earliest) in March 2012, well after the critical date.  The Claimant cites the *Micula* tribunal for the proposition that "… the critical date is when the dispute arose rather than the date when events and actions that may have given rise to the dispute took place."[30]

98. In his Fourth Witness Statement, sworn on 25 November 2013, Mr. Baldwin acknowledges receipt on 16 December 2011 of the Ministry of Finance rejection, but testifies that the rejection at the Ministerial level was understood by Sanum to be simply a prelude to a review by the Prime Minister.  He testified to the following conversation with Ms. Manivone after receipt of Notice 0772, which, in his view, simply confirmed that the locus of negotiations had now shifted from the Ministry of Finance to the Prime Minister's office:

> Notice No. 0772 informed us that the Government had rejected our FTA extension proposal.  Although this notice was dated 28 November 2011, we did not receive it until 16 December 2011 – this again is typical of how the Lao Government operates.  When we received this Notice, I was surprised.  I spoke with **Madame Manivone** about it, and she explained that she was instructed by the Minister of Finance to issue it.  **She assured me, however, that the FTA would nonetheless be extended, and that she would help guide us through the process.**  She explained that **we would now have to go through the Prime Minister's Office** to obtain approval for the FTA extension, and that we should resubmit our proposal directly to the Prime Minister.  So, later that month, we submitted a new proposal to extend the FTA – containing the same proposed flat tax payments as those recommended by Madame Manivone in her 4 August 2011 report to the Minister of Finance – to the Prime Minister.  (para. 20, Emphasis added)

99. The inevitable question, of course, is whether Mr. Baldwin correctly recorded his conversation with Ms. Manivone, and if so her intent in providing what he took to be

---

[30] *Ioan Micula , Viorel Micula and others v. Romania,* ICSID Case No. ARB/05/20, Decision on Jurisdiction and Admissibility, 24 September 2008, ¶ 155.

assurances.  The Lao Government did not adduce any evidence from Ms. Manivone to dispute Mr. Baldwin's evidence.  Mr. Baldwin was present at the 6 January 2014 hearing in respect of the jurisdictional objection but by agreement of counsel (as will be explained) Mr. Baldwin did not testify and was not cross-examined.  His evidence was taken as read.

100.  The Fourth Baldwin Statement continued:

> Throughout early 2012, we believed that our latest proposal for extension of the FTA was under active consideration by the Government.  Indeed, I discussed the extension of Savan Vegas's FTA on multiple occasions during this time period with **Dr. Sinlavong, the Minister to the Prime Minister's Office.**  (Emphasis added)

101.  The Lao Government filed an affidavit by Dr. Sinlavong dated 9 December 2013 stating that "Mr. Baldwin has contacted me many times to discuss his investments in Laos" (para. 4).  His redacted statement does not disclose the content or timing of those discussions.[31]  The Claimant requested that Dr. Sinlavong be produced at the hearing of 6 January 2014 for cross-examination, but Dr. Sinlavong did not appear. Counsel for the Lao Government advised the Tribunal that Dr. Sinlavong had failed to make a timely visa application to the French Embassy.

102.  The Lao Government points out the lack of any written communication from the Lao Government corroborating the version of ongoing "negotiations" testified to by Mr. Baldwin and Mr. Pipes, and it says that the documentation that does exist contradicts rather than confirms their testimony.

---

[31] In the Claimant's Rejoinder on Jurisdiction dated 23 December 2013 it is said at ¶ 45:

> 45. In addition, a document produced by Respondent and recently translated by Claimant shows that Dr. Sinlavong – who now claims to "have never spoken to anyone on the issue related to the extension of the flat tax" – *actually issued an official notice calling for Savan Vegas's exemption from the New Tax Law* in March 2012.  Notice No. 728/GO, dated 28 March 2012 and signed by Dr. Sinlavong, advised the Ministers of Finance and Planning and Investment: *"When the Flat Tax Agreement expires, the new Agreement must be amended* according to the Law on Tax of the Lao PDR (subject to the accounting entry system)."  More specifically, the Notice states that "benefits sharing obtaining [sic] from Casino Income [should be]. . . divided according to the State formula namely 30% and the investor gets 70% of the total income," as an alternative to the 80% demand on revenues established under the New Tax Law.

103.    The Lao Government says that the 28 December 2011 "proposal" was not even a good
faith offer to negotiate.  The yearly payments listed in Mr. Pipes' letter were lower than
the 18 March 2011 proposal the Lao Government had previously rejected. In response,
Mr. Baldwin testified that:

> Moreover, the terms of the December proposal, as was the case with
> every proposal, reflected what we were told at the time had the best
> chance of being accepted by the Lao Government.  It makes no sense for
> us to have submitted a proposal we did not believe in good faith would
> be accepted by the Lao Government – our goal was to obtain an
> extension of the FTA.  [Statement dated 25 November 2013, para. 22]

104.    Moreover, **the Claimant contends that** whatever "legal dispute" existed prior to
March 2012 related to the old tax law, which was at a much lower rate, and not to the
New Tax Code enacted on 20 December 2011 but which did not come into effect until
October 2012, and could not have been applied to the Claimant in any event until the
expiry of Sanum's FTA on 31 December 2013, long after the critical date of 17 January
2012.

105.    The Claimant argues that the "tax laws of the Lao PDR" mentioned in Exhibit C-332[32]
must refer to something other than the New Tax Code because if an 80% tax were
imposed on revenue (plus 10% VAT) the next paragraph makes no sense because there
would be no dividends to divide.

106.    The Claimant, in its 2 August 2013 submission, contends the following:

> In March 2012, after Sanum and Savan Vegas learned that members of
> the Government were opposed to their latest proposal for extension, they
> withdrew their proposal.  Nevertheless, Government officials continued
> to state even after that point that agreement on the FTA could be reached
> before the expiry of Sanum's FTA and the new casino tax would not be
> applied to Savan Vegas.[33]

107.    Also, **according to the Claimant,** the Lao Government did not threaten the Claimant
with the new 80% tax on casino revenue until after the Claimant delivered its Notice to
Arbitrate herein on 12 August 2012.   Prior to that date, there had been "no

---

[32] Referred to in ¶ 55 of this Decision.
[33] Claimant's Provisional Measures Reply dated 2 August 2013, ¶ 26.

confrontation of the points of view of the Parties" on that legal issue.  In its application for Provisional Measures dated 19 April 2013, the Claimant first identified the risk of the application to it of the "80% tax on gaming revenues."  On 12 July 2013, the Lao Government affirmed its intention to impose the New Tax Code and stated:

> Absent any proof that a tax would be "confiscatory", claimant is not entitled to Provisional Measures blocking enforcement of a tax passed in a tax code.  (para. 1)

108.   The Claimant contends that the New Tax Code did not become a "legal dispute" between the Parties until it was raised in 2013 in the context of the Claimant's Request for Provisional Measures.

109.   The Claimant says that in the Provisional Measures proceeding, the Respondent asserted for the first time (and the Claimant subsequently denied), that Savan Vegas would be subject to the New Tax Code.  Thus, the Claimant argues, the "legal dispute" over the application of the New Tax Code did not in fact crystallize until July 2013. The Order for Provisional Measures dated 17 September 2013 granted a measure of protection to the Claimant from the New Tax Code by way of an escrow arrangement. The terms of the Provisional Measures decision are not otherwise at issue in the present application.[34]

---

[34] As to the Provisional Measures the Tribunal enjoined:

> "the Lao Government from (a) demanding that Claimant pay any amounts allegedly due pursuant to the New Tax Law; and (b) instituting or further pursuing any action, judicial or otherwise, to collect any payments Respondent claims are owed by Claimant pursuant to the New Tax Law; (b) enjoins the Lao PDR from taking any enforcement action, judicial or otherwise, to seize or interfere in the operations of the Lao Bao and Ferry Terminal slot clubs based on any disputed tax amounts; (3) enjoins the Lao PDR from taking any action, judicial or otherwise, to freeze or seize funds that Claimant or its related entities place in accounts in the Lao banking system; and ( 4) these orders are under the condition that the Claimant deposits in an escrow account at a Singapore bank or other bank satisfactory to the parties under arrangements negotiated by the parties and approved by the Tribunal, the amount of US$429,330 on the first day of each month commencing 1 January 2014. (5) enjoins both parties from taking any steps that would alter the status quo ante, or aggravate the dispute."

On 16 December 2013, the Claimant informed the Tribunal that both Parties had reached an agreement on the escrow arrangements to be established in accordance with the Tribunal's 17 September 2013 Decision on Claimant's Amended Application for Provisional Measures.  The Tribunal confirmed this agreement on 23 December 2013.

110.    Therefore, it was not until 12 July 2013, according to the Claimant, that the present "legal dispute" arose.

111.    **Finally,** the application of the New Tax Code is a *continuing* measure that will affect the Claimant's investments from and after 1 January 2014, and each assessment will give rise to a new claim or legal dispute.  It is therefore an issue that the Tribunal should deal with.

112.    In any event, according to the Claimant, no "claim" has yet been made against Savan Vegas under the New Tax Code, which did not become law until October 2012, and which could not as a matter of law apply to Savan Vegas until the FTA expired on 31 December 2013 (four days before the hearing of this jurisdictional objection).  If, and when a "claim" is made against the Claimant under the New Tax Code, by way of assessment, demand or otherwise, there will arise a "claim" capable of being referred to arbitration (if necessary) under Article 10, but, says the Claimant, no such "claim" is yet in existence.

**D.  The Tribunal's Analysis of the Claimant's First Response to the Objection *Ratione Temporis:* Namely that the Treaty Contains No *Ratione Temporis* Limitation**

113.    The Tribunal does not accept the argument that there is no temporal limit in relation to Article 9 and that any party may at any time refer to arbitration "legal disputes" that were dealt with before the investor's accession to the Treaty (leaving aside events that form elements of continuing or composite disputes).

114.    The general principle of non-retroactivity is expressed in Article 28 of the *Vienna Convention on the Law of Treaties* as follows:

> "Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party."

- 38 -

115.  It cannot be said that the silence of Article 9 with respect to a temporal limit "clearly" manifests a "different intention" apparent on the face of the Treaty.[35]  The fact (as the Claimant points out) that Laos and The Netherlands used different language in different treaties does not alter the fact that nothing in *this* Treaty contemplates that investors such as the Claimant could change their nationalities at will by artful corporate restructurings to "forum shop" after a legal dispute has arisen with the same investor on the same issue and had therefore become, in the words of the *Paushok* tribunal,[36] a "discrete event in the course of relations [between the Parties]" that predated the Treaty."

116.  The general presumption favours non-retroactivity and in this Treaty the presumption is not displaced by any different intention "apparent" on its face.

117.  The Tribunal does not view the Treaty as intending to provide legal weapons to investors for the purpose of re-engaging in a pre-existing legal dispute with the Lao Government.

118.  Accordingly, the Tribunal concludes that the Respondent is entitled to raise the objection *ratione temporis* to its assertion of a "legal dispute" under Article 9.

119.  The question, therefore, is when did the tax dispute arise?

---

[35] In its 1996 Commentaries to the *Draft Articles of the Law of Treaties,* the International Law Commission stated:

> There is nothing to prevent the Parties from giving a treaty, or some of its provisions, retroactive effect if they think fit.  It is essentially a question of their intention.  The general rule however is that a treaty is not to be treated as intended to have retroactive effects unless such an intention is expressed in the treaty or was <u>clearly</u> to be implied from its terms.  (Emphasis added)

[36] *Sergei Paushok and others v. Republic of Mongolia,* UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011, ¶ 498.

**E.  The Tribunal's Analysis of the Claimant's Second Response to the Respondent's Objection, Namely that the "Legal Dispute" Over the New Tax Code Did Not Arise Between the Parties Until After the Critical Date of 17 January 2012**

### 1.  Definition of a "Legal Dispute"

120.  Both Parties accept as appropriate the definition of "dispute" formulated by the Permanent Court of International Justice in the *Mavrommatis* case[37] at page 11:

> A dispute is a disagreement on a point of law or fact, a conflict of legal views or of interests between two persons.

121.  To which the tribunal in *Victor Pey Casado v. Chile,*[38] added:

> In order to establish the existence of such a dispute, "it must be shown that the claim of one of the Parties meets obvious opposition from the other."  (para. 441)
>
> (;;;)
>
> It is only with the expression and the confrontation of the points of view of the Parties that the dispute is crystallized.  (para. 443)

### 2.  When did the dispute arise? The contentions of the Parties and the Tribunal's findings

122.  The Claimant contests the Lao Government's position that the end of the FTA renewal negotiations (whatever date that might be) triggered a "legal dispute" about the application of the New Tax Code.  The Claimant says the two disputes are distinct and separate.  However, the Tribunal agrees with the Lao Government that the issues are linked.  In the situation confronting the Parties in 2011 and 2012, Sanum clearly understood that it would be subject to the ordinary law of Laos, including the Tax Code, unless affirmatively exempted by the extension of its FTA.  Sanum opposed the application to its investments of the ordinary tax laws on the basis of various alleged Lao Government representations and understandings regarding renewal of the FTA,

---

[37] Legal Authority RA-05, *The Mavrommatis Palestine Concessions*, PCIJ Ser A No 2, 11 (1924).

[38] Legal Authority CA-12, *Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Decision on the Request for Provisional Measures, 25 September 2001.

and assurances from Lao Government officials that it was never their intention to apply the New Tax Code to existing investments such as Savan Vegas.  In the Tribunal's view, the link between the FTA extension and the tax issue, while sequential, is clear, with the result that the treatment of the tax aspects of Sanum's business can be considered as a continuous behaviour.

123. Sanum's objective in the negotiations was to avoid the application of the ordinary tax laws.  Whether or not at that time Sanum had formulated a detailed challenge to the application of the tax law to its investments and the implication of constantly increasing rates of tax being considered by the legislative power, does not detract from the direct link between a failure of the FTA negotiations and the consequent triggering of the tax dispute.

124. The Parties agree that the test for determining the critical date is objective and that the relevant question is not whether the Lao Government subjectively believed the legal dispute to have arisen, or whether the Claimant subjectively believed it had not, the question is whether the facts, objectively analysed, establish the existence of a dispute and if so at what time did it arise, and was it resolved (as the Lao Government argues) before the Treaty came into force as between the Lao Government and the Claimant?

125. In early 2011, the Ministry of Finance decided to undertake a revision of the Tax Code under the supervision of the Director General of the Tax Department, Ms. Manivone Insixiengmai, as related above.

126. Counsel for the Respondent emphasizes that flat tax agreements are also made to serve the Lao Government's interest, not only investor's.  If the Lao Government's assessment of the benefit changes, the *rationale* for the Flat Tax, from its point of view, may disappear.

127. Certainly, Ms. Manivone consistently took the view in her memoranda that the Finance Tax Department had only 15 auditors to audit all the largest companies in Laos and she believed that her department lacked not only the human resources but the expertise to

audit a casino, a cash based business.[39]  She pushed hard for a renewal of the Sanum FTA, and made no secret of the Tax Department's views in her dealings with the Claimant.

128.  From the Claimant's perspective, it needed certainty about future tax treatment if it were to be able to arrange for long term financing to expand its gambling operations in Laos.  The financial prospects of the company, and therefore its potential attraction as an investment, were linked, *inter alia,* to its exposure to an escalation of Laotian taxes over the life of the concession.

129.  The evidence shows that, in the months following Sanum's request for a renewal of the FTA, there was disagreement within the Lao Government over the advantages and disadvantages of extending Sanum's FTA.

130.  The Prime Minister's office was actively involved in the file at least by 10 June 2011 when it issued Notice 1121.  The document, in the Tribunal's view, is ambiguous (as previously discussed).  It cannot reasonably be interpreted, on the present state of the record, as a decision rejecting Sanum's request for a new FTA.  But it establishes that the *locus* for the making of the final decision was at the Prime Ministerial level.

131.  Ms. Manivone, who was a central figure in the Sanum negotiations, does not appear to have treated Notice 1121 as a rejection, and her conduct thereafter (as disclosed by the Lao Government documents) is not consistent with that view.

132.  The Lao Government did file a witness statement from Mr. Bounnam Chounlaboudy, who in June 2011 was Director of the Legislative Division of the Tax Department, but it is apparent from his statement that he was only peripherally involved (if at all) in the Sanum negotiations.[40]  Mr. Bounnam does describe Notice 1121 as a denial of Sanum's

---

[39] Exhibit RE-01, ¶ 10.

[40] Mr. Bounnam's lack of knowledge of relevant events is evident from his witness statement, for example:

> *14. I was aware that Mrs. Manivone had discussions with her staff about the Savan Vegas' request for an extended Flat Tax Agreement during the summer 2011.*
>
> *15. I was aware that Mrs. Manivone directed her staff to write a report addressed to the Minister of Finance.  It is dated August 4, 2011.*

request, but his conclusory statement is unsupported by any explanation or analysis of the text (neither the Laotian text nor the English text).  In light of the unsatisfactory state of the evidentiary record, the Claimant requested Mr. Bounnam be produced at the 6 January 2014 hearing for cross-examination but he failed to appear.

133.  The Lao Government explained that Mr. Bounnam was unable to obtain a French visa because of his last-minute application and the holiday schedule of the French Embassy in Laos.[41]  However, in the Tribunal's view, there was no justification for leaving the visa application until the last minute.  The hearing date for 6 January 2014 had been fixed more than 3 months earlier by the Tribunal's bifurcation order dated 23 September 2013.  It was evident at the 23 September 2013 hearing that there were sharp differences between the Parties on some of the facts central to the Lao Government's own jurisdictional objection.  In the absence of a waiver by the Claimant of its right to cross-examine the Lao Government's deponents, it was up to the Lao Government to have its witnesses available for cross-examination either at the hearing or at some prior occasion under arrangements satisfactory to the Parties.[42]

134.  In light of Mr. Bounnam's failure to appear, and the lack of any evidence from Ms. Manivone, as well as the lack of clarity in the English text, **the Tribunal declines to treat Notice 1121 dated 10 June 2011 as a "decision" to reject the Sanum application, which could have triggered the dispute which is in front of the Tribunal.**

135.  There is no doubt, in any event, that Ms. Manivone and the Tax Department continued to negotiate with Sanum on an open-ended basis.

---

*16. I was informed that Mrs. Manivone held a meeting with her staff and Sanum staff on August 5, 2011.*

*17. I was informed that Mrs. Manivone told Mr. Baldwin that she would submit the Tax Department's recommendation directly to the Minister of Finance.*

[41] Email to the Tribunal from Counsel for the Respondent dated Friday, 3 January 2014.

[42] Pursuant to Procedural Order No. 1, and as provided in the IBA Rules (applicable to these proceedings under Section 14.1 of Procedural Order No. 1), any witness whose statement is submitted as evidence is subject to cross-examination.

- 43 -

136. Document 0772 dated 28 November 2011 on the other hand, clearly documents a decision to reject Sanum's application, but only at the level of the Minister of Finance.

137. On the Lao Government's view, the Flat Tax issue was dead as of 28 November 2011 (or at least by 16 December 2011 when Sanum acknowledged receipt of a copy of document 0772).  At that point, if not earlier, the Lao Government says, Sanum was exposed to the ordinary tax rate, and any "legal dispute" about the New Tax Code arose at that time – at least a month before the critical date of 17 January 2012.

138. The Tribunal agrees with the Lao Government that, if the Sanum Flat Tax issue were shown to have been concluded in or before December 2011, the "legal dispute" over the New Tax Code ought to be held to have arisen prior to the critical date of 17 January 2012, despite the Claimant's view that greater formality would ordinarily be required to turn a potential legal dispute into an actual legal dispute.

139. However, both Mr. Baldwin and Mr. Pipes have provided sworn testimony to demonstrate a reasonable expectation that the decision of the Minister of Finance was just a stepping stone in a longer process.  In his Fourth Witness Statement dated 25 October 2013, Mr. Baldwin testifies:

> Notice No. 0772 informed us that the Government had rejected our FTA extension proposal.  Although this notice was dated 28 November 2011, we did not receive it until 16 December 2011 – this again is typical of how the Lao Government operates.  When we received this Notice, I was surprised.   I spoke with **Madame Manivone about it, and she explained that she was instructed by the Minister of Finance to issue it.  She assured me, however, that the FTA would nonetheless be extended, and that she would help guide us through the process.  She explained that we would now have to go through the Prime Minister's Office to obtain approval for the FTA extension,** and that we should resubmit our proposal directly to the Prime Minister.  So, later that month, we submitted a new proposal to extend the FTA – containing the same proposed flat tax payments as those recommended by Madame Manivone in her 4 August 2011 report to the Minister of Finance – to the Prime Minister.  (para. 20, Emphasis added)

140. Mr. Baldwin was available for cross-examination at the 6 January 2014 hearing.  Ms. Manivone was not.

- 44 -

141.  Mr. Bounnam says in his first Sworn Statement that:

> 22.  In January 2012, the Tax Department received a message from the Prime Minister's office, dated January 10, referring to another request from Sanum to extend the FTA.  I have reviewed this document.

His redacted Statement sheds no light on what transpired in January 2012.  In a further Sworn Statement dated 9 December 2013, Mr. Bounnam refers to work he did in relation to a letter from the Vice-Minister of Finance to the Prime Minister's office dated 10 February 2012 (*i.e. after* the critical date of 17 January 2012).  However, if anything, his testimony simply indicates ongoing preparation for the meeting convened by the Prime Minister on 21 March 2012 to discuss Sanum's FTA proposal.  Mr. Bounnam's statements raise more questions than they provide answers.  This is not to say that Mr. Bounnam is to be disbelieved.  However, his evidence is largely based on hearsay, is vague and uncertain in content, and (absent cross-examination) raises too many questions to be relied on by the Lao Government to establish that the FTA negotiations ended in December 2011.

142.  Therefore, **the Tribunal does not consider the letter of 28 November 2012 as a "decision" to reject Sanum's application, which could have triggered the dispute which is in front of the Tribunal.**

143.  Mr. Pipes' Second Witness Statement sworn 2 August 2013 states that, even after the meeting with the Prime Minister and Deputy Prime Minister on 21 March 2012, Sanum was led to believe that the FTA extension was still a live issue within the Lao Government.

> In March of 2012, we learned that members of the Government were opposed to our most recent proposal to extend the Savan Vegas Flat Tax Agreement, and we withdrew our proposal.  But even after March 2012, we continued to believe that we would succeed in coming to an acceptable agreement for extension of the Flat Tax Agreement based on clear statements by Government representatives to that effect.  **Because of those statements, and also because of other reassurances we had received from various Government officials that the new casino tax would not be applied to Savan Vegas, we believed that we would eventually resolve the issue presented by the new casino tax before the current Flat Tax Agreement expired.**  (para. 11, Emphasis added)

- 45 -

144. Mr. Pipes thus refers to discussions of some sort *after* March 2012. However, Mr. Pipes is not specific about his "sources", nor does he identify the "Government officials" referred to, and this substantially lessens the weight of his testimony. This being said, from a jurisdictional perspective, the question whether the FTA negotiations continued after March 2012 is of little relevance. The Tribunal's concern is with 17 January 2012. In any event, to the extent the evidence of Mr. Pipes on this point was considered by the Lao Government to be of significance, he was present and available for cross-examination at the 6 January 2014 hearing and could have been cross-examined on those issues. This eventuality was avoided by the agreement of counsel, as explained below.

145. However, for present purposes, the Tribunal puts no weight on whatever may subsequently have been said by the anonymous "Government officials" referred to but not identified by the Claimant.

146. **It results from this analysis that it appears to the Tribunal on the analysis of the Claimant's evidence that the dispute arose on 21 March 2012, when the final decision not to grant a new FTA to Sanum was adopted at the highest level, in other words, that the dispute arose after the critical date.** It remains to verify whether the Lao Government has adduced credible contrary evidence on when the dispute arose.

### 3. *The Failure of the Lao Government to Produce Satisfactory Factual Evidence on When a "Legal Dispute" Arose with Respect to the New Tax Code*

147. Ms. Manivone would have been able to provide crucial evidence with respect to the Sanum negotiations, and in particular their progress (or lack of it) within the Lao Government, but, despite the Lao Government's initial statement that it would provide a witness statement from Ms. Manivone, none was ever provided to the Tribunal. [43]

---

[43] Initially, the Tribunal was told no such statement was filed because "Ms. Manivone has left the country on holiday," (16 October 2013) and subsequently, on 11 December 2013, the Tribunal was advised that Ms. Manivone "had to accompany her husband, a Lao senior soldier, to Vietnam on official business."

148. The Respondent instead chose to file witness statements from more peripheral Lao Government officials, including Mr. Bounnam (who as mentioned was not involved in the Sanum negotiations at the relevant time), as well as Mr. Souralay and Minister Sinlavong, neither of whom could shed much light on the actual state of negotiations.

149. On Friday 3 January 2014, three days before the hearing called to consider its own objection to jurisdiction, which had been scheduled three months before, the Respondent Lao Government advised the Tribunal that none of Mr. Bounnam, Mr. Souralay or Minister Sinlavong would be available for cross-examination on their witness statements.

150. As stated, both Mr. Baldwin and Mr. Pipes for the Claimant were available on 6 January 2014 for cross-examination.

151. Eventually counsel for the Parties reached an agreement that the Claimant's witness statements would be taken as read, some of the Laotian witness statements would be redacted, but as redacted would remain in evidence, that the two Laotian witness statements in respect of which the Claimant had waived cross-examination would be entered in full, and that no cross-examination would take place of anybody.[44]

---

[44] The arrangement was put on the record in the 6 January 2014 Hearing Transcript, pp. 1-3:

> MR BRANSON: I made a proposal; Mr Rivkin accepted it.  I will let him explain it.
>
> MR RIVKIN:   Yes, I will explain the proposal and let me explain our thinking about it a little bit as well.  The agreement we reached was that because Mr Branson has not arranged for any of his witnesses to be here for cross-examination, he will not cross-examine Mr Baldwin.  All of the witness statements may be taken into the record, but Mr Branson proposed that we be able to redact certain portions of the witness statements of the three witnesses who did not appear for cross-examination.  We had some back and forth yesterday and agreed on which sections would or would not be redacted.  So we can provide -
>
> PRESIDENT:   Of the Respondent's witnesses?
>
> MR RIVKIN:   Yes.  Mr Baldwin's witness statements are in in full.
>
> PRESIDENT:   Although he is not being cross-examined?
>
> MR RIVKIN:   Although he is not being cross-examined.  The two witnesses whom we had decided not to cross, their witness statements are in in full.  And the four witness statements by the three witnesses who were not brought for cross-examination can be

152.   Nevertheless, counsel agreed that:

> … neither side accepts the truth of what's in the witness statements, even the redacted witness statements, and we will have an opportunity to discuss that in our presentations, of course.

153.   The Tribunal, of course, accepts the agreement of counsel with respect to the testimony.  As a result of counsel's agreement, the Tribunal does not draw any adverse inferences regarding the witnesses on either side.  **However, the Tribunal is still left with the problem of the onus of proof.**  Has the Lao Government proven, as it set out to do, that the legal dispute regarding the application of the New Tax Code arose prior to the critical date of 17 January 2012?  In the Tribunal's view, the Lao Government has not discharged its onus of proof of the facts.

154.   In particular, the Tribunal is of the view that the Lao Government has failed to discharge its burden of proof to establish that the negotiations to renew the FTA had come to an end – and that therefore the application of the "New Tax Code" had become a "legal dispute" between the Parties as of the critical date – namely 17 January 2012.  In fact, on the contrary, it would appear on the current record that the Sanum Flat Tax proposal was very much alive at the meeting in the Prime Minister's office on 21 March 2012.

155.   A similar situation existed in the *Pac Rim* case, where negotiations continued after the date when the Claimant considered that a dispute had arisen because of a "final" refusal of a gold exploitation permit:

---

> admitted as redacted, and we will provide you with those redacted copies now.
>
> (…)
>
> PRESIDENT:    Alright.  Mr Branson, do you have anything to add to that?
>
> MR BRANSON: Yes, I think it was irrelevant.  I made the proposal so that both Parties would have equal treatment at the hearing.  If they can't cross-examine our witnesses, then I shouldn't cross-examine their witnesses, so we have equal treatment.  I also proposed that they could redact sections if they believed they might have been able to impeach, so that it would be equal on both sides.  And I trust that our agreement signifies that there is equal treatment, and that one party won't be able to allege later that there was not equal treatment.  That was the purpose of the proposal and the purpose of the acceptance.

2.83. The Tribunal has taken particular note of the Claimant's belief that it received indications from the Salvadoran authorities, to the effect that the different permits and authorisations could yet be granted to its Enterprises. According to the Claimant, even if there were theoretical legal circumstances under which a government agency's failure to meet a statutory deadline could give rise to a dispute between an investor and **the Respondent, the conduct in this particular case of MARN, the Bureau of Mines and other government officials led the Claimant reasonably to understand that even though deadlines had been missed by these authorities, PRES´s applications for a permit and a concession remained under consideration by the Salvadoran authorities.** Therefore, so the Claimant contends, having induced it to understand that despite the missed deadlines in 2004 or 2007 there was no dispute between the Parties, the Respondent is now effectively precluded, as a matter of law, from here arguing that the missed deadlines triggered the present dispute between the Claimant and the Respondent before December 2007.

2.84. The Tribunal accepts the Claimant's submissions. It also notes that, even after March 2008, there were discussions between the Claimant and the Salvadoran authorities. In the Notice of Intent, it was specifically pleaded that: "(i)n 2008, President Elias Antonio Saca was reported as having publicly stated that he opposed the granting of any outstanding mining permits. In light of President Saca's comments and the Government's actions and inactions, the Enterprises engaged in several meetings with the Government in 2008 seeking approval of the necessary permits." Accordingly, the Tribunal concludes that **the alleged omission to grant a permit and concession was not completely finalised before 13 December 2007, because even at that time there still seemed to be a reasonable possibility, as understood by the Claimant, to receive such permit and concession notwithstanding the passage of time.** (Emphasis added)

156. In other words, the case at hand presents a similar situation, because (to track the language of the *Pac Rim* decision) the Lao Government has failed to demonstrate that the FTA negotiations had been finalized before 17 January 2012 and even at that time there still seemed a reasonable possibility as understood by the Claimant, basing itself on objective facts, that such negotiations would lead to a renewal of the FTA on mutually satisfactory terms.   On the record before the Tribunal the negotiations continued until 21 March 2012.

157. It is unnecessary for the Tribunal to decide whether the FTA issue died as a result of the decision taken by the Prime Minister on that date.

## V. DISPOSITION BY THE TRIBUNAL OF THE RESPONDENT'S OBJECTION TO JURISDICTION *RATIONE TEMPORIS*

158. The Tribunal rejects the jurisdictional challenge on the basis that the Lao Government has not met the burden of showing that a legal dispute with respect to the application of the New Tax Code had arisen on or before the critical date of 17 January 2012.  The Tribunal concludes on the present record that the FTA negotiations continued after that date and, until those negotiations ended, the application of the New Tax Code was a mere possibility that was not yet ripe for a "legal dispute" to arise.

## VI. DISPOSITION OF APPLICATION FOR COSTS

159. The Tribunal does not see fit to make any award of costs at this stage of the proceeding.

- 50 -

## VII.   ISSUES NOT DECIDED BY THE TRIBUNAL

160. In light of its disposition of the Flat Tax issue, it is unnecessary for the Tribunal to decide – and it does not decide – with regard to the Claimant's alternate arguments in opposition to the jurisdictional objection.  The Tribunal also wishes to be clear that it makes no findings of fact in relation to the dispute other than those necessary to the consideration and disposal of the Respondent's objection to jurisdiction *ratione temporis*.


_____
Professor Bernard Hanotiau
Arbitrator

_____
Professor Brigitte Stern
Arbitrator


_____
The Honourable Ian Binnie, C.C., Q.C.
President

# Annex B

ICSID Case No. ARB (AF)/12/6

LAO HOLDINGS N.V.
Claimant

and

THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC
Respondent

---

# DECISION ON THE MERITS

---

ARBITRAL TRIBUNAL

The Honourable Ian Binnie, C.C., Q.C., President
Professor Bernard Hanotiau, Arbitrator
Professor Brigitte Stern, Arbitrator

Secretary of the Tribunal
Ms. Mercedes Cordido-Freytes de Kurowski, ICSID

*Date: June 10, 2015*

**INDEX**

I.       OVERVIEW ................................................................................................2

II.      BRIEF HISTORY OF THE INVESTMENT .........................................................6

III.     THE DEED OF SETTLEMENT DATED 15 JUNE 2014 AND THE SIDE
         LETTER OF 18 JUNE 2014.............................................................................8

         (i)     The Alleged Breaches of the Settlement by the Respondent Government..... 11

         (ii)    The Sanum "Monopoly Rights" .................................................. 12

         (iii)   The Flat Tax Arrangement ......................................................... 14

IV.      THE EVIDENCE DOES NOT ESTABLISH THE ALLEGED BREACH OF
         THE SAVAN VEGAS MONOPOLY RIGHTS..................................................15

         (i)     The "Savan City Project" ........................................................... 15

         (ii)    The Doctored Evidence ............................................................... 21

         (iii)   The "Integrated Entertainment Complex"..................................... 24

         (iv)    Conclusion with Respect to the Activities of the Promoters of Savan City ... 25

V.       ACTIVITIES OF SAVAN CITY AND ITS PROMOTERS CANNOT IN THE
         CIRCUMSTANCES BE ATTRIBUTED TO THE GOVERNMENT..............................27

         (i)     Mere Ownership of a 30% Minority Interest is not "Control" ...................... 28

         (ii)    No Board of Directors Meeting of Savan City Was Called to Authorize the
                 Signing of the 2014 Agreements................................................. 30

         (iii)   There is no Evidence that Officials in the Prime Minister's Office Received
                 Any Application for the Approval and Grant of Permission for a Rival Casino...... 32

VI.      INTERNATIONAL LAW PRINCIPLES OF STATE ATTRIBUTION DO NOT
         IMPOSE LIABILITY ON THE GOVERNMENT...........................................................32

VII.     THE CLAIMANT'S THEORY OF A "TACIT" APPROVAL AND GRANT ....34

VIII.    THE GOVERNMENT IS ENTITLED TO RELY ON THE 45 DAY "CURE"
         PERIOD PROVIDED IN ARTICLE 32...........................................................38

IX.      THE PROPER INTERPRETATION OF ARTICLE 6 OF THE DEED OF
         SETTLEMENT...............................................................................................42

X.       DISPOSITION OF THE APPLICATION FOR PROVISIONAL MEASURES ..43

XI.      DECISION ON THE MERITS OF THE MATERIAL BREACH
         APPLICATION .............................................................................................44

XII.     DISPOSITION OF COSTS ................................................................................44

I.      OVERVIEW

1.      The Claimant, Lao Holdings N.C., owns gambling assets in Laos including the Savan Vegas Hotel and Casino Complex in Savannakhet Province.  It is strategically located near the Friendship Bridge which spans the Mekong River, between Laos and Thailand.  As a result of what it considered to be investment treaty violations, the Claimant, a company incorporated under the laws of Aruba in the Netherlands Antilles, initiated proceedings on 14 August 2012 against the Respondent, the Government of The Lao People's Democratic Republic (the "Government"), before the International Centre for Settlement of Investment Disputes (ICSID).  The claim was made pursuant to the *Agreement on Encouragement and Reciprocal Protection of Investments* between Laos and the Kingdom of the Netherlands[1], and the *Arbitration Rules (Additional Facility)* of ICSID.[2]

2.      The Claimant's original ICSID claims were based on a multiplicity of the Respondent Government's actions, including an 80 % tax on casino revenues and what the Claimant contended were unfair and oppressive audits of its Savan Vegas Hotel and Casino.  The Claimant eventually valued its investment loss at between USD 690 million and USD 1 billion.

---

[1] Signed on 16 May 2003, in force since 1 May 2005.

[2] As amended on 10 April 2006.

3.     The ICSID claims were resolved by a Deed of Settlement concluded between the parties during the merits hearing in Singapore on 15 June 2014 (to be read together with a Side Letter dated 18 June 2014) (herein referred to collectively as "the Settlement").

4.     The Claimant now alleges a "material breach" of the Settlement by the Government which, it says, justifies the Tribunal in reviving the pre-settlement ICSID claims.

5.     The Claimant's core allegation is that subsequent to the Settlement, the Government infringed the Claimant's gambling monopoly rights by approving and granting permission for the establishment of a rival casino or casinos within its area of exclusivity.  The Government undertook in Article 13 thereof to facilitate the sale of the Claimant's gambling assets in Laos "on a basis that will maximize Sale proceeds to the Claimants and Laos".  Instead, according to the Claimant, the Government's approval of a rival casino or casinos has so substantially destroyed the potential value of the Savan Vegas Hotel and Casino in the eyes of potential investors as to frustrate (and terminate) the Settlement.

6.     The Claimant offers no direct evidence of such approval.  Instead it has produced a variety of items of circumstantial evidence, including media reports, blogs, the continuing operation of a rival slot club or clubs in the Claimant's territory and activities of private individuals and entities (not the Government) from all of which, the Claimant argues, Government approval can be inferred.

7.     The important question arises as to whether any of the conduct of various private entities (including a corporation in which the Government holds a minority 30% interest) which promoted creation of a potential rival casino can be attributed to the Government.

3

8.     If the Tribunal is persuaded on the attribution issue, the further question arises as to whether the Government "cured" the alleged default within 45 days "after receipt of notice of such breach" as permitted by Article 32 of the Settlement, by making it clear that no rival casino would be permitted in the Claimant's territory during the balance of the 50 year life of the Claimant's concession.

9.     The Tribunal's jurisdiction to revive the ICSID claims is conferred (and limited) by Article 32 of the Deed of Settlement which reads in part (as clarified by the Side Letter), as follows:[3]

> The Claimants shall only be permitted to revive the arbitration in the event that Laos is in material breach of Sections 5-8, 15, 21-23, 25, 27 or 28 above and only after reasonable written notice is given to Laos by the Claimants of such breach **and such breach is not remedied within 45 days after receipt of notice of such breach.** (emphasis added)

10.    For reasons that follow, the Tribunal is of the view that even accepting *arguendo* the interpretation of the Deed of Settlement most favourable to the Claimant, the evidence

---

[3] The full text of Article 32 as clarified by the Side Letter reads as follows:

> **Article 32**
>
> The Claimants shall only be permitted to revive the arbitration in the event that Laos is in material breach of Sections 5-8, 15, 21-23, 25, 27 or 28 above and only after reasonable written notice is given to Laos by the Claimants of such breach and such breach is not remedied within 45 days after receipt of notice of such breach. The Sale Deadline and any other relevant time periods herein shall be extended by the length of time required to cure such breach. In the event that there is a dispute as to whether or not Laos is in material breach of Sections 5-8, 15, 21-23, 25, 27 or 28 above, the Tribunals shall determine whether or not there has been such a material breach and shall only revive the arbitration if they conclude that there has been such a material breach.

fails to establish on a balance of probabilities that the Government itself, directly or indirectly, "approved and granted" permission for a rival casino contrary to the Claimant's contractual entitlement.

11.     The Tribunal notes the Claimant's contention that against a sovereign state a Claimant "is often unable to furnish direct proof of facts giving rise to responsibility" because, as the Claimant argues, such evidence is often "exclusively within the control of the Government".[4]   Nevertheless where, as here, the Claimant's case is based on "inferences of fact and circumstantial evidence" (see Claimant's Submission, 27 March 2014, at para. 27) a Tribunal must be careful not to shift the onus of proof from the Claimant to the Respondent Government or to bend over backwards to read in inferences against "the sovereign state" that are simply not justified in the context of the whole case.

12.     Further, even if it were accepted, *arguendo,* that some of the evidence is suggestive of some sort of "tacit" signal of approval to rival entrepreneurs, all of which is denied by the Government, it is the Tribunal's conclusion that any such alleged conduct was "cured" by the Government within 45 days.  If there was any doubt before 26 June 2014 about the Government's policy against new casinos, there was none afterwards.  The Government's position was not shouted from the roof tops to the extent the Claimant now insists upon but, in the Tribunal's view, there was no contractual obligation undertaken by the

---

[4]  Relying on the *Corfu Channe*l Case, Judgment of 9 April 1949, at 18 and *Alpha Projektholding GmbH v. Ukraine*, (ICSID Case No. ARB/07/16), Award of 8 November 2010) at 373.

Government to have the Prime Minister make a high level denunciation of every potentially damaging newspaper report or other misinformation sourced in the private sector.

13.    The Tribunal rejects the Claimant's argument that the violations of the Settlement by the Government, to the extent they have been established (if at all), created such serious prejudice to the Claimant as to render the violations incurable within the permitted 45 days. The curative measures that were taken extinguished whatever claim for revival might otherwise have arisen on the evidence before the Tribunal.

14.    Accordingly, the Claimant's application for a revival of the arbitration pursuant to Article 32 of the Deed of Settlement must be dismissed.  The disposition of costs will be dealt with as hereinafter provided, and together with this decision on the merits, will be incorporated in the Award to be issued under Article 52 of the *Arbitration* (*Additional Facility*) *Rules* of ICSID.

## II.    BRIEF HISTORY OF THE INVESTMENT

15.    The Claimant has invested substantial monies since 2007 in three major projects in Laos, the Savan Vegas Hotel and Casino ("Savan Vegas"), the Paksong Vegas Hotel and Casino ("Paksong Vegas") and other enterprises (with local partners) that operated slot machine clubs.  The Claimant's gambling assets are held through Sanum Investments Inc., a company incorporated in Macao.[5]

---

[5] The Government makes the curious submission that there is no "operating company" or "subsidiary" which is a party to the PDA. (Government Submission 3 April 2015 at para 119.)  However, the Claimant's subsidiary Sanum is a party to the PDA.  The Government's submission seems to have overlooked the fact

16.     The ICSID dispute related to the Respondent Government's fiscal, regulatory and administrative measures allegedly targeting the Claimant's investment at the instigation of the Claimant's erstwhile but now estranged Laotian partners.  These measures[6] according to the Claimant deprived it of part or all of the value of its investment in the Laos gaming and tourism industry.  The Government, for its part, accused the Claimant of various acts of criminality.[7]

17.     It is unnecessary for the purposes of this application to explore in any detail the particulars of the ICSID dispute.  Suffice it to say that by the spring of 2014, the Claimant and its U.S. principals wanted to halt the threatened Laotian criminal investigations and to

---

that Lao Holdings NC, not Sanum, is the only Claimant in the ICSID proceeding.

[6]  The "oppressive" measures, the Claimant alleges, were instigated by powerful Laotian business and political leaders in part for the benefit of Sanum's estranged Laotian business partners, a Laotian company called ST and its principals who are Laotian nationals.  Eventually, the Government issued fresh tax claims against Savan Vegas which the Claimant says were invalid but, being unpaid, led to the freezing of the Savan Vegas bank accounts in Laos.  The series of Government measures taken together, the Claimant contended in the ICSID arbitration, amounted to *de facto* expropriation.

[7]  The Government contended that the Claimant and its related companies had for years been operating their gambling operations using impenetrable accounting procedures, and in some respects acting illegally, including through the corruption of Laotian Government officials.  In 2013, the Government declared its intention to initiate criminal investigations of the Claimant and its principals who are U.S. citizens.  Counsel for the Government made the submission at the 6 January 2014 hearing that:

> [The Claimants] decided, for their own reasons, that they would put all their money into Thailand; well, they had been putting their money in Thailand for the last five years.  And it is illegal, it is against the law in Laos for any Lao corporation to have a bank account outside the country, and they had seven bank accounts outside the country for the last five years.  We can tell from some of the documents we received from Ernst & Young that in one of those bank accounts in 2011, a year before the "freezing order", they put $11 million into a Thai bank account.  That's against the law. (Transcript, 6 January 2014, pP. 19-20).

"maximize the Sale proceeds" of their gambling assets in Laos.  Equally, the Government

wanted to see them gone.

### III.  THE DEED OF SETTLEMENT DATED 15 JUNE 2014 AND THE SIDE LETTER OF 18 JUNE 2014

18.     By Deed of Settlement dated 15 June 2014, which is to be read together with a Side

Letter dated 18 June 2014, the Claimant agreed with the Government to end the hearing of

the ICSID arbitration (and a parallel UNCITRAL arbitration involving Paksong Vegas that

was pending before the Permanent Court of Arbitration).

19.     The Settlement is governed by New York law.  It contemplated that the money

necessary to achieve a clean break between the Claimant and Laos would come from a

third party purchaser of the Claimant's gambling assets.  The Government itself did not

agree to pay any compensation.  Its position was described by its counsel as follows:

> We started negotiating on Thursday.  We negotiated all day Friday.  I imposed
> the terms, here are the terms: "We pay them nothing; they dismiss their claims,
> they sell their casino for what they can get, and they leave Lao.  Those are the
> terms."
> (Transcript, 17 June 2014, p. 25)

> I told you, I imposed the terms.  I've been trying my best to make it possible
> for them to work the deal.  So, any time they asked me for anything that would
> make it easier for them to sell, make it easier for them to do this or that, I would
> put it in the Agreement.  I bent over backwards.
> (Transcript, 17 June 2014, p. 33)

20.     Counsel for the Claimant explained the origins of the Settlement somewhat

differently:

> The settlements arose--the possibility of the Settlement arose a couple of weeks
> ago when Claimants received an offer to purchase their--the Savan Vegas
> properties, and it became clear that that might be a means to resolve the disputes.
> But, of course, Claimants can only sell the Savan Vegas and the other properties
> they own with the cooperation of the Laos Government and with certain steps
> taken by the Laos Government that make the properties salable.

8

(Transcript, 19 June 2014, pp. 49-50)  (emphasis added)

The "certain steps taken by the Laos Government" included, in the Claimant's view, negotiation of a new Flat Tax Agreement and preservation of the casino monopoly acquired by Sanum under the *Project Development Agreement on Savan Vegas Entertainment Hotel and Casino in Savannakhet Province* dated 10 August 2007[8] between the Government and Sanum Investments and its private Laotian partners (hereinafter referred to as the "*2007 Sanum Agreement*").

21.    Under the Settlement, the Claimant was entitled to attempt to complete a sale within 10 months from June 15, 2014, with an extension of time if necessary to accommodate a closing date.  During that time, the Claimant and its affiliates would continue to run the businesses subject to the "monitoring and oversight" of the Government's agent, RMC Gaming Management LLC ("RMC").   At the end of 10 months, if no sale had materialized, the Claimants and Laos would have the right "to appoint RMC or any other qualified operator" to step in and manage the gambling assets "in place of the Claimants until the sale is complete" (Article 12 of the Settlement).

22.    Central to the Claimant's argument is the interpretation of Article 6 of the Deed of Settlement (as clarified by the Side Letter):

> **Article 6**
>
> Laos shall treat the Project Development Agreement ("PDA") dated 10 August 2007 in respect of the Savan Vegas Casino and each of the licenses and land concessions issued in respect of the Savan Vegas Casino, the Lao Bao Slot Club

---

[8]  Exhibit C-004 at p. 10

> and the Savannakhet Ferry Terminal Slot Club (collectively the "Gaming Assets"), <u>as being restated as of the Effective Date, with a term in each of fifty (50) years from the Effective Date</u>.  ST owns 40% of the Lao Bao and Ferry Terminal Slot Clubs. [emphasis added]

Much of the present dispute revolves around the disagreement of the parties about the meaning and effect of the underlined words of Article 6.[9]

23.     The Claimant says the effect of Article 6 is to make Sanum's casino monopoly enforceable not only by Sanum but also by its parent, the Claimant.  The Government acknowledges the existence of the casino monopoly but says that only Sanum (not the Claimant) is entitled to enforce it.  Moreover, the Government insists that any dispute under the *2007 Sanum Agreement* lies within the exclusive jurisdiction of the Singapore International Arbitration Centre (SIAC).

24.     The parties agree that the Settlement governs the negotiation of any new *Flat Tax Agreement* (FTA), and that disputes in relation thereto are potentially within the jurisdiction of this Tribunal under Article 32 of the Settlement.  The Claimant argues that the breach of the monopoly destroyed the Settlement, and with it a proper basis for the Claimant to negotiate a new FTA and thereby contributed to its losses.  The Government responds that the Settlement is still in force and the continuing failure to reach a new FTA

---

[9]  In its 3 April 2015 Submission, the Government states that in its ruling of 19 December 2014,

> "the Tribunal never determines that the phrase "to treat as being restated" is ambiguous, and therefore it is error to interpret unambiguous words by reference to some supposed "purpose" not expressed in Article 13".

In fact, the 19 December 2014 ruling stated unequivocally in para. 2 that "the Tribunal has also concluded, for the reasons set out below, that <u>given the ambiguous wording of Article 6</u> of the *Deed of Settlement* on which the Claimant relies…" (emphasis added)

has been, and continues to be, exclusively attributable to the intransigence of the Claimant, which has refused to name its nominee to the joint "Flat Tax Committee" contemplated under Article 9 of the Settlement.

25.     The Claimant also expected to profit from a land concession and development of an airport and other amenities on 90 hectares of land at Thakhet under a memorandum of understanding dated 20 October 2010 as contemplated under Article 22 of the Settlement. When the Claimant declined to pay the required USD 500,000 fee in a timely way, the Government declared an end to the Claimant's potential participation in Thakhet.

**(i)     The Alleged Breaches of the Settlement by the Respondent Government**

26.     A few days after the celebration in Singapore of the signing of the Deed of Settlement and the Side Letter, the Claimant filed on 4 July 2014 an "*Application for Finding of Material Breach of Deed of Settlement and for Reinstatement of Arbitration*" ("the Material Breach Application").   The ground for relief was an allegation that the Respondent Government had "approved and granted" gambling concession(s) to third parties in the nearby "Savan City" project in breach of the Savan Vegas casino monopoly rights, thereby ending (the Claimant said) any possibility of a sale that "will maximize Sale proceeds to the claimant and Laos" as contemplated in Article 13 of the Settlement.[10]   It

---

[10]  The Government argues that Article 13 only applies to a sale by the Gaming Operator, RMC, if and when RMC takes control of the Gaming Assets in the event Sanum fails to "complete a sale on time" (Government Submission, 3 April 2015, at para. 109.).  This is not correct.  "Sale" is defined in Article 10 as "a Sale of the gaming assets".   The context of Article 10 is a sale by the Claimant not the "Gaming Operator" RMC. Accordingly the "Sale" referenced in Article 13 could be by either the Claimant or RMC, depending on the circumstances, and in either case the purpose set out in Article 13 applies.

also alleged, as stated, that the Government, not the Claimant, is responsible for the failure to achieve a new FTA and the frustration of the Thakhet project.

**(ii)    The Sanum "Monopoly Rights"**

27.    The parties appear to agree that any Government permission to open a rival casino would have a "material" impact on the income and future prospects of the Savan Vegas Hotel and Casino.  In its 3 April 2015 Submission, the Government concedes that "the damages caused by a new casino could be large [and] when multiplied by 50 [i.e. the number of years of the monopoly] could be astronomical" [para. 22].  Lower future earnings as a result of increased competition would mean a lower current valuation and a correspondingly reduced price for the Claimant's gambling assets in the market place.

28.    The "monopoly rights" are contained in article 9(24) of the *2007 Sanum Agreement*, which provides as follows:

> The **Company** has been granted monopoly rights for its Casino business operations only with the condition that the **Government** shall not **approve and grant** any other parties or entities who put up their applications for the operation of certain Casino business in the three (3) neighboring provinces close to the Project development zone of the Company namely:  Savannakhet, Khammaouane and Bolikhamsay, throughout the concession period of 50 years.
>
> However, should there have any applications submitted by any parties or entities, all those shall be made through **the consent and approval of both the Government and the authorized investors** who have management rights (emphasis added)

The Government's position is that it has given no "approval and grant" of a casino licence in the Claimant's exclusive territory.  The Claimant responds that Article 9(24) does not use the word "licence" and, in its view, may be breached without the actual grant of a licence.  The Claimant says:

12

"the provision of the PDA that underlies Claimant's Application does not refer to the grant of a gaming license, which in any event would be surprising at this early stage of development of the project, rather, it is the "approval" of "casino business," whether formal or informal that constitutes a breach of Savan Vegas's monopoly rights and a material breach of the Settlement.  (Claimant's Submission, 27 March 2014, para. 7).

According to the Claimant, "informal" approval can be very informal, such as the Government's failure to shut down the non-conforming slot club(s) of Madam Kozy (discussed below) or the presence of the Vice President of the National Assembly at a signing ceremony on 26 June 2014[11] where private developers announced a $10 billion project for Savan City.

29.    In the alternative, the Claimant argues that "even if the Tribunal declines to find that Laos has approved a new casino at Savan City, the refusal of the Prime Minister or political figure of equivalent authority to issue a single public statement denying approval

_____

[11] As Claimant's counsel put it:

How does the government show approval?  Well, it shows approval by sending a senior official like the Vice President of the National Assembly to a signing ceremony which is highly-publicized within Laos and outside of the country; and at which the Vice President of the Lao National Assembly says that the goals of Savan City and the SEZ have been realized.

You'll recall the testimony, you will recall those are in the words in the press release and you will recall Mr. Thongsay confirmed that is what he said.  That is a statement of Lao government approval. It is a public statement of Lao government approval, and it fits in with all the rest of the evidence about what happened.

(Submissions, 14 April 2015, at p. 161)

13

of a casino over the past nine months itself constitutes a separate and independent material breach of Section 6 of the Settlement".[12]

30.     In the further alternative, the Claimant accuses the Respondent Government of attempting to mislead the Tribunal by submitting a "doctored" site map for Savan City and "the Tribunal should need no more than that to determine that Laos is liable."[13]

**(iii)    The Flat Tax Arrangement**

31.     The Claimant's previous 5-year FTA with the Government expired on 31 December, 2014.

32.     The Settlement contemplated the negotiation of a new Flat Tax agreement within 45 days of 15 June 2014.  The Claimant, having filed the present Application on 4 July 2014, declined to join in the agreed process to arrive at a new Flat Tax Agreement.  It argued that because of the Government's alleged breach of the Savan Vegas monopoly rights, the contractual arrangements made in the Settlement were, as a matter of law, nullified.  The Government's breach of the monopoly rights therefore had the knock-on effect of denying the Claimant the benefit of a new FTA as well as the opportunity offered by the potential development of the Thakhet site.

33.     In the result, Savan Vegas has paid no income tax on casino revenues or earnings since 1 January 2015.  It also withheld employment tax from January 1, 2015, until the

---

[12] Claimant's Submission, 27 March 2014, para. 11; Evidence of John Baldwin, 14 April 2015, p.20 ll 12-17

[13] Claimant's Submission, 27 March 2014, para. 15

week prior to the Tribunal's Singapore hearing on 13-14 April 2015, at which point Savan

Vegas paid employment tax said to be owing of approximately USD335,000.[14]

## IV.    THE EVIDENCE DOES NOT ESTABLISH THE ALLEGED BREACH OF THE SAVAN VEGAS MONOPOLY RIGHTS

34.     The Claimant contends that the Government has *approved and granted* permission

to build and operate a rival casino in the "Savan City" project adjacent to the Savan Vegas

Hotel and Casino in Savannakhet Province.

35.     In the Tribunal's view, the evidence does not justify any such conclusion.

## (i)     The "Savan City Project"

36.     The Government, in 2003, established a Special Economic Zone (SEZ) adjacent to

what became the Savan Vegas Hotel and Casino property.  The SEZ is administered by the

Savan SENO Special Economic Authority, ("the SEZ Authority"), a Government entity.

37.     Little if any development of this SEZ has occurred since 2003.

38.     In 2007, the SEZ Authority entered into an agreement for the development of a

portion of the SEZ called Site A with a private developer, the Thai Airports Ground

Services Co. Ltd. ["TAGS"], under which a new operating company (eventually called

---

[14] Baldwin testimony 14 April 2015, p. 5, ll 9-15

"Savan City") would be formed.[15]  For ease of reference, the 2007 Agreement will be herein referred to as "the *2007 Savan City PDA*".

39.     Savan City, as it is now called, is owned 70% by private interests, who were responsible for raising the funds and developing the Project, and owned 30%, directly or indirectly, by the Government.

40.     The *2007 Savan City PDA* attached a Master Plan for development.  Over the ensuing years, TAGS failed to produce a viable development for Site A.

41.     Between 2008 and 2012, the Claimant, through Sanum attempted to promote a development on site A.[16]  In 2013 Sanum submitted a proposal of about 200 pages for development of Site A to the Deputy Prime Minister.  This was not accepted.

42.     In 2014, Savan City put together a development proposal for Site A in conjunction with a Malaysian private developer, Asean Union Inc.

43.     At a press conference in Vientiane, the capital of Laos, on 26 June 2014, Savan City and Asean Union announced the new $10 billion project.  The project was based on three development agreements for a portion of Site A that included an agreement for a financial centre[17] that would offer "off-shore" banking services (herein referred to as the

---

[15] The Agreement is dated 13 June 2007 and made between the Savan SENO Special Economic Zone Authority ["SEZA"] and TAGS

[16] Evidence of the John Baldwin, April 14 2015, p. 24, ll 13-18, Exhibit c-272, p. 25, ll 1-5;

[17] Joint Venture Agreement dated 2 May 2014 in respect of establishing the ASEAN Union Bank between ASEAN Union Inc. and Savan City Co., Ltd. (Exhibit C-887)

"**Asean Bank Agreement**", a project that would require changes in Laotian banking law), an agreement for a substantial resort[18] (herein referred to as the "**Entertainment Complex**" agreement), and an Agreement to establish "**Savan Gateway**", a development that included a shopping centre, Tourist Information Centre, duty free shopping, a petrol station and other facilities.[19]

44.     The Master Plan attached to the *Asean Bank Agreement*[20] and the *Entertainment Complex Agreemen*[21] designated part of the site as the location of a casino.  The casino designation in the Master Plan is heavily relied upon by the Claimant to prove its case.

45.     At the very public "signing ceremony" in Vientiane, the promoters announced a new "US $10 billion" project, to be called Asean Paradize Savan City.  As stated, the Vice President of the National Assembly attended the signing ceremony and welcomed the potential $10 billion investment.  The private promoters hoped to develop  a new casino close to the Savan Vegas Hotel and Casino, but there is no evidence the Vice President was aware of the casino objective.  The promoters' press release on that day did not make explicit reference to a casino:

> "The Integrated Entertainment resort, will become a major
> tourism attraction for Laos with theme parks, recreation,

---

[18] Joint Venture Agreement dated 2 May 2014 between ASEAN Union and Savan City in respect of establishing the Asean Union "Entertainment Resort" (Exhibit C-792)

[19] Joint Venture Agreement dated 28 May 2014 between ASEAN Union and Savan City in Respect of Establishing the Savan Gateway (Exhibit C-793)

[20] Exhibit C-887, 2 May 2014

[21] Exhibit C-792, 2 May 2014

> hospitality and food, and our objective is to rival some of Asia's
> top entertainment regions, as we combine Laotian hospitality with
> modern entertainment concepts and attractions".[22]

46.     The Claimant learned about this announcement in a report published in *The Nation*,

a Thai newspaper, on 27 June 2014, which *did* refer to a casino, as follows:

> Malaysian investor ASEAN Union Group has launched its second venture
> overseas – the Asean Paradize Savan City – in Laos with a total investment of
> USD$10 billion (B13T20 billion) comprising of offshore financial center,
> entertainment, <u>casino</u> and communities for foreigners.  (emphasis added)

47.     The story was taken up by other media including the *Asian Gambling Brief* which

reported on June 27, 2014 that:

> Work is scheduled to start in July this year on a $10 billion project in Laos
> including an offshore financial centre, a <u>casino</u> and entertainment complex and
> community for foreigners, according to *The Nation* Newspaper. (emphasis added)

48.     According to the Claimant, it was the published references to the construction of a

rival casino adjacent to the Savan Vegas Hotel and Casino complex that led the Claimant

to trade mutually accusatory correspondence with the Government and, eventually, to file

its Material Breach Application on 4 July 2014.

49.     The Claimant has identified and filed numerous blogs and websites referring to a

casino project on Site A but none of these announcements are sourced with the

Government.  However, the Claimant says that if the casino publicity was untrue, the Prime

---

[22] Exhibit C-796, 26 June 2014

Minister himself should have publically said so.  Instead, the Prime Minister stayed silent, and the only published denial at the ministerial level was contained in a report in *BCI ASIA* on 26 August 2014.[23]  This was too little and too late, the Claimant says.

50.    In addition, the Claimant relies on the evidence of Ms. Lisa McWilliams, a businesswoman who lives in Saipan who was sent by the Claimant to visit the premises of Asean Paradize (the marketing arm of Asean Union) on August 26, 2014, in Kuala Lumpur. She met with Aubry O'Hara, a senior employee.  Ms. McWilliams indicated to him that she had clients who might be interested in making a direct investment in Site A.  Mr. O'Hara, without prompting, suggested an investment in a casino.  Ms. McWilliams held a similar meeting with Mr. Chew of Asean Union.  Her evidence was that:

> "[Mr. O'Hara of Asean Paradize] explained that Savan City would have an Asean Paradize Bank, shopping malls, condos, off-shore banking, an entertainment centre, hotels and a casino".  (para. 14) (emphasis added)

> "[Mr. Chew of Asean Union] said a casino ultimately would be licensed by the Lao Government. . . and he was very confident that it would be built." (para. 23) (emphasis added)

---

[23] See *BCI ASIA* 26 August 2014: "*Govt says casino not part of Savan City project*."

The government has confirmed that there has been no agreement reached for a casino to operate under the Savan City project, in the Savan-Seno Special Economic Zone (SSEZ) in Savannakhet province.
The Secretariat Office of the Lao National Committee for Special Economic Zones (S-NCSEZ) issued an official letter recently, denying a June 27 report by Thai media (The Nation) that a casino will be incorporated in the development.

\*   \*   \*   \*

Vice Governor of Savan-Seno Special Economic Zone Authority Mr. Thongsay Sayavongkharmdy told *Vientiene Times* yesterday that he wondered howt he media (*the Nation*) got information about this project, saying that their information about the casino is inacurate.

There is no reason to doubt the witness statement of Ms. McWilliams.  However, it simply confirms that ASEAN Union and its affiliates were doing whatever they could to promote development of the site.  If the prize of a casino attracted investment so much the better.  Ms. McWilliams' evidence does not establish any grant and approval of permission for a rival casino that can be attributed to the Government.

51.     Similarly, the Claimant relies on the evidence of Mr. Eugene McCain, a developer based in Phukhet, Thailand**,** who was sent by the Claimant to visit the premises of Asian Engineering Consultants ("AEC") in Bangkok on February 16, 2015.  He was told about an AEC project in Savannakhet and was shown a proposed Master Plan of Savan City that included a casino.  His evidence was that:

> "[The AEC management team] explained that there would actually be two casino gaming facilities at Savan City."  (para. 11)

Again, there is no reason to doubt the accuracy of Mr. McCain's recollection of his conversation with senior officials at AEC.[24]  However, promotional efforts by AEC, an entrepreneurial engineering and planning firm in Bangkok, does not establish any approval and grant of permission by the Government of Laos.

---

[24] See the Agreement between Mr. Hassan's company, Insure Asia and AEC of 25 June 2014 (Exhibit C-795).

52.     Mr. John Baldwin, the principal of the Claimant, acknowledged in cross-examination that he had no personal knowledge of any such Government approval.[25]

53.     Moreover, as stated earlier, Article 9(24) of the *2007 Savan Vegas PDA* contemplates that applications *could* be submitted "by any parties or entities" for a new casino licence in the Claimant's monopoly area, but approval thereof would require the "consent and approval" of both the Government and the "authorized investors who have management rights" [i.e. Sanum itself, which is a subsidiary of the Claimant].  To the extent that Asean Union was attempting to round up funding for a casino project on Site A prior to making such a submission to the Government, there was no breach of the *2007 Savan Vegas PDA*, to which in any event, of course, Asean Union was not a party.  In theory, at least, Sanum might have given its consent, as indeed in 2013 Sanum discussed a joint arrangement with Madam Kozy's slot machine clubs within Sanum's exclusive territory, as described below.

**(ii)     The Doctored Evidence**

54.     The Claimant alleges that the Government attempted to mislead the Tribunal with a "doctored" version of the Site A plan attached to the *2014 Asean Bank Agreement* and the *2014 Entertainment Complex Agreement*.  The new Plan, produced shortly before the Singapore hearing, substituted the designation "CJHQ" for the word "casino" on a cross-

---

[25] Evidence of John Baldwin, Transcript 14A, p. 34, ll 3-6.

hatched portion of the Site Plan.[26]  The "doctored evidence" was so serious a matter, the Claimant says, as to justify rescinding the Settlement.

55.     In the Tribunal's view, the evidence does not warrant or justify this allegation.  The Site plans attached to two of the three Asean Union Agreements *do* indicate a site for a casino.  Mr. Chanchai in paragraph 11 of his 18 December 2014 statement acknowledged this fact.[27]  The Claimant's position was shown to be correct.

56.     When Mr. Chanchai was subsequently asked by counsel for the Respondent Government for a clearer copy of the *original* site plan, Mr. Chanchai says he decided that the designation of a casino should be removed from the map because it was misleading, and he did so.  He testified (as translated) in cross-examination as follows:

> I changed this map because when there are problems, Mr. Thongsay asked me to submit the whole document for him to double-check whether I have any agreement with Asean Union.  When Mr. Thongsay consider and then he complained that the casino, why it is under the plan, casino is the activity that the Government is not allow, so please do not deviate or to mislead people there is casino, so I have to eradicate it so that it is correct.  We have this new plan.[28]

57.     The Claimant objects that the "new plan" was not identified as a "new plan" when transmitted to its counsel but erroneously passed off as a legible copy of the original plan.

---

[26] Transcript, 13 April at p. 32

[27] Chanchai witness statement dated 18 December 2014, para. 11:
>     When we were drafting the agreement at the last minute, I
>     placed a map that showed a hotel with a casino labelled on the
>     map in the agreement because it was an old one in my files.

[28] Transcript, 13 April, p. 188, ll. 2-11.

Be that as it may, Mr. Chanchai's admission with respect to the word "casino" was already in the record, and whatever miscommunication occurred when the map was provided to the Claimant in regrettable but of no great probative value.

58.     The Claimant also contends, based on Mr. John Baldwin's evidence, that Savan City would not have announced the $10 billion project unless the casino had been approved.

59.     Whatever may be Mr. Baldwin's experience, it is clear that Savan City and Asean Union did not comply with such a prudent "practice".  They were prepared to make announcements before the grant of necessary licenses and approvals.  This is confirmed by the fact that on 26 June 2014, the Asean Union itself announced not only a casino but the establishment of a significant "offshore" banking centre on Site A.  The banking centre could not happen without a change in the laws of Laos governing banking.  No such change had been made.  Mr. Hassan of Asean Union testified:

> Q.     You have said in your witness statements that you wish to develop a financial centre?
>
> A.     Yes.
>
> Q.     Inside there?  [i.e. Site A]
>
> A.     That is exactly what I want to do.  That is my expertise.
>
> Q.     You've said that you've approached the Government of Laos to have a financial regulatory laws passed by the national assembly?
>
> A.     Yes, that is right.  I submitted six inches of -- few thousand pages of laws which I expected them to go through and pass for an offshore financial centre to be created.
>
> Q.     If the national legislature, national assembly of Laos, does not pass those laws, does not change the banking regulatory environment, will you invest any money in Site A?
>
> A.     No point in investing there then.

23

> Q.    The answer is no?
>
> A.    <u>No</u>.
>
> (Transcript 13 April, p. 200, l 14 to p. 201, l. 8) (emphasis added)

In other words, no changes had been made to the banking laws, yet the promoters announced the development of an "offshore" banking facility with fanfare on 26 June 2014 as part of a $10 billion investment for which approval had not been secured.

60.    The Tribunal is of the view that no inference of Government prior "grant and approval" of permission for a casino can be drawn from the promoters' publicity at the 26 June "signing ceremony".

### (iii)    The "Integrated Entertainment Complex"

61.    The Claimant argues that the expression "integrated entertainment complex", which appear in various of the promoters' documents, is well understood "in industry parlance" as a euphemism for "a complex built around a casino".[29]   The *2014 "Entertainment Resort" Agreement* uses the expression "Integrated Entertainment Complex" in its preamble, as does more recent promotional material for "Savan Eco-City". Therefore, the Claimant says, a casino is still in the plan for Site A, albeit camouflaged by an euphemism.

---

[29] Claimant's Submission,, 7 March 2015, at para. 2

62.     In the Tribunal's view, the Claimant puts more weight on this argument than is plausible in light of all the other evidence.

63.     Whatever may be the understanding of the phrase "integrated entertainment complex" in some circles, this meaning was not acknowledged by the aspiring promoters of Savan City, neither of whom had any particular experience in the gambling industry. The Government witness Mr. Thongsay denied any such connotation in "our country".  He testified as follows:

> Q.      Did you ever try to understand what the words "integrated entertainment resort" or "integrated entertainment complex" meant in the world of tourism and gaming?
>
> A.      The meaning of "resort" or "comprehensive" - or comprehensive, or "integrated entertainment", I do not understand how they interpret it in other regions, but for our country, it mean that it is related to promotion, tourism promotion, there are play areas for children, there are singing contests, TV programs so that people will have enjoyable activities, because our culture is related to the culture promoting arts, but not about casino. (emphasis added)
>
> (Transcript, 13 April, p. 156)

In any event, unless the Claimant could tie its understanding of the euphemism to the Government, and thereby attempt to link the Government to an *implicit* "grant and approval" of permission for a casino (which the Claimant is unable to do), this terminological argument is of insignificant probative value.

**(iv)      Conclusion with Respect to the Activities of the Promoters of Savan City**

64.     The Tribunal is satisfied that the private developers involved in Savan City promoted the idea of a casino on Site A.  It seems probable that at the time of the "signing ceremony" on 26 June 2014, both Mr. Chanchai and Mr. Hassan optimistically thought the

Government might be persuaded to licence a new casino (however much they may have denied it when challenged by Madam Bouatha Khatthinda, a senior Government official on 2 July 2014). Madam Bouatha testified as follows:

> Q.      Just so I'm clear, at the meeting, did they tell you that they never planned to build a casino in Site A?
>
> A.      Yes. I asked them time and time again not to tell a lie because this is something that you can do it very lightly, and then they answer that, "we never have any intention to develop the casino in Site A", because the largest investor - they're Muslim - so they consider casino violating their belief, so representative Asean Union said so.
>
> Q.      So the representative of Asean Union said it never had any intention to operate a casino in Site A; is that correct?
>
> A.      Yes.[30]

It seems the developers may not have been candid with Madam Bouatha. But she, according to her testimony (which the Tribunal accepts), was very candid and categorical with them. There would be no casino on Site A.

65.      In any event, the intended target of the Claimant's submissions is not the private promoters but to implicate the Government. There is no evidence that Mr. Chanchai or other private developer approached the Savan City Board, or the SEZ Authority or any other Government entity even to inquire about the potential availability of permission for a casino. There is no evidence that either Mr. Chanchai or Mr. Hassan was even aware before June 26, 2014 of the Government prohibition or the Claimant's monopoly entitlement.

---

[30] Evidence of Madam Bouatha, Transcript, April 13, 2015, at p. 114, l. 19 to p. 115, l. 6

## V.   ACTIVITIES OF SAVAN CITY AND ITS PROMOTERS CANNOT IN THE CIRCUMSTANCES BE ATTRIBUTED TO THE GOVERNMENT

66.     As stated, the Government, through its SEZ Authority, has a 30% minority interest in Savan City and three members of the seven members Board of Directors.

67.     The evidence is clear that Savan City is a commercial corporation.  It is not the Government.   The *2007 Savan City PDA* lays the foundation for a public/private partnership.  It bears many of the hallmarks of a shareholders' agreement and establishes a governance structure that considerably limits the authority of Mr. Chanchai and his "majority" shareholders.

68.     The 70% majority shareholder, the Asean Union Inc., appoints the Vice Chairman of the Board who is also the chief operating officer (Mr. Chanchai) and three additional members, who together constitute a majority of the Board.  The Vice Chairman of Savan City is required to run its day to day operations "in accordance with policies and strategies approved by the Board of Directors", but only the Board itself is authorized to make "major decisions".  In particular, the *2007 Savan City PDA* provided that:

> In any Board of Directors meetings, the representatives from "both parties" shall attend and decisions on any major issues shall be made based on the consensus principle:
> The Board had the right and duty to consider and approve investment operational plans of the Company.

27

69.     The uncontradicted evidence of Mr. Thongsay Sayavongkhandy, a Government-appointed Director of Savan City, was that in fact that the Board had not met "for a number of years" because implementation of the Site A project was not "progressing".[31]

**(i)     Mere Ownership of a 30% Minority Interest is not "Control"**

70.     It is elementary that 30% of the voting shares of a corporation, and a minority of seats on the Board of Directors, does not confer "control".  Of course, the majority shareholders would be conscious in their decision making of the existence of such a sizeable 30% minority, especially when the minority shareholder is the Government of Laos.

71.     Moreover, the Claimant points out, a fourth Board member, while not a Government employee, is "intimately connected to the Lao Government and a close relative of a number of senior and powerful Lao officials".[32]

72.     The evidence of Madam Bouatha, head of the SEZ Secretariat, was that the Government representatives played a passive role in public/private partnerships in SEZs because of their inexperience:

> "We never take control, both because of our limited shareholdings and because we
> depend on the expertise and experience of our investing partners to run their
> business.  We want our officials who serve on boards to learn the best practices so

---

[31] Transcript, 13 April, 2015, p. 128, ll 1-6.

[32] Witness Statement of John K. Baldwin, 27 March 2015, para. 6

when the concession terminates and reverts to the Government, we will have been training our officials."[33]

73.     Similarly the Government official most intimately involved in the affairs of Savan City, Mr. Thongsay testified (in translation) in the course of cross-examination as follows:

> The press release broadcasted by Asean Union, they did not present to the board of director and they do not present it to our SEZ management, so it is beyond our jurisdiction and it not official document for government to be recognised on. (Transcript, April 13, 2015, p. 139, ll. 2-7)

<p style="text-align:center">*          *          *</p>

> In fact, I have not contacted with Asean Union, because Asean Union, they are not the partner of the government. (Transcript, April 13, 2015, p. 137, ll. 5-12)

74.     Mr. Thongsay's attitude (and the Tribunal has no reason to doubt his description of the process) was simply that if the "private" partners brought forward a project, it would be processed in accordance with Government requirements.

75.     It is to be noted that on 28 June 2013, a year before the events in question here, a Directive was issued to all SEZs confirming that they had no authority to licence new casinos.

> There must not be any authorization for establishment of casino or gambling related activities in the Special Economic Zones except for the agreements that have already been signed with the Government.[34]

---

[33] Witness Statement of Madam Bouatha, 2 April 2015, para. 14

[34] Laos Ex. 11, 28 June 2013. Letter from Deputy Standing Head of SEZs to the Senior Management/Board of Directors of SEZs

The Claimant points out that this Directive did not purport to preclude the Prime Minister's office from granting permission.  On the other hand, the bureaucratic road to the Prime Minister's office lies through Madam Bouatha, who testified that no application for a casino was made by or on behalf of the developers of Site A.  There is no evidence of anyone following a different path to the Prime Minister's office and the Tribunal cannot proceed on the basis of Mr. Baldwin's unsupported speculation and innuendo that some such "unofficial" approach *may* have been made.

**(ii)     No Board of Directors Meeting of Savan City Was Called to Authorize the Signing of the 2014 Agreements**

76.     The evidence is that the Savan City Board of Directors never met to consider any of the three 2014 development agreements.  The testimony (in translation) of Mr. Thongsay was as follows:

> "… signing of such contract have not communicated and channelled through the board of director of the company, and it is not approved by the Government.  So it makes it just only signing among the private sector".[35]

77.     The Claimant suggests that while the Government was formally in a minority position in terms of shares and board representation, in reality its influence as Government would prevail at the Board level on any "major issue".  This may be so, but the evidence is clear and uncontradicted that no Board of Directors meeting took place.

---

[35] Transcript, 13 April 2015, p. 133, ll 4-8

78.     Counsel for the Claimant conceded that it is obvious that Board approval was required to authorize the three Asean Union agreements.[36]   The Tribunal agrees.   The requirement in the *2007 Savan City PDA* was that a meeting of the Board is to be called "on any major issues" and that the representatives from both parties "shall attend" and decisions "shall be made on the consensus principle".   Moreover, as stated, the Board had the right and duty to consider and approve investment plans of the Company.   On the evidence, then, corporate approval was required and no corporate approval was given.

79.     The Claimant's argument was that either a meeting of the Savan City Board was in fact held as required and approval was in fact given to the Asean Union Agreements, and therefore that the Government witnesses were lying, or that in Laos corporations operate freely outside the framework of their governing laws.   The more plausible conclusion,

---

[36] Counsel for the Claimant submitted:

> It's in this context also that you have to consider the question of whether or not there was board approval.  You have heard Lao's witnesses repeat many times that there was not board approval, that there hadn't been a meeting in years and therefore all these government representatives on the board had never seen the agreements and did not know what the project was all about.  That is why they have to deny that there was any board approval.

> Well, we also saw and you saw yesterday, Mr. Thongsay confirmed and Mr. Khanpheth confirmed that the board of directors has to approve any major agreements.  You saw that in the 2007 agreement in Article 6, you also saw in Article 10 that any hiring of a contractor had to be informed and bringing in of a new partner had to be approved.

> It is impossible to believe that the three agreements that bound Savan City to this project, and that realized the goals of Savan City - - these were binding agreements, these were not MOUs - - that those binding agreements are not operative agreements that had to be approved by the board of directors.  The language of Article 6 in that 2007 agreement, which both sides agree is the operative document, made that clear.

(Submissions, 14 April 2015, p. 162, l 7 to p. 163, l. 6)

31

however, is that no meeting of Directors was held, no approval was given, and the Asean Union Agreements were unauthorized by the Savan City corporation.

**(iii)   There is no Evidence that Officials in the Prime Minister's Office Received Any Application for the Approval and Grant of Permission for a Rival Casino**

80.    The evidence of Madam Bouatha was that the approval for any new casinos licences would have to be decided at "a meeting" of the Prime Minister and Deputy Prime Minister. Such applications would be processed through her office as well as the Ministry of Planning and Investment.[37]   She testified that no such applications were ever made with respect to Savan City.[38]   The Tribunal has no reason to disbelieve her testimony.

## VI.   INTERNATIONAL LAW PRINCIPLES OF STATE ATTRIBUTION DO NOT IMPOSE LIABILITY ON THE GOVERNMENT

81.    It is clear that a minority shareholding in a corporation is not sufficient in international law (as well as domestic law), of itself, to attribute the acts of a corporation to its shareholders.   The result is no different where the minority shareholder is a Government. Professor (now Judge) James Crawford's *Commentary* on Article 8 of The International Law Commission text so states:[39]

---

[37] Ibid., p. 124, l. 22

[38] Transcript, 13 April, 2015, p. 110, l. 16, p. 118, ll. 12-15

[39]  See James Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries*, 112-113 (Cambridge University Press 2002*)*.  See also *Gustav F W Hamester GmbH & Co KG v. Ghana*, (ICSID Case No. ARB/11/28), Award (March 10 2014); *EDF (Services) Limited v. Romania*, (ICSID Case No. ARB/05/13), Award (Oct. 8, 2009) at para 190-200; *Jan de Nul N.V. Dredging International N.V. v. Egypt*, (ICSID Case No. ARB/04/13), Award (Nov. 6, 2008) at para. 157; *Bayindir Insaat Turizm Ticaret vs Sanayi A.S. v. Pakistan*, (ICSID Case No. ARB/03/29), Award (Aug. 27, 2009) at paras. 119-25

> In discussing this issue it is necessary to recall that international law acknowledges the general separateness of corporate entities at the national level, except in those cases where the "corporate veil" is a mere device or a vehicle for fraud or evasion.

There is no evidence that Savan City was engaged in "fraud or evasion".

82.     Of course, corporate acts may be attributed to the Government if the Government directs and controls the corporation's activities,[40] particularly if such control is exercised in relation to the subject matter of the dispute,[41]  Article 8 stands in part for the proposition that:

> where there was evidence …  that the State was using its ownership interest in or control of a corporation specifically in order to achieve a particular result, the conduct in question has been attributed to the State.

However, there is no evidence of such direction or control in this case.  On the contrary, both Madam Bouatha of the SEZ Secretariat, and Mr. Chanchai representing the private developers of Savan City, testified to the contrary, and both were present and cross-examined on this point at the Singapore hearing.

83.     Madam Bouatha testified in her written witness statement:

> "I can state with personal knowledge that the Government has not had any input much less control over the Savan City project for many years.  Mr. Chanchai was not able to raise any money and there were no decisions to make.  There was silence from him.  The Government was not involved in any way in the

---

[40] *Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua)*, 1986 I.C.J. 14 (June 27), at para. 17; *Case Concerning the Application of the Convention on the Prevention and Punishment of the Crime of Genocide* (Bosnia and Herzegovina v. Serbia and Montenegro) (Feb. 26, 2007) at paras. 396-415

[41] *Jan de Nul*, *supra* note 39 at para. 173

negotiations or plans Mr. Chanchai made with Asean Union that were announced in 2014."[42]

84.    Mr. Chanchai made an equivalent written statement:

> "No Government official has had any involvement in design or engineering proposals I developed or SV Leasing developed over the past eight years to help me try to raise money to develop Site A.  No Government official has had any involvement in developing websites for the company.  No design plans I or others developed and the websites were never submitted to the Board or any Government agency or department for information or approval".[43]

85.    Counsel for the Claimant in cross-examination expressed scepticism to both witnesses about the source of the drafting of their witness statements but there was no onus on the Government to establish that approval was *not* given.  The onus was on the Claimant to establish on a balance of probabilities that approval *was* given.  In any event the denials of Madam Bouatha and Mr. Chanchai were not shaken in cross-examination.

## VII.    THE CLAIMANT'S THEORY OF A "TACIT" APPROVAL AND GRANT

86.    Counsel for the Claimant advanced an alternate theory that even if there was no "approval and grant" of permission to a rival casino, the political culture in Laos is such that powerful people and those under their protection may operate businesses under tacit or "unofficial" permission.  Thus, according to the Claimant, an inference of permission should be drawn against the Government based on the informality of local practice.  The

---

[42] Witness Statement of Madam Bouatha dated 2 April 2015, at para. 14

[43] Witness Statement of Chanchai Jaturaphagorn, 3 April 2015, at para. 5

Claimant's evolving Submission on this aspect of the "attribution" issue is made in its 8 April 2015 Submission as follows:

> Claimant has not alleged, and does not allege, that Savan City is a state entity whose action "is in law an action by the Government." Claimant's case does not hinge on proving that the Government itself is responsible for Savan City's actions, including the content of its website. The point is rather that it is not credible to suggest that a company in which the Lao Government holds a significant shareholding, and enjoys a significant corporate governance presence, could have publicized that it would build a casino to future investors, and entered into a joint venture agreement to build a casino, without the Government at the very least knowing and approving of these facts.  [para. 50] (emphasis added)

87.     This position was supported by the evidence of the Claimant's principal, Mr. John Baldwin, as follows:

> While Laos's assertions that it has not granted a competing license might literally be true, my years of experience tell me that Laos must have at least tacitly approved a competing casino project in Savan City. As I stated previously, no developer begins to market a development to investors without at least some assurance that it has permission to build what it is marketing.[44]

The "prudent promoter" argument has already been dealt with.  As to "tacit approval", the Claimant relied heavily on the existence of unlicensed slot club(s) owned by a Laotian citizen, Madam Kozy.  In her case, the Claimant argues, Government approval consisted of no more than a wink and a nod, or simply looking the other way and ignoring her illegal use.

88.     The Tribunal does not agree that based on Madam Kozy's situation the words "approve and grant" in Article 9(24) of the *2007 Sanum PDA* can be interpreted so loosely.

---

[44] Witness Statement of John Baldwin, 27 March 2015 at para. 4

89.     It seems that Madam Kozy had a relatively modest slot club operating before the signing of the *Savan Vegas PDA* in August 2007[45].  The Claimant suggests that Madam Kozy recently opened another club near the Friendship Bridge.  The evidence on this point is unclear.[46]  The Claimant also alleges that the Government drew the boundaries of the SEZ around Madam Kozy's operations so that the Government could continue to say (disingenuously) that there were no casinos permitted in the SEZs.  Madam Kozy and her business partner were well connected socially and politically.

90.     The Tribunal is prepared to assume that if Madam Kozy had formal licences for her slot club(s), the Government would have produced them (as requested) in this arbitration. The Tribunal concludes that no such formal licence(s) exist.

91.     Madam Kozy's operation may or may not be evidence of discrimination or differential treatment.  It seems the Government was prepared to shape the SEZ boundary to leave her gambling operations outside.[47]  However, the fact that the Government has not shut down the slot club operations of Madam Kozy, which do not include a full service casino, is not of sufficient weight to persuade the Tribunal that the words "approve and grant" in Article 9(24) of the *2007 Savan Vegas Agreement* can be stretched out of shape because of alleged nods, winks and the single established instance of a non-compliant slot club operator (Madam Kozy).  The fact that the Government may have turned a blind eye

---

[45] Evidence of John Baldwin, 14 April 2015 at p. 16, ll 3-15

[46] Evidence of John Baldwin, 14 April 2015, p. 15, ll 4-7

[47] Madam Bouatha, Transcript, 13 April 2015, p. 108, l. 5 to 108 l. 7

to a relatively small slot machine operation or two does not mean that there is no formal casino approval process in place or that Article 9(24) refers to something other than a formal "approve and grant" process.  Mr. Baldwin, the principal of the Claimant, and the source of the "tacit" approval theory, acknowledged that indeed a formal licencing system was in place.

> Q.      Who in Laos has the authority to approve a casino licence?
>
> A.      Officially or unofficially?
>
> Q.      You mean there's an unofficial chain of command in the government of Laos?
>
> A.      You have a 11-member politburo who are always trading favours between each other.  If any one of them wants a casino licence and is willing to trade with the others for other things they want, a casino licence will appear.  The president of the country who is also – would be able to grant a licence if he wished.  The head of the party, if he wished to, I believe would be able to.
>
> Q.      Who had the official authority in the government of Laos to grant a casino licence?
>
> A.      It's been – I have been told, although I don't have proof of this, that the prime minister must grant casino licences.
>
> Q.      That is the official position of the government?  The prime minister is the only authority in the country who can grant a casino licence?
>
> A.      Yes.  That is what I have been told.
>
> (Transcript, April 14, 2015, pp 38-39) (emphasis added)

92.     It seems therefore that the ability of powerful political interests to "get their way" is not inconsistent with the requirement of formal approval and grant of a casino license.  The argument that certain people may be able to obtain such a license despite the general prohibition does not mean the need for such a license would be dispensed with.  It seems obvious a major investor, particularly a foreign investor, would want a

formal written licence before making a major investment in Laotian gambling facilities, as did Sanum itself in 2007.

93.     It should be noted that the Government's tolerance of Madam Kozy's slot club(s) is not put forward as an independent ground of complaint in the Claimant's Material Breach Application.

## VIII.   THE GOVERNMENT IS ENTITLED TO RELY ON THE 45 DAY "CURE" PERIOD PROVIDED IN ARTICLE 32

94.     Even if it were established that the Government had approved and granted permission for a casino to operate in Site A with a wink or a nod on or before receipt of the Claimant's Notice of Breach on 27 June 2014, the Government had a contractual right to cure the breach within 45-days of receipt of such Notice and if it did so, there can be no revival of the ICSID arbitration.

95.     Madam Bouatha testified that when she learned of the Claimant's complaint that permission had been granted for a Site A casino, she summonsed Mr. Thongsay, Mr. Chanchai and a representative of the ASEAN Union, Mr. Ellingham to a meeting on 2 July 2014, and made it clear that "only the Prime Minister" had the authority to approve.[48] She says that she was assured that there would be no casino in the Site A development.

96.     Madam Bouatha instructed Savan City and Asean Union to contact *The Nation* and at least one other publication to correct the published misinformation about the plan for a

---

[48] Transcript, 13 April 2015, page 110

casino.  This was done although it appears the demands made no specific reference to the casino.

97.     Mr. Khanpheth Viraphondet, a senior legal advisor to the Government was dispatched to Savannakhet by the Prime Minister's office[49] to investigate.  He met with representatives of Savan City and local officials on 4 August and 5 August 2014. Mr. Khanpheth testified that his investigation confirmed that the Savan City Board had not met and that no approval was granted or purportedly granted by the local SEZ Authority or any other Government entity or official.  His evidence was not weakened on cross-examination.

98.     The Tribunal is satisfied that the Government did respond promptly to the 26 June 2014 misreporting in the media about a rival casino and made it clear to the private developers in Savan City that no permission for a casino had been or would be approved or granted.

99.     The Claimant contends that the post 26 June 2014 conduct of the Government was not sufficient to cure the damage done.  The Government's action amounted to shutting the barn door after the horse had left the stable.  Prospective purchasers would already have lost confidence in the promises of the Government, and even more effective remedial action would have been futile.  The breach, the Claimant says, was incurable.

---

[49] Transcript, 13 April 2015, p. 72, ll. 15-25

100.    The Tribunal does not accept the Claimant's argument that a misleading article in a Thai newspaper and subsequent and related postings inflicted such destruction on the value or marketability of Savan Vegas as to make the so-called breach incurable. Newspapers are known to most people to make mistakes.  Blogs sometimes privilege speed over accuracy.  The Government moved promptly to clarify its prohibition to the Savan City promoters.  In any event, the evidence of Greg Bousquette, a merchant banker well versed in the gambling industry,[50] who was contacted by Mr. Baldwin following the Settlement, affirmed that "it is key that Buyers have comfort that they will get a monopoly signed off on at the highest levels of the Lao government."[51] (emphasis added)  Serious buyers would not be put off by cyber-gossip.

101.    The Tribunal accepts the evidence of the Government's expert, Mr. Govinda Singh, a principal at BDO.  In Mr. Singh's opinion:

> … no investor would only consider a newspaper article.  If an announcement is made which is not consistent with the market's understanding of the agreements in place, an investor would seek to understand the issues by undertaking further investigations.

Such "further investigations" would have demonstrated that permission had not been "approved and granted" for a rival casino, and that the Government had procedures in place to prevent permission for a casino without authority from a "meeting" of the Prime Minister and Deputy Prime Minister, which on the evidence was not initiated.  Mr. Singh

---

[50] Evidence of John Baldwin, 14 April 2015 at p. 49, l 22 to p. 50, l. 16

[51] C-856, Email from John Baldwin, dated 20 June 2014

was available in Singapore to be cross-examined but the Claimant elected not to cross-examine him.

102.    In order to find the Government liable for what the Claimant regards as an insufficiently public Government denunciation of reports and blogs about the "rival casino", the Claimant must identify some source of a legal obligation on the part of the Government to do so.  In the Tribunal's view, the Government did not, as a term of the Settlement, assume any undertaking, directly or indirectly, to respond publicly to misleading statements about Savan City in the media, blogs or websites.  The Settlement obligation to complete the sale "on a basis that will maximize Sale proceeds" (Article 13) does not go so far, nor is such a positive obligation imported into the Settlement by the duty of good faith performance under New York law.[52]   Assuming for the sake of argument the interpretation of the Settlement most favourable to the Claimant, its case put at its highest is that the Government was obligated to respect Sanum's monopoly.  On the evidence, the Government did so.

---

[52] Counsel for the Claimant put this aspect of his argument as follows:

Q.  Where do you ground that obligation to speak up?

Mr. Rivkin:  it's grounded in the obligation of good faith and fair dealing which is in every New York law contract.  It is also grounded in the specific provision of the deed that says they are going to work with us to maximize the sale proceeds, and it's grounded in the way all of the provisions of the deed of settlement work together, including this provision, and the clear purpose of Article 6 and the restating of the monopoly provision was what I have described to you earlier, is letting the market know that you can trust Lao with respect to this; you can have a higher degree of trust anyway with respect to that, and so it's based on that..

(Submission 14 April 2015, p. 166, l. 14 to p. 167, l. 3)

103.    To the extent such misleading statements in the media and cyberspace might chill potential purchasers, such purchasers would, as Mr. Singh testified, have looked into the monopoly issue and verified the facts with senior Government officials.  Upon inquiry they would have been told what Mr. Chanchai and Mr. Ellington were told.  No rival casino had or would be approved.

104.    The Tribunal's conclusions do not ignore Mr. Baldwin's evidence about the risk of powerful people in Laos getting their way at some future date and obtaining permission for rival gambling facilities (albeit such conduct could expose the Government to a claim for substantial damages by Sanum under s. 9 (24) of the *2014 Sanum Agreement*).  However, the Tribunal is not tasked with speculation about what might happen in the future.  In the Tribunal's view, the Government's default, if there was any default in June 2014 or otherwise as alleged by the Claimant, was cured within the 45 days permitted by the Settlement.

## IX.    THE PROPER INTERPRETATION OF ARTICLE 6 OF THE DEED OF SETTLEMENT

105.    In its interim ruling of 19 December 2014, the Tribunal identified two potential interpretations of Article 6, one of which favoured the Claimant and the other, had it been adopted, favoured the Government.

106.    In view of the Tribunal's conclusions on the facts, it is not necessary to revisit the issue of contract interpretation, which is no longer of practical significance.

## X.    DISPOSITION OF THE APPLICATION FOR PROVISIONAL MEASURES

107.    The Tribunal deferred to the April 13/14, 2015 Singapore hearing the Claimant's Application for a Provisional Measures Order (PMO) to preserve the *status quo* against potential Government action between the date of the April hearing and the issuance of a final award.

108.    By order dated 14 April 2015, having heard the evidence, the Tribunal dismissed the PMO Application for reasons to follow.  The reasons are as follows.

109.    As the Tribunal noted in its Provisional Measures Order of 17 September 2013, a PMO is only available when the following conditions are met (1) *prima facie* jurisdiction; (2) *prima facie* establishment of the right to the relief sought; (3) urgency; (4) imminent danger of serious prejudice (necessity); and (5) proportionality.[53]    Each of these components except for (2) was met in this instance.

110.    With respect to condition (2) however, the Tribunal was satisfied at the conclusion of the evidence on 14 April, after deliberation, that the Claimant had not established even a *prima facie* right to the relief sought.

111.    The Claimant's application for a PMO was therefore dismissed.

---

[53] See also *Paushok v. Government of Mongolia*, Order on Interim Measures at para. 45 (UNCITRAL Sept. 2, 2009).

"[F]ive standards have to be met"… (1)  *prima facie* jurisdiction.  (2) *prima facie* establishment of the case, (3) urgency, (4) imminent danger of serious prejudice (necessity) and (5) proportionality."

## XI.   DECISION ON THE MERITS OF THE MATERIAL BREACH APPLICATION

112.   For the foregoing reasons the Claimant's Material Breach Application pursuant to Article 32 of the Deed of Settlement dated 15 June 2014 as clarified by the Side Letter dated 18 June 2014 is dismissed.

## XII.   DISPOSITION OF COSTS

113.   The Claimant will be ordered to pay the Respondent Government's costs of the arbitration.  If the parties can agree on an appropriate amount, the said amount will be incorporated in the Tribunal's Award.  If no agreement on costs is reached, the Respondent Government is to make its submission on costs to the Tribunal within 60 days of this date. The Claimant will have 30 days from the filing of that submission to reply to it.  The Respondent will have 30 days from the filing of the Claimant's Reply to make its response. The Tribunal will then proceed to make its Award under Article 52 of the *Arbitration* (*Additional Facility*) *Rules* of ICSID incorporating both the reasons herein on the merits and its disposition of costs.

Made in Washington, DC.


_____                    _____
Professor Brigitte Stern                                          Professor Bernard Hanotiau
Arbitrator                                                               Arbitrator


                         _____
                         The Honourable Ian Binnie, C.C., Q.C.
                         President

# Annex C

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

ICSID Case No. ARB (AF)/12/6

LAO HOLDINGS N.V.
Claimant

and

THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC
Respondent

---

# DECISION ON COSTS

---

ARBITRAL TRIBUNAL

The Honourable Ian Binnie, C.C., Q.C., President
Professor Bernard Hanotiau, Arbitrator
Professor Brigitte Stern, Arbitrator

Secretary of the Tribunal
Ms. Anneliese Fleckenstein, ICSID

Date of dispatch to the Parties: 5 November 2015

**INDEX**

I.    INTRODUCTION ........................................................................................................ 1

II.   THE LAW AND THE FACTS .................................................................................. 1

      a)    The law .......................................................................................................... 1

      b)    The facts ........................................................................................................ 1

      c)    The Government's bill of costs .................................................................. 3

III.  THE TRIBUNAL'S ANALYSIS .............................................................................. 3

      a)    Reasonableness of time and hours spent .................................................. 3

      b)    The unsuccessful jurisdictional challenge ................................................ 4

      c)    Are there other elements to take into consideration? ............................ 5

      d)    Disbursements .............................................................................................. 5

IV.   CONCLUSION ............................................................................................................ 6

## I.     INTRODUCTION

1.      In its Decision on the Merits dated 10 June 2015, the Tribunal directed, pursuant to Article 58 of the ICSID Arbitration (Additional Facility) Rules, that the Government of Laos People's Democratic Republic (the "Government") be awarded costs against the Claimant, Laos Holdings (the "Claimant"), as a result of the unsuccessful allegation by the Claimant of a material breach of the Settlement Agreement dated 15 June 2014 and side letter dated 17 June 2014 (the "Material Breach Application").

## II.    THE LAW AND THE FACTS

### a)  The law

2.      Article 58 of the ICSID Arbitration (AF) Rules provides that:

> **Article 58**
> (1) Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne. The Tribunal may, to that end, call on the Secretariat and the parties to provide it with the information it needs in order to formulate the division of the cost of the proceeding between the parties.
>
> (2) The decision of the Tribunal pursuant to paragraph (1) of this Article shall form part of the award.

3.      This Article gives a broad discretion to the Tribunal in the allocation of costs, according to all the circumstances of the case.

### b)  The facts

4.      Pursuant to the Decision on the Merits, counsel for the Government has submitted a claim for fees in the sum of USD $684,007.75 and disbursements of USD $78,698.08 for a total of USD $762,705.83.

5.      The Material Breach Application was based essentially on an allegation that the Government had either licensed or agreed to license a rival casino contrary to the 50-year monopoly conferred on the Claimant's subsidiary by agreement with the Government.  The establishment of a rival casino, according to the Claimant, destroyed much of the value of its investment and essentially rendered it unmarketable except at an unacceptable discount to the fair market of its gambling facilities predicated on a monopoly concession.

6.      The Government's ultimate success turned on the testimony of public servants and other witnesses given at the hearing in Singapore on 13-14 April 2015.  The Claimant's allegation of a breach of its monopoly was shown to be based on erroneous newspaper reports and the activities of promoters of a rival casino who acted without the Government's approval or encouragement.

7.      The Claimant was unable to present direct evidence in support of its Material Breach Application and such secondary inferences as were available were persuasively refuted by testimony by the Government officials most directly involved.

8.      A list of the submissions, decisions and hearings in the Material Breach Application is attached hereto as **Appendix "A"** to these reasons.

9.      In assessing the Government's costs of its successful defence, the Tribunal should attempt to assess a *quantum* that is fair and reasonable to both parties in all the circumstances.

**c) The Government's bill of costs**

10.    The Government's skeleton bill of costs is set out in a one and a quarter page chart identifying the lawyers or paralegals who worked on the case, their hourly rate and total billing for each individual, as well as a statement of disbursements.  The document is attached as **Appendix "B"** to these reasons.

11.    The Tribunal has been provided with little in the way of submissions by either party.

12.    The Claimant takes the position that considerable time and costs were unnecessarily thrown away on an ultimately unsuccessful jurisdictional challenge and related procedural issues.  To further its argument, the Claimant requested copies of the billing records of the Respondent Government to determine how much time was spent on various unsuccessful procedures in the course of its defence against the Material Breach Application.  The records were refused by the Government on the basis that at New York law, being the governing law of the Deed of Settlement, "billing time sheets are privileged and are not produced to opposing counsel".  The Claimant contests that position.  The Tribunal considers it unnecessary to resolve this particular dispute and will proceed on the basis of the material now made available to it.

**III.    THE TRIBUNAL'S ANALYSIS**

**a) Reasonableness of time and hours spent**

13.    The Tribunal has taken into account the following considerations:

(a)    The *quantum* of costs claimed by the Government is proportionate to the importance and the complexity of the issues at stake.

(b)     The *amount of time* docketed by the various lawyers and paralegals is not excessive given the degree of responsibility assumed by counsel acting on behalf of the Government and the monetary value of the matters in issue.

(c)     The *rates* are reasonable in the surrounding circumstances. Lead counsel for the Government are experienced lawyers in matters of international commercial law and their rates are in line with rates charged by counsel of comparable skill and experience in matters of similar value and complexity.

(d)     The *work's organisation* was efficient. It appears from the distribution of hours amongst counsel that appropriate measures were taken by senior counsel to delegate to more junior counsel (at a lower hourly rate) work suitable to their level of experience.

(e)     In the end result, *the Government was entirely successful* on the merits in resisting the Material Breach Application of the Claimant.

**b)  The unsuccessful jurisdictional challenge**

14.     While the Tribunal accepts that the time shown in the Government's bill of costs was in fact spent by each of the persons listed, and that their hourly rates are reasonable, the Government's success rested almost entirely on the factual evidence presented in Singapore on 13-14 April 2015.  Prior to that date, there was much procedural skirmishing, particularly in relation to the Government's unsuccessful challenge to the jurisdiction of the Tribunal even to embark on its mandate to consider the Claimant's Material Breach Application.  The Tribunal gave extensive reasons for its conclusion that there was no merit to this challenge.  After the point was decided adversely to the Government, it launched an

4

unsuccessful Request for Re-consideration which essentially repeated the arguments already made and already rejected by the Tribunal in the original (and unsuccessful) jurisdictional challenge.

15.     In the Tribunal's view, while the Government was certainly entitled to bring its jurisdictional challenge, it is not fair and reasonable to ask the Claimant to fully indemnify the Government against the cost of procedural skirmishing that served no purpose other than a distraction from the factual issues before the Tribunal.

### c)  Are there other elements to take into consideration?

16.     In the Tribunal's view, the Government case was made in a professional manner with due regard to economy and efficiency. However, the assessment of the Government's costs must take into account its unnecessary and unsuccessful procedural manoeuvres. Reference should also be made to the fact that the Claimant lost two successive Requests for Provisional Measures, respectively dated 19 January 2015 and 2 April 2015. The Tribunal rejected both requests, respectively on 18 March 2015 and 14 April 2015.

17.     As the Government has declined to produce records that would enable the Tribunal to calculate more precisely the amount of time consumed by its jurisdictional challenges and related motions, the Tribunal will simply apply a percentage reduction as hereinafter specified.

### d)  Disbursements

18.     The Tribunal has no reason to doubt the justification for any of the disbursements. As the Government points out, USD $93,849.00 is a reasonable sum for out-of-pocket expenses for a ten-month case where the client is in Laos, witnesses were in Laos and Kuala

Lumpur, and hearings were held in Washington and Singapore.  The Claimant requested the presence in Singapore of the Government officials for whose expenses it is now being called on to pay.

19.     The Washington hearing (and associated costs), however, was entirely dedicated to the Government's unsuccessful jurisdictional challenge and related issues.

## IV.     CONCLUSION

20.     In light of the foregoing considerations, the Tribunal concludes that the *quantum* of costs claimed by the Government, exceeds what is fair and reasonable to call upon the Claimant to pay.

21.     As the Government has declined to produce any breakdown of the activities in respect of which costs are claimed (apart from research on the interpretation of the Deed of Settlement under New York law and development of the Government's position in that regard), the Tribunal is left with the option of assessing a global factor to determine a fair and reasonable award of costs relative to the work done and the result accomplished.

22.     The Tribunal concludes that the decision should be 70% of the total claim of USD $762,705.83.

23.     The Tribunal therefore awards to the Respondent costs and legal fees of USD $533,894.08.

24.     Pursuant to paragraphs 31 and 32 of the Settlement Agreement dated 15 June 2014, this proceeding remains suspended.

DATED THIS 5th DAY OF NOVEMBER 2015.


_____
Professor Brigitte Stern
Arbitrator

_____
Professor Bernard Hanotiau
Arbitrator


_____
The Honourable Ian Binnie, C.C., Q.C.
President

7

# APPENDIX A

| June 17- 19, 2014 | Hearing on the merits in Singapore. |
|---|---|
| June 19, 2014 | The proceeding is suspended, pursuant to the parties' agreement. |
| July 4, 2014 | Claimant's Application for a Finding of Material Breach of Deed of Settlement and for Reinstatement of Arbitration |
| July 11, 2014 | Respondent's Response to Claimant's Application |
| August 1, 2014 | Claimant's Reply on its Application |
| August 8, 2014 | Respondent's Rejoinder to Claimant's Application |
| August 21, 2014 | Procedural Order No. 4 (one day hearing would be held in order to hear the parties on the Claimant's Application for a Finding of Material Breach and for Reinstatement of the Arbitration) |
| September 12, 2014 | Respondent's Objection to Jurisdiction and Motion to Suspend |
| September 17, 2014 | Claimant's Response to Respondent's Objection and Motion |
| September 19, 2014 | Procedural Order No. 5 (affirmed PO No. 4) |
| October 1, 2014 | Claimants' Submission on the Legal Issues Raised in the Tribunals' Letters of 21 Aug 2014 |
| October 14, 2014 | Hearing on Claimant's Application for a Finding of Material Breach in Washington, D.C. |
| December 19, 2014 | Interim Ruling on Issues Arising under the Deed of Settlement |
| January 19, 2015 | Claimant's Provisional Measures Application |
| January 27, 2015 | Respondent's Request for Reconsideration of Interim Ruling |
| January 28, 2015 | Respondent's Reply to Claimant's Provisional Measures Application |
| January 29, 2015 | Claimant's Response to Respondent's Request for Reconsideration (by letter) |
| February 2, 2015 | Respondent's Reply to Claimant's Response to Request for Reconsideration (by email) |
| February 5, 2015 | Procedural Order No. 6 (Request for Reconsideration and Provisional Measures) |
| February 18, 2015 | Claimant's Response to Respondent's Reply to Provisional Measures Application |
| March 10, 2015 | The Tribunal and the parties hold a conference call on the Second Request for Provisional Measures |
| March 18, 2015 | Decision on Second Request for Provisional Measures |
| March 27, 2015 | Claimant's Memorial Submission on Material Breach |
| March 27, 2015 | Following exchanges between the parties, the Respondent files a request for the Tribunal to decide on production of documents and disclosure of information. |
| March 31, 2015 | The Claimant files observations on the Respondent's request for the Tribunal to decide on production of documents and disclosure of information. |

| April 2, 2015 | The Respondent files a response to the Claimant's observations of March 31, 2015 and withdraws its request concerning production of documents of March 27, 2015. |
|---|---|
| April 2, 2015 | The Claimant files further observations on the Respondent's response of April 2, 2015. |
| April 3, 2015 | Respondent's Reply to Claimant's 27 March 2015 Submission |
| April 5, 2015 | Procedural Order No. 7 – Decision on Respondent's request for disclosure of information |
| April 8, 2015 | Claimant's Reply Submission on its Material Breach Application |
| April 11, 2015 | Respondent's Reply to Claimant's 8 April 2015 Submission |
| April 13 - 14, 2015 | Hearing on Merits of Claimant's Application for Finding of Material Breach |
| April 14, 2015 | The Tribunal decides on Claimant's request for provisional measures |
| April 29, 2015 | The Respondent files a request for the Tribunal to decide on the admissibility of new evidence – ("Government's Request to Augment the Record With Claimant's Judicial Admission") |
| May 12, 2015 | The Claimant files observations on the Respondent's request of April 29, 2015 by email. |
| May 13, 2015 | The Tribunal decides on the admissibility of new evidence. |
| June 10, 2015 | The Tribunal issues a decision on the merits. |

# APPENDIX B

Lao Holdings N.V. v. Lao People's Democratic Republic
ICSID Case No. ARB(AF)/12/6

**Lao PDR Costs from 28 June 2014 to 23 April 2015**

| Description | Rate | Hours | Total Fees in US$ |
|---|---|---|---|
| | **Lawyers' Fees** | | |
| Branson, David J. | $800,00 | 652,30 | $521 840,00 |
| Willems, Jane | $800,00 | 26,70 | $21 360,00 |
| King, Anthony  (King & Branson LLC) | $500,00 | 0,10 | $50,00 |
| Bey, Tiana A. (King & Branson LLC) | $260,00 | 69,20 | $17 992,00 |
| Branson, John (Parker Poe) | $250,00 | 231,80 | $57 950,00 |
| Hutchins, Sarah F. (Parker Poe) | $290,00 | 0,80 | $232,00 |
| Martin, Melissa J. (Parker Poe) | $140,00 | 0,30 | $42,00 |
| Skinner, Kathryn (Parker Poe) | $100,00 | 3,60 | $360,00 |
| **General Litigation Support** | | | |
| | | | |
| Sanford, Alex | $550,00 | 9,60 | $5 280,00 |
| Molo, Steven (Mololamken) | $550,00 | 2,00 | $1 100,00 |
| Kry, Robert (Mololamken) | $550,00 | 5,20 | $2 860,00 |
| Melendez, Joel (Mololamken) | $550,00 | 4,30 | $2 365,00 |
| **Interpretation Deed under New York Law** | | | |
| | | | |
| Wallace, Don Jr. | $500,00 | 63,50 | $31 750,00 |
| Birch, Nicholas J. (Stewart & Stewart) 2014 | $185,00 | 3,55 | $656,75 |
| Birch, Nicholas J. (Stewart & Stewart) 2015 | $200,00 | 98,15 | $19 630,00 |
| **Public International Law Support** | | | |
| | | | |
| **Paralegals** | | | |
| Lagvilava, Tamari (Stewart & Stewart) | $90,00 | 6,00 | $540,00 |
| | | | |
| **Sub-total** | | **1177,10** | **$684 007,75** |

| Disbursements | Total in US$ |
|---|---|
| Translators Fees | $4 350,00 |
| Air/Train Fares (Branson, David J.) | $48 614,16 |
| Ground Transportation/Parking (Branson, David J.) | $1 303,13 |
| Hotel & Expenses (Branson, David J.) | $21 844,84 |
| Office Supply/ Photocopying (Branson, David J.) | $421,86 |
| Telephone/Internet charges (Branson, David J.) | $248,25 |
| Visas (Branson, David J.) | $283,00 |
| Telephone Conference (Wallace, Don Jr.) | $58,56 |
| Travel (Parker Poe) | $809,96 |
| Meals (Parker Poe) | $199,46 |
| Photocopies and printing (Stewart & Stewart) | $25,80 |
| Westlaw (Stewart & Stewart) | $539,46 |
| | |
| **Sub-total** | **$78 698,48** |

Lao Holdings N.V. v. Lao People's Democratic Republic
ICSID Case No. ARB(AF)/12/6

**Lao PDR Costs from 28 June 2014 to 23 April 2015**

| GOL Expenses | Total in US$ |
|---|---|
| GOL Personnel Travel | $5 000,00 |
| | |
| **Sub-total** | **$5 000,00** |

| TOTAL | $767 706,23 |
|---|---|

# Annex D

**IN THE ARBITRATION UNDER THE AGREEMENT ON ENCOURAGEMENT
AND RECIPROCAL PROTECTION OF INVESTMENTS BETWEEN THE LAO
PEOPLE'S DEMOCRATIC REPUBLIC AND THE KINGDOM OF THE
NETHERLANDS AND THE ICSID ARBITRATION (ADDITIONAL FACILITY)
RULES
BETWEEN**

LAO HOLDINGS N.V.

Claimant

AND

THE GOVERNMENT OF THE LAO
PEOPLE'S DEMOCRATIC
REPUBLIC

Respondent

ICSID Case No. ARB(AF)/12/6

---

# DECISION ON THE MERITS OF THE CLAIMANTS' SECOND MATERIAL BREACH APPLICATION

---

***Members of the Tribunal***
The Honourable Ian Binnie, C.C., Q.C., President
Professor Bernard Hanotiau, Arbitrator
Professor Brigitte Stern, Arbitrator

***Secretary of the Tribunal***
Ms. Anneliese Fleckenstein, ICSID

Date of dispatch to the Parties: 15 December 2017

# Contents

I.  INTRODUCTION...................................................................................6

    i.    The Parties ................................................................................6

    ii.    The Treaty Claims.....................................................................7

    iii.    The Settlement .........................................................................8

II.  PROCEDURAL HISTORY OF THE SECOND MATERIAL BREACH
APPLICATION........................................................................................9

    i.    The Objections to Jurisdiction .................................................9

    ii.    The Sanum Proceedings Before the Permanent Court of Arbitration are
Revived ..................................................................................10

    iii.    The Hearing on the Merits .......................................................11

III.  BACKGROUND TO THE SECOND MATERIAL BREACH
APPLICATION......................................................................................12

    i.    The First Material Breach Application .....................................14

    ii.    The Claimants' Conduct Pending a Decision on the First Material Breach
Application and the Impact on Subsequent Events, Rights and Responsibilities..15

    iii.    The Government Moves Ahead to Establish a Flat Tax Committee ........18

    iv.    The Government Moves Ahead with the Sale ...........................20

    v.    The ICSID Tribunal Rejects the Claimants' First Material Breach
Application.............................................................................23

    vi.    The Government's Seizure and Sale of the Casino ..................24

    vii.    The Change of Position of Sanum Seeking to Participate in the Sale
Process ...................................................................................24

    viii.    The Ad Valorem Tax Rate of Mr. Va .....................................25

    ix.    The Government Announces a New Plan to Sell the Casino....................26

    x.    The Recommendation of a 28% Ad Valorem Tax by Mr. Va .................27

    xi.    The Reliance on the Settlement both by the Government and Sanum at the
SIAC Hearing on 16 June 2015 ..............................................28

xii.     The Government Takes Ownership of the Gambling Assets....................29

xiii.    The Government's Failed Auction Process ................................................30

xiv.     The Macau Legend Flat Tax Agreement ...................................................32

xv.      The Award of the SIAC Tribunal Dated 29 June 2017 ............................33

**IV.    OUTLINE OF THE SUBMISSIONS OF THE PARTIES ON THE SECOND MATERIAL BREACH APPLICATION ........................................................36**

i.      The Claimants' Contentions in Support of the Second Material Breach Application.................................................................................................36

ii.     The Government Defences to the Second Material Breach Application...41

**V.     THRESHOLD ISSUES RAISED BY THE GOVERNMENT AGAINST THE ENTIRETY OF THE CLAIMANTS' APPLICATION................................45**

i.      Res Judicata and the Alleged Impact of the SIAC Award Rendered on 29 June 2017 on the Jurisdiction of the Tribunal.........................................45

(a)     The Government's Position .......................................................................45

(b)     The Claimants' Position ...........................................................................46

(c)     The Tribunal's Ruling ..............................................................................47

ii.     Did the Claimants Forfeit Any Right to Government Performance Under the Settlement by Their Own Non-Performance?......................................51

(a)     The Government's Position .......................................................................51

(b)     The Claimants' Position ...........................................................................52

(c)     The Tribunal's Ruling ..............................................................................54

iii.    Are the Claimants Barred from Claiming the Benefit of Section 32 Because They Did Not Perform Their Contractual Obligations and New York Law Provides That a Party in Default Cannot Call on the Other Contracting Party for Enforcement? ..........................................................................................57

(a)     The Government's Position .......................................................................57

(b)     The Claimants' Position ...........................................................................57

(c)     The Tribunal's Ruling ..............................................................................58

iv.     Are the Claimants Barred from Relief Under Section 32 Because They Do Not Have "Clean Hands"? .......................................................................59

(a)     The Government's Position .......................................................................59

(b)     The Claimants' Position ...........................................................................60

(c)     The Tribunal's Ruling ....................................................................61

**VI.     THE GOVERNMENT'S ALLEGED MATERIAL BREACHES OF THE SECTIONS LISTED IN SECTION 32 OF THE SETTLEMENT.............................62**

i.      Are Any of the Government's Breaches "Material"?...............62

(a)     The Claimants' Position ................................................................62

(b)     The Government's Position ..........................................................64

(c)     The Tribunal's Ruling .................................................................65

ii.     Did the Government Imposition of a 28% Ad Valorem Tax Comply with the Promise of a "New Flat Tax" in Section 8 of the Settlement?.......................66

(a)     The Claimants' Position ................................................................66

(b)     The Government's Position ..........................................................66

(c)     The Tribunal's Ruling .................................................................67

iii.    Did the Government's Collection of Alleged Tax Arrears of $26,659,000 Constitute a Material Breach of Section 7 of the Settlement? ..............................72

(a)     The Claimants' Position ................................................................72

(b)     The Government's Position ..........................................................73

(c)     The Tribunal's Ruling .................................................................73

iv.     Did the Government's Failure to Establish a Joint Escrow Account to Receive the Proceeds of Sale of the Gaming Assets Constitute a Material Breach of Section 15 of the Settlement? ........................................................75

(a)     The Claimants' Position ................................................................75

(b)     The Government's Position ..........................................................76

(c)     The Tribunal's Ruling .................................................................76

v.      Did the Government's Failure to Include the Right to Extend the Savannakhet Airport Runway as Part of the Gaming Assets Constitute a Material Breach of Section 25? ...........................................................77

(a)     The Claimants' Position ................................................................77

(b)     The Government's Position ..........................................................78

(c)     The Tribunal's Ruling .................................................................78

vi.     Did the Government's Alleged Failure to Negotiate the Thakhaek Agreements "in Good Faith" Constitute a Material Breach of Section 22 of the Settlement?..........................................................79

(a)     The Claimants' Position ................................................................80

(b)     The Government's Position ..........................................................81

(c)    The Tribunal's Ruling ............................................................81

vii.    Did the Government's Failure to Discontinue Criminal Investigations Against the Claimants and their Principals Constitute a Material Breach of Section 23 and Section 27? .....................................................82

(a)    The Claimants' Position ...........................................................83

(b)    The Government's Position ......................................................83

(c)    The Tribunal's Ruling .............................................................83

**VII.    CONCLUSION ..............................................................................86**

**VIII.    COSTS ...........................................................................................87**

(a)    The Claimants' Position ...........................................................87

(b)    The Government's Position ......................................................87

(c)    The Tribunal's Ruling .............................................................88

**IX.    DECISION .....................................................................................88**

6

## I.   INTRODUCTION

### i.   The Parties

1.   The Claimant, Lao Holdings N.V. ("LHNV"), owned gambling assets in Laos including the Savan Vegas Hotel and a Casino Complex in Savannakhet Province. The Casino is strategically located near the Friendship Bridge which spans the Mekong River between Laos and Thailand.  The Claimant also had an investment in two "slot clubs."  As a result of what it considered to be treaty violations, the Claimant LHNV, a company incorporated under the laws of Aruba in the Netherlands Antilles, initiated proceedings on 14 August 2012 against the Respondent, the Government of The Lao People's Democratic Republic (the "Government"), before the International Centre for Settlement of Investment Disputes (ICSID).   The claim was made pursuant to the Agreement on Encouragement and Reciprocal Protection of Investments between Laos and the Kingdom of the Netherlands,[1] and the Arbitration Rules (Additional Facility) of ICSID.[2]

2.   Parallel proceedings were initiated against the Government by the Claimant, Sanum Investments Limited, a LHNV subsidiary which operated the Savan Vegas Hotel and Casino, before the Permanent Court of Arbitration (PCA) for alleged violations of the Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning The

---

[1] Signed on 16 May 2003, in force since 1 May 2005.
[2] As amended on 10 April 2006.

Encouragement and Reciprocal Protection of Investments, dated January 31, 1993 and the UNCITRAL Arbitration Rules as revised in 2010.

3. While the proceedings before the two Tribunals are distinct and separate, the current application was the subject of a joint hearing in Singapore on 3 and 4 July 2017. Accordingly, for ease of reference only, LHNV will be referred to in this Ruling as "the Claimants", as its case is intermingled with the Sanum case. This terminology is not to suggest, however, that the two arbitral proceedings are consolidated or otherwise conjoined.

### ii.    The Treaty Claims

4. The Claimants allege expropriation without compensation of their investment in gambling projects described in the Project Development Agreement ("PDA") dated 10 August 2007 in respect of the Savan Vegas Casino, as well as the slot clubs located at the border at Lao Bao and Savannakhet Ferry Terminal (located at the Savannakhet/Mukdahan checkpoint) all in Savannakhet Province (collectively, the "Gaming Assets").   The claims also relate to the expected expansion of the Savannakhet Airport and opportunities for development in the Special Economic Zone at Thakheak.

5. The Claimants' original treaty claims were based on a multiplicity of alleged treaty breaches by the Government including an 80% tax on casino revenues and what the Claimants contended were unfair and oppressive audits of the Savan Vegas Hotel and Casino.   In the treaty proceedings, the Claimants eventually valued their

investment loss as of 31 August 2016 at between USD $690 million and USD $1 billion.[3]

### iii.   The Settlement

6.   The treaty claims were thought to be resolved by a Deed of Settlement concluded between the parties during the merits hearing in Singapore on 15 June 2014 (to be read together with a Side Letter dated 18 June 2014) (herein referred to collectively as "the Settlement").

7.   Shortly after the Settlement, the Claimants alleged that the Government had committed a material breach of its terms which entitled them to revive the Treaty arbitration ("the First Material Breach Application").  The Government contested jurisdiction.  On 11 August 2014, the Government filed a Notice of Arbitration with the Singapore International Arbitration Centre ("SIAC") pursuant to Paragraphs 35 and 42 of the Settlement, seeking an order directing Sanum to comply with its settlement obligations.

8.   The ICSID and PCA Tribunals held a hearing on the objections to jurisdiction, which were dismissed.  However, on 20 January 2015, the High Court of the Republic of Singapore held that the PCA Tribunal did not possess subject matter jurisdiction under the 31 January 1993 Investment Treaty between Laos and China because of the status of Macao and issues of state succession not here relevant, as well as the limitation in the BIT, according to which "only disputes over the amount

---

[3] See Reports of Joseph P. Kalt dated 14 October 2016, 2 December 2016, 22 December 2016 and 15 March 2017.

of compensation for expropriation can be submitted to arbitration."[4]  This judgment

was later reversed by the Court of Appeal for Singapore on 29 September 2016.[5]

9.    In the meantime, the ICSID proceedings continued.   After hearing the parties on

the merits, this Tribunal delivered a decision on 10 June 2015, dismissing the First

Material Breach Application.

## II.    PROCEDURAL HISTORY OF THE SECOND MATERIAL BREACH APPLICATION

10.    On 26 April 2016, the Claimant LHNV submitted a Second Material Breach

Application to the ICSID Tribunal with accompanying documentation.

11.    On 29 April 2016, the Government informed ICSID that it would be submitting a

response to the Second Material Breach Application which, when filed on 12 May

2016, included its Objections to Jurisdiction and a request for a procedural

conference.

### i.    The Objections to Jurisdiction

12.    On 24 June 2016, the Government requested a stay of the ICSID proceedings

pending the outcome of the SIAC proceedings.   Subsequently, the SIAC Tribunal

rejected Sanum's request for interim measures to block the Government's seizure

and proposed sale of the Gaming Assets.

13.    On 29 June 2016, the Tribunal held a pre-hearing conference call with the parties.

---

[4] *Government of the Lao People's Democratic Republic v. Sanum Investments Ltd.*, [2015] SGHC 15, para. 128.
[5] *Sanum Investments Ltd. v. Government of the Lao People's Democratic Republic*, [2016] SGCA 57.

14.   On 30 June 2016, the Tribunal issued a Decision on Bifurcation ordering a separate hearing with respect to the Government's objections to jurisdiction.

15.   On 16 September 2016, the Government submitted to the Tribunal a request for security for costs.

16.   On 7 October 2016, the Claimant LHNV submitted a response opposing the Government's objections to jurisdiction, the motion to stay the proceedings and the request for security for costs.

17.   On 18 October 2016, the Tribunal and the parties held a hearing on the Government's objections to jurisdiction in Brussels, Belgium.  At the beginning of the hearing, the Government informed the Tribunal that it withdrew its objections to jurisdiction as they were now moot.

18.   On 20 October 2016, the Tribunal issued Procedural Order No. 8, amended on 21 October 2016, in respect of the agreed upon filing dates, rejecting the request to stay the current proceedings, but setting out a schedule that was expected to accommodate the time required by the SIAC Tribunal to complete its deliberations. The Tribunal also rejected the Government's request for an order for security for costs.

### ii.   The Sanum Proceedings Before the Permanent Court of Arbitration are Revived

19.   On 23 February 2017, the Claimant Sanum filed a Second Material Breach Application before the PCA Tribunal, which had been revived, as mentioned, by a decision of the Singapore Court of Appeals dated 29 September 2016.[6]

---

[6] *Sanum Investments Ltd. v. Government of the Lao People's Democratic Republic*, [2016] SGCA 57.

20.   On 6 March 2017, the Claimants submitted a request for the production of documents.  On 17 March 2017, the Government responded.  On 31 March 2017, the Claimants submitted a reply.   On 3 April 2017, the Claimants' request for production of documents was dismissed in light of the parties' prior agreement to forgo a fresh document production phase and the lack of any compelling circumstances to order otherwise.

21.   On 16 March 2017, the Claimants submitted their Memorial on the Merits of the Second Material Breach Application with accompanying documentation. On 5 May 2017, the Government submitted its Counter-Memorial on the Claimants' Second Material Breach Application, with accompanying documentation. On 31 May 2017, the Claimants submitted their Reply and on 21 June 2017, the Government submitted its Rejoinder.

### iii.    The Hearing on the Merits

22.   On 30 June 2017, shortly before the scheduled hearing of the Second Material Breach Application on the merits, the Government filed with this Tribunal the Final Award in this dispute from the SIAC Tribunal, Case No. ARB143/14/MV, rendered on 29 June 2017 (which had been notified to the parties on 30 June 2017).

23.   On 3 and 4 July 2017, the ICSID and PCA Tribunals proceeded with the merits hearing of the Claimants' Second Material Breach Application at Maxwell Chambers in Singapore.   At the hearing, counsel for both parties presented comprehensive submissions to the Tribunals.

24.   On 8 July 2017, the Government announced that it would be formally requesting from this Tribunal a Mareva Injunction to secure funds in the escrow account under

the control of the SIAC Tribunal to ensure payment to the Government of any potential award of costs in the event of a dismissal of the Claimants' Second Material Breach Application.  On 9 July 2017, the Government filed a formal application for a Mareva Injunction with accompanying documentation.  By communication of 10 July 2017, the Tribunal established an expedited schedule for further submissions, which were exchanged by the parties.

25. On 17 July 2017, the Tribunal issued Procedural Order No. 9 dismissing the Government's Application for a Mareva Injunction and reserving any award of costs until rendering a decision on the merits of the Second Material Breach Application.

## III.    BACKGROUND TO THE SECOND MATERIAL BREACH APPLICATION

26. As stated, the treaty claims were thought to be resolved by the Settlement. The Settlement contemplated the sale of the Gaming Assets by the Claimants within 10 months, failing which a third party agreeable to both the Claimants and the Government would assume management of the gambling facilities pending their sale on "a basis that will maximize Sale proceeds to the Claimants and Laos"[7] including assurances to a new purchaser of the Gaming Assets of:

    (a) a continued gambling monopoly for 50 years in the Claimants' area of exclusivity[8];

    (b) a "new" flat tax;[9] and

---

[7] Settlement, Section 13.
[8] Settlement, Section 6.
[9] Settlement, Section 8.

(c) discontinuance of pending criminal investigations.[10]

27.  It was agreed that the Government would appoint RMC Gaming Management LLC
("RMC") or other suitable agent to assist in monitoring the Claimants' Gaming
Assets pending a sale and to assist with the sale itself[11] as described in Annex E to
the Settlement.

28.  The parties agreed that the Settlement would be "governed by and construed solely
in accordance with the laws of New York"[12] coupled with a somewhat complex
dispute resolution mechanism:

(a) The Tribunal was given exclusive jurisdiction to revive the "suspended"
treaty proceedings in the event of a material breach of a section or
sections of the Settlement specified and listed under Section 32, "if not
remedied within 45 days after receipt of notice of such breach"; [13]

---

[10] Settlement, Section 23.
[11] Settlement, Section 9.
[12] Settlement, Section 42.
[13] Section 32 provides:

The Claimants shall only be permitted to revive the arbitration in the event that Laos is in material
breach of Sections 5-8, 15, 21-23, 25, 27 or 28 above and only after reasonable written notice is
given to Laos by the Claimants of such breach and such breach is not remedied within 45 days after
receipt of notice of such breach.  **The Sale Deadline and any other relevant time periods herein
shall be extended by the length of time required to cure such breach**.  In the event that there is
a dispute as to whether or not Laos is in material breach of Sections 5-8, 15, 21-23, 25, 27 or 28
above, the Tribunals shall determine whether or not there has been such a material breach and shall
only revive the arbitration if they conclude that there has been such a material breach.  (emphasis
added)

Section 35 provides:

In the event that the Claimants fail to comply with their obligations under this Deed, Laos shall be
entitled to commence a fresh arbitration to enforce the terms of this Deed.  Such arbitration shall be
conducted in Singapore in accordance with the Arbitration Rules of the **Singapore International
Arbitration Centre** for the time being in force.  The seat of the arbitration shall be Singapore.  The
Tribunal shall consist of three arbitrators.  Each Party shall nominate one arbitrator and the two
nominated arbitrators shall nominate the presiding arbitrator.  In the event that the two nominated
arbitrators are unable to agree on a presiding arbitrator, the presiding arbitrator shall be appointed

(b) All other disputes arising out of the Settlement would be referred to the Singapore Centre for International Arbitration (SIAC) under Section 35 and Section 42.[14]

29. The Government paid no financial compensation to the Claimants under or in respect of the Settlement.

30. Following the execution of the Settlement, Sanum continued to operate the Casino. The Government nominated Mr. Robert Russell (the CEO of RMC) on 20 June 2014 to serve on the Flat Tax Committee ("FTC"), and Sanum nominated Mr. Steve Rittvo (Chairman of Innovation Group and adviser to and expert witness for Sanum) on 25 June 2014.[15]

### i.   The First Material Breach Application

31. However, as stated, on 27 June 2014, nine days after the Settlement and the Consent Award issued was executed, LHNV and Sanum gave Notice of a Material Breach alleging that the Government's violations of the Settlement "entitle[d] Claimants

---

by the President of the SIAC Court of Arbitration.  The language of the arbitration shall be English. (emphasis added)

[14] Section 42 provides as follows:

This Deed shall be governed by and construed solely in accordance with the laws of New York. Any dispute arising out of or in connection with this Deed, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by **arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre** for the time being in force, including its emergency arbitration rules.  The seat of the arbitration shall be Singapore.  The Tribunal shall consist of three arbitrators.  Each Party shall nominate one arbitrator and the two nominated arbitrators shall nominate the presiding arbitrator.  In the event that the two nominated arbitrators are unable to agree on a presiding arbitrator, the presiding arbitrator shall be appointed by the President of the SIAC Court of Arbitration.  The language of the arbitration shall be English.  (emphasis added)

[15] See SIAC Tribunal Award, 29 June 2017, para. 74 (Flat Tax Committee – Independent Member Position Compensation Package, 20 June 2014).

to revive the international arbitration proceedings"[16] under Section 32 of the Settlement.

32.  The Material Breach Notice alleged in particular that the Government had violated Section 6 of the Settlement by granting or approving the grant of a gaming licence to a rival casino or casinos within Sanum's area of exclusivity, thereby substantially reducing the price at which the Claimants' Gaming Assets could be expected to be sold to prospective purchasers.   The breach was said to be so serious and fundamental as not to be "susceptible to cure due to the irreversible impact on the pool of buyers for the asset."[17]   Moreover, in any event, the Claimants took the position that under Section 32 of the Settlement "all deed deadlines in the Deed and Side Letter are extended by the length of time required to cure this breach."[18]

### ii.  The Claimants' Conduct Pending a Decision on the First Material Breach Application and the Impact on Subsequent Events, Rights and Responsibilities

33.  On 2 July 2014, the Claimants sent the Government a further email taking a more nuanced position on the suspension of deadlines, namely that while:

> [n]either the Deed nor the Side Letter expressly addresses what happens with respect to the parties' performance during the 45-day cure period contemplated by Section 32 of the Deed, …Claimants hereby 'suspend[ed] further performance under the Deed and Side Letter, at least **until we have [the Government's] response to the Material Breach Notice**.  (emphasis added)

---

[16] C-777, Material Breach Notice, *Laos Holdings N.V. v. Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, p. 2, 27 June 2014.
[17] *Ibid*, p. 2.
[18] *Ibid*.

34. The Claimants proceeded to suspend (i) their participation in the work of the FT Committee to appoint a third member, and (ii) the monthly payments of RMC's fees as required under Annex E of the Deed.[19]

35. That same day, 2 July 2014, the Claimants expressly instructed Mr. Rittvo not to participate in the FT Committee.[20]

36. The Government responded by sending Sanum an email, also on 2 July 2014, asserting that if RMC were not paid, the Government would apply to SIAC to appoint RMC to take control of the Casino and to sell it.[21]

37. Despite what it regarded as bad faith conduct by the Claimants, the Government never did take steps to terminate the Settlement as threatened on 2 July 2014 or otherwise.

38. On 4 July 2014, the Claimants filed their formal Application for Finding of Material Breach of Deed of Settlement and for Reinstatement of Arbitration in the Treaty arbitration.

39. On 11 July 2014, the Government responded by asserting (and enclosing evidence) that:

> In fact, there has been no grant of a license, no grant of permission, no grant of any kind that will allow the operation of a new casino in Savannakhet, Laos.  That is a fact.  **The Government attaches letters from the relevant officials who have personal knowledge of the recent transactions** that state unequivocally that there is no casino in the new development plans.  (emphasis added)

---

[19] C-780, Email to Minister of Planning and Investment and Werner Tsu from David Rivkin, p. 1, 2 July 2014.

[20] C-971, Laos' SIAC Opening Memorial, para. 42.

[21] C-781, Emails between Christopher Tahbaz and David Branson, p. 2, 2-3 July 2014.

40.     On 11 August 2014, the Government filed a Notice of Arbitration with SIAC pursuant to Sections 35 and 42 of the Settlement, seeking an order directing Sanum to comply with its obligations under the Settlement, including a declaration that the waiver of overdue taxes contained in Section 7 of the Settlement was no longer binding on the Government, because Sanum refused to proceed with the establishment of a Flat Tax Committee or to cooperate with RMC's monitoring of Savan Vegas pending the sale of the Casino, plus compensation, costs and interest on all monies due.

41.     The Government thereby continued to affirm the Settlement notwithstanding what it regarded as the Claimants' bad faith breaches of the Settlement.

42.     Sanum responded in the SIAC proceedings with a request for:

> (a) A declaration that the Settlement was void *ab initio* as a result of the Government's alleged fraudulent inducement of the Settlement; or
>
> (b) Rescission of the Settlement in light of the Government's material breach of the Settlement;
>
> (c) Or, in the further alternative, an award of monetary damages.[22]

43.     The SIAC Tribunal temporarily deferred ruling on Sanum's Motion to Stay the SIAC Arbitration pending the results of the Treaty arbitration rulings in the First Material Breach Application.

---

[22] C-825, Response to Notice of Arbitration and Brief Statement of Counterclaims, p. 1, 16 September 2014.

### iii. The Government Moves Ahead to Establish a Flat Tax Committee

44. On 5 December 2014, approximately six months after the Settlement had been executed, and there being no cooperation from the Claimants regarding formation of the Flat Tax Committee, the Government wrote to the President of the Macau Society of Registered Accountants pursuant to Section 9 of the Settlement explaining that a three-member committee was to be formed to determine a flat tax and requesting that the President assist in "secur[ing] the appointment of the third member of the Committee." It was specified that "[t]he person will be a member of your Society familiar with the taxation of casinos."[23]

45. The Government then wrote to Sanum on 24 December 2014 requesting it to facilitate

> … the orderly process of the exchange of control due on 15 April 2105, in the event Sanum/LH does not complete a sale or have in place an MOU, as stated in the Deed.[24]

46. On 29 December 2014, while the First Material Breach Application was still pending, the Government sent a notice to Mr. John Baldwin and Claimants' counsel advising that if the Claimants did not participate in forming the FT Committee and the Flat Tax Agreement expired, Laotian tax law would apply at a rate of 35% plus 10% VAT.[25]

---

[23] See SIAC Tribunal Award, 29 June 2017, para. 95.
[24] R-014, Letter from Dr. Bounthavy Sisouphanthong to John Baldwin and Christopher Tahbaz, 24 December 2014.
[25] See SIAC Tribunal Award, 29 June 2017, para. 97 (Letter from Laos' Ministry of Finance to John Baldwin and Christopher Tahbaz, 29 December 2014):

> The Ministry of Finance has been requested by the Committee Supervising the Sanum Settlement to assist in compliance with the tax aspects of the Deed of Settlement (Deed). According to the Deed, the parties were to have agreed to a procedure to set a Flat Tax for Savan Vegas and Casino

47. The existing Flat Tax Agreement expired according to its terms on December 31, 2013.[26]

48. The Claimants maintained their position that all rights and obligations under the Settlement (including the obligation to pay tax and to cooperate with the establishment of a "new" flat tax) were suspended pending a resolution of their First Material Breach Application.

49. On 6 January 2015, RMC, which had previously stopped working "as a result of the lack of cooperation and payment from Savan Vegas", and had declined to step

---

Co. (Savan Vegas). We understand that Sanum Investments Limited (Sanum) and Lao Holdings NV (LH) are refusing to comply with that procedure.

It is not acceptable to the Government of the Lao PDR that a large gaming establishment operating with the good licenses of the Government simply refuses to pay taxes to the Government … The Ministry of Finance requests compliance by Sanum, LH and Savan Vegas with the laws of the Government of the Lao PDR in connection with proper taxation of the gross gaming revenues of the Savan Vegas casino, operated in Savannakhet Province of the Lao PDR … **A failure to execute a Flat Tax Agreement within 30 days as required by your agreement with the Government will lead to the imposition of tax according to the laws, based upon the requested financial reports.** We call to your attention that by Presidential Decree, dated 24 October 2014, amending Article 20, point 2, of the Tax Law, the tax rate on Savan Vegas **gaming revenues has been set to 35%. In addition, 10% VAT applies to such revenues**.

If there is no cooperation in submitting the financial reports within 15 days, a Tax Order will be sent to Savan Vegas for the last six months of 2014, based upon the new Tax Law and the above stated estimate of revenue for 2013. If after payment of taxes so imposed, the parties later agree to a Flat Tax with retroactive effect, the Ministry will make adjustments accordingly. (emphasis added)

[26] See Agreement No. 2569 dated 1 September 2009 Regarding Flat Tax Payment for Casino Business of Savan Vegas and Casino between Tax Department, Financial Management Government Enterprises Department and Savan Vegas and Casino Company, Ltd.: (LHNV Exhibit C-7)

In order to assure that the payment of taxes of Savan Vegas and Casino Limited to the Government of Lao PDR is fit with actual business activity and is in line with the laws and regulations of Lao PDR as issued periodically, both parties agree to make this **Flat Tax Agreement for the experimental period of 5 years. This shall begin the 1st of January 2009 to the 31 of December 2013.**
**Article 1:** Savan Vegas and Casino, LTD agrees to pay the government Flat Tax which specifically covers the Casino Business and includes Excise tax, turn over tax, profit tax, Dividend tax, and dividend which is included in the Flat Tax (see "Dividend" of below timetable) and is in an amount of **$745,000 (seven hundred forty-five thousand dollars) per year**. The payment shall be split into 4 payments, in the period of 3 months each. The Flat Tax shall be paid to the Provincial Tax Department of Savannkhet Province but the dividend portion of the Flat Tax shall be paid to the Ministry of Finance through State Enterprise Finance Supervision Department. (emphasis added)

in to act as the "qualified gaming operator" of Savan Vegas, were Sanum to fail to sell the Casino by the deadline of 15 April 2015,[27] recommended that in its place, the Government appoint San Marco Capital Partners LLC ("San Marco") and its president, Ms. Kelly Gass, to manage and sell the Savan Vegas Hotel and Casino.

50.   On 19 January 2015, the Claimants sought to block the Government's plan to market the Casino by filing a further Application for Provisional Measures before the ICSID Tribunal requesting an order prohibiting the Government from:

(a)  Applying a 45% tax (35% plus 10% VAT) on gross gaming revenues to Savan Vegas;

(b)  Seizing the Casino; and

(c)  Taking any steps that would alter the status quo of the dispute pending the resolution by the Tribunal of the Claimants' First Material Breach Application.[28]

### iv.   The Government Moves Ahead with the Sale

51.   Events continued to progress.  On 7 March 2015, the President of the Macau Society of Registered Accountants appointed Mr. Quin Va, a Macau registered accountant and qualified auditor, to be the Chair of the Flat Tax Committee.[29]  (The Government did not formally retain Mr. Va until 15 May 2015.[30])

---

[27] See SIAC Tribunal Award, 29 June 2017, para. 99 (Email from Robert Russell (RMC) to David Branson, 6 January 2015).
[28] Claimant's Application for Provisional Measures, *Lao Holdings N.V. v. Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, 19 January 2015.
[29] C-971, Laos' SIAC Opening Memorial, para. 78.
[30] C-979, Flat Tax Committee Appointment Agreement between Laos and Quin Va, 15 May 2015.

52.   The ICSID Tribunal held a telephone hearing on 10 March 2015 in respect of the Claimants' pending Application for Provisional Measures.  During this hearing, the Government declared that it would proceed to form the FT Committee without the Claimants' participation:

> The Government contends … that it is open to the Government to have the Flat Tax Committee constituted without the cooperation of [Sanum] by resorting under Article 9 of the Deed of Settlement, to the President of the Macao Society of Registered Accountants.[31]

53.   On 18 March 2015, the ICSID Tribunal denied the Claimants' Second Application for Provisional Measures, stating in relevant part:

> In the Tribunal's view, the Claimant has not established a case for relief from the collection of the 45% tax on gross gaming revenues enacted in October 2014.[32]
>
> …
>
> The Tribunal notes that the Government was quite prepared to proceed with the renegotiation of a Flat Tax Agreement under the Terms of the Settlement and in fact appointed its nominee early in July 2014.  The Claimant has refused to participate as part of its broader disagreement with the Government of Laos over the status of the Deed of Settlement.
>
> When the Flat Tax Agreement expired on 31 December [2013], Savan Vegas became subject to the applicable tax laws of Laos. It is common ground that although Savan Vegas has continued to do business in Laos, it has not paid taxes either directly or in escrow since 1 January 2014.  While it now offers to pay in escrow the sum of US $429,300 per month retroactive to 1 January 2014, there is no obligation on the Government to agree to such a figure or to any escrow arrangement.[33]

---

[31] Decision on Claimant's Second Application for Provisional Measures, *Lao Holdings, N.V. v. The Government of the Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, para. 33, 18 March 2015.
[32] *Ibid*, para 27.
[33] *Ibid*, paras. 31-32.

…

> … [F]or so long as the Claimant continues to do business in Laos, it can reasonably expect to be bound by the Laotian income tax laws applicable to gambling casinos unless and until a new Flat Tax Agreement is negotiated.[34]

54. On 30 March 2015, the Government again reiterated by letter to the Claimants the Government's intention to take control of Savan Vegas on 15 April 2015, unless Sanum had either completed a sale or had signed a binding MOU with a purchaser of Savan Vegas.  Nothing less would extend Sanum's sale deadline (under the terms of Section 11 of the Settlement).[35]  The letter also referenced the decision of the ICSID Tribunal to reject the Application for Provisional Measures.   The Government stated that:

> the Government is not enjoined from proceeding to complete the takeover of the Gaming Assets (and further not enjoined from enforcing the outstanding tax invoices sent to Savan Vegas in January 2015) … **We trust Sanum/LH will now agree to cooperate to ensure a peaceful turnover.**  (emphasis added)

55. The letter concluded by inviting Sanum:

> to be in contact with the Ministry of Planning and Investment … to set forth **[Sanum's] proposed compliance with these important terms of the Deed** [of Settlement].  (emphasis added)

56. The Claimants persisted in the view that while their First Material Breach Application was still pending, their obligations under the Settlement were suspended, as were the rights of the Government to proceed to take control of Savan Vegas and sell it.

---

[34] *Ibid*, para. 34.
[35] R-018, Letter from Dr. Bounthavy Sisouphanthong to John Baldwin and Christopher Tahbaz, 30 March 2015.

v. **The ICSID Tribunal Rejects the Claimants' First Material Breach Application**

57. On 13 and 14 April 2015, the ICSID Tribunal held a hearing on the merits of the First Material Breach Application in Singapore.  On the evening of 14 April 2015, following the conclusion of the hearing, the Tribunal emailed both parties its decision not to grant the Claimants' request for a provisional measure to prohibit the Government from proceeding with the take-over of the Savan Vegas Casino:

> The Tribunal is seized of [a] request for Provisional Measures in support of the Claimant's Material Breach Application.  Having deliberated … the Tribunal concludes that the Claimant has failed to establish all of the requisite elements for such an order, and therefore dismisses the application, with reasons to follow.[36]

58. It later emerged that during the Singapore hearing,[37] Mr. Shawn Scott, Mr. Baldwin's partner, initiated a discussion with a Mr. Angus Noble about the potential purchase and sale of the Casino.  On the evening of 14 April 2015, at 23:04, shortly after receipt of notification of the ICSID Tribunal's refusal of provisional measures, and minutes before the expiry of the deadline to sell the Casino, Sanum provided to the Government a MOU signed by Mr. Angus Noble on behalf of his company, MaxGaming Consulting Services, Ltd. ("MaxGaming"), to purchase the Casino.  The Government declined to take the Noble MOU seriously and was later vindicated by the SIAC Tribunal which concluded after hearing all the evidence that the Noble MOU was not a serious document but a

---

[36] R- 025, Email from Ian Binnie to the Parties, 14 April 2015.
[37] Hearing Transcript, p. 64, *Lao Holdings N.V. v. Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, 14 April 2015 (cross-examination of Mr. Baldwin).

worthless device designed simply to extend the time of Sanum's operation of the Casino.[38]

### vi.    The Government's Seizure and Sale of the Casino

59.  On 16 April 2015, one day after the expiry of the Claimants' deadline to sell the Casino, the Government took control of the Casino.  It appointed San Marco to manage and operate the Gaming Assets pending a sale.

### vii.    The Change of Position of Sanum Seeking to Participate in the Sale Process

60.  On 5 May 2015, the Claimants changed direction and proposed to "try to work together to sell the property."  The Government declined the offer.  The Government made it clear that the effort to sell Savan Vegas "will not be a joint effort; the Government will adopt a procedure to have a due diligence room, and create a fair process for accepting bids and evaluating them … the Government will not allow … Mr. Crawford [a senior Sanum employee] on the premises.  He is free of course to meet anyone off the property and say what he wishes, but he must not be offered as an agent or emissary of the Government."[39]

61.  Once again, the Government thereby affirmed the agreement to sell the Casino under the authority of the Settlement, but to do so on the Government's own terms.

---

[38] See SIAC Tribunal Award, paras. 189-191.
[39] *Ibid,* para. 112.

### viii.    The *Ad Valorem* Tax Rate of Mr. Va

62. On 15 May 2015, the Government formally engaged Mr. Va to be the sole member

    of the FT Committee and to determine the tax to be paid by Savan Vegas.[40] The

    Government provided Mr. Va with three documents:  (i) a Gaming Tax

    Recommendation by BDO that described tax rates in other Asian jurisdictions; (ii)

    a Report to the Flat Tax Committee that described the tax situation with the other

    two casinos in Laos; and (iii) the Taxation Opinion of Professor Rose.[41]  No

    documents were passed to Mr. Va by or on behalf of the Claimants, who were

    unaware at the time of Mr. Va's appointment.

63. It is not clear to what extent, if at all, Mr. Va was briefed on the "old" flat tax

    arrangement between Savan Vegas and the Government dated 1 September 2009

    which was to be replaced by the "new" flat tax he was to recommend.

64. On 23 May 2015, Sanum wrote to the Government to indicate that it was prepared

    to resume participation in the FT Committee if the ICSID Tribunal were to deny

    the Claimant LHNV's First Material Breach Application:

> In the event that the ICSID tribunal denies the Material Breach
> Application, then that suspension [of performance of the
> Settlement] comes to an end and performance of the Parties'
> obligations under the Settlement resumes … On this basis … our
> clients write with regard to the immediate steps that should be
> taken by the Parties to move forward now with the Settlement.
>
> FT Committee … Prior to the suspension of the Deed in June
> 2014, the Government had appointed Robert Russell of RMC
> Consulting to sit on the Committee, while our clients had
> appointed Steven Rittvo … Please confirm that Mr. Russell
> remains the Government's nominee to the Committee.  **As soon**

---

[40] C-1979, Flat Tax Committee Appointment Agreement between Laos and Quin Va, 15 May 2015.
[41] C-971, Laos' SIAC Opening Memorial, para. 81.

**as we receive that confirmation, Mr. Rittvo will reach out to Mr. Russell in order to agree the third FT Committee Member**.[42]  (emphasis added)

65.   The Government rejected the proposal (conditional in any event on the outcome of the First Material Breach Application) to proceed by way of a three members Flat Tax Committee.

### ix.   The Government Announces a New Plan to Sell the Casino

66.   On 29 May 2015, the Government filed with the SIAC Tribunal its Response to the Claimants' Amended Provisional Measures Application.   The Government acknowledged that it had seized the Savan Vegas Casino and intended to proceed unilaterally with its sale as follows:

(a)   the Government will terminate the Savan Vegas Project Development Agreement (2007);

(b)   the Government will form a Newco;

(c)   the Government will grant Newco a 50 years concession agreement to operate the Casino, a gaming license and land concession the day it terminates the [2007] PDA;

(d)   the Government **will have an independent expert set a flat tax** which will be enshrined in the Newco concession agreement;

(e)   on completion of the audit [of Savan Vegas], the Government will put Newco on the market for sale by **auction**; the audit should be complete by mid-July;

---

[42] C-1050, Letter from Christopher Tahbaz to the Minister of Planning and Investment and David Branson, pp. 1-2, 23 May 2015.

(f) when the bids are evaluated, and the highest bid selected, Newco will be sold;

(g) the Government will pay Sanum its share of the proceeds;

(h) the Government expects to close the sale before year-end.[43]

67. The Government's proposed procedure did not comply (and did not purport to comply) with the terms of the Settlement.

### x. The Recommendation of a 28% Ad Valorem Tax by Mr. Va

68. On 9 June 2015, Mr. Quin Va produced his report on the taxation of Savan Vegas. He considered the existing Laotian taxation system and relevant Government policies, the taxation policy of other countries in the region in relation to gambling businesses and their comparative advantages and disadvantages, the current size of Savan Vegas, the current market position of Laos in the Asian gaming industry and the impact of the gaming policies of Thailand (Savan Vegas' largest source of gamblers). Mr. Va recommended that Savan Vegas be taxed on an *ad valorem* basis at the rate of 28% of gross gaming revenue ("GGR").[44]

69. The evidence is that during the period between his appointment (15 May 2015 when he received the three reports referred to earlier[45]) and the issuance of his report (9 June 2015), Mr. Va had no discussions or communications with the Claimants.

70. Mr. Va gave no weight (if he was aware of it) to the earlier 1 September 2009 Flat Tax Agreement between Sanum and the Government for a "flat tax" of the fixed

---

[43] Claimant's Response to Respondent's Amended Appeal for Provisional Measures, pp. 6-7, 29 May 2015.
[44] C-971, Laos' SIAC Opening Memorial, para. 81.
[45] R-053, Final SIAC Hearing Transcript, pp. 654-655, 24 January 2017 (testimony of Mr. Va).

amount of US $745,000 per year for 5 years, ending 31 December 2013, with the possibility of a renewal.[46]

71.   On 10 June 2015, the ICSID Tribunal issued reasons[47] for its dismissal on the merits of the Claimant LHNV's First Material Breach Application.

  **xi.   The Reliance on the Settlement both by the Government and Sanum at the SIAC Hearing on 16 June 2015**

72.   The SIAC Tribunal convened a hearing on 16 June 2015 to deal with all pending interim relief sought by Sanum.  In its decision of 29 June 2015, the SIAC Tribunal noted:

> At that hearing before this Tribunal, both **Laos and Sanum specifically reiterated their desire to enforce the Deed to effectuate the sale of the Casino** and agreed that the Deed's fundamental purpose was to sell the Casino at the maximum price possible and divide the proceeds 80/20 between Sanum and Laos.[48]  (emphasis added)

73.   It is therefore clear that despite what the Government considered to be the wrongful and provocative conduct of the Claimants referred to above, the Government elected "to enforce the Deed [of Settlement]."  (Sanum had earlier asked SIAC to rescind the Settlement.)  The Government made it clear it had no desire to return to the *status quo ante*.  The SIAC Tribunal continued:

---

[46] Flat Tax Agreement between the Tax Department, Ministry of Finance, the Lao Government and Savan Vegas, 1 September 2009 (LHNV Exhibit C-7).
[47] Decision on the Merits, *Lao Holdings N.V. v. The Government of the Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, paras. 6, 10, 34-35, 10 June 2015.
[48] See C-917, Hearing Transcript, pp. 122-123 (statement of Mr. Branson), 168 (statement of Mr. Rivkin), 16 June 2015.

Laos also stated that it had appointed Mr. Va to unilaterally determine the tax rate and that he had already done so.[49]

On 18 June 2015, Laos terminated the 2007 PDA with Sanum, asserting its right to do so "pursuant to the terms of the PDA, the provisions of the Law on Investment Promotion (2009) and other applicable laws of the Lao PDR" and citing, among other reasons, Sanum's non-payment of taxes.[50]

74. On 30 June 2015, the SIAC Tribunal denied Sanum's Application for Provisional Measures, seeking a reversion of the operation of the Savan Vegas Casino to Sanum and a prohibition of the termination of the 2007 PDA. However, the SIAC Tribunal did order the Government to provide Sanum with regular and ongoing financial information including any developments in respect of marketing initiatives. The SIAC Tribunal also observed that the Government had acknowledged that it had, as did its agent San Marco, a "fiduciary duty to Sanum in managing the casino and making efforts to obtain the maximum price at a sale."[51]

### xii.    The Government Takes Ownership of the Gambling Assets

75. On 28 September 2015, the Government issued a decree transferring all assets owned by the Claimants (but not the corporate liabilities) to Savan Lao, a new entity (earlier identified as Newco) that was solely owned by the Government, in order to accomplish the sale contemplated in the Settlement,[52] but on terms decided by the Government and fully disclosed to the SIAC Tribunal. In doing so, the Government claimed to be acting pursuant to the Settlement.

---

[49] *Ibid*, p. 87 (statement of Mr. Branson).
[50] C-921, PDA Termination Notice, 18 June 2015.
[51] C-919, Order on Respondent's Amended Application, para. 34, 30 June 2015.
[52] Claimants' Opening, 3 July 2017, citing the Ministry of Finance Declaration of 28 September 2015.

76.   After receiving draft versions of San Marco's marketing documents at the end of September 2015, Sanum objected to the SIAC Tribunal that, *inter alia*, the assets on offer failed to include the Lao Bao Slot Club and the Savannakhet Ferry Terminal Slot Club.  Moreover, contrary to Section 6 of the Settlement, the draft of the New PDA to be executed by the eventual purchaser contained less favourable terms than the 2007 PDA between Laos and Sanum.  These departures were not contemplated by the Settlement, and according to the Claimants significantly reduced the potential sale price.  However, the SIAC Tribunal declined to intervene with the Government's proposed course of action.  In its view, any actionable damages suffered by the Claimants could be satisfied by financial compensation.

### xiii.   The Government's Failed Auction Process

77.   In March 2016, six prospective buyers were approved by the Government to bid on Savan Vegas, including the eventual purchaser, Macau Legend Development Ltd. ("Macau Legend").

78.   At the end of March, the six approved bidders were given access to relevant financial and other data, which included the relevant Savan Vegas financial statements.[53]   In addition, some of the bidders, including Macau Legend, met privately with Government representatives.

---

[53] See SIAC Tribunal Award, 29 June 2017, para. 129 (Email exchange between Steve Croxton and Kelly Gass, 17-29 March 2016 (when asked when the financial information would be provided, Ms. Gass responds on the same day that they "will be sending out the instructions for accessing the data room Wednesday or Thursday USA time.")).

79. In its discussions with Government representatives, Macau Legend switched the focus somewhat from the Savan Vegas Casino to a proposed USD $300 million development for the 300-hectare land parcel adjacent to the Casino property (known as "Site A").  The Site A development was linked by Macau Legend to the purchase of the Casino.[54]  The Claimants argue that the proposed development of Site A, with facilities in competition with the Casino, further diluted the market value of the Casino itself.

80. Macau Legend offered to purchase Savan Vegas for US $40 million, provided the auction was cancelled and Macau Legend was given development rights in Site A.[55]

81. The SIAC Tribunal accepted the Government's evidence that as the "auction" process moved forward, and some potential bidders pulled out, the Government became legitimately alarmed that in the end Macau Legend would be the only bidder at the auction and in consequence be in a position to offer a low bid.  The Prime Minister met with some of his Ministers and decided that Laos would accept Macau Legend's offer to cancel the auction, and close the deal with Macau Legend, provided the sale price was increased from US $40 million to US $42 million.[56]

82. On 6 May 2016, Macau Legend accepted the counter-offer,[57] and, on the same day, the Government advised the SIAC Tribunal that it had entered into an agreement

---

[54] R-078 (SIAC), First Witness Statement of Dr. Vounthavy Sisouphanthong, para. 35,R-080 (SIAC), Witness Statement of Mr. Sheldon Trainor-DeGirolamo, para. 16, 29 November 2016.
[55] *Ibid*, paras. 24-26.
[56] R-078 (SIAC), First Witness Statement of Dr. Bounthavy Sisouphanthong, paras. 39-41.
[57] *Ibid*, para. 42; R-080 (SIAC), Witness Statement of Mr. Sheldon Trainor-DeGirolamo, para. 31.

with Macau Legend for the sale of Savan Vegas.  Macau Legend and Laos executed the New PDA and other relevant documentation on or about 13 May 2016.[58]

### xiv.    The Macau Legend Flat Tax Agreement

83.  The Government and Macau Legend subsequently concluded a flat tax agreement, pursuant to which Macau Legend would pay a flat tax of US $10 million annually for three years following the closing of the purchase, which would then increase somewhat thereafter, for two extensions of one year each.[59]  As part of the deal, Macau Legend also committed to invest in certain infrastructure projects in Laos.[60]

84.  While the Claimants note the difference between the flat tax agreed to with Macau Legend, and the 28% *ad valorem* tax recommended by Mr. Va, they also contend that the "tax" payments of US $10 million per year in fact amounted in significant part to a deferred purchase price, which would go entirely to the Government instead of the 80/20 split agreed to in the Settlement.

85.  Meanwhile, as the sale to Macau Legend was being finalized, ST Vegas Enterprise Ltd. ("ST Group"), a Lao company that had previously partnered with Sanum (and had initially invested in the Casino and slot clubs), communicated to the Government its interest in purchasing Savan Vegas.  On 15 August 2016, the ST Group offered "to buy our properties and business of Savan Vegas and Casino, Ltd … with the proposed price of US $100,000,000 (one hundred million dollars), with

---

[58] See SIAC Tribunal Award, 29 June 2017, para. 136 (PDA between Laos and Macau Legend, 13 May 2016; Letter of Record for Savan Vegas Hotel, 13 May 2016).
[59] C-964, Executed Flat Tax Agreement between the Ministry of Finance of the Lao People's Democratic Republic and Savan Legend Resorts Sole Company Limited, 19 August 2016.
[60] See SIAC Tribunal Award, 29 June 2017, para. 136 (PDA between Laos and Macau Legend, at Annex C, 13 May 2016).

additional payments of US $380 million denominated as taxes over the next twenty years."[61]  The ST proposal was not pursued by the Government.

86.   On 31 August 2016, Macau Legend funded the Asset Purchase Agreement and took possession of Savan Vegas.

### xv.    The Award of the SIAC Tribunal Dated 29 June 2017

87.   As explained above, one of the difficulties created by the framing of the Settlement is the allocation of overlapping jurisdiction in some respects between this Tribunal and the SIAC Tribunal.  The Government contends that its victory at SIAC in the Award of 29 June 2017 puts an end to the treaty proceedings by virtue of the New York law doctrines of *res judicata* and issue preclusion.

88.   The majority decision of the SIAC Tribunal was rendered by Judge Rosemary Barkett (Presiding Arbitrator) and Mr. Laurence Craig.  An opinion dissenting in part was delivered by Ms. Carolyn Lamm.

89.   The majority decision of the SIAC Tribunal concluded that the Government had not only affirmed the Settlement despite the conduct of the Claimants, but had actually implemented the Settlement:

(a)   The Government "did not breach its obligations under the Deed [of Settlement]" [Award, para. 328(f)];

(b)   "The Tribunal determines that both Parties are entitled to a share of the purchase price of Savan Vegas, … as defined by the Asset Purchase

---

[61] Claimants' Opening, 3 July 2017, citing Letter of Intent from ST Group, 15 August 2016.

Agreement between Laos and Macau Legend, proportionate to their ownership interest in Savan Vegas" [Award, para. 312(d)];

(c) "Laos is entitled to receive 20% of the purchase price of US $15,341,000 which equals US $3,068,200 and Sanum is entitled to receive the remaining 80% which equals US $12,272,800" [Award, para. 317];

(d) In respect of the sale process, "[LHNV and Sanum] were in material breach of their obligations under Paragraph 9 of the Deed and Annex E of the Deed concerning payment to and cooperation with RMC" [Award, para. 328(d)];

(e) "[LHNV and Sanum] materially breached their obligations under Paragraph 10 of the Deed concerning their obligation to take steps to sell Savan Vegas" [Award, para. 328(c)];

(f) The SIAC Tribunal noted that "[LHNV and Sanum] also argue that the Deed's requirement that the tax be 'flat' means that the tax should be a fixed, unchanging, periodic amount, not a fixed tax rate."  However, [the SIAC Tribunal comments] "the Deed does not define 'flat tax', and when Mr. Va, a qualified professional knowledgeable about the taxation of casinos, was asked to determine a 'flat tax', he interpreted this term to mean a tax with a flat rate … a flat tax is a tax that applies a constant marginal rate on income, **the Majority does not find Mr. Va's interpretation to be an unreasonable one"** [Award, para. 287]; (emphasis added)

(g) "[LHNV and Sanum] materially breached their obligations under Paragraph 7 of the Deed concerning their obligation to cause Savan Vegas to pay taxes to Laos as of 1 July 2014" [Award, para. 328(b)];

(h) "We conclude that [LHNV and Sanum] have not proven their claim with respect to the exclusion of the Slot Clubs from the sale of Savan Vegas" [Award, para. 228];

(i) "The Deed itself acknowledges that [the Government's] obligation to terminate 'the current criminal investigations against Sanum/Savan Vegas and its management' only exists 'provided that the terms and conditions agreed herein are duly and fully implemented by [LHNV and Sanum] [Award, para. 310];

(j) "Evidence is undisputed that, for ten months, as delineated earlier in this Award, 'the terms and conditions' agreed [in the Deed] were not 'duly and fully implemented'" [Award, para. 311];

(k) "… the Majority concludes that Claimant [the Government] did not breach any obligation under these circumstances by failing to grant the new buyer the right to extend the runway at Savannakhet" [Award, para. 239];

(l) "Therefore, the Majority concludes that, based on the record [LHNV and Sanum] failed to demonstrate that [the Government] did not maximize the Sale proceeds of Savan Vegas" [Award, para. 295].

90. Extracts of the reasons dissenting in part of Ms. Carolyn Lamm will appear, when relevant, below.

## IV.   OUTLINE OF THE SUBMISSIONS OF THE PARTIES ON THE SECOND MATERIAL BREACH APPLICATION

### i.   The Claimants' Contentions in Support of the Second Material Breach Application

91.   The Claimants note that under New York law "material breach" means that "a party has failed to substantially perform its obligations under the relevant contract or provision."[62]   Therefore, the "Claimants need only show that the breach was material in light of the performance, promised benefit and purpose of each of the enumerated sections, not of the contract as a whole."[63]

92.   The Claimants contend that each of the following breaches by the Government, taken in isolation, is sufficient to revive the Treaty arbitration:

(a) The Government willfully breached Section 5 of the Settlement by physically seizing and unilaterally operating Savan Vegas, by expropriating the Casino's assets by decree and structuring the sale of the Casino so as to deprive Claimant of the 80% value of the proceeds;

(b) The Government willfully breached Section 6 of the Settlement by terminating the Savan Vegas PDA and publicizing a new and deficient Project Development Agreement ("PDA") as part of the auction process.   The PDA executed by the Government with Macau Legend provided for fewer rights and more obligations than the original 2007 PDA with Sanum.   These modifications made Savan Vegas less valuable as a going concern;

---

[62] Memorial, para. 111.
[63] *Ibid*, para. 112.

(c) The value of the "Gaming Assets" was further reduced by failing to include in the sale the Lao Bao Slot Club and the Savannakhet Ferry Terminal Slot Club.  The Claimants reject the Government's contention that it could not sell the "slot clubs" as the licenses were actually held by the Claimants' former Laotian partner, ST, because, the Claimants contend, the Government was aware at the time of the Settlement of the ownership structure of the slot clubs.  The Government keeps a record of the gaming licenses that it has issued.  Despite this knowledge of ST's interest, the Government included the slot clubs in the definition of gambling assets to be sold as contemplated by Section 6 of the Settlement;[64]

(d) The Government breached Sections 7 and 8 of the Settlement in respect of the "new flat tax" by abandoning the mutually agreed procedure, and imposing a tax which is not a flat tax but an *ad valorem* tax of 28% of gross gambling revenues.  The Claimants contend that under any

---

[64] The Government explains the "slot club" issue as follows:

What actually happened was that it was admitted that ST owned the land on which the slot clubs were built, ST owned the buildings in which the slot clubs operated and ST owned the licences issued by the government to operate the slot clubs.  All Mr. Baldwin had was a contract which is called, in the slot club industry, a participation agreement, which allows you to put your slot clubs into somebody else's property under their licence and you share the profits 60/40.  That was the only 60/40 right Mr. Baldwin had.  It was to 60 per cent of the profits of operating the slot machines.

I wrote to them three times, and it's listed in the SIAC Award.  I wrote to them in July, August and September, and each time I said to them, "We have discovered that ST owns the slot clubs", and even the participation agreement cannot be assigned – Sanum was the 60 per cent majority in the participation agreement – the agreement expressly says it cannot be assigned unless ST agrees to the assignment.

So we said to them, "The government has no objection to selling the slot clubs, delighted, but we can't sell them if the owner doesn't agree.  So please deal with ST and come up with a solution."  (3 July 2017, Hearing Transcript, p. 165.)

plausible scenario an *ad valorem* tax of 28% GGR depressed materially the value of the Casino.  According to the Claimants, the wrongful purpose of setting an *ad valorem* tax was to confiscate value from the Claimants and to reduce the Claimants' share of the proceeds;

(e) The 28% *ad valorem* tax is discriminatory as it has only been applied to Savan Vegas and not to other casinos in Laos.  Furthermore, the Claimants point to the lump sum payments of US $10 million per year by Macau Legend for the first three years as proof of what was always understood by both the Government and the Claimants to constitute a "flat tax."  The breach of the promise of a flat tax was willful and altogether destroyed a material driver of the value of the gambling assets.  The *ad valorem* tax was non-flat and unreasonably high and thereby materially depressed the purchase price;

(f) Furthermore, the Government misused the *ad valorem* tax to justify seizing a substantial part of the Claimants' share of the purchase price paid by Macau Legend for payment of supposed back taxes;

(g) The Government accepted a lower price for the sale of the Casino in exchange for Macau Legend's agreement to pay post-purchase inflated flat-tax payments;

(h) The Government also breached Section 15 of the Settlement by depositing all of the sale proceeds in its own bank accounts or those of its own wholly-owned entity Savan Lao rather than in a joint escrow account.  It then wrongfully diverted US $26,659,000 million of the $42

million purchase price to satisfy the Claimants' alleged tax liability which was not lawfully imposed.  According to the Claimant, "the fact that Respondent deposited the remaining US $15,341,000 in a sole party escrow account almost four months after the transaction closed, in an effort to make a show of compliance [with the Settlement], does not change the fact that Laos failed to comply with the Deed's requirement that all proceeds be deposited directly by the buyer into a **joint** escrow account established by both Parties";

(i)   The Government breached Section 25 of the Settlement by falsely representing to prospective purchasers that expansion of the Savannakhet Airport runway was not feasible. While the Government suggested the possibility of development of a new airport at an alternative location, such an "alternative" proposal does not remedy the breach.  Construction of a new airport will take longer and cost more than extending the existing Airport at Savannakhet, and, under New York law, a material breach in respect of a unique asset cannot be cured by substituting a different asset. Based on their experts' calculations, the Claimants contend that the failure to include the airport right in the sale resulted in the material loss of nearly a fifth of the Casino's value;

(j)   The Government breached Section 22 of the Settlement in respect of Thakhaek development site.  The Claimants paid the US $500,000 deposit required by Section 22 and they say they attempted to negotiate in good faith development proposals for the 90 hectares site but were

stonewalled by the Government and have received none of the benefit which was intended and expected.   The Government refused to negotiate the Thakhaek Agreements in good faith and in particular:

(a)     refused to include the most valuable 16 hectares of the site on the basis that it was private property, notwithstanding that the 16 hectares were included on the map attached to the MOU, in which the Government had implicitly committed itself to pay compensation to the private owners;

(b)     rejected without explanation the Claimants' proposal for an alternative concession arrangement;

(c)     based on the valuation of their expert, the Claimants claim that the opportunity to develop the Thakhaek concession was worth as much as US$ 10.52 million;

(k) The Government materially breached Sections 23 and 27 of the Deed by commencing and continuing to pursue criminal investigations in US Federal Courts under 28 USC 1782, invoking the suspended allegations of bribery and attempted corruption.  The Government's pursuit of those criminal investigations entitles the Claimant "to revive arbitration proceedings on that basis, in addition to the other material breaches described above."[65]

---

[65] Memorial, para. 168.

ii.     **The Government Defences to the Second Material Breach Application**

93.     The Government points out that the Claimants' arguments and contentions in this Application rest on the same basis and duplicate the legal claims decided against the Claimants by the SIAC Tribunal on 29 June 2017.  Accordingly, under New York law, the principles of *res judicata* and issue preclusion apply to bar the application.[66]

94.     The Government emphasizes that in order to revive a pre-settlement claim under the Settlement, interpreted in accordance with New York law, "the breach must be material, destroying the 'root of the bargain'"[67] of the entire contract.

95.     The Tribunal has already determined that Section 32 requires a determination "on both the existence of the breach and its materiality."[68]  The Government says the Claimants agreed at SIAC and in the treaty proceedings that the "root of the bargain" is to sell the Casino "on a basis that will maximize Sale proceeds."[69]  The SIAC Tribunal concluded that the Casino was in fact sold for maximum value within the meaning of Section 13 (which is not a section listed in Section 32 and therefore not within the jurisdiction of the Tribunal).  The breaches alleged against the Government under Sections 5-8 – even if established – would by definition not be material because the Claimants did receive the essence of their bargain, namely the sale of the Casino "on a basis that will maximize Sale proceeds."

---

[66] Counter-Memorial, para. 11.  Preclusion is "plainly applicable here because all the facts and legal issues that serve as the basis of Sanum's claims in these proceedings were fully pled before, and are soon to be adjudicated by, the SIAC Tribunal."
[67] *Ibid*, para. 28.
[68] Rejoinder, para. 23.
[69] Settlement, Section 13.

96. Insofar as the Claimants argue that revival under Section 32 is equivalent to the equitable remedy of rescission, the Government points out that entitlement to an equitable remedy requires clean hands.  The Claimants and their principals do not have "clean hands."  They have committed repeated acts of fraud and bribery.  Even at the date of the Settlement, Mr. Baldwin had no intention of selling the Savan Vegas Casino regardless of the price, according to the Government:

   (a) First, Tak Chun, the possible buyer touted by Mr. Baldwin, at the time of the Settlement, was not an interested buyer.  "Sanum concocted this false narrative from the very beginning, during the settlement negotiations, in order to keep control of the Casino. It is only because Sanum said they had a buyer that it was allowed [by the Government] to keep control for 10 months to complete the sale;"[70]

   (b) Second, the First Material Breach Application was a bad faith effort to pressure Laos to renegotiate the Settlement.  The strategem failed but "the Decision on the Merits exposed Sanum's bad faith.  The LHNV Tribunal held that the Government did not materially breach the Deed, but also, and more significantly, that Sanum's decision to unilaterally stop performance and disregard the 'cure' provision was wholly unjustified;"[71]

   (c) Third, the Government says the Claimants put forward a fraudulent buyer, Mr. Angus Noble, for Savan Vegas after the First Material

_____

[70] Counter-Memorial, para. 44.
[71] *Ibid*, para. 50.

Breach Application failed. "Claimants induced Mr. Noble to sign this fraudulent document [the MOU], suborned knowingly false testimony from Mr. Noble [by paying him] $10,000 per month for twenty-one (21) months. Sanum submitted the fraudulent Noble MOU to the Government, and more egregiously, to the SIAC Tribunal, all in an effort to further Mr. Baldwin's objective of maintaining control of the casino;"[72]

(d) "Rather than accept the Government's numerous invitations to participate in the transition of control, and to help the Government complete the Deed's purpose by selling the Casino, Mr. Baldwin chose [to pursue] the Angus Nobel fraud. For Mr. Baldwin, the Noble fraud 'was the right thing to do' simply because he desperately 'needed' to maintain control – **that was the plan all along**;"[73] (emphasis added)

(e) In late spring-early summer 2015, after the Settlement, Mr. Baldwin hatched a scheme to bribe Government officials in an attempt to recover control of Savan Vegas. The Government points to a draft consulting agreement with an unemployed security guard, Mr. Ben Gersten, disclosing (the Government says) the bribe that Mr. Baldwin was willing to pay to Government officials to permit Sanum to recover control of the Casino;

---

[72] *Ibid*, para. 70.
[73] *Ibid*, para. 73.

(f) The Government says bribery is part of Sanum's regular business model as shown by numerous documented and uncontroverted acts of illegality uncovered or proven after the Settlement was signed. It is now established, the Government says, that Mr. Baldwin authorized a bribe of $30,000 to obtain the original 2009 Savan Vegas Flat Tax Agreement, and paid various other bribes to have the Thanaleng Slot Club shut down, to tamper with witness in the court case with his former partner, ST, and to obtain a lottery license in Cambodia.

97. The Government concludes: "In light of Sanum's egregious bad faith conduct in connection with the Deed, the Tribunal should exercise its broad discretion under New York law and the ICSID Rules to refuse to aid Sanum, the unclean litigant."[74]

98. In the result, the Government claims the following relief: "the Tribunals must deny the Second Material Breach Application and dismiss Sanum's claims in their entirety."[75] Both Tribunals must order "that these arbitration proceedings are discontinued and terminated."[76] Finally, the Government claims indemnification under Section 28 of the Settlement.[77]

---

[74] *Ibid*, para. 101.
[75] *Ibid*, para. 102.
[76] *Ibid*, para. 102.
[77] Section 28 provides:
    Each of the Claimants and Laos shall indemnify and keep the other Party hereto indemnified on demand and shall defend and, hold the other Party hereto harmless from and against all liabilities, loss, damages, expenses and claims of any nature whatsoever by any person for any and all losses or damages arising out of or in any way connected with the indemnifying Party's breach hereof and any negligent or willful act or omission of the indemnifying Party hereunder.

## V.   THRESHOLD ISSUES RAISED BY THE GOVERNMENT AGAINST THE ENTIRETY OF THE CLAIMANTS' APPLICATION

### i.   *Res Judicata* **and the Alleged Impact of the SIAC Award Rendered on 29 June 2017 on the Jurisdiction of the Tribunal**

#### (a)   The Government's Position

99. The Government contends that the issues raised by Sanum in the Government-initiated SIAC proceedings track the issues raised by the Claimants in the ICSID and PCA proceedings.  Thus, "LHNV literally cut and pasted their claims from the Second Material Breach Application into their Second Amended SIAC Counterclaims."[78]

100. The Claimants' Second Material Breach Application contains 65 paragraphs, of which 35 paragraphs present Sanum's legal claims, and of these 35 paragraphs, 33 paragraphs are identical to the text of Sanum's Counterclaims before the SIAC Tribunal.[79]

101. *Res judicata* and collateral estoppel are plainly applicable here because all the facts and legal issues that serve as the basis of Sanum's claims in these proceedings were fully pleaded before, and were adjudicated by, the SIAC Tribunal.[80]  The Government cites in support of its position, *inter alia*, the decision of the New York Court of Appeals for the proposition that:

> [I]n general the doctrines of claim preclusion and issue preclusion between the same parties (more familiarly referred to as res

---

[78] Respondent's Opening, 3 July 2017.
[79] Counter-Memorial, para. 6.
[80] *Ibid*, para. 11.

judicata or direct estoppel) apply as well to awards in arbitration as they do to adjudications in judicial proceedings.[81]

**(b)   The Claimants' Position**

102.   The Claimants deny that the SIAC Award precludes the Tribunal from reviving the Treaty arbitration under Section 32 of the Settlement.  First, the SIAC Tribunal had no jurisdiction to consider the only relief claimed before this Tribunal, namely whether the Claimants are entitled to revive the Treaty arbitration under Section 32 of the Settlement.  Second, New York procedure does not govern these proceedings. *Res judicata* and issue preclusion questions are to be governed by international law.

103.   In any event, the Government has not established the prerequisites for *res judicata* or issue preclusion for the following reasons:  first, the claims do not meet the triple identity test applied by international tribunals, (identity of parties, causes of action and relief);[82] second, under New York law, "claim preclusion could be invoked only to bar a claim that had been or could have been brought in the prior proceeding";[83] third, [t]here are no clear rules under international law as to how, when and whether the doctrine of issue preclusion is to be applied as between two arbitrations";[84] and fourth, under New York law, "collateral estoppel [issue

---

[81] RLA-063, *Matter of American Ins. Co. (Messinger – Aetna Cas. & Sur. Co.)*, 43 N.Y. 2d 184, 189-90, 191 (Ct. App. 1977).
[82] CLA-316, *Gavassi v. Romania*, ICSID Case No. ARB/12/25, Decision on Jurisdiction Admissibility and Liability, 21 April 2015, paras. 164, 166:

164 … From its perspective as an international tribunal formed under the BIT, the Tribunal applies international law as the law applicable to these questions
…
166 … Under international law, three conditions need to be fulfilled for a decision to have binding effect in later proceedings:  namely, that in both instances, the object of the claim, the cause of action, and the parties are identical.

[83] Reply, para. 61.
[84] *Ibid*, para. 62.

preclusion] applies only if the issue in the two forums is identical, there was a full and fair opportunity to litigate the issue in the first forum, and the issue was actually decided and necessary to the outcome in the first forum."[85]

104. The Government's only reference to an "international" case is *Grynberg and RSM v. Grenada*[86] which was not a case (as here) where the two tribunals were constituted under the same instrument, with one tribunal assigned jurisdiction over certain issues, and the other tribunal assigned jurisdiction over certain other issues.

### (c)    The Tribunal's Ruling

105. The preclusion issue must be approached from an international law perspective.[87] The Tribunal was not "constituted" by the Settlement.  It was constituted under, and derives its jurisdiction from, international treaties.  The Treaty hearings were suspended (perhaps permanently) by the Settlement, but the Tribunal continues to exist "in suspense" as a Treaty Tribunal.  A finding of a material breach of one of the sections listed in Section 32 is a condition precedent, of course, to any revival of the Treaty arbitration, but the fact that the parties have stipulated that "(t)his Deed shall be governed by and construed solely in accordance with the laws of New

---

[85] *Ibid*, para. 63.

[86] RLA-071, *Grynberg and RSM v. Grenada*, ICSID Case No. ARB/10/6, Award, 10 December 2010, paras. 2.4.1, 4.6.18.

[87] CLA-293, Gary Born, *International Commercial Arbitration*, (Second Edition) (Kluwer 2014), para. 3775:

> Nonetheless, as discussed above, there are substantial grounds for doubting that national preclusion rules are appropriate in international arbitration, particularly with regard to the preclusive effects of arbitral awards.  For the reasons already detailed, the appropriate choice-of-law treatment of the preclusive effect of awards is to develop and apply uniform international standards of preclusion derived from the New York Convention.

Mr. Born's point was that international tribunals should not resort to national law because it could often lead to overly technical applications of preclusion.  (See Hearing Transcript, R-047, 18 October 2016, p. 23).

York" does not transform the Treaty Tribunal into a domestic New York commercial arbitration tribunal.

106. As acknowledged by counsel for the Government at an earlier stage in these proceedings, the contractual basis of arbitration jurisdiction distinguishes international arbitrations from a court system established under a state constitution:

> Mr. D. Branson: … there's a hierarchy, in our court system. That doesn't exist in international arbitration. So, technically, while you must, under New York law, if you're a court in New York, apply the doctrines of *res judicata* and collateral estoppel, you're not required to apply them. We would have to ask you to apply them as a matter of wisdom and good sense.[88]

107. While the Government took a more aggressive position on this point at the merits hearing in Singapore, in the Tribunal's view, Mr. Branson' earlier statement is the correct analysis.

108. Even in matters governed by U.S. domestic law, including the law of New York, it is for the parties to determine by contract their chosen "scheme of remedies." Party autonomy in arbitration in this respect is affirmed by the jurisprudence cited in the *American Restatement of Law (Judgments)*:

> Assuming that the arbitration procedure has the elements of validity and has become final, it should be accorded claim preclusive effect **unless a scheme of remedies requires that it be denied such effect**.[89] (emphasis added)

109. In arbitral matters, the contract governs. The Settlement confers two distinct and separate arbitral mandates without creating any preclusive hierarchy in their

---

[88] R-047, Hearing Transcript, 18 October 2016, p. 18.
[89] CLA-360, *American Restatement (Second) of Law (Judgments)* Section 84 Arbitration Award (1982), (March 2017 Update); Chapter 6, Special Problems Deriving from Nature of Forum Rendering Judgment.

authority to decide issues within their respective spheres.  The Settlement creates no rule of paramountcy between the SIAC Tribunal and this Treaty Tribunal.  The application in these circumstances of *res judicata* or issue preclusion would be contrary to the freedom of contract exercised by the parties.

110.  Acceptance of the Government's position would set up the proverbial "race to the Courthouse."  If the Claimants could get a revival from the Tribunal before the Government could get an award in its favour from SIAC, then the Claimants would prevail.  If SIAC issued a favourable award first, the Government would prevail.  The scheme of overlapping jurisdiction created by the Settlement does create some complexities, but there is nothing in the Settlement to suggest that the parties intended the complexities to be solved by a "race to the Courthouse."

111.  The SIAC Tribunal itself acknowledged the existence of separate mandates to be exercised by the SIAC Tribunal and this Tribunal to address different causes of action and different remedial relief:

> Given the contents of the prior decision of the LHNV BIT Tribunal, the Second Material Breach application, and Respondents' Amended Response and Counterclaims, **we cannot conclude**, based on the record before us, that there is a **substantial overlap of the issues** and requested relief before the LHNV BIT Tribunal and the issues and requested relief remaining before this Tribunal.[90]  (emphasis added)

112.  The Tribunal has no authority to abdicate in favour of a SIAC Tribunal its Section 32 mandate to revive or not to revive the Treaty arbitration.

---

[90] C-962, SIAC Tribunal's Order on Interim Measures and Requests to Stay Proceedings, 22 July 2016, para. 5.

113.   That having been said, it is equally the duty of the Tribunal to confine itself to the sections listed in Section 32 and not to second guess the SIAC Tribunal in respect of sections of the Settlement not listed in Section 32.

114.   Thus, for example, Section 9 of the Settlement describes the procedure for the determination of the "new flat tax."  The SIAC Tribunal concluded that the process adopted by the Government did **not** violate Section 9.  The Claimants contend that Section 9 is incorporated by reference into Section 8, but counsel for the Government correctly points out the fallacy of this position:

> If [the Claimants] wanted to make section 9 or the way that the Flat Tax Committee was formed or the way it operated or the way they made a fair and reasonable tax, then get section 9 into section 32.
>
> We didn't agree to put section 9 in section 32.  You can't incorporate by reference, when you have two clauses next to each other, one of them is in section 32, the next one is not, and then say, "Oh, this one really is in section 32 because it's incorporated in section 8."[91]

115.   Any views of the Tribunal about the Government's compliance with the **process** set out in Section 9 are not relevant because Section 9 is not listed in Section 32. On the other hand, the Tribunal is required to determine for the sole purpose of revival whether the **outcome** of the Section 9 process was a "new flat tax" within the meaning of Section 8.  The differing mandates under Sections 32 and 42 of the Settlement are not to be confused (and the legitimate expectation of the Claimants thereby negated) by doctrines of *res judicata* and issue estoppel.

---

[91] Hearing Transcript, 3 July 2017, p. 175.

116. The Tribunal is thus limited in its jurisdiction to a sub-set of sections of the Settlement, namely those listed in Section 32.  The SIAC Tribunals have no such limitation, either in terms of the elements of the Settlement (except Section 32) subject to their consideration, or in the type of relief (including financial compensation) which they may grant except for the "carve out" from SIAC jurisdiction in respect of revival of the Treaty arbitration.  Therefore, the "carve out" in favour of this Tribunal must be respected.

117. The Government's objection based on *res judicata* and issue preclusion is rejected.

### ii.  Did the Claimants Forfeit Any Right to Government Performance Under the Settlement by Their Own Non-Performance?

118. The Tribunal agrees with the Government that during the pendency of the First Material Breach Application, and in particular in the period beyond the 45 day cure period, the Claimants repeatedly violated important obligations under the Settlement, including through their refusal to proceed with the establishment of a Flat Tax Committee, to cooperate with RMC's monitoring of Casino matters pending the sale of the Casino, or to cooperate in "the orderly exchange of control" of the unsold Casino on 15 April 2015.

119. The issue is whether these breaches of the Settlement preclude the relief sought by the Claimants in their Second Material Breach Application.

### (a)  The Government's Position

120. The Government contends that the Claimants forfeited by their repudiation of their obligations under the Settlement any procedural rights under the Settlement to participate in the sale of the Gaming Assets.  Despite provocation and disruption

by the Claimants, the Government proceeded prudently by subjecting the sale process to the supervision of the SIAC Tribunal, which endorsed (where it did not actually direct) the steps taken by the Government to sell the Gaming Assets.  Any departures from the process set out in the Settlement were made under SIAC supervision in order to salvage a sale "that maximized proceeds."

### (b)   The Claimants' Position

121.  The Claimants say that their obligations under the Settlement were **suspended** until the First Material Breach Application was decided on 10 June 2015.  At that point, the Government had a choice:  treat the Settlement as terminated by reason of material breaches by the Claimants, or, notwithstanding such breaches, affirm and carry on with implementation of the Settlement.  The Government, having elected to continue to take the **benefit** of the Settlement by so declaring and proceeding with the sale of the Gaming Assets as it did, was thereby obligated to accept the **burden** of the Claimants' rights and privileges.[92]  As pointed out by the Claimants, the Government explicitly affirmed its intention to take the benefits under the Settlement:

---

[92] See Claimants' Opening, 3 July 2017, citing CLA-367, *V.S. Int'l v. Boyden World Corp.*, 862 F. Supp. 1188 (S.D.N.Y. 1994):

When one party to a contract materially breaches the contract during the course of a continuing performance, the non-breaching party "has a choice presented to him of continuing the contract or of refusing to go on."  *Id.* (quoting *Emigrant Industr. Savs. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943)).  When the "injured party chooses to go on, he loses his right to terminate the contract because of the default."  *Apex Pool Equip.*, 419 F.2d at 562.  In short, '[o]nce the non-breaching party elects to continue the contract, he may not at a later time renounce his election and seek to terminate based on the prior breach."

…

Accordingly, based on the findings of fact set forth above, this Court finds that defendant is not liable to plaintiffs for breach of contract because plaintiffs elected to affirm the contract by continuing to receive benefits thereunder.

(i) in the Government's Notice of Arbitration filed with SIAC dated 14 August 2014, at para. 37;

(ii) in the Government's Response to Sanum's Amended Application for Provisional Measures dated 29 May 2015, at p. 26; and

(iii) in the Government's Amended SIAC Notice of Arbitration dated 3 June 2015 at para. 79.

122. Even after the sale of the Casino to Macau Legend on 31 August 2016, the Government repeatedly affirmed its election before the SIAC Tribunal:

(i) 14 October 2016: "The Government is entitled to specific performance under Section 16 of the Deed;"[93]

(ii) 23 December 2016: "The Government is entitled to both specific performance and money damages under the Deed;"[94]

(iii) 22 January 2017: "The Government fully performed its duties and therefore is entitled to specific performance and damages."[95]

123. The Government derived substantial benefits from its affirmation of the Settlement:

(a) It received US $15,341,000 out of the sale proceeds, as well as unfettered access to the Casino's revenues for over a year;

(b) It recovered US $26,659,000 in taxes from the period before the sale on the basis of an *ad valorem* tax on 28% of gross gaming revenue;

---

[93] Laos' SIAC Opening Memorial, para. 91.
[94] Laos' SIAC Rejoinder, para. 95.
[95] Laos' SIAC Opening Statement, 7:19-22.

      (c) It received US $500,000 as payment to restart the Thakhaek negotiations which led nowhere;

      (d) In the meantime, the Government has relied on the Section 27 release and suspension of the Treaty arbitration to avoid litigating the alleged treaty violations.

124. Citing New York jurisprudence,[96] the Claimants contend that "it is black-letter law that when one party to a contract materially breaches it, the non-breaching party has two options: it can terminate the agreement and sue for total breach, or it can continue the contract and sue for partial breach. There is, however, no third option allowing the party claiming a breach to invoke 'self-help' and only perform those obligations it wishes to perform."

### (c) The Tribunal's Ruling

125. The Settlement was a compromise under which the Claimants gave up (on conditions) their claim to treaty compensation (the merits and quantum of which were never determined) in exchange for a process for the sale of the Gaming Assets that included substantial rights of participation by the Claimants.

126. While the Tribunal ultimately found the First Material Breach Application to be without merit, the Government thereafter declined the renewed offers of cooperation, but instead:

---

[96] *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 3.83, 398-398 (S.D.N.Y. 1999); *V.S. Int'l v. Boyden World Corp.*, *Global Switching, Inc. v. Kasper*, 2006 WL 385315 (E.D.N.Y. Feb. 17, 2006) CLA-365; *Precision Pine & Timber, Inc. v. United States*, 62 Fed. CL 635 (2004) CLA-366; 863 F. Supp. 1188, 1197 (SDNY 1994) CLA-367; *A.R.P. Films. Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643 (2d Cir. 1991); *Estate of John Lennon v. Leggoons, Inc.*, 95 Civ. 8875, 1997 WL 346733, 1(S.D.N.Y. 1997); *Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d932, 686 N.Y.S.2d 911; *Farnsworth Contracts*, Section 8.19 (3d ed. 1999).

(a) assumed control of the Casino;

(b) unilaterally carried out preparation for its sale;

(c) implemented a procedure to determine the applicable tax;

(d) adopted a 28% *ad valorem* tax;

(e) sold the Casino to Macau Legend in a package that included "Site A" to which the Casino licence would be transferred.

127. The Government clearly affirmed and relied on the terms of the Settlement to sell the Gaming Assets and to rid Laos of the Claimants and their managers and principals.  As emphatically stated by counsel for the Government to counsel for the Claimants in an email of 30 May 2015 rejecting Sanum's belated proposal to participate in the Flat Tax Committee:

> The Government rejects your assumptions and proposals.
>
> The Government has stated its position on the overall issues in its Response dated May 29, 2015, filed with the SIAC Tribunal.
>
> The Government has no interest in continuing any dealings with **the criminals you represent**.[97]  (emphasis added)

128. By affirming the Settlement on numerous occasions up to and including the hearing on 3 and 4 July 2017, the Government obliged itself to accept the burden as well as the benefit of its terms, however distasteful it may have found the obligation to continue to deal with the officers and principals of the Claimants.  As expressed by the dissenting arbitrator in the SIAC Award of 29 June 2017 at paragraphs 5 and 6:

> Under New York law, a party may not accept the benefits of a contract while refusing to accept the burdens.

---

[97] C-981, Email from David Branson to Christopher Tahbaz, 30 May 2015.

> If there is a material breach, the non-breaching party must choose between two remedies: to terminate the contract or to continue it. Under New York's doctrine of election of remedies there is not a "third option" allowing a party claiming breach to invoke self-help and only perform those obligations which it wishes to perform.

129.  Indeed, in the course of the hearing of 3 July 2017, counsel for the Government acknowledged a more nuanced position:

> So the court says [in ESPN Inc. v. Office of the Comm'r of Baseball[98]] baseball has two choices: it can terminate the parties' contract and claim damages for total breach, or it can continue the contract and sue for partial breach. That's the law of New York.
>
> The point is that you have to look at the type of contract the parties are engaged in to determine what the options are when you are confronted with a breach. What it usually means is you are confronted with a breach, you obviously, if it's a material breach, have the right to terminate the contract and sue for damages for the whole contract, but there are times when that's not in the interests of the party on the other side … so [it] can continue performance because you get the benefit of the future performance, but **you can sue for partial damages** that have occurred.[99]  (emphasis added)

130.  The Government's potential claim for "partial damages" is not before the Tribunal.

131.  The Tribunal intends no disrespect to the majority decision of the SIAC Tribunal. The Tribunal is concerned only with the entitlement (if any) of the Claimants to rely on Section 32 of the Settlement. This was not an issue that was dealt with or could be dealt with by the SIAC Tribunal.

132.  Accordingly, the Government erred in treating the Claimants as having forfeited important ongoing rights to renewed participation in the sale of the Gaming Assets.

---

[98] CLA-281, *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 3.83, 398-398 (S.D.N.Y. 1999).
[99] Hearing Transcript, 3 July 2016, pp. 220-221.

### iii. Are the Claimants Barred from Claiming the Benefit of Section 32 Because They Did Not Perform Their Contractual Obligations and New York Law Provides That a Party in Default Cannot Call on the Other Contracting Party for Enforcement?

#### (a) The Government's Position

133. The Claimants are barred from Section 32 relief because of their failure to perform their own obligations: (i) to establish and complete the work of the Flat Tax Committee; (ii) to accept RMC as the qualified gaming monitor; (iii) to pay taxes to the Government; (iv) to sell the Gaming Assets; and (v) to cooperate in the transition of control to the Government after failing to sell the Gaming Assets within ten months.[100]

134. Such failures bar the Application under the two interrelated principles that (a) "one who breaches a contract may not seek to enforce other provisions of that contract to his or her benefit" and (b) "in order to seek relief under the Deed, Sanum must establish its own performance of its obligations, which it cannot."[101]

#### (b) The Claimants' Position

135. New York law establishes no such principle applicable to a commercial contract where (as here) both parties allege multiple breaches by the other.  It is common in litigation in New York and elsewhere for both contracting parties to point a finger at the other as contract breakers.  Both parties may succeed in their claims in some respects and lose in other respects.

---

[100] Rejoinder, para. 78.
[101] Rejoinder, para. 77.

## (c)      The Tribunal's Ruling

136.   The Government's argument assumes the point in issue, namely whether it is the Claimants or the Government (or both, or neither) that is in breach of the Settlement.

137.   In this particular case, the Government relies principally on the Claimants' conduct prior to the dismissal by the ICSID Panel of the First Material Breach Application on 10 June 2015.

138.   However, since at least 8 May 2015,[102] the Claimants have professed a desire to participate in the Flat Tax Committee and preparations for the sale of the Casino but were rebuffed by the Government, which, while affirming its reliance on the Settlement, refused to have "any dealings with the criminals you represent."[103]

139.   The Government clearly regarded as made in bad faith the Claimants' late flowering offer to cooperate in the sales process which they had for months declared to be "suspended."[104]   Apart from everything else, the Government says the

---

[102] C-1045, Respondent's Amended Provisional Measures Application, SIAC, 8 May 2015, para. 36:

Second, instead of waiting for the Flat Tax Committee to establish the proper tax – the Respondents are prepared to constitute that Committee immediately, to preserve their contractual rights under Sections 8 and 9 of the Settlement in the event that the Material Breach Application is denied.

[103] C-981, Email from D. Branson to C. Tahbaz, 30 May 2015.

[104] The Government's interpretation of the 8 May 2015 "offer" differs from that of the Claimants:

What their position was, was not that we want to admit that you are in proper control of the casino and then let's work together to set a flat tax so you can sell it. No. Their positions was: "We're entitled to control of the casino for ten more months because the period was suspended while we were having our material breach application, and if you give us the casino back for ten more months, then we'll set up a Flat Tax Committee because we're going to sell the casino."

That wasn't acceptable to the government.  Ten months meant ten months.  As the SIAC tribunal said, if their version of the suspension provision was correct, they could just keep filing material breach applications and we would never see the sale of the casino.  That was another feature to what was going on at that time.

Claimants took the position that the end of the "suspension" re-started the clock, giving the Claimants a further 10 months of time of the Casino **starting from the date of the end of the suspension**. But the Claimants' good or bad faith was never put to the test. They were simply shut out of the sales process as "criminals." (emphasis added)

140. In the circumstances, it is not open to the Government to simultaneously affirm and rely on the Settlement while attempting to ban the Claimants from seeking a remedy on the basis of the Claimants' conduct (or misconduct) that predated the Government's affirmations that continued to and included the Singapore hearing on 3 and 4 July 2017.

### iv. Are the Claimants Barred from Relief Under Section 32 Because They Do Not Have "Clean Hands"?

#### (a) The Government's Position

141. The Government contends that the Tribunal should not revive the Treaty arbitration at the request of "criminals" who are "unclean litigants."

142. The Government contends that the Claimants' unclean hands are a complete bar to the Second Material Breach Application.[105] Each instance of misconduct described by the Government in its Counter-Memorial "meets the legal requirements for

---

We took control in April. I asked Mr. Baldwin in the proceeding in Paris, I said, "Mr. Baldwin, did you ever intend to allow the government to sell the casino?" It's on page 1120 of the transcript of the fourth day.

Well, his answer was, "No, I never intended to allow the government to sell the casino." And everything he did, everything he did between April and when we sold the casino was to try and prevent the government from selling the casino. (Hearing Transcript, 3 July 2017, pp. 182-183)

[105] Rejoinder, paras. 70-75.

unclean hands – the conduct (1) relates to the Deed, (2) was committed in bad faith; and (3) injured the Government."[106]

143. The Government argues that the remedy sought by the Claimants, namely revival of the Treaty arbitration, is in substance an equitable remedy for rescission of the Settlement, and is therefore barred by unclean hands. The fact that the parties have a contract "does not convert rescission into a remedy at law."[107] It notes that the Claimants have pleaded rescission before SIAC as an alternative ground for relief.

### (b)    The Claimants' Position

144. The Claimants contend that the Government's unclean hands defense is irrelevant to the issues before the Tribunal and unsupported by the evidence. Under New York law, a "clean hands" defense bars only equitable relief[108] and the Claimants seek no such equitable relief, only a procedural order explicitly authorized by Section 32 of the Settlement as a matter of contract law not equity. The Claimants point out that the Government "does not even attempt to explain how a procedural determination, allowing the BIT arbitrations to resume on the merits in accordance with a contractual termination provision, could constitute equitable relief."[109]

145. Moreover, the Claimants argue, the "clean hands" argument invites the Tribunal to examine the truth of the Government's "allegations of fraud and bribery" but such

---

[106] *Ibid*, para. 70.
[107] *Ibid*, para. 71.
[108] CLA-325, *Aetna Cas. And Sur. Co. v. Aniero Concrete Co.*, Inc.., 404 F.3d 566 (2d. Cir. 2005):

"Unclean hands is *an equitable defense to equitable claims*. Because the [claimant] seeks damages in an action at law, [respondent] cannot avail itself of unclean hands as a defense."

See also CLA-338, *Hasbro Bradly v. Coopers & Lybrand*, N.Y.S.2d 461 (N.Y. App. Div. 1987).
[109] Reply, para. 68.

allegations fall outside the Tribunal's Section 32 jurisdiction.  To the extent (if any) that the same allegations are at issue in the underlying Treaty arbitration, the Tribunal may consider them only *after* granting the Section 32 applications, and may do so only on the frozen record agreed at the time of the Settlement as specified in Sections 33 and 34 of the Deed."[110]

### (c)      The Tribunal's Ruling

146.   The Tribunal considers that the claim under Section 32 of the Settlement is not a claim for equitable relief.  The Claimants seek to enforce a contractual right.  They do so as a matter of legal entitlement (Section 32 uses the word "shall").  There is no equitable discretion.  Section 32 does not use "may" which would signal the existence of a discretion, to which the Government might address arguments for dismissal.

147.   The Government argues that in effect the Claimants' demand for revival is equivalent to its demand at SIAC in rescission:

> … because as to their counterclaims in SIAC and their claims here, they're identical.  The only difference they say is, "We're asking for revival instead of rescission" – no, they are asking for rescission which leads to revival.[111]

148.   The Tribunal is unable to agree.  A revival of the Treaty arbitration would be *enforcement* of Section 32, not rescission of the Settlement.  Revival of the Treaty arbitration would be on the terms set out in Sections 33 and 34 of the Settlement

---

[110] *Ibid*., para. 70.  The Claimants continue: "The Government "does not even attempt to connect [the Claimants' "alleged misconduct"] with the relief that the Claimants are seeking here or the Government's breaches, as required to plead an unclean hands defense, nor does it attempt to assert that it was injured by them.", para. 84.
[111] Hearing Transcript, 3 July 2017, p. 147.

governing the content of the record and the bar against "new claims or evidence …

or additional relief."

149.   Accordingly, the Claimants do not seek rescission or other form of equitable relief

and under New York law, the enforcement of a **legal** contractual right, if otherwise

justified, is not conditional on "clean hands."  The defence based on unclean hands

cannot therefore bar the Tribunal's jurisdiction.


**VI.   THE GOVERNMENT'S ALLEGED MATERIAL BREACHES OF THE SECTIONS LISTED IN SECTION 32 OF THE SETTLEMENT**

**i.      Are Any of the Government's Breaches "Material"?**

150.   In its Interim Ruling on Issues Arising Under the Deed of Settlement, the Tribunal

held that:[112]

> … Section 32 gives the consent of the parties to the jurisdiction of
> the Tribunal to decide whether there has been a breach and
> whether the breach thus established is material.

**(a)      The Claimants' Position**

151.   The Claimants dispute the relevance of the Government's argument that a party may

rescind a contract only for a material breach of the contract as a whole.  According

to the Claimants, New York law requires Section 32 to be enforced **as written** and

therefore, the Claimants are entitled to an order granting their Second Material

Breach Application for a material breach of **any** of the listed sections.  In any case,

argue the Claimants, the Government's breaches deprived the Claimants of virtually

all the benefits agreed by the parties in the Settlement.  The Claimants add: "Under

any reasonable view of the facts, these breaches are a material breach of the

---

[112] R-013, para. 70.

Settlement as a whole, regardless of whether Laos sold the assets it decided to sell on terms that maximized their sale price."[113]

152. Many of the listed Settlement provisions have nothing to do with maximizing the sale price under Section 13: the Government has disregarded the civil and criminal releases (Sections 23 and 27), breached the escrow provision (Section 15) that the proceeds of the sale be deposited **directly** into a **joint** escrow account; formally expropriated the Claimants' assets in breach of Section 5, breached Section 22 respecting the Thakhaek concession, and Sections 7 and 8 on the imposition of taxes. Section 32 of the Settlement gives Claimants the right to revive the arbitration if **any** of these provisions has been materially breached irrespective of whether Section 13 has been breached or the Settlement as a whole has been materially breached.

153. The Claimants argue that the Government also materially breached Settlement provisions designed to support the sale price separately from Section 13, such as Sections 6, 7, 8 and 25.[114] The Claimants explain that these terms were included because "they would have a profound effect on the nature and value of the concession that was being transferred to the buyer of the Gaming Assets." The

---

[113] Reply, para. 47.

[114] The Claimants cite CLA-298, *Hadden v. Consolidated Edison Co. of N.Y. Inc.*, 34 N.Y.2d 88, 96 (N.Y. 1974):

    There is no simple test for determining whether substantial performance has been rendered and several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance. (See 3A Corbin, Contracts, paras. 704-707, 6 Williston, Contracts, paras. 841-888 844 [3rd ed.]).

assets sold by the Government materially differ from the "Gaming Assets" the parties agreed to sell, and the proceeds of the sale were correspondingly reduced.

154. The Claimants point out that "if the Government were right that only a breach of Section 13 could be material, Section 32 of the Deed would be entirely meaningless. Section 32, as amended by the Side Letter, lists twelve separate sections – which do not include Section 13 – that are capable of being materially breached.  If the Government were right that only Section 13 can be materially breached, then Section 32 could never apply because Section 13 is not listed there.  That is obviously not what the parties intended when they negotiated Section 32, and it cannot be what Section 32 means."[115]

155. According to the Claimants, under New York law, Claimants are entitled "to rely on the terms of the Deed of Settlement as agreed by the parties.  Performance that substantially departs from what the parties agreed is not substantial performance and is by definition a material breach."[116]

#### (b)   The Government's Position

156. The Government emphasizes that "to revive a pre-settlement claim under New York law and the Deed, the breach must be material, destroying the 'root of the bargain.'"[117]

157. The Government contends that, under New York law, a party may rescind a contract only for a material breach of the contract as a whole.  In light of the facts that: (i)

---

[115] Reply, para. 41.
[116] *Ibid*, para. 42.  Emphasis in the original.
[117] Counter-Memorial, para. 28.

the SIAC Tribunal found that the Government successfully "maximized sale proceeds" within the meaning of Section 13; and (ii) the Claimants agreed throughout these proceedings that the essential purpose of the Settlement was to "maximize" the sale proceeds, therefore none of the other alleged breaches, even if established, can be considered "material" under New York law.  The essential benefit of the parties' bargain as expressed in Section 13 has been satisfied.  This is not a matter that can be revisited by the Tribunal because Section 13 itself is not listed in Section 32.

### (c)    The Tribunal's Ruling

158.  The text of Section 32 of the Settlement governs.  It provides for revival "in the event that Laos is in **material breach of Sections** 5-8, 15, 21-23, 25, 27 or 28." Section 32 does not speak of material breach **of the Deed**.  Accordingly, the Government is correct that revival is justified only if the breach is material but the text of Section 32 makes clear that materiality is decided disjunctively on a section by section analysis of the provisions listed in Section 32 and not on the Settlement as a whole.

159.  The Tribunal agrees with the Claimants that a breach of Section 13 cannot be a condition precedent to revival under Section 32, because Section 32 sets out the conditions for revival and Section 13 is not referenced in Section 32.

160.  In determining materiality of a breach of a listed section, however, the Tribunal is content to proceed on the basis of the formulation of "materiality" suggested by the Government, namely that the breach of the section must "go to the root" of the

benefit promised by that section, and "defeat the object of the parties" in their agreement on that provision.[118]

### ii. Did the Government Imposition of a 28% *Ad Valorem* Tax Comply with the Promise of a "New Flat Tax" in Section 8 of the Settlement?

#### (a)   The Claimants' Position

161.   An *ad valorem* tax is not a "flat tax."  The guarantee of a flat tax was an essential feature of the Claimants' plan to market the Casino.  The inability to offer a flat tax, and the consequent destruction of shareholder value by imposition of an *ad valorem* tax went to the root of Section 8 and indeed to the value to the Claimants of the Settlement as a whole.

#### (b)   The Government's Position

162.   The Government adopts the position of the majority of the SIAC Tribunal in the 29 June 2017 Award as follows:

> [LHNV and Sanum] also argue that the Deed's requirement that the tax be "flat" means that the tax should be a fixed, unchanging, periodic amount, not a fixed tax rate.  However, the Deed does not define "flat tax" and when Mr. Va, a qualified professional knowledgeable about the taxation of casinos, was asked to determine a "flat tax", he interpreted this term to mean a tax with a flat rate … a flat tax is a tax that applies a constant marginal rate on income, **the Majority does not find Mr. Va's interpretation to be an unreasonable one**.  (emphasis added)

---

[118] The Government cites *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997), RLA-012.

(c)      **The Tribunal's Ruling**

163.   Section 8 of the Settlement promised the Claimants a "new flat tax" to be

ascertained by following the procedure set out in Section 9.  Section 9 is not listed

in Section 32.  Section 8 provides as follows:

> Laos and the Claimants agree that a **new flat tax** ("FT") shall be
> promptly established **in accordance with the procedure
> described in Section 9 below**, and such FT shall be applied to the
> Gaming Assets with retroactive effect dating back to 1 July 2014.
> The FT shall apply throughout the fifty (50) year term of the PDA.
> Such FT shall be escalated by five percent (5%) at the fifth (5th)
> anniversary of the Effective Date and by five percent (5%) on
> every five (5) year anniversary thereafter throughout the term.
> (emphasis added)

164.   A distinction must be drawn between the **outcome** promised in Section 8 ("a new

flat tax") and the **procedure** by which the outcome is achieved under "the

procedure described in Section 9 below."[119]

165.   Section 7 of the Settlement actually cross-references the lump sum flat tax, which

is "specifically indicated in Article 1 of the previously signed FTA attached as

---

[119] Section 9 provides:

   9.   Laos shall appoint RMC Gaming Management LLC ("RMC") not later than ten (10) days after
   the Effective Date, on the terms and conditions attached hereto as Annex E.  If RMC does not accept
   the appointment within 4 days of the Effective Date, Laos shall appoint another agent to assist it in
   the matter as described in Annex E.  Within ten (10) days of the Effective Date, the Claimants
   (collectively) shall nominate one person and Laos shall nominate one person (which may be an
   employee of RMC) to be members of a Flat Tax Committee (the "FT Committee").  Within ten (10)
   days after the Effective Date, the two persons nominated by the Claimants and Laos to the FT
   Committee shall nominate a mutually acceptable third FT Committee member.  If the two FT
   Committee members fail to reach an agreement on such third FT Committee member within such
   deadline, the third FT Committee member shall be appointed in the sole discretion of the President
   of the Macau Society of Registered Accountants.  Within forty-five (45) days of the Effective Date,
   the duly composed, three-member FT Committee shall determine a new fair and reasonable FT
   applicable to the Gaming Assets, taking into due consideration all relevant information submitted
   to the FT Committee by the Claimants and Laos.

Annex D hereto."  The "previously signed FTA" affords no basis for the imposition of an *ad valorem* tax.

166.  Sections 7[120] and 8 are within the jurisdiction of the Tribunal whereas Section 9 is not.  Accordingly, the Claimants are bound to accept the view of the SIAC Tribunal that the **process** followed by the Government in establishing a "new flat tax" complied with Section 9.  However, the Tribunal is required to form its independent view as to whether the **outcome**, namely the resulting 28% *ad valorem* tax, comes within the expression "new flat tax" which in Section 8 the Government and the Claimants agreed "**shall** be promptly established."

167.  Under Section 7 of the Settlement, the Government "waived any and all taxes and related interest and penalties due and payable by the Claimants and the Gaming Assets up to 1 July 2014" at which point implementation of a "new flat tax" as provided in Section 8 was expected to come into effect.

168.  According to the Tribunal, an *ad valorem* tax is not a flat tax within the meaning of Section 32 of the Settlement.

169.  The Government argues, in effect, that the word "flat" refers to "rate", but the word "rate" nowhere appears in Section 8, where the word "flat" clearly modifies the word "tax."

---

[120] Section 7 provides:

> Laos shall forgive and waive any and all taxes and related interest and penalties due and payable by the Claimants and the Gaming Assets up to 1 July 2014 in respect of the Gaming Assets, provided, however, that taxes shall be due and payable as from 1 July 2014 as provided in Section 8 below. The taxes covered herein are all taxes and fees including but not limited to those that are specifically indicated in Article 1 of the previously signed FTA attached as Annex D hereto.

170. The *"new"* flat tax is to replace the "old" flat tax which was a "fixed unchanging, periodic amount." The SIAC Tribunal suggested that there was no definition of flat tax in Section 8. With respect, this ignores the word "new" which relates the obligation back to the previous "old" lump sum flat tax. Mr. Va gave no weight (if he was aware of it) to the "old" flat tax under the 1 September 2009 Flat Tax Agreement between Sanum and the Government which required a "fixed unchanging periodic" payment of US $745,000 per year for 5 years, with the possibility of renewal.[121] Instead, Mr. Va was given a report by the Government's expert, Professor Nelson Rose, which advocated a tax based on percentage of revenue.[122]

171. It is evident that Mr. Va did not focus his research on flat tax regimes but broadly canvassed the taxation policy of different countries in the region in relation to gambling businesses and their comparative advantages and disadvantages, the

---

[121] Flat Tax Agreement between the Tax Department, Ministry of Finance, the Lao Government and Savan Vegas, 1 September 2009 (LHNV Exhibit C-7).

[122] C-979, Flat Tax Committee Appointment Agreement between the Government of the Lao PDR and Quin Va, 15 May 2015, para. 5:

5. **The Procedure:** On or before May 26, 2015, the Government's expert on gaming taxation, BDO, will prepare and present to Mr. Va a report on gaming customs and practices in Asia with respect to taxation of gaming operations. The report will provide data concerning casinos throughout Asia including the two casinos now operating in Laos. **The Government will also present a report by Professor L. Nelson Rose, on the necessity of stating the flat tax as a percentage of gaming revenue.** Mr. Va will set the flat tax regime applicable to the Gaming Assets during the life of the concession to be granted to the new buyer and operator of the Gaming Assets. While Mr. Va may consider the BDO report and the Professor Rose report, he is equally free and able to consider information from his own experience or if he so desires, his own research, it being further understood that Mr. Va may consider the factual and financial characteristics of the Gaming Operations and of other gaming facilities in Asia, the 50-year life of the concession and other factors he deems relevant. **Mr. Va may freely determine the basis for the flat tax, whether expressed as a percentage of revenues, dollar amount or other measure**, provided that the measure, once established, will not be subject to revision during the life of the concession. Mr. Va may utilize others for assistance, but he retains the authority and responsibility to set the flat tax. (emphasis added)

current size of Savan Vegas, the current market position of Laos in the Asian gaming industry and the impact of the gaming policies of Thailand (Savan Vegas' largest source of gamblers).[123]

172. The Government knew full well the difference between an *ad valorem* tax with a flat (28%) rate and a "new flat tax" for a fixed lump sum annual amount (as had been agreed to in 2009). The Government soon entered into an agreement dated 19 August 2016 for a lump sum flat tax, at the request of Macau Legend. The result was described in the text of the Macau Legend Agreement as a "flat tax."

| Flat Tax Agreed to with Sanum in 2009 | Flat Tax Agreed to with Macau Legend dated 19 August 2016 |
|---|---|
| Article 1:  Savan Vegas and Casino, LTD **agrees to pay the government a Flat Tax** which specifically covers the Casino Business and includes Excise tax, turn over tax, profit tax, Dividend tax, and dividend **which is included in the Flat Tax** (see "Dividend" of below timetable) **and is in an amount of $745,000 (seven hundred forty five thousand dollars) per year**. The payment shall be split into 4 payments, in the period of 3 months each.  The Flat Tax shall be paid to the Provincial Tax Department of Savannakhet Province but the dividend portion of the Flat Tax shall be paid to the Ministry of Finance through State Enterprise Finance Supervision Department.[124] (emphasis added) | B.  In the Letter of Record dated May 13, 2016, the **Investor requested that the Company pay a flat tax** in connection with or relating to the Concession Rights, Concession Activities, the Project and Project Management.  The PDA provides that such flat tax shall be paid **pursuant to this Flat Tax Agreement** (this "Agreement"). In consideration of the foregoing and the mutual promises contained herein, and intending to be legally bound hereby, the parties agree as follows: 1… 2.  **Amount.  The flat tax shall be United States Ten Million (US $10,000,000.00) per year** (the "**Flat Tax**") in relation only to Gaming Activities. 3.  **Payee**.  The Company shall pay the Flat Tax to the Tax Department of the Ministry of Finance. 4.    **Period of Application of Flat Tax**. |

---

[123] See SIAC Tribunal Award, 29 June 2017, para. 277.
[124] Flat Tax Agreement between the Tax Department, Ministry of Finance, the Lao Government and Savan Vegas, 1 September 2009 (LHNV Exhibit C-7).

| | Subject to Paragraph 5 below, **the Flat Tax** shall be paid for the three (3) year period commencing from the Closing and ending on the third anniversary of the Closing.[125] |
|---|---|

173. While substitution of an *ad valorem* tax with a flat tax rate was in the view of the SIAC majority "reasonable" for SIAC's purposes, the majority did so by deferring to Mr. Va's "legal" opinion.

174. In the view of the Tribunal, however, the issue is not what Mr. Va regarded as "reasonable" but whether what he recommended, and what the Government accepted, could correctly be described as a "new flat tax" within the meaning of Section 8.  In the view of the Tribunal, a 28% *ad valorem* tax is non-compliant.

175. The question remains whether the 28% *ad valorem* tax is a **material** breach of Section 8.  In the view of the Tribunal, the breach is material.  It is noted that every other casino in Laos also pays a flat tax established as a lump sum annually.[126]

176. It is apparent from both the First Material Breach Application and the Second Material Breach Application that the Claimants regarded a flat tax as essential to the successful marketing of the Casino.

177. The expert evidence is that the market value of the Casino is highly sensitive to taxation and that establishment of a "fair and reasonable" fixed payment would enhance the marketability of the Gaming Assets and the price they would fetch in

[125] C-964, Executed Flat Tax Agreement between the Ministry of Finance of the Lao People's Democratic Republic and Savan Legend Resorts Sole Company Limited, dated 19 August 2016.
[126] C-980, Joel M. Melendez Report to the Flat Tax Committee, 28 May 2015, para. 23 (Kings Roman Casino) and para. 35 (Dansavanh Casino).

the market.  Rightly or wrongly, the Claimants clearly regarded a "flat tax" as of the essence of Section 8.  It went to the "root" of the Section 8 bargain.  The Claimants' *quantum* expert, Dr. Joseph Kalt, proceeded on the basis that a fair and reasonable flat tax in respect of the Casino would be no more than $2,062,200 each year for 5 years and assumed such flat tax amounts would escalate by 5% on the fifth anniversary of the 15 June 2014 Effective Date, and escalate by an additional 5% on every five-year anniversary thereafter, as stated in the Settlement.[127]  This suggested tax burden (which, of course, was no more than an untested opinion) was materially less than the imposition of an *ad valorem* tax calculated by the Government at $26,659,000 and deducted from the proceeds of the sale.

178.  In the view of the Tribunal, the Government's failure to establish a "new" flat tax similar in form to the "old" flat tax is a breach of Section 8 of the Settlement and the breach is "material" within the meaning of New York law.

179.  Accordingly, on that basis alone, the Claimants are entitled to a revival of the Treaty arbitration.

     **iii.    Did the Government's Collection of Alleged Tax Arrears of $26,659,000 Constitute a Material Breach of Section 7 of the Settlement?**

        **(a)    The Claimants' Position**

180.  The Claimants contend that they were entitled to pay no more than the "new flat tax." The Government refused to participate in the Flat Tax Committee even though the Claimants remained ready, willing and able to do so after the dismissal of the

---

[127] Witness Statement of Joseph P. Kalt, Ph.D., dated 14 October 2016, p. 22.

First Material Breach Application. The Government was not entitled to affirm and rely on the Settlement while at the same time attempting to collect a tax that was not authorized under the Settlement and which no other casino in Laos was required to pay.

**(b)      The Government's Position**

181.   The Respondent contends that the Claimants' privileged tax status ended on 1 July 2014. At that point, being a Casino conducting business in Laos, they were required to pay the tax established by the law of Laos for such a business.  In the absence of a new flat tax agreement, which was to be established by a process boycotted by the Claimants, the Claimants were bound by the ordinary law, and having failed to do so, the Government was entitled to collect the arrears of tax owing.

**(c)      The Tribunal's Ruling**

182.   The Claimants and the Gaming Assets were required to pay taxes "as from 1 July 2014 **as provided in Section 8 below**."  The SIAC majority concluded that there had been a "new flat tax" established "as provided in Section 8 below", and therefore the Claimants were in default for not paying the 28% *ad valorem* tax as required by Section 7.[128]

183.   In light of the conclusion of the Tribunal that no "new flat tax" had been established within the meaning of Section 8, and that the Claimants had, after numerous

---

[128] Section 7 provides:

7.   Laos shall forgive and waive any and all taxes and related interest and penalties due and payable by the Claimants and the Gaming Assets up to 1 July 2014 in respect of the Gaming Assets, **provided, however, that taxes shall be due** and payable as from 1 July 2014 **as provided in Section 8 below**.  The taxes covered herein are all taxes and fees including but not limited to those that are specifically indicated in Article 1 of the previously signed FTA attached as Annex D hereto. (emphasis added)

breaches of the Settlement, attempted to rejoin the FTC process, and moreover that the Government had (notwithstanding these breaches) elected to continue to affirm the Settlement, it follows that there was no tax properly payable "*as provided in Section 8 below.*"

184. However, the Government's waiver of taxes ended on 30 June 2014. At the time of the taking of the $29,659,000, the Casino had paid no taxes whatsoever since December 31, 2013. The Casino had no right to operate in Laos free of tax.

185. The ICSID Tribunal in rejecting the Claimants' Second Application for Provisional Measures on 18 March 2015 stated in relevant part:

> When the Flat Tax Agreement expired on 31 December [2013], Savan Vegas became subject to the applicable tax laws of Laos. It is common ground that although Savan Vegas has continued to do business in Laos, it has not paid taxes either directly or in escrow since 1 January [2014]. While it now offers to pay in escrow the sum of US $429,300 per month retroactive to 1 January [2014], there is no obligation on the Government to agree to such a figure or to any escrow arrangement.[129]
>
> …
>
> … [F]or so long as the Claimant continues to do business in Laos, it can reasonably expect to be bound by the Laotian income tax laws applicable to gambling casinos unless and until a new Flat Tax Agreement is negotiated.[130]

186. At some point, the Claimants' tax liability will have to be assessed and paid. Accordingly, while the Tribunal considers that the Government departed from its obligations under Section 7, the breach in this instance is not material because there is an accumulating tax debt owed by the Claimants, and any recalculation of the

---

[129] Decision on Claimant's Second Application for Provisional Measures, dated 18 March 2015, para. 32.
[130] *Ibid*, para. 34.

precise amount of tax owing does not in any sense rob the Claimants of the substantial benefit of their Section 7 bargain.  This ground offers no independent basis for a revival of the Treaty arbitration.

### iv.   Did the Government's Failure to Establish a Joint Escrow Account to Receive the Proceeds of Sale of the Gaming Assets Constitute a Material Breach of Section 15 of the Settlement?

#### (a)   The Claimants' Position

187.   Under the terms of Section 15, the proceeds of the sale of the Gaming Assets were to be received **directly** from the buyer [Macau Legend] "into an escrow account … under instructions to be jointly issued by the Claimants and Laos."[131]

188.   In the Second Material Breach Application, the Claimants argue that the Government breached Section 15 in at least two material ways:

(a) The Government caused Macau Legend to deposit all of the sale proceeds into bank accounts wholly controlled, directly or indirectly, by the Government; and

(b) The Government impermissibly diverted US $26,659,000 million of the $42 million purchase price into its own treasury in purported satisfaction of the Claimants' alleged tax liability.[132]  Such a unilateral "taking" was not permitted by the Settlement.

---

[131] Section 15 provides:

> 15.  All Sale proceeds shall be received directly from the buyer into an escrow account at TMF Trustees Singapore Limited in Singapore under instructions to be jointly issued by the Claimants and Laos.  No moneys shall be withdrawn from such escrow account except in compliance with this document.  The Claimants and Savan Vegas (in the case of assets sale rather than corporate sale) shall have no liability to pay any withholding or capital gains taxes in respect of the Sale.

[132] Memorial, para. 141, Reply, paras. 19(e), 32.

189.    This Section 15 breach is independent of whether or not the Gaming Assets were sold for maximum value.  Rather, Section 15 is separate and apart from Section 13 and requires **all** proceeds, regardless of the amount, to be deposited directly into escrow.[133]

### (b)    The Government's Position

190.    The escrow account was established in consultation with the SIAC Tribunal. The Claimants were bound and determined to undermine the Settlement and giving them a veto over the payment of funds from a jointly controlled escrow account would have allowed them to create endless mischief and delay. The SIAC Tribunal in effect endorsed this view in its Award of 29 June 2017. In any event, the Claimants ultimately received their full financial entitlement under the order of the President of the SIAC Tribunal annexed to the Award of 29 June 2017. If there was a breach, therefore, it was not material.

### (c)    The Tribunal's Ruling

191.    In the course of the SIAC proceedings, the escrow procedure was modified.  After ordering the parties to work together to establish the escrow account and issue "joint instructions",[134] the SIAC Tribunal directed payment of the sale proceeds into an

---

[133] Reply, para. 30.
[134] C-1095, Order on Respondents' Request for Provisional Measures and Claimant's Motion for a Stay of Discovery and Motion Practice, SIAC, 6 January 2016, para. 10:

> The Tribunal grants the request to the extent of requiring the parties to work together to establish the escrow account by 30 March 2016 and issue before that date joint instructions to TMF Trustees Singapore Limited for procedures for the receipt and disbursement of funds.  The Tribunal cannot at this time, on this record, resolve the question of the amount to be deposited into escrow under the Deed.  The Tribunal will examine the question anew if the parties do not submit the joint instruction by the date required (30 March 2016) or if either party submits a motivated request for interpretation

escrow account under the control of the President of the SIAC Tribunal.  It is evident from the SIAC Award of 29 June 2017 that the Claimants continued to favour the sale of the Casino (albeit on different terms from those favoured by the Government) in their appearances before the SIAC Tribunal.)  "Interim" arrangements for an escrow account were worked out in conjunction with the SIAC Tribunal.  The President of the SIAC Tribunal signed a "Tribunal Payment Notice" attached to the SIAC Award of 29 June 2017 clearing the escrow account.

192.  The escrow account as established accomplished its functional purpose.  While its terms differed from the arrangements described in Section 15, the differences do not amount to a material breach. The Claimants have not established any loss or other damage flowing from the escrow arrangements.[135]

193.  Accordingly, the Tribunal declines to find a material breach of Section 15.

     **v.    Did the Government's Failure to Include the Right to Extend the Savannakhet Airport Runway as Part of the Gaming Assets Constitute a Material Breach of Section 25?**

     **(a)    The Claimants' Position**

194.  The Claimants contend that the right to expand the Savannakhet Airport was a key contributor to the potential value of the Casino.  The Government, it says, falsely represented to prospective purchasers (in the RSE report) that expansion to accommodate Boeing 737 type aircraft was not feasible. However, the Government

---

of the Deed including a substantiated record of the positions taken by the parties and defining the dispute on interpretation to be resolved.

[135] The Government contends that the Claimants' desire for "joint" control was to enable them to precipitate an impasse and roil any sale.

was obligated to do what was necessary to enable the Claimants (at their own expense) to extend the runway at Savannakhet Airport.[136]

### (b)    The Government's Position

195.  Both parties acknowledge that there is not enough land at Savannakhet Airport to lengthen the runway sufficiently to accommodate the normal operations of a Boeing 737 size aircraft. At no time did the Government represent otherwise.

196.  Moreover, the Government gave no undertaking, express or implied, to expropriate private land for the benefit of a private developer.

### (c)    The Tribunal's Ruling

197.  The "right" asserted by the Claimants is found in Section 25 which reads in relevant part that:

> The Claimants or a new owner of the Gaming Assets (the "SV Owner" as the case may be) shall have the right to make the necessary investment (free of all cost to Laos) to extend the existing runway at Savannakhet Airport sufficiently to accommodate planes up to Boeing 737 size …

198.  The Claimants contend that "if an expansion had not been feasible because the Government was unwilling to exercise its eminent domain powers or, alternatively, to allow jets to use the Airport with payload and range restrictions, there would have been no point to the Parties' inclusion of Section 25 in the Deed."[137] However, there is no persuasive evidence in the Settlement documentation or elsewhere that

---

[136] Memorial, para. 144, Reply, para. 19(g).
[137] Memorial, para. 145.

the Government undertook either of these measures.  The exercise of power of eminent domain is certainly not mentioned in the Settlement.

199.  In the view of the Tribunal, this ground is without merit.  The new owner of the Gaming Assets is free to make "the necessary investment" itself by acquiring land from the current owners if suitable terms can be worked out by private contracts.

200.  There is no evidence to suggest any legal or regulatory restraint on the Casino owner's expenditure of private monies for this purpose.  However, in the Tribunal's view, there is no obligation on the Government to facilitate such an acquisition of land belonging to other private owners for the private benefit of the Claimants or their successors.

201.  The Tribunal concludes that there is therefore no material breach in connection with the extension of the Savannakhet Airport.

### vi.    Did the Government's Alleged Failure to Negotiate the Thakhaek Agreements "in Good Faith" Constitute a Material Breach of Section 22 of the Settlement?

202.  The Thakhaek Free Enterprise Zone is an area some distance from the Savan Vegas Hotel and Casino complex.   The Claimants desired about 90 hectares for development "completely separate from the provision for sale of the Gaming Assets."[138]  Such a potential development had been the subject of a Memorandum of Understanding with Savan Vegas dated 20 October 2010.

---

[138] Reply, para. 36.

203.   A condition precedent to negotiations for the Thakhaek development was the payment of US $500,000 to the Government which was paid by the Claimants.[139]

204.   In the course of negotiations, a dispute arose over the inclusion (or not) of a 16 hectares' portion of land fronting National Road 13.   It emerged that the 16 hectares' parcel was privately owned.

### (a)   The Claimants' Position

205.   The Claimants assert that the 16 hectares parcel of private land with its highway frontage was critical to the success of the contemplated development.   It was included in the parcel of 90 hectares as shown on a map attached to the said Memorandum of Understanding and referred to in a number of subsequent "draft agreements." The Claimants then say the "Government summarily rejected without explanation Claimants' proposal for an alternative concession arrangement that would compensate it for the loss of the 16 hectares."[140]

---

[139] Section 22 provides as follows:

> 22.  Subject to the Claimants' payment of US $500,000 to Laos, the Parties will negotiate in good faith and conclude a land concession and project development agreement with respect to the 90 hectares of land at Thakhaet identified in the MOU signed on 20 October 2010 between Savan Vegas and Governor Khambhay Damlath of Khammouane Province, LAO PDR, on the basis that no gaming activities whatsoever will be allowed at or in connection with that 90 hectares site.  The Claimants acknowledge and agree that: (i) there shall be no gaming license, sublicense or other grant of gaming rights issued by Laos at any time in respect of such 90 hectares site; (ii) any development of, at or pertaining to such 90 hectares site shall be in the form of commercial, non-gaming activities only; and (iii) the Claimants shall have no right to claim or receive any compensation from Laos in regard to the prohibition of gaming activities at such 90 hectares site.  Fees and charges, if any, imposed in connection with the project at the 90 hectares site shall be commensurate with those charged in connection with any similar site or project in the Thakhaek Free Enterprise Zone.

[140]   Memorial, para. 157.

**(b)     The Government's Position**

206.   The 16 hectares parcel is in private ownership and was not included in the 90 hectares contemplated for development.  The original survey attached to the MOU showed about 105 acres, which included 15 acres in private ownership.  The Government made no promise of land it did not own.  Eventually, the Government offered the Claimants an alternative 90 acres in the same special Economic Zone, but the Claimants would not agree to develop the property themselves but suggested they would invite other investors to build within a type of "Dubai Free Trade Zone."  This was a role reversal which the Government considered to be a fundamental departure from Section 22.[141]

**(c)     The Tribunal's Ruling**

207.   In the Tribunal's view, the Claimants have not established a land entitlement that includes the disputed 16 hectares, and there is no undertaking by the Government in Section 22 to use its powers of eminent domain to expropriate the existing private owners for the financial benefit of the Claimants.  Refusal to expropriate private land for private gain of the Claimant does not constitute evidence of "bad faith."

---

[141] As explained by Government counsel:

… the parties went back and forth.  The government offered, "If you want another 90 hectares in a Special Economic Zone, we have lots of land in the Thakhaet region that's in a Special Economic Zone", so they were making offers back and forth.

Then Mr. James wrote a letter, Mr. Menezes, and said, "Our proposal is to create a Dubai Free Trade Zone in Thakhaet, which means the business we build, we won't build our own business, we'll turn it into a Free Trade Zone, so other investors can come until and build buildings and they won't have to pay tax."

So the government said, "That's not acceptable, more than not acceptable", and that was the end of negotiations.  They refused to make another offer.  (Hearing Transcript 3 July 2017, p. 200)

208. Moreover, Section 22 does not oblige the Government to negotiate an alternative concession, especially when the Claimants' plan was to try to attract other developers rather than develop the property themselves.

209. In the view of the Tribunal, the Claimants' Section 22 argument is without merit.

      **vii.**    **Did the Government's Failure to Discontinue Criminal Investigations Against the Claimants and their Principals Constitute a Material Breach of Section 23 and Section 27?**

210. The Government has made numerous allegations of criminality against the Claimants and their principals, in particular, John Baldwin and Shawn Scott, as outlined above.

211. As part of the Settlement, the parties agreed in Section 23 that:

> Laos shall discontinue the current criminal investigations against Sanum/Savan Vegas and its management or other personnel and shall not reinstate such investigations **provided that the terms and conditions agreed herein are duly and fully implemented by the Claimants.** (emphasis added)

212. Section 27 provided for mutual releases subject to similar conditions.[142]

---

[142] Section 27 provides:

> The Claimants hereby wholly waive and release any and all claims whatsoever against Laos and all officials thereof and advisors, counsels and experts thereto related, and to forego the lodging of any dispute or claim against any of them, and shall ensure that each of the following persons – the direct and indirect shareholders, personnel, affiliates, subsidiaries and managers of the Claimants, John Baldwin and Shawn Scott – shall also wholly waive and release any and all claims whatsoever against Laos and all officials thereof and advisors, counsels and experts thereto related and forego the lodging of any dispute or claim against any of them. The Claimants shall fully indemnify Laos and all officials thereof and advisors, counsels and experts thereto in the event that any direct and indirect shareholders, personnel, affiliates, subsidiaries and managers of the Claimants, John Baldwin and Shawn Scott shall fail to provide such waiver and release. Laos hereby waives and releases any and all claims with respect to the matters addressed in the arbitrations against the Claimants, shareholders, officers and directors and the Gaming Assets companies. Notwithstanding the above, if the arbitrations suspended hereby, or either of them is or are revived or re-instated to any extent by either Party, then the releases and waivers provided herein shall be null and void and

### (a)       The Claimants' Position

213. The Government is currently pursuing applications for third-party discovery pursuant to 28 U.S.C. s. 1782 before U.S. federal courts ostensibly in support of the same allegations of bribery that the Government had asserted in the criminal investigation and in the SIAC arbitration as a ground for terminating the 2007 Savan Vegas PDA.[143]

### (b)       The Government's Position

214. The agreement to discontinue current criminal investigations was expressly conditional on the Claimants "duly and fully" observing the "terms and conditions agreed herein."  The Claimants breached numerous "terms and conditions."  The Government was therefore entitled to revive the "current criminal investigations."

### (c)       The Tribunal's Ruling

215. Section 23 is a limited undertaking by the Government restricted to "current criminal investigations of offences" known to the Government as of the date of Settlement (15 June 2014) and being investigated prior to the date of the Settlement.

216. The Government continues to pursue the benefits of the Settlement.  In exchange for those benefits, a major consideration for the principals of LHNV and Sanum was the Government's agreement to discontinue the "current criminal investigations."[144]  As a matter of New York law, as discussed previously, the

---

any and all claims previously made and facts asserted in the arbitration(s) are not waived and no liability of either party thereunder is waived or released.

[143] Memorial, paras. 165-166.
[144] As noted by the dissenting arbitrator in the SIAC Award of 29 June 2017, paras. 100, 101:

Government is not entitled to resile from a major benefit of the Settlement on the basis of breaches by the Claimants (that predate the multiple affirmations by the Government) while at the same time affirming its determination to sell the Gaming Assets under the authority of the same Settlement.  Nevertheless, the Government is currently pursuing evidence of criminality in the U.S. Federal Courts in Idaho and the North Mariana Island.[145]

217.   The Section 23 undertaking is limited.  Section 23 does not cover acts of potential criminality that existed as of the date of the Settlement but were not known to the Government at that time, or were known but were not at the time of the Settlement the subject of a "current criminal investigation."  This means that the Settlement did not in any way (regardless of any material breach) impede the Government from launching a criminal investigation after the date of the Settlement into facts that pre-dated the Settlement provided there was no ongoing investigation at the time of the Settlement. Indeed, much of the alleged criminality now of concern to the Government were facts that predated the Settlement but became known to the

---

If Claimant chose to perform the Deed by taking the Casino, selling it, and setting a Flat Tax reportedly consistent with the Deed, it cannot deny Respondents the benefit of Paragraph 23 of the Deed.

I cannot join the Majority in reaching a conclusion that, as the Majority acknowledges, would give only Laos the benefit of the bargain while depriving Sanum entirely of one of the few benefits of the Deed it was entitled to.

[145] C-933, Order Denying Application for Issuance of Subpoenas, in *re* Application of the Government of the Lao People's Democratic Republic, Case 1:15-mc-00018 (D.N. Mar. I. Apr. 7, 2016), p. 18:

The Court is also particularly swayed by GOL's seeming disregard for the Deed of Settlement.  In June 2014, GOL was apparently satisfied that Baldwin and other owners and managers at the Savan Vegas were not criminals.  It agreed not to prosecute them as part of the settlement.  Despite the failure of the settlement to actually resolve the issues facing the Savan Vegas, the parties agreed to be bound by its terms, including non-prosecution.

Government only after the date of the Settlement, when the Government gained access to the books and records of the Claimants, including allegations that:

(a) The Claimants induced Mr. Angus Noble to sign a **fraudulent** MOU purporting to offer to buy the Gaming Assets and **knowingly suborned false testimony** from Mr. Noble [by paying him] $10,000 per month for twenty-one (21) months;[146]

(b) In late spring-early summer 2015, after the Settlement, Mr. Baldwin hatched a scheme to **bribe Government officials** in an attempt to recover control of Savan Vegas. The Government points to a draft consulting agreement with an unemployed security guard, Mr. Ben Gersten, disclosing (the Government says), the bribe that Mr. Baldwin was willing to pay to Government officials to permit Sanum to recover control of the Casino despite the Settlement;

(c) The Government says it has discovered numerous **documented and uncontroverted acts of bribery and other illegality** uncovered **after** the Settlement was signed;

(d) The Government says that it emerged after the Settlement that Mr. Baldwin authorized **a bribe** of $30,000 to obtain the original 2009 Savan Vegas Flat Tax Agreement, and paid various other **bribes** to have the Thanaleng slot club shut down, to **tamper with witnesses** in the

---

[146] According to the Claimants, "the Government's efforts to construct a conspiracy theory out of innocuous and unremarkable facts – that the MOU was negotiated quickly, that it was based on a template from a prior deal, and that Mr. Nobel had other dealings with the Claimants' principals and one of their family members – prove nothing and require no further response.  Reply, para. 86.

court case with his former partner, ST, and to **obtain a lottery license** in Cambodia.

218. The Tribunal, of course, has no views on whether these more recent allegations by the Government are true or not.  What is at issue under Section 23 in contrast, are acts of criminality that were known and were being "currently" investigated as of 15 June 2014.

219. As a matter of New York law, the Government was not entitled to disregard a major benefit of the Settlement to the Claimants or their principals involving their personal jeopardy on the basis of breaches of the Settlement by the Claimants while proceeding to sell the Casino under the authority of the same Settlement.

220. As to materiality, pursuit or renewal of the "current criminal investigations" clearly goes to the heart of the benefits promised to the Claimants in Section 23.  Indeed revival of "current criminal" investigations deprives the Claimants of the **only** benefit promised the Claimants under Section 23.

221. The Government was not free to revive the "current criminal investigations" unless it had been willing to repudiate the Settlement, and had done so.

222. Having not done so, it was not open to the Government to deny the Claimants the major and significant benefit of Section 12 and on that account, as well, the Claimants are entitled to revival of the Treaty arbitration.

## VII.   CONCLUSION

223. The Tribunal does not underestimate the Government's frustration with the intransigence of the Claimants' post-settlement conduct whose efforts from 4 July 2014 to June 2015 were clearly directed to undermining the Settlement and

extricating themselves from its terms.  Unfortunately for the Government, it wanted to retain the Settlement as much as the Claimants wanted to get rid of it.  Faced with this dilemma, the Government chose to affirm the Settlement.

## VIII.   COSTS

### (a)   The Claimants' Position

224.  The Claimants claim costs if successful.  If unsuccessful, the Claimants argue that the Government's claim for costs should be rejected because:

(a) New York's highest court has explained that, unless clearly provided in the underlying contract, the American rule that parties are responsible for their own attorney's fees applies.  There is no language in the Settlement indicating any intent of the parties to indemnify each other for costs;

(b) In any event, the Tribunal would not have jurisdiction over a Section 28 claim for damages since its jurisdiction is reserved to the specific provisions listed in Section 32.[147]

### (b)   The Government's Position

225.  The Government also claims costs.  In part, it relies on Section 28 of the Settlement, a general provision for indemnification of damages arising out of a breach of the Settlement.

---

[147] Reply, para. 98.

(c)     **The Tribunal's Ruling**

226. Costs, including the costs of the Mareva injunction, are deferred until the Award on the Merits following the hearing on the revived treaty claims.

## IX.    DECISION

227. The Second Material Breach Application is allowed.

228. Pursuant to Section 32 of the Settlement, the Treaty arbitration is revived on the basis jointly and severally of the Government's breaches of:

> (a) Section 8, which promised a "new flat tax", but instead the Government imposed a 28% *ad valorem* tax on gross gaming revenues;
>
> (b) Section 23, which promised the Claimants relief from "current criminal investigations", which nevertheless have been revived.

229. Both of these breaches constitute material breaches that deprived the Claimants of the intended benefits (or "bargain") promised by each of Section 8 and Section 23.

230. Except as aforesaid, the grounds of revival relied on by the Claimants are rejected.

231. The parties are instructed to confer and propose to the Tribunal a timetable for the renewed Treaty arbitration within 30 days of the date of this decision.

232. A pre-hearing teleconference to resolve any outstanding issues will be held within 45 days of the date of this decision.

233. The issue of costs of this application is reserved to be dealt with at the conclusion of the hearing on the merits.

DATED THIS 15ᵗʰ DAY OF DECEMBER 2017.

_____

Professor Brigitte Stern
Arbitrator

_____

Professor Bernard Hanotiau
Arbitrator

_____

The Honourable Ian Binnie, C.C., Q.C.
President of the Tribunal

# EXHIBIT D



COUR PERMANENTE D'ARBITRAGE                    PERMANENT COURT OF ARBITRATION

Ms. Deborah Deitsch-Perez                          Mr. David Branson
Mr. Jeffrey T. Prudhomme                              Beijing, PRC
Mr. Alexander Hinckley
Stinson LLP                          **BY E-MAIL: DBSANUMGOL@GMAIL.COM;**
3102 Oak Lawn Avenue                     **DBSANUMGOL@YAHOO.COM**
Suite 777
Dallas, Texas 75219-4259, U.S.A.                    Mr. John D. Branson
Ms. Emily C. Doll
Mr. Russ Ferguson
**BY E-MAIL:**              Womble Bond Dickinson (US) LLP
**DEBORAH.DEITSCHPEREZ@STINSON.COM;**        One Wells Fargo Center
**JEFF.PRUDHOMME@STINSON.COM;**           301 South College Street
**ALEXANDER.HINCKLEY@STINSON.COM**                  Suite 3500
Charlotte, NC 28202, U.S.A.

Dr. Todd Weiler
Barrister & Solicitor              **BY E-MAIL: JOHN.BRANSON@WBD-US.COM;**
#19 - 2014 Valleyrun Blvd.                **EMILY.DOLL@WBD-US.COM;**
London, Ontario N6G 5N8                **RUSS.FERGUSON@WBD-US.COM**
Canada                         **AND COURIER**

**BY E-MAIL: TODD@TREATYLAW.COM**

Mr. Ken Kroot
Sanum Investments, Limited
Chief Litigation Officer
c/o ARB Legal – Advogados/Lawyers
Av. da Amizade, 555,
Edf. Landmark, 13 (1308)
Macau

**BY COURIER**

AG 279171                                              6 August 2019
DIRECT DIAL: +65 650 99034
E-MAIL: FSMITH@PCA-CPA.ORG

RE:     PCA CASE Nᵒ 2013-13 - SANUM INVESTMENTS LIMITED (PEOPLE'S REPUBLIC OF CHINA) V. THE
        GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC

Dear Mesdames, dear Sirs,

On behalf of the Tribunal in the above-referenced matter, please find attached herewith the Tribunal's
Award of today's date.

Yours sincerely,

Fedelma C. Smith
Senior Legal Counsel & PCA Representative in Singapore

Encl.:   Award (6 August 2019)

COUR PERMANENTE D'ARBITRAGE          PERMANENT COURT OF ARBITRATION
Palais de la Paix, Carnegieplein 2, 2517 KJ La Haye, Pays-Bas   Peace Palace, Carnegieplein 2, 2517 KJ The Hague, The Netherlands
Téléphone: + 31 70 302 4165, Télécopie: + 31 70 302 4167   Telephone: + 31 70 302 4165, Facsimile: + 31 70 302 4167
Courriel: bureau@pca-cpa.org                    E-mail: bureau@pca-cpa.org

cc:    Dr. Andrés Rigo Sureda
7002 Beechwood Dr.
Chevy Chase, MD 20815
United States of America
(*by courier and by e-mail*: arigo@rigo.net)

Prof. Bernard Hanotiau
HANOTIAU & VAN DEN BERG
IT Tower
Avenue Louise 480, Box 9
B-1050 Brussels
Belgium
(*by courier and by e-mail*: bernard.hanotiau@hvdb.com)

Prof. Brigitte Stern
7, rue Pierre Nicole
75005 Paris
France
(*by courier and by e-mail*: brigitte.stern@jstern.org)

Judge Ian Binnie (*by e-mail only:* ibinnie@litigate.com)
Ms. Catherine Kettlewell (*by e-mail only:* ckettlewell@worldbank.org)

**In the proceedings pursuant to the Agreement between the Government of the People's Republic of China and the Government of the Lao People's Democratic Republic Concerning the Encouragement and Reciprocal Protection of Investments, dated January 31, 1993, and the UNCITRAL Arbitration Rules, as revised in 2010**

between

**SANUM INVESTMENTS LIMITED**

Claimant

and

**THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC**

Respondent

_____

**AWARD**

_____

*Tribunal*
Dr. Andrés Rigo Sureda, Presiding Arbitrator
Professor Bernard Hanotiau
Professor Brigitte Stern

*Registry*
Permanent Court of Arbitration

*Secretary to the Tribunal*
Fedelma C. Smith

**6 August 2019**

*This page intentionally blank.*

# CONTENTS

1.  OVERVIEW ...................................................................................................10

2.  PROCEDURAL HISTORY ............................................................................11

3.  OVERVIEW OF THE FACTS ........................................................................22

    3.1. Laos:  The Claimants' Investments in Laos ...................................22

    3.2. The Original Treaty Claims .............................................................23

    3.3. Claims and Counterclaims ...............................................................24

    3.4. The Settlement and its Aftermath ...................................................24

    3.5. Delimitation of the Relief Presently Sought by the Claimants ...........................25

4.  RELEVANT ARTICLES OF THE BIT .........................................................26

5.  OTHER MATTERS .......................................................................................27

    5.1. Other Legal Provisions .....................................................................27

    5.2. The Tribunal's Analysis ...................................................................28

    5.3. Clarification on the Nature of the Respondent's Illegality Claims ...................29

6.  THE RESPONDENT'S THRESHOLD POSITION IS THAT THE CLAIMS
     OUGHT NOT TO BE ENTERTAINED BY REASON OF THE
    CLAIMANTS' BRIBERY and CORRUPTION .........................................29

    6.1. Evidence of Bribery and Corruption is Relevant Both at the Time of
       Investment and During Subsequent Performance................................32

       6.1.1.  The Respondent's Argument......................................................32

       6.1.2.  The Claimant's Argument .........................................................34

       6.1.3.  The Tribunal's Analysis ............................................................35

    6.2. The Applicable Standard of Proof ..................................................36

       6.2.1.  The Respondent's Argument......................................................36

       6.2.2.  The Claimant's Argument .........................................................37

       6.2.3.  The Tribunal's Analysis ............................................................37

    6.3. Failure of the Respondent to Investigate and Prosecute Persons who
       Allegedly Accepted Bribes ................................................................38

       6.3.1.  First Allegation – Bribes to Obtain the 2009 Flat Tax Agreement .........38

           6.3.1.1.  The Respondent's Argument.....................................38

           6.3.1.2.  The Claimant's Argument ........................................41

           6.3.1.3.  The Tribunal's Analysis ...........................................42

       6.3.2.  Second Allegation – Bribes to Extend the Flat Tax Agreement After
           Expiry of the 5-Year Term .............................................................42

6.3.2.1. The Respondent's Argument.................................42

6.3.2.2. The Claimant's Argument...................................44

6.3.2.3. The Tribunal's Analysis....................................44

6.3.3. Third Allegation – The Claimants Paid US $500,000 in Bribes in 2012 to (i) Shut Down the E&Y Audit of Savan Vegas and (ii) to Cause the Government to Shut Down the Thanaleng Slot Club to the Disadvantage of ST Holdings ...............................................................44

6.3.3.1. The E&Y Audit..............................................45

6.3.3.1.1. The Respondent's Argument ........................45

6.3.3.1.2. The Claimant's Argument...........................46

6.3.3.1.3. The Tribunal's Analysis ...........................46

6.3.3.2. Payment of About $200,000 in Bribes to Shut Down the Thanaleng Slot Club..............................................48

6.3.3.2.1. The Respondent's Argument ........................48

6.3.3.2.2. The Claimant's Argument...........................49

6.3.3.2.3. The Tribunal's Analysis ...........................50

6.3.4. Fourth Allegation – The Claimants Arranged for a Further $575,000 Bribe to Madam Sengkeo to Prevent Her from Testifying in These Proceedings ....................................................................51

6.3.4.1. The Respondent's Argument.................................52

6.3.4.2. The Claimant's Argument...................................53

6.3.4.3. The Tribunal's Analysis....................................54

6.3.5. Fifth Allegation – Bribery Scheme in June 2015 to Restore Control of Savan Vegas to the Claimants .............................................55

6.3.5.1. The Respondent's Argument.................................56

6.3.5.2. The Claimant'sArgument...................................57

6.3.5.3. The Tribunal's Analysis....................................57

6.3.6. Sixth Allegation – Miscellaneous Acts of Bribery and Corruption ........57

6.4. The Claimant's Lack of Good Faith ......................................58

7. THE CLAIM FOR EXPROPRIATION ............................................61

7.1. Thanaleng Slot Club ....................................................61

7.1.1. Background ..........................................................61

7.1.2. The Claimants' Argument .............................................62

7.1.3. The Respondent's Argument ...........................................63

7.1.4. The Tribunal's Analysis ..............................................64

7.2. Paksong Vegas Hotel and Casino ..........................................67

7.2.1. Background ..........................................................67

        7.2.2.  Location of Paksong ....................................................... 67

        7.2.3.  The Claimant's Argument ............................................ 70

        7.2.4.  The Respondent's Argument ......................................... 70

        7.2.5.  The Tribunal's Analysis ............................................... 71

    7.3.  **Paksan Slot Club** .............................................................. 74

        7.3.1.  Background .................................................................. 74

        7.3.2.  The Claimant's Argument ............................................ 75

        7.3.3.  The Respondent's Argument ......................................... 76

        7.3.4.  The Tribunal's Analysis ............................................... 77

    7.4.  **Thakhet Casino and Hotel Resort** ..................................... 78

        7.4.1.  Background .................................................................. 78

        7.4.2.  The Claimant's Argument ............................................ 79

        7.4.3.  The Respondent's Argument ......................................... 81

        7.4.4.  The Tribunal's Analysis ............................................... 82

**8.    COSTS** ....................................................................................... 85

    8.1.  **Expenses** ......................................................................... 87

        8.1.1.  Travel Expenses .......................................................... 87

        8.1.2.  Miscellaneous Services and Expenses ........................... 87

    8.2.  **Arbitration Costs** ............................................................ 88

**9.    DISPOSITION** ....................................................................... 89

REPRESENTATION OF THE PARTIES

**Representing Sanum Investments Limited:**

Ms. Deborah Deitsch-Perez
Mr. Jeff Prudhome
Ms. Vanessa S. Barrs
Ms. Alexander Hinckley
Ms. Stephanie Hess
Ms. Jennifer Guidry

**Stinson Leonard Street LLP**
777 – 3102 Oak Lawn Avenue
Dallas, Texas 75219-4259
United States of America


Dr. Todd Weiler
Barrister & Solicitor
19 – 2014 Valleyrun Boulevard
London, Ontario N6G 5N8
Canada


and


Mr. Ken Kroot
Sanum Investments, Limited
Chief Litigation Officer
c/o ARB Legal – Advogados/Lawyers
Av. da Amizade, 555,
Edf. Landmark, 13 (1308)
Macau

**Representing The Lao People's Democratic Republic**

Mr. David J. Branson
Professor Jane Willems
School of Law, University of International
Business Economics
Beijing
People's Republic of China


and


Mr. John D. Branson
Ms. Emily Doll
Mr. Russ Ferguson

**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
301 South College Street
Suite 3500
Charlotte, NC 28202
United States of America

FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| Abbreviation | Meaning |
|---|---|
| BIT or Treaty | Agreement between the Government of the People's Republic of China and the Government of the Lao People's Democratic Republic Concerning the Encouragement and Reciprocal Protection of Investments, dated 31 January 1993 |
| BIT II Proceedings | Proceedings between *Lao Holdings N.V. v. Lao People's Democratic Republic* (ICSID Case No. ARB(AF)/16/2)/ *Sanum Investments Limited v. Lao People's Democratic Republic* (ICSID Case No. ADHOC/17/1) |
| C(B)-[XX] | Claimants' Exhibits |
| C(S)-[XX] | Claimant Sanum's Exhibits |
| CLA(B)-[XX] or CLA-[XX] | Claimants' Legal Authorities |
| Claimant's Memorial | Claimant's Memorial dated 22 July 2013 |
| Claimant's Reply | Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 |
| Claimant | Sanum Investments Limited |
| Claimants | Sanum Investments Limited and Lao Holding NV |
| Decision on the Second Material Breach | Tribunal's Decision on the Merits of the Claimant's Second Material Breach Application, dated 15 December 2017 |
| E&Y | Ernst & Young |
| First Material Breach Application | Claimant's First Material Breach Application dated 4 July 2014 |
| FTA | Flat Tax Agreement between Laos and Savan Vegas dated 21 September 2009 |
| Gaming Assets | Savan Vegas Casino, Lao Bao Slot Club and Savannakhet Ferry Terminal Slot Club |
| Government or Respondent | Respondent Government of The Lao People's Democratic Republic |
| Hearing | Hearing on the Merits of the Second Material Breach Application held from 3 to 7 September 2018 in Singapore |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID-AF Rules | Arbitration Rules (Additional Facility) of the International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| LHNV | Lao Holdings NV |
| Reply | Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 |
| SRE-[XX] | Respondent's Exhibits |
| SRA-[XX] | Respondent's Legal Authorities |
| MaxGaming | MaxGaming Consulting Services Limited (Macau) |
| MIC | Ministry of Information and Culture |
| Paksong PDA | Project Development Agreement by and between The Lao People's Democratic Republic, Sanum Investments, Nouansavanh Construction Co. Ltd., and Mr. Sittixay Xaysana dated 10 August 2007 |
| Paksong Vegas | Paksong Vegas Hotel and Casino |
| Participation Agreement | Participation Agreement for Thanaleng by and between Sanum and ST Holdings dated 4 October 2008 |
| PCA | Permanent Court of Arbitration |
| PCA Proceeding | PCA proceeding between *Sanum Investments Limited (People's Republic of China) v. the Government of the Lao People's Democratic Republic* – PCA Case No. 2013-13, chaired by Dr. Andrés Rigo Sureda |
| PDA | Savan Vegas Project Development Agreement |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits dated 20 February 2014 |
| Respondent's Rejoinder | Respondent's Rejoinder (Amended) dated 4 June 2014 |
| RMC | RMC Gaming Management LLC |
| Sanum or Claimant | Sanum Investments |
| Savan Vegas | Savan Vegas Hotel and Casino |
| Settlement | Deed of Settlement dated 15 June 2014 and Side Letter dated 18 June 2014 |
| SIAC | Singapore International Arbitration Centre |
| ST | ST Holdings |
| Thanaleng | Thanaleng Slot Club |
| Amended Transcript, [Day], p. [page], [lines] | Transcript of the Hearing, as amended on the basis of corrections agreed by the Parties |
| UNCAC | United Nations Convention Against Corruption |
| UNCITRAL Rules | UNCITRAL Arbitration Rules, as revised in 2010 |

VCLT                                      Vienna Convention on the Law of Treaties

1.   OVERVIEW

1.   Mr. John Baldwin and Mr. Shawn Scott, two U.S. entrepreneurs who were experienced
in a number of businesses including gambling facilities, became involved in casinos
and slot machines in Laos in 2007.  For this purpose, they caused two companies to be
incorporated in Aruba, the Netherlands Antilles **Lao Holdings NV** ("**LHNV**"), and a
subsidiary **Sanum Investments** ("**Sanum**") in Macau (collectively referred to as "the
**Claimants**").  Mr. Baldwin and Mr. Scott, using various corporate structures partnered
with a Laotian conglomerate ("**ST Holdings**") in two casino projects and three slot
machine clubs in Laos positioned near its border with Thailand.  One of the casinos,
the **Savan Vegas Hotel and Casino** ("**Savan Vegas**"), was built and operated
successfully.  The second casino, **Paksong Vegas Casino** ("**Paksong Vegas**"), was
never built.

2.   Within three years there was a falling out between the Claimants and their local
partners.  ST Holdings ceased cooperation with Sanum, initiated litigation against it
and shut Sanum out of Thanaleng, the most profitable of the slot clubs.  Mr. John
Baldwin testified that ST Holdings was closely connected to leading politicians in the
Respondent Government.  He said that ST Holdings orchestrated a series of wrongful
Government acts against LHNV which led to the result, designed by the Government,
of driving Sanum out of Laos and appropriating for the Government the wealth created
by the investment and expertise of Mr. Baldwin and his associated companies.

3.   The Claimants initiated arbitrations by LHNV under the bilateral investment treaties
between Laos and the Netherlands,[1] and by Sanum pursuant to a similar investment
treaty between Laos and Macau (now China).[2]  These arbitrations have consumed
multiple proceedings and years of litigation.  Eventually Sanum obtained an award
against ST Holdings from the Singapore International Arbitration Centre ("**SIAC**") for
over US $200 million.  LHNV is not a claimant before this Tribunal, and the Tribunal
does not purport to address its claims.  However, much of the evidence of Mr. John

---

[1] *Agreement on Encouragement and Reciprocal Protection of Investments between Laos and the Kingdom of the Netherlands*, signed on 16 May 2003, in force since 1 May 2005.

[2] *Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning the Encouragement and Reciprocal Protection of Investments*, dated 31 January 1993, as amended on 10 April 2006.

Baldwin is related to both companies, and as he was the directing mind of both companies, and their principal witness, references will be made to LHNV from time to time (or collectively to "**the Claimants**" in the plural) as part of the background to the disposition of the Sanum claims.  Moreover, counsel for the Claimants advised that it did not withdraw "any factual allegations, as the **totality of the facts remain relevant to certain treaty breaches** for which the Claimants will seek relief."[3]

## 2.   PROCEDURAL HISTORY

4.   The Tribunal has issued the following decisions during the proceeding: (i) Award on Jurisdiction of 13 December 2013; (ii) Interim Ruling on Issues Arising Under the Deed of Settlement of 19 December 2014 and (iii) Decision on the Merits of the Claimant's Second Material Breach Application of 15 December 2017 ("**Decision on the Second Material Breach**").  The full procedural history of this case is described in these decisions. These Decisions, and the Decision on the Second Material Breach, are an integral part of the Award.

5.   The procedural details of this arbitration following the Decision on the Second Material Breach are summarized below.

6.   In the Decision on the Second Material Breach, the Tribunal ruled as follows:

    (a)   the Second Material Breach Application is allowed;

    (b)   pursuant to Section 32 of the Settlement, the Treaty arbitration is revived on the basis jointly and severally of the Government's breaches of:

        (i)   Section 8, which promised a "new flat tax", but instead the Government imposed a 28% *ad valorem* tax on gross gaming revenues;

        (ii)   Section 23, which promised the Claimant relief from "current criminal investigations," which nevertheless have been revived;

    (c)   both of these breaches constitute material breaches that deprived the Claimant of the intended benefits (or "bargain") promised by each of Section 8 and Section 23;

    (d)   except as aforesaid, the grounds of revival relied on by the Claimant are rejected;

---

[3] Letter dated 26 March 2018 from Claimant to the Tribunal.

- 12 -

(e)   the parties are instructed to confer and propose to the Tribunal a timetable for the renewed arbitration within 30 days of the date of this decision;

(f)   a pre-hearing teleconference to resolve any outstanding issues will be held within 45 days of the date of this decision;

(g)   the issue of costs is reserved to be dealt with at the conclusion of the hearing on the merits.

7.   By letter dated 14 January 2018, the Claimant informed the Tribunals of its intention to propose a timetable for the renewed Treaty arbitrations, as requested by the Tribunals' Decisions on the Merits of the Claimant's Second Material Breach Applications of 15 December 2017.  By the same letter, the Claimant requested that the Tribunals in the revived arbitration be set for a merits hearing to take place at a reasonable time after the scheduled hearing of related but separate proceedings, identified as *Lao Holdings N.V. v. Lao People's Democratic Republic* (ICSID Case No. ARB(AF)/16/2)/ *Sanum Investments Limited v. Lao People's Democratic Republic* (ICSID Case No. ADHOC/17/1) (the "**BIT II Proceedings**"), and proposed an in-person pre-hearing conference, to explore with the Tribunals how to proceed and to receive any instructions the Tribunals may have.

8.   By letter dated 18 January 2018, the Respondent objected to the Tribunals' Interim Decision on the Claimant's Second Material Breach Applications.  By the same letter, the Respondent objected to the Claimant's suggestion that the hearings for the revived proceedings be delayed until the conclusion of the BIT II Proceedings.  The Respondent proposed a hearing schedule and stated its desire to complete the original disputes as soon as possible.

9.   By letter dated 26 January 2018, the Claimant provided further comments regarding the basis for a post-January 2019 hearing.

10.   By letter dated 30 January 2018, the Tribunal invited the Respondent to comment, should it wish, on the Claimant's assertions concerning the matters raised in the letter dated 26 January 2018.   The Respondent provided its response by letter dated 9 February 2018.

11. By letter dated 19 February 2018, the Tribunal issued directions for the Parties to "confer regarding a schedule for the exchange of submissions and other logistical matters."

12. By letter dated 2 March 2018, the Claimant informed the Tribunal that no consensus had been reached and detailed the Parties' discussions on the schedule.

13. By letter dated 8 March 2018, the PCA informed the Parties that in order to resolve outstanding matters, the Tribunal would hold a teleconference on 21 March 2018 at 12 noon Washington, D.C. time.

14. By letter dated 19 March 2018, the Claimant informed the Tribunal of the Parties' positions with respect to the agenda for the telephone conference, noting any areas of agreement reached between the Parties and setting forth the discussion on matters not in agreement.

15. On 21 March 2018, the Tribunal held a telephone conference with the Parties.

16. By letter dated 26 March 2018, the Claimant informed the Tribunal and the Respondent of the claims for which they would no longer seek specific relief and clarified the claims they were still pursing.

17. On 29 March 2018, the Tribunal issued **Procedural Order No. 8** on the organization of the hearing.

18. On 24 April 2018, the Respondent confirmed that it maintained its defences.

19. By email dated 16 May 2018, the Respondent submitted its list of witnesses to be called for examination at the merits hearing in Singapore scheduled for 3 to 7 September 2018.

20. By email dated 15 May 2018, the Respondent submitted its Application for Additional Evidence and Index of Additional Evidence, together with an index of supporting documentation and Exhibits R-001-002, R-004, R-028-029, R-034-036, C-1053, and R-054-055 and three additional documents not identified for the record.

21. By email dated 17 May 2018, each Party submitted its preliminary list of witnesses to be called for examination at the hearing to be taking place between 3-7 September 2018.

22.     On 30 May 2018, the Claimant filed its response to the Respondent's Application for Additional Evidence together with Exhibits C-1225 to C-1227, and Legal Authorities CL-379 to CL-389.

23.     By letter of 31 May 2018, the Respondent requested that the Tribunal order the Claimant to inform it on order of presentation of the witnesses to be examined at the scheduled hearing. Additionally, the Respondent requested the examination from Lao PDR *via* video-link of the following witnesses: Minister Kmabay Damlath, Dr. Sinlavong Khoutphaythoun, and Minister Chaleune Yiapaoheu.

24.     On 6 June 2018, the Tribunal provided further instructions to the Parties regarding the submissions on the list of witnesses for cross-examination at the scheduled hearing.  On 8 June 2018, the Claimant filed its response opposing the Respondent's request for the witnesses' video-link testimony, together with Exhibits C-1224, C-1235 and Legal Authority CL-390.

25.     On 15 June 2018, the Respondent filed its reply to its Application for Additional Evidence. On this same date, the Claimant filed its objection to the Respondent's preliminary witness list, pointing out that the Respondent had not indicated the intended purpose or subjects of one of the witnesses' cross-examination, together with Exhibit C-1237.

26.     On 22 June 2018, the Respondent filed its response to the Claimant's opposition to the examination of witnesses *via* video-link.

27.     On 25 June 2018, the Tribunal issued Procedural Order No. 9, in which it ruled on the Respondent's Application for Additional Evidence.

28.     On 26 June 2018, the Tribunal issued Procedural Order No. 10, on the Respondent's request for the examination of witnesses *via* video-link.

29.     On 27 June 2018, the Respondent filed a request for clarification of Tribunal's Procedural Order No. 9. On this same date, it stated its agreement to the full consolidation of the present arbitration with the matter chaired by the Honorable Ian Binnie QC, ICSID Case No. ARB(AF)/12/6, Lao Holdings NV *v. Lao People's Democratic Republic* (the "**ICSID Proceedings**").

- 15 -

30.     On 28 June 2018, the Tribunal issued an amended Procedural Order No. 9, in which certain typographical errors were corrected.

31.     By letter of 28 June 2018, the Tribunal informed the Parties that the Claimant's request objecting the Respondent's witness list was approved and invited the Parties to submit their final witness lists.

32.     On 5 July 2018, the Tribunal addressed the Respondent's communication of 27 June 2018, concerning its agreement to the full consolidation of this proceeding with the ICSID Proceeding. In this communication, the Tribunal informed the Parties that it did not consider the consolidation as "practical or necessary at this late stage of the proceeding".

33.     On 6 July 2018, each Party submitted its final witness list for the hearing of 3 to 7 September 2018.

34.     By email dated 6 July 2018, the Respondent confirmed that there were no changes to its witness list of 16 May 2018, with the exception of one witness in accordance with the Tribunal's decision contained in its letter of 28 June 2018.

35.     On 9 July 2018, the Parties jointly requested the Tribunal for a one-day extension for the further deadlines in the organization of the hearing.  On 11 July 2018, the Tribunal took note of the Parties' agreed extensions.

36.     On 17 July 2018, the Claimant submitted a request for additional evidence to rebut the Respondent's additional evidence pursuant to the Tribunal's Procedural Order No. 9.

37.     On 18 July 2018, the Claimant submitted a request to substitute Dr. Thomas Zitt for Mr. Steven Rittvo for examination on the Innovation Group's Expert Report at the scheduled hearing, together with Exhibit C-1267 and Exhibits A to F. On the same date, the Respondent submitted its objection to the Claimant's request together with Exhibits 1 through 12.  On 19 July 2018, the Tribunal invited the Claimant to submit its comments to the Respondent's objection.  On 25 July 2018, the Claimant filed its response to the Respondent's objection of 24 July 2018, together with Exhibits G through L.

38.     On 25 July 2018, the Respondent filed its observations to the Claimant's request for additional evidence of 17 July 2018. The Claimant's filed its reply on support of its request on 26 July 2018.

39.     On 26 July 2018, the Respondent filed additional observations to the Claimant's request for the substitution of experts of 18 July 2018.

40.     On 31 July 2018, the Tribunal issued Procedural Order No. 11 deciding that the scheduled hearing would proceed on all issues except for damages and quantum and ruled on the Claimant's request for the substitution of experts to give testimony at the hearing. Simultaneously, the Tribunal issued and Procedural Order No. 13 on the Claimant's request for additional evidence as follows:

> "1.     The following documents submitted by the Claimants are admitted on consent:
>
> Exhibits R-049, C-1240, R-046, C-1241, C-1242, C-0928, C-1243, C-1131, C-1244, C-1245, C-1246, C-774, C-755, C-1226, C-1248, C-1249, C-1250, C-1251, R-026, C-1238 A, C-1238 B , C-1239, C-1256, C-1257, C-1258, C-1259, C-1260, C-1261, C-1262, C-1263, C-1264, C-1265, C-1266.
>
> 2.     The Tribunal admits the extracts of the Witness statements of John Baldwin, Angus Noble, William Greenlee and Clay Crawford submitted by the Claimants, but permits the Government to provide additional extracts from the same witness statements which the Government contends are necessary to give "balance" to the extracts submitted by the Claimants, as per the ruling in item 1 above.
>
> 3.     The Baldwin Statement (Exhibit C-1244) and the Kurlantzick Report (Exhibit C-1247) are not admitted into evidence.
>
> 4.     The Government's Opening Memorial in SIAC Arb 143/14/MV (Exhibit C-971) is admitted into evidence.
>
> 5.     The interlocutory correspondence in ICSID Case No ARB (AF)/16/2 (Exhibits C-1252, C-1253, C-1254 and C-1255) are not admitted into evidence.
>
> 6.     The admissibility of the further report of Professor Joseph Kalt is deferred pending a decision following the merits hearing as to whether a hearing on damages and quantum is required."

41.     On 10 August 2018, the Respondent filed a request to strike the witness statement of Mr. William Greenlee, together with Appendices 1 through 4. By communication of

the same date, the Respondent requested leave from the Tribunal to include new evidence into the record (Exhibit SRE-164 and SRE-165).

42.     On 17 August 2018, the Claimant filed its response opposing the Respondent's request to strike Mr. Greenlee's witness statement from the record, together with the following supporting documentation: Exhibit C(B)-434, C(B)-492, C-1242, R-001 and R-036. On the same date, the Claimant filed its observations, partially agreeing with the Respondent's request to include new evidence into the record. On 20 August 2018, the Tribunal invited the Respondent to comment on the Claimant's observations.

43.      On 20 August 2018, the Claimant filed a request to increase their examination time at the Hearing and sent a proposed hearing schedule for the Tribunal's consideration. On 22 August 2018, the Tribunal invited the Respondent to comment on Claimant's proposal.

44.     On 23 August 2018, the Respondent filed a reply to the Claimant's response concerning its request to strike Mr. Greenlee's witness statement and its observations to the Claimant's position towards its request to include new evidence into the record. This submission was filed together with Appendices 1 through 5.

45.     On this same date, the Claimant submitted additional observations to the Respondent's comments on Mr. Greenlee's witness statement and requested the Tribunal to strike from the record an exhibit of 291 pages filed by the Respondent together with BDO's expert report as part of the Respondent's additional evidence submitted pursuant to Procedural Order No. 11.  The Tribunal invited the Respondent to comment on these two submissions by the Claimant.

46.     On 23 August 2018, the Respondent submitted its opposition to the Claimant's request for an enlargement of the examination time, together with Appendices 1 through 3.

47.     On 24 August 2018, the Respondent filed its observations on the Claimant's objection to the introduction of the exhibit to BDO's expert report, and its rejoinder on Mr. Greenlee's witness statement.

48.    On the same date, the Claimant informed the Tribunal and the Respondent of its decision to withdraw their request to cross-examine Sivath Sengdouangchanh at the hearing.

49.    On 25 August 2018, the Claimant requested the Tribunal's clarification on paragraph 3.ii of Procedural Order No. 8, concerning the witnesses' examination. On 26 August 2018, the Respondent filed its observations to this request.

50.    On 28 August 2018, the Respondent withdrew the witness statement of Mr. Vanheung (Vanheuang) Nanthachak from the record.

51.    On 29 August 2018, the Tribunal issued Procedural Order No. 13, on (1) Respondent's request to strike from the record Mr. William Greenlee's witness statements; (2) Respondent's request to introduce exhibits SRE-164 and SRE-165; (3) Claimant's request to extend the time assigned at the hearing; (4) Claimant's request to exclude the BDO Report submitted by the Respondent, and (5) Claimant's request for advance notice for witness examination.  These issues were decided as follows:

> "1.    The Respondent's request to strike from the record Mr. William Greenlee's witness statements is premature.
>
> 2.    Exhibits SRE-164 and SRE-165 are to be admitted into evidence.
>
> 3.    Each party shall have equal time and is to determine the order in which its own cross-examinations proceed as well as time allocation.
>
> 4.    The Claimants' request to exclude from the record the 291 additional pages attached to the BDO Report contained in Exhibit SRE-161 is granted.
>
> 5.    The Parties are not required to provide advance notice of topics to be covered in cross-examination."

52.    By letter of the same date, the Tribunal requested the Parties to confer and provide to the Tribunal a final hearing schedule.

53.    On 30 August 2018, the Claimant submitted the Parties' final and agreed hearing schedule.

54.    A hearing on the merits was held at Maxwell Chambers in Singapore, from 3 to 7 September 2018 (the "**Hearing**").  As on previous occasions, the Tribunal conducted the hearing jointly with the Tribunal in the ICSID Proceedings.  At no time were the

ICSID proceedings and the PCA proceedings consolidated.   The following persons were present at the Hearing:

*Tribunal*:
Dr. Andrés Rigo                           President
Prof. Bernard Hanotiau                    Arbitrator
Prof. Brigitte Stern                      Arbitrator

*PCA*:
Ms. Fedelma Claire Smith                  Secretary of the Tribunal
Ms. Gaëlle Buchet                         Case Manager
(*Attending Video Conference from Laos*)

*ICSID Tribunal*:
The Honorable Ian Binnie, QC              President
Prof. Bernard Hanotiau                    Arbitrator
Prof. Brigitte Stern                      Arbitrator

*ICSID Secretariat*:
Ms. Cathy Kettlewell                      Secretary of the Tribunal

*For the Claimant*:
Ms. Deborah Deitsch-Perez                 Stinson Leonard Street
Mr. Jeff Prudhomme                        Stinson Leonard Street
Mr. Alexander Hinckley                    Stinson Leonard Street
Mr. Todd Weiler
Mr. Ken Kroot                             In house counsel-Sanum
Mr. Jorge Menezes                         FCLaw
(Attending Video Conference from Laos)
*Parties:*
Mr. Shawn Scott
Mr. Tucker Baldwin

*Other:*
Ms. Benjawan Poomsan Terlecky
Ms. Diana Paraguacuto

*Claimant's Expert*:
Mr. Gerard Ngo

*For the Respondent*:
Mr. David Branson
Mr. Kurt Lindquist II                     Womble Bond Dickinson (US) LLP
Mr. John Branson                          Womble Bond Dickinson (US) LLP

| | |
|---|---|
| Ms. Emily Doll | Womble Bond Dickinson (US) LLP |
| Mr. Russ Ferguson | Womble Bond Dickinson (US) LLP |
| Mr. John Dackson | Womble Bond Dickinson (US) LLP |

*Parties*:
Outakeo Keodouangsinh
Phothilath Sokhotchounlamaly
*Other*:
Ms. Xaynari Chanthala
(Attending Video Conference from Laos)
Mr. K.P. Santivong
(Attending Video Conference from Laos)

*Respondent's Expert*:
Prof. Hervé Ascensio

| | |
|---|---|
| *Court Reporters*: | |
| Mr. Goh Chee Jian | Epiq |
| Mr. Tan Chee Keeng | Epiq |
| Ms. Tan Liang Chiah Sharon | Epiq |
| Tay Ai Poh | Epiq |
| Mr. Chua Hong Guan (Damien) | Epiq |

| | |
|---|---|
| *Interpreters*: | |
| Mr. John Johnston | Laotian/English |
| Ms. Maly Siribounthong | Laotian/English |
| Mr. Samuel Mattix | Laotian/English |
| Ms. Ana Ooms | French/English |
| Mr. Jean-Christophe Kuzniak | French/English |

55.     During the Hearing, the following persons were examined:

*On behalf of the Claimant*:
Mr. John Baldwin
Mr. Clay Crawford
Mr. Angus Noble
*On behalf of the Respondent*:
Mr. Phimphone Sengthong
Judge Soulideth Souvannasaly
Minister Chaleune Yiapaoheu
(Video Conferencing from Laos)
Minister   Sinlavong   Khoutphaythoun
(Video Conferencing from Laos)
Governor Kambay Damlath
(Video Conferencing from Laos)

56.     On 18 September 2018, the Respondent requested that the Tribunal provide further directions concerning the submission of further pleadings or applications.

57.     On 19 September 2018, the Claimant filed a submission addressing the Respondent's closing arguments made at the Hearing.

58.     By communication of 20 September 2018, the Tribunal informed the Parties that it would not admit into the record the Claimant's submission of 19 September 2018 and that any further submissions, but for those related to transcript issues, would require the Tribunal's approval.  The Tribunal invited the Parties to submit their corrections to the hearing transcript by 28 September 2018.

59.     Following the Tribunal's instructions, on 28 September 2018, the Claimant submitted the Parties' agreed transcript corrections to be included by the Court Reporters.  Amended transcripts were received from the Court Reporters on 22 October 2018.

60.     On 22 February 2019, the Respondent filed its submission on costs and on 7 March 2019, the Claimant filed its submission on costs.  On 12 March 2019, the Tribunal invited the Parties to comment on the other Party's submission on costs, if they wished to do so.  On 15 March 2019, the Respondent submitted its comments to the Claimant's submission on costs.

61.     The proceeding was closed on 17 July 2019.

## 3.   OVERVIEW OF THE FACTS

### 3.1.  Laos:  The Claimants' Investments in Laos



62.    As mentioned earlier, LHNV, owned directly and indirectly through its subsidiary, Sanum, gambling assets in Laos, including the Savan Vegas Hotel and Casino Complex in Savannakhet Province.   The Casino is strategically located near the Friendship Bridge which spans the Mekong River between Laos and Thailand.  The Claimants also had an investment in "slot clubs" located at the Thai border at Lao Bao and Savannakhet Ferry Terminal (located at the Savannakhet/Mukdahan checkpoint), all in the Savannakhet Province and at Thanaleng to the Northwest.   LHNV and its subsidiary Sanum, claim to have invested many millions of dollars in these projects.[4]

---

[4] The Claimants' principal, Mr. John Baldwin, testified as follows:

Q. … Can you tell us when Sanum first invested in Laos and what kind of money it invested, at what time period?
A. We – we started investing in Laos in 2007.  Our initial commitment was a total of seven and a half million dollars – my recollection is seven and a half million dollars paid to ST Group in various stages, and then the next thing we invested in was getting new plans drawn and studies done for Savan Vegas and Paksong Vegas.
Q. And in what year was that done?
A. That was done in 2008 primarily.
Q. When was the first monies paid?  2007 or 2008?
A. First monies, 2007.

### 3.2. The Original Treaty Claims

63.  The Claimants allege expropriation without compensation and Treaty breaches in respect of their investment in gambling projects described in the Project Development Agreement ("**PDA**") dated 10 August 2007 in respect of the Savan Vegas Casino, as well as the three slot clubs, Thanaleng, Lao Bao and Savannakhet Ferry.  The claims also relate to the expected expansion of the Savannakhet Airport and opportunities for development in the Special Economic Zone at Thakhet.

64.  On 14 August 2012, Sanum Investments Limited, a LHNV subsidiary which operated the Savan Vegas Hotel and Casino, initiated its claim before the PCA for alleged violations of the *Agreement between the Government of the People's Republic of China and the Government of The Lao People's Democratic Republic Concerning The Encouragement and Reciprocal Protection of Investments,* dated 31 January 1993 and the UNCITRAL Arbitration Rules as revised in 2010.

65.  Also on 14 August 2012, LHNV initiated its ICSID proceedings against the Respondent, before the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") pursuant to the *Agreement on Encouragement and Reciprocal Protection of Investments between Laos and the Kingdom of the Netherlands*,[5] and the *Arbitration Rules (Additional Facility)* of ICSID ("**ICSID-AF Rules**").[6]

66.  While the proceedings before the two Tribunals are distinct and separate, the proceedings were the subject of joint hearings in Singapore and elsewhere. Accordingly, for ease of reference only, LHNV and Sanum will be referred to as "the Claimants", as the facts of the cases are intermingled.  This terminology is not to

---

Q. And then the money that was in 2008, can you say during roughly what month?
A. Well, the largest amount of money was paid prior to the Savan – was paid in probably the last six months of 2008.
Q. During all of that time in 2007 and 2008, did you have a flat tax agreement yet?
A. Yes.
Q. Prior – let me show you some documents.  Let me show you –
A. Well, we had an agreement to get the flat tax agreement.  The flat tax was approved – the flat tax was approved by Prime Minister Bouasone in [29 December 2008].

 Transcript, 5 September 2018, p. 134, l. 10 to p. 135, l. 12, date corrected p. 135, ll. 9-12.
[5] Signed on 16 May 2003, in force since 1 May 2005.
[6] As amended on 10 April 2006.

suggest, however, that the two arbitral proceedings are consolidated or otherwise conjoined.

### 3.3.  Claims and Counterclaims

67.   The Claimants' original Treaty claims were based on a multiplicity of alleged treaty breaches by the Government including (but not limited to) an 80% tax on casino revenues and what the Claimants contended were unfair and oppressive audits of the Savan Vegas Hotel and Casino.  In addition, the Claimants alleged that the Government abused its sovereign authority to assist ST Holdings to acquire other assets which belonged in whole or in part, to the Claimants.  In the Treaty proceedings, the Claimants eventually valued their investment loss as of 31 August 2016 at between US $690 million and US $1 billion.[7]

### 3.4.  The Settlement and its Aftermath

68.   The Treaty claims were thought to have been resolved by a Deed of Settlement concluded between the Parties during the merits hearing in Singapore on 15 June 2014 (to be read together with a Side Letter dated 18 June 2014) (herein referred to collectively as "**the Settlement**").

69.   Shortly after the Settlement, the Claimants alleged that the Government had committed a material breach of its terms which entitled them to a revival of the Treaty arbitrations ("**the First Material Breach Application**").  The Government contested jurisdiction. On 11 August 2014, the Government filed a Notice of Arbitration with the SIAC pursuant to paragraphs 35 and 42 of the Settlement, seeking an order directing Sanum to comply with its obligations under the Settlement.

70.   The ICSID and PCA Tribunals held a hearing on 14 October 2014 in Washington, D.C. on the objections to jurisdiction, which were dismissed.  However, on 20 January 2015, the High Court of the Republic of Singapore held that the PCA Tribunal did not possess subject matter jurisdiction under the Laos-China BIT because of the status of Macau and issues of state succession not here relevant, as well as the limitation in the BIT,

---

[7] See Reports of Joseph P. Kalt dated 14 October 2016, 2 December 2016, 22 December 2016 and 15 March 2017.

according to which "only disputes over the amount of compensation for expropriation can be submitted to arbitration."[8]   This judgment was later reversed by the Court of Appeal of Singapore on 29 September 2016.[9]

### 3.5. Delimitation of the Relief Presently Sought by the Claimants

71.   The Claimants' Second Material Breach Application was successful, and on 15 December 2017, the Hearing on the merits of the "revived" claim was ordered to proceed.  On 26 March 2018, the Claimants advised the Tribunal of the claims for which they no longer sought relief, namely, in respect of the PCA proceedings, "Article 6 expropriation claim regarding the [Savan Vegas], its Article 6 expropriation claim regarding Ferry Terminal or Lao Bao slot clubs […], or its claims regarding Respondent's seizure of its bank account in breach of Articles 3(2), 3(4), 4, 5, and 6."[10]

72.   The Claimants' letter of 26 March 2018 notionally divided and separated their claims concerning LHNV (Thanaleng, Savan Vegas and the Ferry Terminal and Lao Bao slots) and Sanum (Thanaleng, Paksan, Thakhet and Paksong Vegas Hotel and Casino).  As mentioned, however, counsel for the Claimants asserted in the same letter that "the totality of the facts remain relevant to certain treaty breaches for which the Claimants will seek relief."  Equally, the Respondent conjoined its "clean hands" defence to all claims by both Claimants at issue in the ICSID and PCA proceedings involving Mr. John Baldwin and the various interrelated allegations of bribery and corruption. Accordingly, it will be necessary for the Tribunal to address "the totality" of the factual circumstances of the listed projects of both Claimants insofar as they are relevant to the position of Sanum.

73. Sanum maintained the expropriation claim pursuant to Article 4 of the Treaty regarding the Thanaleng slot club, Paksan, Thakhet and the Paksong Vegas Hotel and Casino.

---

[8] *Government of the Lao People's Democratic Republic v. Sanum Investments Ltd*., [2015] SGHC 15 at para. 128.
[9] *Sanum Investments Ltd. v. Government of the Lao People's Democratic Republic*, [2016] SGCA 57.
[10] Letter dated 26 March 2018 from Claimant to the Tribunal.

**4.     RELEVANT ARTICLES OF THE BIT**

74. The Preamble to the Treaty provides, in relevant part:

> The Government of the People's Republic of China and the Government of the Lao People's Democratic Republic (hereinafter referred to as Contracting States), Desiring to encourage, protect and create favorable conditions for investment by investors of one Contracting State in the territory of the other Contracting State based on the principles of mutual respect for sovereignty, equality and mutual benefit and for the purpose of the development of economic cooperation between both States […]

75.     Article 1(1) of the Treaty provides, in relevant part:

> The term "investments" means every kind of asset invested by investors of one Contracting State in accordance with the laws and regulations of the other Contracting State in the territory of the latter, including mainly (a) movable and immovable property and other property rights; (b) shares in companies or other forms of interest in such companies; (c) a claim to money or to any performance having an economic value; (d) copyrights, industrial property, know-how and technological process; (e) concessions conferred by law, including concessions to search for or to exploit natural resources.

76.     Article 1(2)(b) of the Treaty provides, in relevant part:

> The term "investors" means: In respect of both Contracting States: […] (b) economic entities established in accordance with the laws and regulations of each contracting State.

77. Article 3(1) and 3(2) of the Treaty provide:

> (1) Investments and activities associated with investments of investors of either Contracting State shall be accorded fair and equitable treatment and shall enjoy protection in the territory of the other Contracting State.
>
> (2) The treatment and protection as mentioned in Paragraph 1 of this Article shall not be less favorable than that accorded to investments and activities associated with such investments of investors of a third State.

78. Article 4(1) and 4(2) of the Treaty provide:

> (1) Neither Contracting State shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against investments of investors of the other Contracting state in its territory, unless the following conditions are met:
>
> > (a) as necessitated by the public interest;
> >
> > (b) in accordance with domestic legal procedures;
> >
> > (c) without discrimination;

(d) against appropriate and effective compensation.

(2) The compensation mentioned in paragraph 1(d) of this Article shall be equivalent to the value of the expropriated investments at the time when expropriation is proclaimed, be convertible and freely transferable. The compensation shall be paid without unreasonable delay.

79. Article 8(1), 8(2), and 8(3) of the Treaty provide:

(1) Any dispute between an investor of one Contracting State and the other Contracting State in connection with an investment in the territory of the other Contracting State shall, as far as possible, be settled amicably through negotiation between the parties to the dispute.

(2) If the dispute cannot be settled through negotiation within six months, either party to the dispute shall be entitled to submit the dispute to the competent court of the Contracting State accepting the investment.

(3) If a dispute involving the amount of compensation for expropriation cannot be settled through negotiation within six months as specified in paragraph 1 of this Article, it may be submitted at the request of either party to an ad hoc arbitral tribunal. The provisions of this paragraph shall not apply if the investor concerned has resorted to the procedure specified in the paragraph 2 of this Article.

## 5.   OTHER MATTERS

### 5.1.  Other Legal Provisions

80.   The Respondent argues that, in addition to the BIT, domestic law is relevant to the existence of the Claimants' contractual rights and the legality of the conduct of the foreign investors.  Furthermore, there are international norms such as "[t]he United Nations Convention Against Corruption which defines bribery and money laundering as fundamental criminal offenses that undermine the international system of foreign trade."[11]  It is the contention of the Respondent that the Claimants violated the BIT, the laws of Laos and international norms.

81.   According to the Claimant Sanum's Reply, the "[BIT] clearly governs this dispute."[12] The United Nations Convention Against Corruption ("**UNCAC**") "creates obligations only for the state Parties, to develop anti-corruption policies, practices, and task forces.

---

[11] Respondent's Counter-Memorial, para. 20.

[12] Claimant's Reply and Opposition to Respondent's Counterclaims dated 9 May 2014 (hereinafter "**Claimant's Reply**"), para. -237.

- 28 -

It does not bind or purport to bind the conduct of entities such as the Claimant."[13]  The Claimants also question the Respondent's appeal to international public policy and, in particular, the international standard for the gaming industry based on domestic gaming regulations of just four jurisdictions, none of them applicable to the Claimants' projects in Laos.

82.   While the Claimants admit that domestic statutes obviously do determine whether certain alleged acts are legal or illegal for the purposes of domestic law, domestic law does not dictate the consequences for an investor's claims under the Treaty.

83.   The Claimants argue that "once an investor has established its investment in conformity with the host state's laws, that investment falls within the scope of the treaty (assuming all of the other jurisdictional hurdles have been cleared), and the investor is *prima facie* entitled to its protections."[14]  The Claimants further argue that the cases that "consider whether allegations of misconduct constitute a proper defence on the merits do not assist Laos because tribunals have required Respondents to demonstrate that the actions taken in breach of the treaty were actually justified by the misconduct."[15]

84.   The Claimants also dispute the relevance of the "uncontroversial proposition that arbitral tribunals have an inherent power to preserve the integrity of their own process …"[16]  The Claimants equally reject the applicability of the "unclean hands" doctrine and note that the Respondent has not cited any case in which a tribunal has sanctioned post-investment behaviour with a full dismissal of the Claimant's case.

### 5.2. The Tribunal's Analysis

85.   The law to be applied by the Tribunal is determined by the Treaty.  The Treaty is an international instrument that to the extent it requires interpretation will be interpreted by the Tribunal in accordance with the provisions of the Vienna Convention on the Law of the Treaties ("**VCLT**") to which both State parties to the Treaty have acceded.  As the Parties admit in their exchanges, the domestic law of the State may also be relevant.

---

[13] *Ibid.*
[14] *Ibid.*, para. 246.
[15] *Ibid.*, para. 249.
[16] *Ibid.*, para. 252.

The extent of its relevance is a matter of dispute between the Parties, particularly on the question of whether to be protected an investment needs to be made *and operated* according to the law of the host State.  This issue and the disputed applicability of international policy relate to the defence of illegal conduct and the Tribunal will address both matters as needed in its consideration of the Respondent's defence.

### 5.3. Clarification on the Nature of the Respondent's Illegality Claims

86.    As part of its defence, the Respondent has pleaded that the Tribunal should dismiss all claims because of the illegal activities in which the Claimants allegedly engaged, including bribery, embezzlement and money laundering.  The Claimants have at times characterized this defence as a "request for dismissal…for lack of jurisdiction" because at inception or in its operation the investment of the Claimants was illegal.[17]

87.    As the Tribunal understands it, the present submission of the Respondent to dismiss all claims on grounds of illegality is not an objection to the Tribunal's jurisdiction, but an affirmation of the Tribunal's jurisdiction to consider the claims on their merits which, the Government says, ought to be dismissed because of the Claimants' illegal conduct.

### 6.    THE RESPONDENT'S THRESHOLD POSITION IS THAT THE CLAIMS OUGHT NOT TO BE ENTERTAINED BY REASON OF THE CLAIMANTS' BRIBERY AND CORRUPTION

88.    At the threshold of its argument, the Respondent contends that the claims should be dismissed in their entirety, in part because of corruption in the creation of the investments, and in part because of corruption in the course of performance of the various PDAs and unsuccessful initiatives by the Claimants to obtain licences for new gambling facilities.

89.    The Respondent alleges that the principals behind the Claimants, Mr. John Baldwin and Mr. Sean Scott, were quite brazen about how to do business in a culture of corruption.  However, Mr. Baldwin says, they steadfastly resisted.  In this respect, Mr. Baldwin testified that:

> Laos can be quite a corrupt country … As I met fellow businessmen in Laos,
> I came to realize that almost every major business operating in Laos has paid

---

[17] Claimant's Reply, para. 13.

money under the table for their concessions, or their flat tax agreements or other Government approvals.  Sanum, however, has not.[18]

90.     In his re-examination at the Hearing, Mr. John Baldwin made an even more emphatic denial of corrupt activities: "I gave strict instructions always that we weren't paying any bribes."[19]

91.     The allegations of bribery in the course of making the initial investment include:

    (a)  an alleged bribe of US $30,000 to Laotian tax authorities to obtain approval of the original 2009 Flat Tax Agreement which the Claimants regarded as essential to their investment in their flagship Savan Vegas Hotel and Casino project;

    (b)  payment of US $25,000 to Government officials to procure a licence for the Claimants' proposed Thakhaek Slot Club and Welcome Centre.[20]

92.     The allegations of bribery in the course of performance of the PDAs and related initiatives include:

    (a)  payment of US $875,000 to the Claimants' consultant in the Laos private sector, Madam Sengkeo Phimmasone, to bribe Government officials to stop an audit by Ernst & Young ("**E&Y**") of Savan Vegas in order to avoid disclosure of the Claimants' illegal activity[21] and witness tampering (Madam Sengkeo Phimmasone refused to make herself available to testify in these proceedings. The Respondent alleges she was paid by the Claimants to stay away);

---

[18] John Baldwin Second Witness Statement dated 9 May 2014, para. 5.

[19] Mr. Baldwin testified as follows in re-examination by his counsel:

> Q. Mr. Branson asked you a number of questions about the contracts, the consulting contracts, that Mr. Bouker had that Marty Gersten had written up and you said you hadn't seen them, but now that you've seen them, do they cause you to believe that Mr. Bouker was being dispatched to go and bribe people?
> A. No.
> Q. And why is that?
> A. Well, first and foremost, **I gave strict instructions always that we weren't paying any bribes**. That's number one.  I just don't do it and I'm a stubborn guy and I just don't – I tell my staff the same thing always, you know, it's a slippery slope and you can't start down it, so that's number one. But number two is, you know, fair value [in terms of a success fee] for result for work given.  I mean, if he [Mr. Bowker] has the contacts to do this, more power to him.  (emphasis added)
> Amended Transcript, 5 September 2018, p. 168, ll. 8-19.

[20] Respondent's Rejoinder, paras. 10-11, 15-17.

[21] Respondent's Counter-Memorial, para. 73; Respondent's Rejoinder, para. 9(i) and (vii).

(b)  payment of bribes totalling US $21,000 in 2012 to Government officials in an effort to obtain an extension of the 2009 Flax Tax Agreement;[22]

(c)  offer of a US $7 million bribe to the Prime Minister of Laos for approval of a licence to establish a casino in the capital city of Vientiane;[23]

(d)  a bribe of US $80,000 to the Governor of the Province of Champasak to approve a slot club at Chong Mek;[24]

(e)  bribes totalling US $106,000 to Government officials to close the Paksan Slot Club as a way of bringing pressure on ST Holdings to settle their differences;[25]

(f)  a claim (now abandoned) of payment of unspecified amounts of bribes to Government officials stationed at Savan Vegas to turn a blind eye to unlawful gambling by Lao citizens;[26]

(g)  an allegation (now abandoned) of payment of unspecified amounts to Thai border officials to facilitate Thai gamblers crossing into Laos to gamble and return unhindered with their winnings;[27] and

(h)  additional allegations (now abandoned) that the Claimants engaged in money laundering and embezzled funds from Savan Vegas by use of phoney loans.[28]

93.   In addition, the Respondent alleges that the Claimants paid US $120,000 to Cambodian officials for a Cambodian lottery licence, bribed Cambodian officials to obtain Cambodian diplomatic passports and bribed Cambodian customs officials to ignore unlawful border crossings.  These allegations were designed to demonstrate that the principals of the Claimants are "bad people" with a predisposition to use bribery and corruption to advance their financial interests.  The facts underlying the Cambodian

---

[22] Respondent's Counter-Memorial, paras. 90-93; Respondent's Rejoinder, paras. 10,15, 19.
[23] Respondent's Counter-Memorial, para. 97.
[24] Respondent's Counter-Memorial, paras. 100-101; Respondent's Rejoinder, paras. 21-22.
[25] Respondent's Counter-Memorial, paras. 102-104.
[26] Respondent's Counter-Memorial, paras. 110-113.
[27] Respondent's Counter-Memorial, paras. 114.
[28] Respondent's Counter-Memorial, paras. 115-199, 133, 135, 338.

allegations are so far removed from the allegations of corruption in Laos, that the allegations relating to Cambodia will not be considered further.

### 6.1. Evidence of Bribery and Corruption is Relevant Both at the Time of Investment and During Subsequent Performance

94.     The Parties agree that investment tribunals are rightly sensitive to allegations of corruption.  They agree that the Respondent bears the burden of proof.  They disagree on the standard of proof, *i.e.* whether a balance of probabilities is sufficient or whether corruption must be established to the more demanding standard of "clear and convincing evidence" of corruption.  They also, of course, disagree on the facts.

95.     There is no doubt that bribery and corruption are contrary to the domestic laws of Laos.[29]

### 6.1.1. The Respondent's Argument

96.     The Respondent asserts that the Claimants are not legally entitled to maintain any of their claims in these proceedings as a matter of *ordre public international* and public policy.[30]  Corruption, the Respondent argues, is relevant to the initial investment but

---

[29] **Lao Penal Code**
   Article 157:
   Any person bribing or agreeing to bribe a civil servant shall be punished by six months to two years of imprisonment and a fine equal to the amount or value of the bribe.
   In the event of a substantial bribe, the bribed civil servant, the briber and the person who agrees to give the bribe shall be punished by three to five years of imprisonment and fines equal to twice the amount or value of the bribe.
   Bribe intermediaries shall be punished by six months to two years of imprisonment and fines equal to the amount or value of the bribe.
   LHRA-15.
**Lao Law on Investment Promotion**
   Article 73:  Prohibited actions for investors:
   Investors are prohibited to perform the following actions:
   1. Give bribes to officers and government officials who have responsibilities for concerned tasks;
   LHRA-21**.**
[30] *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award ("**World Duty Free v. Kenya**"), at para. 188(3), LHRA-31.

also to the investor's subsequent conduct in relation to the investment in the host country.[31]

97.     The difference is that corruption in the making of the investment will raise issues of jurisdiction for the Tribunal, whereas subsequent acts of corruption will go to a claimant's entitlement for relief under the BIT.[32]

98.     In particular, the Respondent relies on the analysis in *Metal-Tech v. Uzbekistan*:

> While reaching the conclusion that the claims are barred as a result of corruption, the Tribunal is sensitive to the ongoing debate that findings on corruption often come down heavily on claimants, while possibly exonerating defendants that may have themselves been involved in the corrupt acts.  It is true that the outcome in cases of corruption often appears unsatisfactory because, at first sight at least, it seems to give an unfair advantage to the defendant party.  The idea, however, is not to punish one party at the cost of the other, but rather to ensure the promotion of the rule of law, which entails that a court or tribunal cannot grant assistance to a party that has engaged in a corrupt act.[33]  (emphasis added)

99.     The Respondent also relies, more generally, on the doctrine of "clean hands".  The Claimants' misconduct is sufficient, it is said, to deny them the assistance of investor-state arbitration.

---

[31] Referencing ICC Dossier:  *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 11, at para. 31, LHRA-155 (citing *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014, at paras. 129-132):

> 31. The approach to bribery is different in investment arbitrations, where jurisdiction does not derive from a contract, but rather from an investment treaty.  In these cases, validity of contracts is not the question.  The issue is whether an investor who has incurred in corrupt practices when making or performing the investment can still enjoy protection under the relevant investment treaty.  And the answer is no.  (38)  Investment arbitration has initiated and led the movement of zero tolerance towards corruption.

[32] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, at para. 345, LHRA-29:

> If, at the time of the initiation of the investment, there has been compliance with the law of the host state, allegations by the host state of violations of its law **in the course of the investment**, as a justification for state action with respect to the investment, **might be a defence** to claimed *substantive* violations of the BIT, but could not deprive a tribunal acting under the authority of the BIT of its jurisdiction. (emphasis added)

[33] Respondent's Opening Submission, Slide 143, citing *Metal-Tech Ltd. v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, 4 October 2013, at para. 389, Exhibit LHRA-157.

### 6.1.2.  The Claimant's Argument

100.   The Claimants point out that the Tribunal's jurisdiction is founded on the BIT and neither the Netherlands nor the Chinese BIT contains a provision authorizing a tribunal to deny the treaty's protection on the basis that the claimant/investor engaged in corruption.  If the BITs provide no authority to dismiss, the Tribunal would have to base its decision on customary international law.  However, the lack of "clean hands" is neither a recognized rule of customary international law nor a general principle of international law and thus affords no authority to dismiss.[34]

101.   The Claimants acknowledge that corruption in **the establishment of an investment** can render a claim inadmissible because treaty protections are only available for valid investments recognized under the treaty (based upon either an explicit or implied legality requirement).[35]   The Claimants deny corruption but in any event deny any causal connection between the acts of *alleged* corruption and these claims.   The Respondent only concocted its corruption allegations **after** the arbitrations were commenced and in any event has failed to govern itself in a manner consistent with its international obligations, including due process and good faith, and the prosecution of bribe-takers as well as alleged bribe-givers.[36]

102.   The Claimants' principal, Mr. John Baldwin, denied the applicability of the "red flags" approach to the investments in issue here:

> Q. Is it possible that when you enter into a consulting contract like this, that if the event is achieved, the consultant is sent the money and the consultant then is instructed to pay it to certain government ministers so that it keeps the company one step removed from proof of the bribe?  Isn't that how it works, Mr Baldwin?
>
> A. That's a possibility, although it didn't happen here.[37]

---

[34] Citing *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL PCA Case No. AA 227, Award, 18 July 2014, at paras. 1362-1363, CLA(B)-395.

[35] Claimant's Closing Submission, Slide 3.

[36] Claimant's Opening Submission on Respondent's Corruption Allegations, Slide 4.

[37] Amended Transcript, 5 September 2018, p. 91, 16-25.

### 6.1.3.  The Tribunal's Analysis

103.    The Tribunal considers that proof of corruption at any stage of the investment may be relevant depending on the circumstances.  While the UNCAC applies to States rather than private parties, it embodies what has become a principle of customary international law applicable, according to the OECD, to root out corruption used "to **obtain** or **retain business** or other undue advantage **in relation to the conduct** of international business."[38]

104.    The Respondent also relies on a generalized doctrine of "clean hands" which is a metaphor employed as a defence to equitable relief in common law jurisdictions. Incorporation of such a general doctrine into investor-State law without careful boundaries would risk opening investment disputes to an open-ended, vague and ultimately unmanageable principle.  However, putting aside the label, serious financial misconduct by the Claimants incompatible with their good faith obligations as investors in the host country (such as criminality in defrauding the host Government in respect of an investment) is not without Treaty consequences, both in relation to their attempt to rely on the guarantee of fair and equitable treatment, as well as their entitlement to relief of any kind from an international tribunal.

---

[38] *UN Convention Against Corruption, Article 16(1), LHRA-16.  See also OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions*, Article 1(1), Exhibit LHRA-136:

> Each Party shall take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally to <u>offer, promise or give</u> any undue pecuniary or other advantage, whether directly or through intermediaries, to a foreign public official, for that official or for a third party, in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain <u>or retain business</u> or other improper advantage in the conduct of international business. (emphasis added) .

See also ICC Dossier:  *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 11, at para. 34, Exhibit LHRA-155:

> It is now undisputed that a finding of corruption when making <u>or performing an investment</u> will lead to <u>dismissal of claimant's claims</u> and to a loss of any protection afforded by the treaty. (emphasis added)

Respondent's Opening Statement, Slide 146.

## 6.2. The Applicable Standard of Proof

### 6.2.1. The Respondent's Argument

105. The Respondent notes that many international tribunals have recognized the difficulty of "proving" bribery and corruption. In the nature of things, the parties to such transactions are generally careful to leave no paper trail or other direct or documentary evidence. As a result, if corruption is to be combatted effectively, it is necessary to rely on inferences from circumstantial evidence. A reasonable approach is to identify "red flags" which, if established, require the alleged perpetrators to provide an exculpatory explanation of otherwise suspicious conduct. In *Metal-Tech v. Uzbekistan*,[39] for example, the tribunal considered probative of corruption the Government's evidence of substantial payments to a consultant where:

   (a) the consultant lacks experience in the sector,

   (b) the consultant is not a resident of the country where the project is located;

   (c) the consultant has no significant business presence or experience within the country;

   (d) the consultant requests "urgent" payments and/or unusually high commissions;

   (e) the consultant requests payments be made in cash, be made in a third country, to a numbered bank account, or to some other person or entity than the one with whom the agreement was signed;

   (f) the consultant has a close personal/professional relationship to the Government that could improperly influence the decision.[40]

---

[39] Metal-Tech v. Uzbekistan, Exhibit LHRA-157, at para. 293. See also ICC Dossier *Addressing Issues of Corruption in Commercial and Investment Arbitration*, Chapter 5, Exhibit LHRA-160.

[40] *Metal-Tech v. Uzbekistan*, Exhibit LHRA-157, para. 293.

### 6.2.2.  The Claimant's Argument

106.  The Claimants contend that the applicable standard of proof of corruption in international law is "**clear and convincing evidence**" which must consist of "substantial facts" not mere "inferences".[41]   Relevance is placed on *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt,* where the tribunal held that "the applicable standard of proof is greater than the balance of probabilities but less than beyond a reasonable doubt."  The term favoured by the Claimants is "**clear and convincing evidence**."[42]

### 6.2.3.  The Tribunal's Analysis

107.  The Tribunal acknowledges the difficulty of proving corruption as well as the importance of exposing corruption where it exists.  In the nature of the offence, the person offering the bribe and the person accepting it will take care to cover their tracks.  Nevertheless, given the seriousness of the charge, and the severity of the consequences to the individuals concerned, procedural fairness requires that there be proof rather than conjecture.  The standard of "probabilities" requires the trier of fact to stand back and make an overall assessment.  The requirement of "clear and convincing" evidence puts the focus more closely on the building blocks of the evidence to ensure a rigorous testing.

108.  In the Tribunal's view, there need not be "clear and convincing evidence" on every element of every allegation of corruption, but such "clear and convincing evidence" as exists must point clearly to corruption. An assessment must then be made of which

---

[41] *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, Exhibit CLA(B)-441, at para. 424:

 … It is not sufficient to present evidence which could possibly indicate that there might have been or even probably was corruption.  Rather Claimants have to *prove* corruption…[T]he issue is not one of inference, and the Tribunal considers that Claimants have not met their burden of proof in this regard.

See also *Gustav FW Hamseter GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exhibit LHRA-26, at para. 134.

[42] *Waguih Elie George Siag & Clorinda Vecchi v. Arab Republic of Egypt,* ICSID Case No ARB/05/15, Award, 1 June 2009, Exhibit CLA(LH)-069, at para. 326.

elements of the alleged act of corruption have been established by clear and convincing evidence, and which elements are left to reasonable inference, and on the whole whether the alleged act of corruption is established to a standard higher than the balance of probabilities but less than the criminal standard of beyond reasonable doubt, although, of course proof beyond reasonable doubt would be conclusive. This approach reflects the general proposition that the "graver the charge, the more confidence there must be in the evidence relied on."[43]

### 6.3. Failure of the Respondent to Investigate and Prosecute Persons who Allegedly Accepted Bribes

109.   As the Claimants point out, the Respondent has brought no prosecutions against any Government official said to be on the receiving end of the bribes.  Nor is there before the Tribunal any evidence of a serious criminal investigation of anyone other than the principals of the Claimant, Mr. John Baldwin and Mr. Sean Scott.

110.   Conviction of its own officials would not estop the Government from pursuing the Claimants as bribe-givers.

111.   However, in this case, the Tribunal finds it disturbing that **no** prosecutions have been brought against **any** persons alleged to have accepted bribes, nor has there been evidence of due diligence in any investigation.  These omissions are relevant to the credibility of the Government's allegations, as will be seen.

### 6.3.1.  First Allegation – Bribes to Obtain the 2009 Flat Tax Agreement

#### 6.3.1.1.  The Respondent's Argument

112.   The Claimants have repeatedly acknowledged that the Flat Tax Agreement ("**FTA**")[44] was essential to the economic profitability of Savan Vegas.  Mr. John Baldwin testified in Singapore that the Claimants would not have built the casino without an FTA:

---

[43] *See Libananco* v. *Turkey* (Exh. RLA-117), para. 125; *Rompetrol* v. *Romania* (Exh. RLA-233), para. 182; both relying on the Separate Opinion of Judge Higgins in the *Oil Platforms* case, ICJ Reports 1996, at 856.

[44] Flat Tax Agreement between Laos and Savan Vegas, dated 21 September 2009, Exhibit C(B)-007.

> Q. And would you have built the Savan Vegas casino for $25 million, $30 million if that was the tax you had to pay, if the government refused to give you a flat tax agreement?
>
> A. No.[45]

113.   It is alleged that to obtain the original 2009 FTA, a bribe of US $30,000 was paid to Ms. Manivone or Mr. Khamphai, senior officials with the Government tax department, through the Claimants' intermediary or consultant, Madam Sengkeo.

114.   The FTA was of great value to the Claimants as it limited most types of tax to a flat sum of US $745,000 per year regardless of the profits made by the multi-million dollar casino operation.

115.   The chronology is as follows:

| DATE | ACTIVITY |
|---|---|
| 29 December 2008 | Prime Minister approves FTA in principle |
| 21 September 2009 | Flat Tax Agreement signed. |
| 22 September 2009 | Internal Sanum e-mail records that Mr. Khamphai requested wire of "agreed payment" to Madam Sengkeo's account "approved" by Mr. Baldwin.[46] |
| 24 September 2009 | Internal Sanum e-mail records that the "**tax people** are requesting […] $30,000 USD […] to get the flat tax approval."[47] |
| 7 October 2009 | Internal Sanum e-mail records that Madam Sengkeo "has provided **her daughter's** bank account" information.[48] |
| 8 October 2009 | Internal Sanum e-mail records that Mr. Baldwin instructed the disbursement of funds "by wire" for "service[s] partially rendered". Amounts of US $10,000 and US $20,000 were disbursed from the account "by wire".[49] |

---

[45] Amended Transcript, 5 September 208, p. 89, 12-16.

[46] Emails regarding Flat Tax, Exhibit SRE-152.

[47] *Ibid.*

[48] *Ibid.*

[49] *Ibid.*

116.    According to the Respondent, the sequence of dates, and the use of the daughter's bank account in lieu of Madam Sengkeo's own account, raise "red flags".

117.    While the FTA had been agreed to in principle in December 2008, Mr. John Baldwin testified that the deal was not done, because "we needed to get the flat tax agreement reduced into a formal document at that specific time."[50]   Accordingly, it would have been quite understandable for the payment of a bribe to be delayed until October 2009 when the FTA was signed, as opposed to December 2008 when it was purportedly approved in principle by the Government.

118.    In cross-examination, Mr. John Baldwin denied any illegal payment to Madam Sengkeo, but according to the Respondent, Mr. Baldwin's explanation that the reference to payment in October 2009 of US $30,000 to the "**tax people**" meant payment to Madam Sengkeo for her own benefit rather than as a bribe for tax officials is (according to the Respondent) manifestly absurd.   In this respect, Mr. John Baldwin testified as follows:

> Q.  Isn't this a statement to the CFO of Sanum/Savan Vegas to pay a bribe of $30,000 to a tax official in the Ministry of Finance?
>
> A.  No.
>
> Q.  How do you interpret it? What does it mean?
>
> A.  That the $30,000 success fee was supposed to be paid to Madam Sengkeo and her tax people that were with her.
>
> Q.  She is "the Tax people"?
>
> A.  Yes.
>
> Q.  Did she work for the government then?
>
> A.  No.
>
> Q.  She didn't? She's not an employee of the Ministry of Finance?

---

[50] Mr. John Baldwin testified as follows:
> Q. What was the agreement's substance?  I mean, the agreement with Madam Sengkeo, what was the substance of that agreement?
> A. I believe – I – I don't know specifically, but I believe that we needed to get the flat tax agreement reduced into a formal document at that specific time, but Madam Sengkeo's engagement went back nearly a year, is my recollection, and that she helped, through that whole period, to get the flat tax agreement.
> Q. What was the agreement? Why was she getting 30,000? Why not 50,000?
> A. Well, she agreed to take $30,000.
Amended Transcript, 5 September 2018, p.69, 16-25 to 70, 1-3.

A. No.[51]

119. The Respondent adds that the US $30,000 may have gone to Madam Sengkeo in the first instance, but in the Respondent's view, the coincidence of timing with Sanum's apparent need to ingratiate itself with Government officials is fatal to Mr. Baldwin's credibility.

### 6.3.1.2.   The Claimant's Argument

120. The Claimant contends that payment of US $30,000 to Madam Sengkeo was a "success fee" for obtaining the FTA where previous intermediaries had failed.[52]   Mr. Baldwin strongly denied any impropriety:

> Q. Down at the bottom of the page it says:
>
> "Dear Billy and Team, Mr Khamphai of the Tax Department and Mdm Sengkeo had just informed us that Joe had picked up the flat tax document at his office [meaning Mr Khamphai's] since 9AM this morning ...
>
> However, he has asked us to wire the agreed payment to Madam Sengkeo's account as followed ..."
>
> And then they give the account number. So isn't this interesting, that **the day that the flat tax agreement is delivered to your employee, he asked that $30,000 is wired that day**?
>
> A. Well, my reading of this is that "he" is Joe.
>
> Q. And who is he saying that the money should be paid to?
>
> A. Madam Sengkeo.[53]   (emphasis added)

---

[51] Amended Transcript, 5 September 2018, p. 66, 1-15.

[52] Mr. Baldwin testified in his Second Witness Statement in the SIAC case of 8 June 2015 as follows:

> 15. The Government alleges that I authorized payments totaling US$30,000 to Madame Sengkeo Phimmasone, as a bribe to obtain the flat tax agreement issued on 1 September 2009 for Savan Vegas. This too is false.  **The payments represented a success fee to Madam Sengkeo** for her efforts to help Savan Vegas negotiate a Flat Tax Agreement with the Lao Government – a project on which she had worked since at least July 2008.
>
> 16. Initially, it was the ST Group – then our local partner in Laos – that was responsible for obtaining a flat tax agreement for Savan Vegas.  However, it failed to do so, thus by mid-2008, we took it upon ourselves to negotiate such an agreement with the Lao Government.  In order to have local Lao expertise to assist us, **Savan Vegas offered a success fee to Madam Sengkeo** to lobby for a satisfactory Flat Tax Agreement for Savan Vegas.  Madam Sengkeo was a partner of ST, which is how I came to know her.  I discovered that she had many high-level connections in the Lao Government.  This made her a natural choice for this consulting engagement.  (emphasis added)

John Baldwin Second Witness Statement, 8 June 2015, paras. 15-16, Exhibit SRE-159.

[53] Amended Transcript, 5 September 2018, p. 67, 2-18.

121.   Mr. John Baldwin testified that there was no reason to bribe any Government employee in September 2009 as the Prime Minister had already agreed to a flat tax agreement in December 2008.[54]

### 6.3.1.3.   The Tribunal's Analysis

122.   The Respondent's case is speculative rather than substantial.  Madam Sengkeo was in the consulting business.  Consultants are paid.  While the Claimants never produced a "consulting agreement" with Madam Sengkeo, the evidence is that it is not unusual for consultants to insist on a success fee as part of their remuneration.  The effort to obtain a FTA was successful.  It was likely worth millions of dollars to the Claimants in reduced taxes.  In that context, payment of US $30,000 in 2009 is not a disproportionate "success fee".  Moreover, no one was prosecuted in this affair.  Even if Madam Sengkeo did not cooperate with the Government, why was her daughter (the owner of the bank account) not investigated?  What is the daughter's explanation?  The evidence of corruption in this instance is neither clear nor convincing.  The bribery allegation in connection with the FTA is not established to the necessary standard for such a serious charge.

### 6.3.2.   Second Allegation – Bribes to Extend the Flat Tax Agreement After Expiry of the 5-Year Term

#### 6.3.2.1.   The Respondent's Argument

123.   On 18 March 2011, Savan Vegas submitted its proposal to extend the FTA, which was due to expire on 31 December 2014.  Six days later, on 24 March 2011, the Claimants paid US $21,000 to Mr. Bouker Noutharath, a retired hospital worker from Olympia, Washington State, United States of America, who had returned to live in Laos.  He had no experience as a "consultant" but had good contacts within the Government.  On

---

[54] Mr. Baldwin testified:

Q. Would there be any reason to have to bribe anyone when the Prime Minister had already approved your flat tax?
A. You know, there's no reason to and, plus, obviously, the Prime Minister's office was watching this.  The local tax people were watching this, the finance department's watching this.  This was a significant project and lots of people were watching it and there's no way.  You just wouldn't – couldn't happen.

Amended Transcript, 5 September 2018, p. 151, 2-11.

4 March 2011, he was retained by Savan Vegas[55] as a consultant to lobby in favour of an extension of the FTA.  Mr. Baldwin says Mr. Bouker was promised a success fee substantially in excess of US $ 21,000, but Mr. Bouker, who agreed to cooperate with the Government, testified that:

> I have seen the entry in the general ledger that I was sent $21,000 on March 24, 2011.  The entry says "prof fee re flat tax acceptance – Brian Nonthavet." RE-131.  I remember that Sanum was concerned about extending a flat tax agreement, but **I was not involved** in that issue.  **I was sent the $21,000 to deliver it to a government person.**  I remember it was Mr. Paoa [of Savan Vegas] who asked me to make this payment about the tax issue but **I cannot remember the name of the Government person** who I gave this payment too.[56]  (emphasis added)

> \* \* \* \* \*

> These contracts are for fraud reasons.  They were drafted and sent to me by lawyer Martin Gersten …They were to provide a cover for the bribes Sanum intended to pay to have the Government extend the Flat Tax Agreement and to obtain the Thakhaek slot club licence.[57]

124.    The Respondent believes the unidentified "Government Person" was Ms. Manivone, but Mr. Baldwin testified he was "sure" this was not so:

> Q. Do you know that at the time you were negotiating with Madam Manivone in the tax department of the Ministry of Finance?

> A. Well, we were – negotiated with Madam Manivone from 2007 clear through, you know, into 2012.

> \* \* \* \* \*

> Q. Isn't it true that Mr Paoa asked Bouker to deliver $21,000 [in 2012] to Ms Manivone in the tax department to help in negotiations for the flat tax agreement?

> A. I don't think so.

> Q. But you're not sure?

> A. I'm sure…[58]

---

[55] Bouker Nonthavet Third Witness Statement, 23 May 2014, Exhibit 4, Respondent's Opening Submission, Slide 161.
[56] Bouker Nonthavet First Witness Statement, 2 April 2014, at para. 7.
[57] Amended Transcript, 5 September 2018, p. 90, 20-25.
[58] Amended Transcript, 5 September 2018, p. 86, ll. 7-24.

### 6.3.2.2. The Claimant's Argument

125. Mr. Bouker received a legitimate consulting mandate. By e-mail dated 21 March 2011, he requested US $21,000 as "an advance". His bank records do not show a withdrawal of US $21,000 but withdrawals of three different amounts on 28 March (US $9,500 cash), 30 March (US $9,000 to his son) and 4 April (US $2,135 cash). Mr. Bouker is a dissatisfied former employee whose testimony is not credible.

### 6.3.2.3. The Tribunal's Analysis

126. There are inconsistencies in Mr. Bouker's evidence and it is significant that he can remember nothing about (or is otherwise unwilling to identify) "the Government Person" to whom he said he handed US $21,000. There are too many loose ends to his story. There is no evidence that Madam Manivone (the presumed recipient) or anyone else was prosecuted. In the Tribunal's view, the Respondent's evidence does not establish by clear and convincing evidence or on a balance of probabilities that a US $21,000 bribe was offered by Mr. Bouker to any Government official as alleged.

### 6.3.3. Third Allegation – The Claimants Paid US $500,000 in Bribes in 2012 to (i) Shut Down the E&Y Audit of Savan Vegas and (ii) to Cause the Government to Shut Down the Thanaleng Slot Club to the Disadvantage of ST Holdings

127. On 8 July 2012, Mr. Baldwin wired Sanum's Chief Financial Officer, Mr. Clay Crawford, that "Savan has an extraordinary expense of $500,000 this week. I've tell you about it when we speak on the phone, but please think about our cash situation."[59]

128. Mr. Baldwin accepts that the sum of US $500,000 was subsequently sent to Vientiane including US $300,000 cash in a backpack delivered to Madam Sengkeo by his personal assistant, Bruce Douglas.[60]

---

[59] E-mail from John Baldwin to Clay Crawford, 8 July 2012, Exhibit SRE-154.

[60] Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, pp. 207-208, Exhibit SRE-160:
    Q. You ordered Mr. Douglas on that day, or the day before, rather, the same day you had to have the 200,000 on 11 July you ordered Mr. Douglas to get into an airplane in Cambodia, fly across the border with USD 300,000 in a suitcase, didn't you?
    A. In a backpack.
    Q. You have USD 500,000 going into Vientiane in a two-day period in cash?
    A. Yes.

### 6.3.3.1.  The E&Y Audit

129.   Mr. Baldwin acknowledges ordering Mr. Douglas to fly to Vientiane with US $300,000 in cash.  It is established that US $300,000 was subsequently deposited in Madam Sengkeo's bank account.  She subsequently deposited US $30,000 in her bank account in New York.

130.   The Respondent's allegation is that the balance of US $270,000 was paid by Madam Sengkeo to Government officials to stop the E&Y audit of the Savan Vegas which Mr. Baldwin considered part of a Government move to get rid of Sanum and take over the Claimants' gambling assets without compensation.[61]

#### 6.3.3.1.1.        The Respondent's Argument

131.   The Respondent points out that the alleged "loan" to Madam Sengkeo was undocumented.[62]  Only US $15,000 has been repaid.[63]  Mr. Baldwin acknowledges that

---

[61] Mr. John Baldwin testified in his Third Witness Statement, 22 July 2013, at para. 5:

…"Even those few Government officials who will still speak with me have admitted that we have been the target of a deliberate campaign to strip Sanum of its investments in Laos.  The objective of these efforts appears to be to leave the successful businesses, in which we invested so much and which we spent years developing, in the hands of our local commercial partner, the ST Group...and the senior Lao Government officials who have intimate business and familial connections with ST."

[62] See testimony of John Baldwin, Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 209, Exhibit SRE-160:

Judge Barkett:  Can I ask a question?  Would there be loan documents evidencing this loan?
A. **Not on this loan.  We have made her other loans that there are.  This was – she was part owner of Paksong Vegas and a part owner of Savan Vegas, small pieces.  We had – she helped us with a lot of things, but she and I become very close friends.  When she called us, she said she needed it and I responded to that need.**  (emphasis added)

[63] Testimony of John Baldwin, Amended Transcript, 5 September 2018 at p. 41, 14-25 to p. 42,  5-10:

Q. …first of all, your $300,000 loan that you say you gave Madam Sengkeo in 2012, are there any loan documents for that loan?
A. No, there are not.
Q. Has she ever repaid it?
A. She – she paid me 500,000 Thai baht.
Q. That's US$15,000?
A. US$15,000.
Q. Do you have any record of that payment?
A. I think so – yeah, I do.
Q. Have you ever produced it? You have been asked….
* * * * *
Q. Okay. But the other – let's assume she gave you US$15,000. The other 285,000 that you lent her in 2012 has not been repaid?
A. It has not been repaid.
Q. And we're now in 2018?
A. Yes.

Madam Sengkeo has not been asked by the Claimants to repay the balance.  The US $30,000 deposit in New York was 10% of the US $300,000 transfer.  Madam Sengkeo was a "ten percenter", and her receipt of US $30,000 indicates that bribes of US $270,000 were paid.

132.  The bribe succeeded, according to the Respondent.  On 12 July 2012, Ernst & Young ("**E&Y**") was ordered by unidentified Government officials to stop work on its audit of Savan Vegas.[64]  The E&Y audit would have disclosed the Claimants' illegal activities (subsequently uncovered by a BDO audit after the Government ousted the Claimants from the casino) including (the Government alleges) embezzlement and money laundering.

### 6.3.3.1.2.  The Claimant's Argument

133.  The Claimant says the US $300,000 was a "loan" to Madam Sengkeo.  The New York deposits are unrelated.  Madam Sengkeo was closely involved with ST Holdings.  There had been a falling out.  She thus had an "urgency" for funds when ST Holdings malevolently cut off Madam Sengkeo's regular source of income.[65]  Mr. Baldwin was a loyal friend.

### 6.3.3.1.3.  The Tribunal's Analysis

134.  Mr. Baldwin's explanation of the US $300,000 payment to Madam Sengkeo is not credible.  It is clear on the evidence that Mr. Baldwin and his CFO, Mr. Clay Crawford, were concerned about the threat to Sanum's business posed by the E&Y audit.  Mr.

---

[64] Letter from Ernst & Young to the Ministry of Finance, Exhibit SRE-53:

In relation to our final report, we also feel it necessary to remind the Inspection Committee that, since we were instructed by your goodself on 10 July 2012 to cease our fieldwork at Savan Vegas Hotel & Casino (SVC) and to refrain from receiving any additional information and/or documents from SVC on the same day, our final report will only contain our preliminary findings and/or observations for the work performed on documents and information received by us from SVC up till and including 10 July 2012.

[65] Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 207-208, Exhibit SRE-160:

Q. What was going on in Vientiane in July 2012 that you needed all that cash there except the Thanaleng case was happening about 10 days later and the E&Y audit was terminated the day before.  Those are the two events that I can think of that related to Savan Vegas, what can you think of?
A. **ST had cut Madame Sengkeo off from any income from their investments, because she had helped us over him, he had cut her off from any money and she lives primarily on money from him.  She needed money to pay bills on the hotel she was building.  The USD 300,000 is a loan to her.**  (emphasis added)

Baldwin had every incentive to influence the Government to call off the E&Y audit in the summer of 2012.  It is simply not plausible, as the Claimants argue, that the E&Y audit was stopped because Government officials had concluded that E&Y had *failed* to find incriminating evidence.  If that were true, the obvious instructions from the Government to E&Y would have been to keep digging, not to give up and down tools.

135.  On the other hand, the Claimants had a powerful motive to stop the audit as Mr. Baldwin and Mr. Crawford knew (and the Government merely suspected) of the existence of financial skeletons in the Savan Vegas books later uncovered by the BDO audit.  All in all, the Tribunal concludes that the Claimants got a senior Government official to stop the audit and that the $270,000 was paid through Madam Sengkeo (i.e. $300,000 less 10%) to that Government person or persons.

136.  That said, the Tribunal is troubled by the fact that the Government has apparently not identified any bribe-*takers*.  The order to E&Y to stop the audit came as a surprise to E&Y and must have been issued by a senior Government source, otherwise the audit would have continued.  The Respondent does not suggest that E&Y took the bribe **but E&Y must know who gave its auditors the order to stop work**.  The evidentiary trail could then have been followed up the chain of command from the Government person who gave the order to identify the person who authorized the order, who could then have been required to provide the Government (and subsequently the Tribunal) with an explanation for the stop work order.

137.  The Respondent has not offered any explanation for this gap in the evidence.  In the circumstances, while the evidence of Mr. Baldwin that Madam Sengkeo required the funds for her personal use is deeply unsatisfactory, so too is the Government's apparent failure even to *attempt* (so far the evidence is concerned) to get to the bottom of the matter, not only potentially to punish the wrongdoers, but to provide solid evidence that a bribe was given and taken by Government official(s) to stop the E&Y audit.

138.  The Tribunal concludes that it is more probable than not that Madam Sengkeo was used as a conduit to bribe Government officials to stop the E&Y audit, but that this conclusion is not established to the higher standard of "clear and convincing evidence".  The Tribunal is satisfied, however, on the lesser standard of a balance of probabilities,

that Mr. Baldwin involved the Claimants in serious financial illegalities in respect of the halt of the E&Y audit.

### 6.3.3.2. Payment of About $200,000 in Bribes to Shut Down the Thanaleng Slot Club

139.   In 2012, the Claimants were experiencing tense relations with their then Laotian partner, ST Holdings.  In part, the tensions related to a profitable slot club at Thanaleng, which ST Holdings agreed to joint venture with Sanum.  The joint venture was to commence at a future date awaiting the expiry of an earlier arrangement ST Holdings had contracted with a different slot machine supplier.  However, when the date for the change-over arrived, ST Holdings refused to proceed with its deal with Sanum.

140.   Mr. Baldwin is alleged to have then paid bribes to Government officials through a "consultant", Mr. Anousith Thepsimuong, in an effort to shut down the Thanaleng Slot Club as a pressure tactic to force ST Holdings to negotiate a solution rather than continue with litigation (which the Claimants ultimately lost in the Laotian Courts).

#### 6.3.3.2.1. The Respondent's Argument

141.   On 28 July 2012, during the corporate struggle over the Thanaleng Slot Club, the Claimants attempted to obtain leverage over ST Holdings by bribing Government Ministries to shut down the Club.  The money was channelled through Mr. Anousith. The sum of US $190,000 was deposited in Mr. Anousith's bank account on 11 July 2012 and a cash withdrawal of US $100,000 was made the following day.[66]

142.   Mr. Baldwin testified that Mr. Anousith was paid to lobby "the National Assembly" but this explanation is not credible.  The National Assembly has no executive function. Only a Government Minister would have operational authority to issue a stop order against the Thanaleng Slot Club.

143.   Mr. Baldwin acknowledged that he could not explain how or why the National Assembly would get involved in such an executive action:

---

[66] Extract of ANZ Bank Statement for Mr. Anousith Thepsimoung, Exhibit SRE-153.

Q. You say that the National Assembly is going to suspend a licence, but did he [the Deputy Prime Minister] ever explain or did you ever find out how the National Assembly would actually do that?

A. No.[67]

### 6.3.3.2.2.    The Claimant's Argument

144.   Mr. John Baldwin readily admits that in July 2012 he was doing what was possible to get the Government to close the Thangaleng Slot Club[68], including by a written submission to the country's President.   The Claimants say there is no reason to disbelieve Mr. Baldwin's evidence that he was told by the Deputy Prime Minister to lobby the country's National Assembly.[69]

145.   Mr. Baldwin denied that money was intended for a Government Minister:

Q. See, that brings us back to July and this $500,000 pot of money that we have sitting in Vientiane in Madam Sengkeo's bank account – her son-in-law's bank account.   Isn't it true that that money was there to stop the court case from having a judgment – the money was there so you could get the slot club shut down and negotiate with Mr Sithat?

---

[67] Amended Transcript, 5 September 2018, at p. 9,23-25 to p. 10, 1-4.

[68] Mr. Baldwin testified that he wrote to President Choummaly Sayasone requesting the Government to shut down the Thangaleng Slot Club:

"Sanum asks that the Government suspend that the slot machine licence at the Vientiane Friendship Bridge.  We believe that a temporary suspension will encourage the parties to negotiate and come to terms so they can work together.  Once the parties have reached an agreement, formed a joint venture that is approved by the relevant ministries, and determine that they can operate the Vientiane…Bridge Slot Club together, the licence would be reinstated.  Until then, Sanum requests your assistance in suspending the licence and allowing time and space to work [together] towards peace with [the] ST Group."  Correct?  So, as I said, you were trying to get a space to negotiate your way out of this trouble with ST.
A. Yes.
Amended Transcript, 5 September 2018, p. 7, 19-25 to p. 8, 1-11.

[69] In re-examination, Mr. Baldwin testified about the National Assembly as follows:

MS DEITSCH-PEREZ: You spoke with Mr Branson about the Thanaleng lobbying.  Can you tell us where you first got the idea to lobby the assembly with respect to Thanaleng?
A. Yeah.  I was having breakfast with Deputy Prime Minister Somsavath – we were having oatmeal – and he – I said I got – I have to get – make peace with Sithat somehow and I – how do we do it and he said, you know, it's a tough row, because, you know, she's joined at the hip with Bounnhang – you know, with vice-president Vorachith, Bounnhang Vorachith, and he said I – there's not very many people that are going to be able to help you with this, you've got to make peace with Sithat and Vorachith, so I said, "Well, who can help me do that?", and he said, "Well, two places – the politburo and the National Assembly", and he said the politburo, "That's difficult, so I would suggest that you reach out to the National Assembly."
Amended Transcript, 5 September 2018, p. 171, 3-22.

A. The money was specifically earmarked to do lobbying with the National Assembly.

Q. Well, we just established that y**ou have a good friend who is the fourth most powerful person in the country**.  Wasn't the money for him to shut down the club so you could stop the court decision?

A. No.[70]  (emphasis added)

146.    The Claimants argue that there is no evidence that Mr. Anousith paid money to any Government official.  He received fees as a consultant to lobby the National Assembly to shut down the Thanaleng Slot Club.  He was entitled to spend that money as he wished.  Laos is a cash economy.  Payment of large amounts of cash in respect of legitimate transactions is not unusual.[71]  Cash does not signal illegality.

### 6.3.3.2.3.   The Tribunal's Analysis

147.    Once again, the payment to Mr. Anousith is deeply suspicious.   There is no documentation of any consultancy.   There is no explanation of the work for which almost $200,000 were paid to him and deposited in his personal bank account.  The mandate to lobby the "National Assembly" seems far-fetched.  Moreover, despite the alleged payment of bribes, the Thanaleng Slot Club was not shut down.   In the circumstances, the Tribunal is unable to find "clear and convincing evidence" that a bribe was made or even offered through Mr. Anousith.   However, on the lower "probabilities" standard, the Tribunal concludes that it is more likely than not that a

---

[70] Amended Transcript, 5 September 2018, p. 15, 3-18.

[71] Testimony of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, pp. 12667-1268, Exhibit SRE-163:

    **Q. And then the next day, on July the 12th there was a withdrawal of a hundred thousand, correct, in cash?**
    A. It shows a withdrawal of a hundred thousand.
    **Q. What did you tell Mr. Anousith to do with that hundred thousand?**
    A. I didn't tell him to do anything with that money.
    **Q. I see.  Why did you think he took out a hundred thousand of the 193 you just sent him?**
    A. We paid him a fee, we didn't – it's his money to do with as he wishes.
    * * * * *
    **Q. Was his job to get a government minister to shut down the Thanaleng Slot Club?**
    A. No.
    **Q. What was it to do?**
    A. We had hired, we had hired him to lobby the national assembly to ask them to shut down the Thanaleng slot club.  (emphasis added)

bribe was paid to an unidentified Government official or officials in an unsuccessful effort to advance the Claimants' agenda at the Thanaleng Slot Club.

### 6.3.4.  Fourth Allegation – The Claimants Arranged for a Further $575,000 Bribe to Madam Sengkeo to Prevent Her from Testifying in These Proceedings

148.    In 2014, when the initial phase of these proceedings was pending, the Government sought to have Madam Sengkeo testify.  To that end, she was provided with a written assurance of immunity dated 7 May 2014, if she provided "information and documents related to offering of bribery to government of [sic] official(s) who were performing accounting audit activities at Savan Vegas and Casino Co., Ltd."[72]

149.    At a pre-hearing conference on 14 May 2014, the Claimants (amongst other matters) applied to the Tribunal to allow Mr. Baldwin to make a "personal loan" to Madam Sengkeo of US $575,000.[73]  Given the importance and sensitivity of Madam Sengkeo's evidence potentially to be given at the merits hearing, the Tribunal declined to give its permission for a US $575,000 loan to her from Mr. Baldwin.

150.    The initial hearing on the merits proceeded in Singapore in June 2014.  Madam Sengkeo did not attend to testify for the Government.

---

[72] Letter of Immunity from Government's Anti-Corruption Office dated 07/05/2014, Exhibit SRE-140:

**LETTER OF ASSURANCE**

**Re:  Protection of the rights and best interests of individuals who provide information for anti-corruption purpose**

The President of the Government Inspection Committee issues a Letter of Assurance for protection to Ms. Sengkeo Phimmasone, aged 60, a business person, residing at Xangkhou Village, Xaythany District, of Vientiane Capital.  The assurance of protection is for her contribution in the anti-corruption efforts by providing information and documents related to offering of bribery to government of official(s) who were performing accounting audit activities at Savan Vegas and Casino Co., Ltd.  In accordance with Article 08, Chapter I of the Law on Anti-Corruption, the Government Inspection Committee issues this Letter, and informs the ministries and organizations, provinces and domestic and foreign organizations to acknowledge based on this Letter of Assurance for Ms. Sengkeo Phimmasone, and this Letter serves as legal evidence.

[73] See evidence of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1391, Exhibit SRE-163, Respondent's Opening Submission, Slide 182.

### 6.3.4.1.  The Respondent's Argument

151.    Mr. John Baldwin, having been denied the Tribunal's permission, arranged for a third party, Mr. Gary Morris,[74] to make Madam Sengkeo a US $575,000 "loan" which was undocumented and was not in fact a loan,[75] but an inducement to keep Madam Sengkeo from testifying.  There is no evidence that the Claimants' loan of US $300,000 in July 2012 or the third party "loan" of US $575,000 of May 2014, being a total of

---

[74] Testimony of Mr. John Baldwin, Transcript, 16 June 2015 Hearing, SIAC Case No. ARB/143/14/MV, p. 213, Exhibit SRE-163:

> Mr. Branson: Mr. Baldwin, did you ever provide that additional loan guarantee of 575,000 to Ms. Sengkeo?
> **A. No**.
> Q. What did you do instead?
> **A. I asked one of my friends to lend her money on other assets.**
> Q. Did you guarantee that loan?
> **A. I did not have to.**
> Q. Mm?
> **A. I did not have to.**
> Q. Why not?
> **A. The assets that she pledged were of sufficient value that he was content with the loan that was made.**
> Q. Okay, so you arranged for her to get another loan?
> **A. Yes.**

[75] Amended Transcript, 5 September 2018, p. 43, 12-23:

> Q. When did Madam Sengkeo ask you for the $575,000?
> A. My recollection is perhaps two weeks before the [ICSID] hearing [in May 2014].  (p. 25, 16-18)
> * * * * *
> Q. I see.  So in May 2014, when your counsel asked this tribunal to allow you to pay her or lend – guarantee, rather, $575,000, what did you do after the tribunal refused to bless that?
> A. I started asking mutual friends, people that I know, to lend money, if they would lend – make her a loan.  (p. 27, 19-25)
> * * * * *
> Q. And what loan documentation did he get to secure that loan?
> A. My understanding, and my recollection, is that there are mortgages – there were mortgages given by Madam Sengkeo on significant pieces of real estate that she owned in Vientiane.  (p. 28, 8-13)
> * * * * *
> Q. – to ask Madam Sengkeo?
> A. No.
> Q. How about your good friend, Gary Morris, have you asked him to show you any loan documents that he has?
> A. No.
> Q. So the two people that, supposedly, are your good friends haven't produced any documents to you to produce to the tribunal?
> A. No.
> Q. Has she paid back the 575 to Mr Morris?
> A. I don't know.

US $875,000 has been repaid except for US $15,000, leaving US $860,000 not accounted for.[76]

### 6.3.4.2.  The Claimant's Argument

152.  Mr. Baldwin had a long-standing business relationship with Madam Sengkeo which, over time, developed into personal friendship.  It was perfectly normal for Madam Sengkeo to seek a personal loan and for Mr. Baldwin to arrange it.  There is no evidence whatsoever that the loan of US $575,000 or any part thereof was intended by Mr. Baldwin, or understood by Madam Sengkeo, as an inducement not to testify.  Madam Sengkeo,[77] who now lives outside Laos, was being improperly pressured by the Government to give false evidence to support its bribery and corruption case[78] and it is therefore quite understandable that she wished to avoid being a witness.  Mr. Baldwin's explanation of the loans to Madam Sengkeo is not rebutted and there is no evidence inconsistent with his version of events.

---

[76] Testimony of Mr. John Baldwin, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1392, Exhibit SRE-163:

> Q. Has Ms. Sengkeo paid any of that money back?
> A. I don't know.
> Q. It means that, as we sit here today, that you lent her 300,000, Mr. Morris, Mr. McCain's colleagues lent her 575, that's $875,000.  Has she paid you back?
> A. She paid me back 500,000 baht.
> Q. That's 15,000 US?
> A. Baht money.

[77] Mr. Baldwin testified to his friendship as follows:

> …but my friendship with Madam Sengkeo is – is - I mean, Madam Sengkeo and I had a great relationship.  I mean, it wasn't - she is my friend.  I mean, she - we went to many, many, many dinners.  I hung out with her family.  We – you know, she's my friend.  I mean, there was nothing untoward about my business relationships with her.

Amended Transcript, 5 September 2018, p. 38, 12-20.

[78] Mr. John Baldwin testified in re-examination:

> Q. What else did you hear from  Peep about Madam Sengkeo's situation?
> A. Madam Sengkeo has been under – it's been – what I've been told is that Madam Sengkeo has been under a great deal of pressure by the government of Lao to sign documents making allegations that were not true and she has been very worried about the consequences of this on not only just her economic state, her property holdings and even her personal safety –
> JUDGE BINNIE: When you say you have been told, who told you?
> A. Peep.  Peep told me, and the – madam – Peep [a Sanum employee] has expressed to me that Madam Sengkeo has expressed to her that she just feels there's an enormous amount of pressure and an enormous amount of personal harm that she is subject to if she doesn't do everything the government asks her to, whether it's true or not.  It's there – she says it's been stressed to her it doesn't matter that it's true; she needs to help the government of Lao in their efforts.

Amended Transcript, 5 September 2018, p. 161, 4-25.

### 6.3.4.3.  The Tribunal's Analysis

153.    The US $575,000 loan, coming on top of the previous loan of US $300,000, of which only US $15,000 were repaid bristles with "red flags".  Mr. Baldwin clearly intended to sidestep the Tribunal's denial of permission by arranging for the US $575,000 loan from a third party.  Given Madam Sengkeo's central role in dealings between the Claimants and the Government over many years, her testimony would have shed crucial light on the legality or illegality of many of the disbursements at issue in the Respondent's allegations.

154.    Mr. John Baldwin testified:

> Q. So when **Mdm Sengkeo withdrew US$80,000 in cash on July 20**, the day before you went to visit your good friend, the **Deputy Prime Minister**, what do you think she was going to do with those US dollars?
>
> A. It was Mdm Sengkeo's money to do what she wanted.  She represented to me that **she needed the loan to pay construction bills**.[79]  (emphasis added)

155.    It cannot be said that the bare payment of US $875,000 to Madam Sengkeo is "clear and convincing evidence" of bribery.  There is no evidence to contradict Mr. Baldwin's evidence of her need for funds.  There are other possible explanations for their disbursement.

156.    On the whole, however, while the Tribunal is unable to find "clear and convincing evidence" that the money was paid to Madam Sengkeo to bribe Government Ministers, the Tribunal is nevertheless satisfied on the lower standard of balance of probabilities that Mr. Baldwin and Madam Sengkeo were involved in channeling funds illicitly to Lao Government officials, and further that she was paid to secure her loyalty and to avoid her testifying on behalf of the Government, thereby obstructing justice.

157.    The coincidence of the timing of "loans" of US $875,000 (less one repayment of US $15,000) to Madam Sengkeo and the Claimants' urgent need for Government intervention on its behalf at critical junctures of its business (the termination of the E&Y audit and the attempt to shut down the Thanaleng Slot Club), together with Madam Sengkeo's role as the Claimants' principal go-between with the Government, which

---

[79] Amended Transcript, 5 September 2018, p. 23, 4-11.

Mr. Baldwin describes as a corrupt Government, compels an inference of Mr. Baldwin's unlawful conduct and through Mr. Baldwin, the culpability and bad faith of both LHNV and Sanum, on whose behalf he acted.

158. The Government's failure to track down bribe-takers or to provide a convincing explanation of its efforts (even if on occasion unsuccessful) to do so, weighs against the Government's case, although the fact that the key witness, Madam Sengkeo, herself refused to cooperate made the Government's task more difficult.

159. Possibly the Government prefers to spare itself some embarrassment by declining to put whatever it knows about "bribe-*takers*" into the record of the Tribunal.

160. Be that as it may be, the circumstances disclosed to the Tribunal do not rise to the level of "clear and compelling evidence" of corruption.

161. However, the Tribunal's conclusion that corruption of Government officials is established to the lower standard of "balance of probabilities" is relevant to the issue of the Claimants' good faith, which is dealt with below.

#### 6.3.5. Fifth Allegation – Bribery Scheme in June 2015 to Restore Control of Savan Vegas to the Claimants

162. The Respondent seized control of the Savan Vegas and gambling facilities on 15 April 2015. Its right to do so was eventually confirmed by an arbitral tribunal constituted under the SIAC by its Award dated 29 June 2017.[80]

163. Prior to the SIAC Award, however, the Claimants asserted a right under the 2014 Settlement to take back control[81] on the basis they had managed to sell their investments on the open market prior to the 15 April 2015 deadline imposed as a term of the

---

[80] SIAC Award dated 29 June 2017.

[81] Email from Mr. Gene McCain to Mr. John Baldwin and Mr. Shawn Scott dated 15 May 2015, Exhibit SRE-156:

> The Buyers have also made it clear that Sanum Investments Ltd. must be given back control of the management of the Casino for the Buyers to regain confidence that the Laos government will honor the Deed of Settlement and so that Sanum can be given time to get the revenue and operations back to where they should be. The Buyers are [sic] require that the Deed of Settlement be reinstated and that the terms of the Deed are followed.

Respondent's Opening Submission, Slide 195.

Settlement with the Government.  The allegedly genuine third-party offer to purchase dated 14 April 2015 was from an entity called **MaxGaming Consulting Services Limited (Macau) ("MaxGaming")**.[82]  Its CEO, Mr. Angus Noble, represented in writing that MaxGaming had funds available to complete the transaction and intended to do so.[83]  In testimony before the SIAC tribunal in January 2017, Angus Noble acknowledged that these representations were false.[84]  He repeated this retraction to this Tribunal at the Hearing.  The MaxGaming transaction did not proceed and was found by the SIAC tribunal to be a sham.[85]  Having heard Mr. Noble's evidence, this Tribunal also concludes that the 14 April 2015 offer was a sham.  Indeed Mr. Noble more or less concedes that it was a sham.

### 6.3.5.1.  The Respondent's Argument

164.  The MaxGaming offer was a fraudulent scheme perpetrated by the Claimants in order to regain control of Savan Vegas[86] from the Government.  The Claimants had every

---

[82] Email and attachment from Mr. Tucker Baldwin to Mr. Gene McCain dated 10 June 2015, Exhibit SRE-157:

> I, the undersigned, hereby acknowledge that Sanum Investments Co., Ltd. is aware of and supportive of Mr. Eugene McCain and Mr. Ben Gersten acting on behalf of Maxgaming Consulting Services, Ltd. in their efforts to resolve the Savan Vegas and Gaming Assets dispute such that the terms of the Deed of Settlement and the original PDA and Land Concession rights are reinstated and implemented on terms which will allow Maxgaming to complete their purchase of Savan Vegas Casino.

[83] Letter from Mr. Angus Noble to Mr. John Baldwin and Mr. Shawn Scott dated 29 April 2015, Exhibit SRE-155:

> I have reconfirmed that our funds are available and allocated for this acquisition.  My partners in the acquisition are eager to complete the purchase and move forward on their plans for expanding and upgrading the facilities.  With the major changes in the Macau gaming industry, our acquisition of Savan Vegas could not be better timed.

[84] Testimony of Gus Noble, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, p. 1484, Exhibit SRE-163:

> **Q. Is any of that true?**
> A. No, it is not.
> **Q. Wasn't true?**
> A. No.

Respondent's Opening Submission, Slide 190.  See also Testimony of Gus Noble, Transcript, 26 January 2017 Hearing, SIAC Case No. ARB/143/14/MV, pp. 1493-1494, Exhibit SRE-163:

> **Q. They say your financial backers.  At that time you didn't have any financial backers, did you, June 9, 2015?**
> A. No, I did not.

Respondent's Opening Submission, Slide 199.

[85] SIAC Award dated 29 June 2017.

[86] Email and clean copies of Gersten's Consulting Agreement, Exhibit SRE-158, Respondent's Opening Submission, Slide 186.  Consultants were retained to advance the transaction for success fees totaling US $11 million.

interest in pre-empting the Government's seizure of Savan Vegas and putting a halt to the Government's access to the books of Savan Vegas and records targeted by a Government audit into alleged wrongdoing at Savan Vegas including money laundering and embezzlement.

### 6.3.5.2.  The Claimant's Argument

165.    While unrealistic, Mr. Noble genuinely believed he could orchestrate the purchase, which he testified was, for him, "the chance of a lifetime."

### 6.3.5.3.  The Tribunal's Analysis

166.    The MaxGaming offer was indeed a sham, but bribery and corruption, as opposed to fraud and chicanery, is not established.

### 6.3.6.  Sixth Allegation – Miscellaneous Acts of Bribery and Corruption

167.    Other allegations of bribery and corruption were made:

    (a)      offer of a US $7 million bribe to the Prime Minister of Laos for approval of a licence to establish a casino in the capital city of Vientiane;[87]

    (b)      a bribe of US $80,000 to the Governor of the Province of Champasak to approve a slot club at Chong Mek;[88] and

    (c)      bribes totalling US $106,000 to Government officials to enable the opening and continued operation of the Paksan Slot Club.[89]

There is no "clear and convincing" evidence against the Claimants in support of any of these additional claims of bribery and corruption.

---

[87] Respondent's Counter-Memorial, para. 97.
[88] Respondent's Counter-Memorial, paras. 100-101; Respondent's Rejoinder, paras. 21-22.
[89] Respondent's Counter-Memorial, paras. 102-104.

168.    As the Claimants point out, the Respondent has identified only two possible Government bribe takers, namely Mr. Bounnong (but there is no indication he has been investigated) and Madam Manivone.  The evidence is that Madam Manivone was put under investigation only after refusing to testify for the Respondent.[90]  The Claimants state that on 29 May 2014, the Respondent promised its Rejoinder would reveal the results of its investigation.  It did not.

169.    The Claimants complain, rightly, that the Respondent's failure to offer any credible explanation for not pursuing the investigation of its own employees, or indeed even to attempt to identify the alleged bribe-takers, weighs against the credibility of these miscellaneous allegations.[91]

170.    Nevertheless, in the Tribunal's view, none of these additional allegations is supported by sufficient evidence to warrant further inquiry or comment.

### 6.4.  The Claimant's Lack of Good Faith

171.    Much of the Claimant's case rests on the allegation that it proceeded in all respects in good faith but was thwarted at every turn by a corrupt and devious Government acting in bad faith.  On the contrary, the evidence is clear that the Claimants dealt in bad faith with the Government from the initial signing of the Paksong Hotel and Casino PDA calling for a US $25 million hotel and casino to the financial irregularities in the operation of the Savan Vegas Hotel and Casino.  The Claimants never intended to build a US $25 million facility in Paksong.  From the Claimants' perspective, the benefit of

---

[90] See the Respondent's email to the Tribunal dated 29 May 2014, Claimants' Closing Submission, Slide 12.

[91] The Claimants cite *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, CLA(LH)-070, which rejected the Government's bribery defence in part for failure to show the implicated Government official was investigated and prosecuted:

116. Although the Tribunal believes Minister Sultan's testimony that he was not personally aware that "Mr. Kandil was an agent to Farargy" and that when he did learn about it, "I passed that to the prosecutor requesting a full-fledged investigation", it is undisputed that Mr. Kandil was never prosecuted in Egypt in connection with this agreement.  Regrettably, because Egypt has failed to present the Tribunal with any information about the investigation requested by Minister Sultan, the Tribunal does not know whether an investigation was conducted and, if so, whether the investigation was closed because the prosecutor determined that Mr. Kandil was innocent, because of lack of evidence, or because of complicity by other government officials.  Nevertheless, given the fact that the Egyptian government was made aware of this agreement by Minister Sultan but decided (for whatever reasons) not to prosecute Mr. Kandil, the Tribunal is reluctant to immunize Egypt from liability in this arbitration because it now alleges that the agreement with Mr. Kandil was illegal under Egyptian law.

the Paksong PDA was a monopoly to block other more serious investors from offering gambling facilities in Champaska and Salavan Provinces.   Having obtained the monopoly, the Claimants attempted to force the Government's hand in relocating the project to what, from the Government's perspective, was a much less attractive site. The bad faith continued through the disputes over the Savan Vegas Hotel and Casino, which was built but operated in defiance of Sanum's reporting obligations to the Government (and, when the books were eventually opened, revealed significant financial irregularities).   The bad faith continued further up to its recent efforts to deter Madam Sengkeo's appearance to testify at the merits proceeding and the sham MaxGaming offer to purchase Savan Vegas in April of 2015.

172.    The principle of good faith arises in investment treaty arbitrations in various contexts. Tribunals, of course, regularly refer to Article 31(1) of the VCLT for the rule that treaties shall be interpreted in good faith.   The obligation extends to a duty of parties to arbitrate in good faith.[92]   In *Phoenix v. Czech Republic*, the tribunal referred to Phoenix's "initiation and pursuit of this arbitration" as "an abuse of the system of international ICSID investment arbitration."[93]   (The tribunal found an abuse of rights in that case by the "claimant's creation of a legal fiction in order to gain access to an international arbitration procedure to which it was not entitled."[94])

173.    The Tribunal listened carefully to the testimony of Mr. John Baldwin and found him to be an argumentative witness who preferred evasion to candour. Much of his testimony was simply not credible.   He proceeded in bad faith from the outset in assuring the Government that he intended to invest US $25 million at the Paksong site, which by his own account was likely to be highly unprofitable.

174.    Mr. Baldwin is the directing mind of both Claimant companies.  His conduct throughout was to advance their corporate interests.  His bad faith conduct is their conduct.  While

---

[92] *Libananco Holdings Co Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Final Award, Exhibit CLA-168, where good faith was discussed in the context of the alleged interception and surveillance by Turkish police of legally privileged communications between the claimant, its counsel and witnesses.   See also Born, *International Commercial Arbitration* at pp. 1008-1014 and *Methanex Corporation v. United States of America*, UNCITRAL (1976), Final Award, Exhibit CLA-259.

[93] *Phoenix Action, Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, at para. 144, Exhibit RA-25.

[94] *Ibid.*, para. 143.

the Government's conduct was at times aggressive and inappropriate in relation to the Settlement (as documented, for example, in the Second Material Breach Application), nevertheless the Claimant failed to establish that the Government acted in bad faith in relation to the investors or the investments.

175. It is well established that the bad faith conduct of the investor is relevant to the grant of relief under an investment treaty.[95]

176. To summarize, the particular acts of bad faith by Mr. Baldwin on behalf of the Claimant of most concern to the Tribunal are:

(a) misrepresentations made to the Government to obtain Paksong Hotel and Casino PDA on the strength of a promise to make a US $25 million investment on the site which, in the Tribunal's view, the Claimants never intended to pursue;

(b) likely making illegal payments to Government officials to stop the E&Y audit of the Savan Vegas Hotel and Casino;

(c) likely attempting to obstruct justice with the payment of US $875,000 to Madam Sengkeo directed, as to US $575,000, to the obstruction of the due process of this arbitration by paying Madam Sengkeo not to testify;

(d) attempting to mislead the Treaty Tribunals with the sham offer to purchase the Savan Vegas from MaxGaming Consulting.[96]

177. As will be seen, the Claimant's claims for expropriation fail on the facts. However, having listened to Mr. Baldwin's explanations over several hearings of his dealings

---

[95] See UNCTAD Series on International Agreements III, *Fair and Equitable Treatment* (2012) at pp. 83-85:
   Investor conduct has emerged as a relevant factor in the analysis of FET claims by arbitral tribunals. It may be relevant in two ways. First, **it may justify the measure taken against the investor by the respondent country**. Thus in *Genin v. Estonia*, the tribunal found that the Estonian national bank had good reasons to revoke the operating license of the claimant's investment because the claimant had failed to disclose relevant facts. In such cases, the adverse measure serves as a State's reaction to, or a sanction for the investor's conduct…**Fraud or misrepresentation on the part of an investor may form the basis of a legitimate regulatory interference with its rights. In such cases, even the outright termination of the investment may be justified, provided it is a proportionate response to the investor's conduct in light of the relevant domestic laws of the host State**…in some situations, an investor's own conduct may be held to be a cause for the harm suffered.
[96] Although the MaxGaming incident occurred after the date of Settlement, it was fully debated at the Hearing and formed part of the corpus of the bad faith allegations.

with Laos, the Tribunal wishes to leave in no doubt its conclusion that Mr. Baldwin and Sanum exhibited manifest bad faith in various efforts not only to manipulate the Government to advance their gambling initiatives but, in the instance of Madam Sengkeo, to manipulate the arbitration process itself.

## 7.    THE CLAIM FOR EXPROPRIATION

### 7.1.  Thanaleng Slot Club

#### 7.1.1.  Background

178.   At its origin, the dispute underlying the Thanaleng claim is a contractual dispute between two private parties, Sanum and ST.  They had signed a **Master Agreement** on 30 May 2007, where they agreed "to negotiate and work towards entering into certain joint ventures, represented by necessary agreements, which shall convey 60% of all 2nd Party's [ST] gaming businesses located in the country of Lao PDR … This Agreement is not intended to be a definitive agreement but only provides the Parties' general understandings of their relationship.  The Parties agree to work together in good faith to negotiate and finalize all necessary agreement to fully implement the concept and terms set forth in this Agreement."[97]   The Respondent's treatment of the Thanaleng situation is part of the "totality of the facts" said by counsel for the Claimants to be relevant to Sanum's Treaty claims.[98]

179.   On 4 October 2008, Sanum and ST signed a Participation Agreement for Thanaleng ("**Participation Agreement**").  Under this agreement, Sanum agreed to supply to ST certain slot machines, on a "generated revenue sharing/participation basis."[99]   This agreement was meant to expire on 11 October 2011 when an existing contract of ST with another supplier of slot machines expired.  As explained by Sanum, "the expiration of the Participation [Agreement] is only the end of percentage of profit distribution and proportion of shareholding of each party in the business participation of the Slot Club, which shifted from ST Group who used to receive 60% to receive 40% instead, and

---

[97] Master Agreement, Exhibit C(B)-1.

[99] Participation Agreement, Exhibit C(B)-6.

Sanum who used to receive 40% to receive 60%, and at the same time (after 11 October 2011) there shall change or create a joint venture company of which Sanum holds 60% and ST Group 40%.”[100]

180.    The controversy arose because Sanum and ST disagreed on whether the Master Agreement remained in force and was valid and created binding obligations on the parties, despite the expiration of the Participation Agreement.  Was the Participation Agreement a temporary agreement just to cover the period of time when other slot machine supplier contracts were in place?  Once those machine supplier contract expired on 11 October 2011, did the Master Agreement and other agreements referenced above remain in effect and control the contractual relationship between Sanum and the ST Group?[101]

### 7.1.2.  The Claimants' Argument

181.    The Claimants argue that they were deprived of their investment by flawed court proceedings tainted by interference by the Respondent and without payment of compensation.  The Claimants summarize the measures for which they seek relief as follows: “Beginning with premature termination of the OEDR proceedings on orders from the Minister of Justice, and police participation in Sanum's eviction from the Thanaleng Club, and ending with manifestly unreasonable judgments rendered by the courts of Laos, Respondent directed a result in favor of ST that deprived Sanum of its entitlement to 60% of the revenues generated by its investment in the Thanaleng Slot Club.  The entire process was marred by manifest procedural defects, as well as producing a result that was substantially unreasonable.”[102]

182.    At the closing of the Hearing, the Claimants confirmed that their Thanaleng claim in this proceeding is not based on denial of justice but on the allegation that the totality of

---

[100] See Sanum's Defense and Counterclaim in the proceedings before the Lao Commercial Court dated 3 July 2012, Exhibit C(B)-181.

[101] *Ibid*.  The term “supplier contract” is used in singular or plural indistinctly in the original text.

[102] Claimants' Closing Submission, Slide 25; Amended Transcript, 7 September 2018, p. 23, 21-25 to p. 25, 8-21.

the Respondent's treatment substantially deprived the Claimants of the enjoyment of their investment without the payment of compensation.[103]

183. The Claimants insist that Sanum did have an ownership interest in Thanaleng as established in the Master Agreement, and invested millions of dollars in Thanaleng. The Claimants argue that the Respondent's interpretation of the Master Agreement is contrary to the understanding and conduct of the parties to this agreement; it was a binding agreement that contemplated future negotiations between Sanum and a would-be supplier of slot machines and not between Sanum and ST. The fact that the Master Agreement contemplated additional agreements does not detract from its binding character. The Claimants point out that when ST sought the judicial annulment of the Master Agreement, the document was described as the "basic agreement defining rights in order to manage the relations between both parties."[104]

184. The Claimants dispute the relevance of the cases relied on by the Respondent because in the instant case the Respondent consistently treated the Master Agreement as legally binding, "[o]nly Laos – for the first time in these proceedings – has ever characterized the Master Agreement as an agreement to agree that did not generate legally enforceable rights."[105]

185. According to the Claimants, ST refused repeatedly to accept payment in exchange for a contractually-required exchange of rights which did not extinguish the rights of Sanum, "but merely constituted another breach by ST of its obligations to relinquish control of the club to Sanum."[106]

### 7.1.3. The Respondent's Argument

186. The Respondent submits that the decision of the Lao Courts concerns a private dispute between ST and Sanum and there was nothing untoward in the various judicial proceedings in Laos. According to the Respondent, the Claimant has committed abuse of process by pursuing contradictory claims in parallel arbitrations against Laos based

---

[103] Claimants' Closing Submission, Slide 68.
[104] Claimant's Reply, para. 37.
[105] *Ibid.*, para. 39.
[106] *Ibid.*, para. 48.

on the same treaties and the same economic interests.  In this respect the Respondent, at the Hearing, recounted the timeline of the procedure:

> We have in July 2012 the decision of the Lao Commercial Court. Immediately, before they exhausted their local remedies, which they are required to do under international law, they filed this arbitration alleging that the Thanaleng court decision was a denial of justice and an expropriation. Later they amended to say it's an expropriation.
>
> In June 2015, there was a decision by the LHNV tribunal on the first material, the breach application.  They didn't prevail.
>
> Three months later, they filed the SIAC arbitration against ST on the same contracts, alleging that the Lao court proceedings had no meaning, they were just -- how would one say it?
>
> One would say their view of the Lao court proceedings in Singapore was that they were a voluntary mediation.  If you don't like the result of a mediation, you withdraw and you go to court.  That's how they're treating the Lao court proceeding when they go to Singapore: it didn't matter, is it wasn't definitive.
>
> So, they get an ST SIAC Award in August 2016.  They filed it in the Lao courts in 2017.
>
> Then the Lao courts refused to enforce it in August 2017.  On 1 September 2017, they filed a denial of justice claim in the new ICSID arbitration.  Then in December 2017, the second material breach application was granted, reinstating this tribunal to hear the Thanaleng case again.
>
> So they have these conflicting – once you issued the second material breach decision, it revived these two treaty claims that are in conflict with the treaty claims they had filed in September 2017.[107]

187.    The Respondent further explained:

> Sanum said in these cases that the 26 July 2012 decision of the court was expropriation number one.  They said their rights were expropriated, that's the claim here, and they filed the first BIT claims in August 2012.
>
> But the second BIT arbitration says that the date of expropriation was August 2017 when the Lao courts refused to enforce the SIAC award, and that's the subject of the second BIT arbitration.
>
> So you have these inconsistent claims made by the same claimant under the same   treaties, based on the same facts.  We say that's an abuse of process.[108]

### 7.1.4.  The Tribunal's Analysis

188.    The Thanaleng claim relates to a dispute between the Claimants and ST.  It concerns the Respondent only to the extent of the Respondent's alleged interference in court

---

[107] Amended Transcript, 3 September 2018, p. 143, 6-25 to p. 144, 1-17.
[108] *Ibid.*, p. 145, 5-19.

proceedings, and only if its actions could be characterized as a violation of international law.

189.   The Claimants have placed the weight of their argument on the alleged interference of the Respondent in the Lao Commercial Court proceedings in 2012.  But the dispute resolution provision in the Master Agreement (Article 2.10)[109] provides for a four-stage mechanism.  At the fourth stage, after a party to the Master Agreement has exhausted the remedies available in the Lao Courts, it may submit the dispute to arbitration if it is unsatisfied with the result without the need to demonstrate a breach of due process or other violations in the conduct of the court proceedings.

190.   The Claimants also explained that the four-step mechanism provided for in the Master Agreement has been found to violate Lao law and, therefore, "any award rendered under the mechanism that differed from the judgment of the Lao Courts would [not] be enforceable in Laos (the only country where the ST's assets are now located) as a matter of Lao public policy.'"[110]

191.   Sanum has exercised in full the four levels of remedies provided for in the Master Agreement.  After exhausting its recourse to the Lao Courts, Sanum initiated the SIAC arbitration in 2015. In 2016, the SIAC tribunal awarded Sanum the $200 million it had claimed.

192.   The Claimants say that they have not been able to enforce the SIAC award and link the inability to enforce it to the alleged interference of the Respondent in the Lao Commercial Court in 2012.  As explained by the Claimants at the Hearing:

> The problem is, looking at the totality of the circumstances, the Lao Court of Appeals – and that's the highest level in an enforcement proceeding – won't

---

[109] "If any dispute shall arise, the Parties agree to conduct an amicable negotiation.  If such dispute cannot be settled by mediation, the Parties may submit such disputes to the Resolution of Economic Dispute Organization or Courts of the Lao PDR according to the provision and law of Lao PDR in accordance with this Agreement.  All proceedings of the arbitration shall be conducted in Lao and English languages.

Before settlement by the arbitrator under the Rules of the Resolution of Economic Dispute Organization, the Parties shall use all efforts to assist the dispute resolution in accordance with the laws of Lao PDR.

If one of the Parties is unsatisfied with the results of the above procedure, the Parties shall mediate and, if necessary, arbitrate such dispute using internationally recognized mediation/arbitration company in Macao, SAR PRC."  Master Agreement, C(B)-001.

[110] Claimant's Closing Submission, Slide 69.

allow enforcement of the SIAC award and so the original action that the government took in ramming the original decision through to benefit ST and forcing claimants to have to go to that additional stage, to have to go to the fourth stage, that allowed ST the time to move all of its assets back into Laos and put the claimants in a position where they would be dependent on going to Laos to enforce the award against ST where the same thing, or worse, could happen.  So, there was a distinct consequence at the stage of the measure relating to the Thanaleng proceeding in 2012.

Even if the claimant could then go on to the SIAC proceeding, which it did, there was still a consequence and there was still harm caused by that action, because being able to go to the fourth tier, that didn't right the ship.  That didn't enable Sanum to have a clear path to recovery.  So there's still consequences to what the government did in 2012."[111]

193.   The Claimants want to skip over the fact that Sanum has a valid arbitral award against a private party in which it was awarded 200 million dollars after it exhausted the remedies in the Lao Courts for the alleged interference of the Respondent in the Lao Commercial Court back in 2012.  The alleged inability to enforce the award is not before this Tribunal and it has not been proven by the Claimants that "there was a distinct consequence [of the Government's alleged interference] at the stage of the measure relating to the Thanaleng proceeding in 2012."[112]  There is simply no persuasive evidence that the alleged interference of the Respondent in the proceeding of a lower court interfered with the steps taken by the Claimants to exercise their rights under the Master Agreement and, in particular, their recourse to SIAC arbitration.

194.   The Claimants say their claim in the SIAC arbitration was not for the full amount of the value lost in Thanaleng.  The Claimants explained why Sanum capped its claim for damages:

in part because ST did not appear and that raised the issue of whether or not they were going to hide assets, such that it was fruitless to seek the full value of Thanaleng.  The full value of Thanaleng, I know we're bifurcated so we're not going to talk very much about those kind of things, but the full value of Thanaleng is more than 400 million in order to not have the fees, and in light of the practical recognition that ST was likely hiding its assets, we capped the SIAC claim at 200 million.  So it won't be possible to recover the full amount from ST to cover the cost of the damage that the government caused by directing the Thanaleng case in Laos.[113]

---

[111] Amended Transcript, 7 September 2018, p. 40, 19-25 to p.41, 1-17.
[112] Amended Transcript, 7 September 2018, p. 41, 7-9.
[113] Amended Transcript, 3 September 2018, p. 125, 3-16.

195.   The Respondent is not responsible for the decision of the Claimants to self-limit the amount of the claim against ST.  The evidence does not establish any improper interference by the Respondent in the court proceedings.

196.   In sum, the Tribunal concludes that the claim for expropriation in respect of the Thanaleng investment lacks any merit.

### 7.2.  Paksong Vegas Hotel and Casino

#### 7.2.1.  Background

197.   On 10 August 2007, a Project Development Agreement was concluded between Lao PDR, and Sanum, the Laotian company Nouansavanh Construction Co. Ltd., and Mr. Sittixay Xaysana for the development of the Paksong casino ("**Paksong PDA**").  Under the Paksong PDA, a Laotian entity, Paksong Vegas and Casino Co. Ltd., was set up with Lao PDR holding 20%, Sanum 60% and the ST entities 20%.  The Paksong PDA required the Company to build and operate a $25 million hotel casino and golf resort in the Paksong district of Champasak Province.

#### 7.2.2.  Location of Paksong

198.   As explained by the Claimants, the location was challenging:

> "The challenges were both logistical and commercial. Logistically, Paksong's location meant that transportation of construction materials would be more costly than at the Savan Vegas site, as access to the site was more difficult and time consuming, and that other construction costs would be significantly higher than those of Savan Vegas. Also, the concession was located on the side of a large hill which precluded the building of simple, large buildings to house the hotel and casino and other amenities. Commercially, since Paksong was not located on the border with Thailand or even in a population center in Laos that was easy to access, it lacked a readily identifiable customer base. The challenges of attracting customers made it difficult to identify the optimal type of facility to construct on the site."[114]

---

[114] Statement of Claim, para. 63.



*(Respondent's Opening Submission, Slide 96)*

199.    Mr. Baldwin testified about the problem posed by Paksong's distance from the Thai border:

>    Another challenge posed by Paksong Vegas had to do with its customer base. Because Lao citizens generally are restricted from playing table games, the customer base for our casinos consists largely of Thai citizens who live in Northeastern Thailand.  However, because Paksong Vegas would be located deep in Laos's interior, without easy access to the border, we were concerned that it would be difficult to attract customers to the casino. [115]

200.    These challenges notwithstanding, Mr. John Baldwin testified that the Paksong project package "came with very valuable benefits. Chief among these were the monopoly gaming rights in Champasak and Salavan Provinces granted to Paksong Vegas under the PDA."[116]

201.    Due to the challenges posed by the site, on 31 March 2008, Paksong Vegas proposed to the provincial government, *inter alia*, to move the entire project to the area near Chong Mek.   On 29 April 2008, the proposal was rejected by the provincial government.

202.    On 21 August 2008, the office of the Prime Minister advised that Paksong Vegas was to return Paksong and pursue only the project at Khone Phapheng (where the Government also favoured development) together with other interested parties.  The

---

[115] First Witness Statement of Mr. John Baldwin, 1 October 2013, para. 32.
[116] *Ibid.*, para. 64.

notice from the Champasak Provincial Office requested Sanum "to follow the agreements already reached by higher authority and only do the work at Kilometer 30 in Paksong. (According to instructions from the Government Secretariat, if the company cannot comply, then the project must be placed on hold for now)."[117]  The notice added that "[i]t is not approved to open casino branches in Paksong and other places, only at Khone Phapheng.  The Paksong land (Kilometer 30) will be returned to the Government."[118]

203.   On 23 October 2008, the Prime Minister's Office issued a notice, purporting to strip Paksong Vegas of its monopoly rights.  The Prime Minister's Office also reiterated that Yingsoksay, the operator of the existing hotel and resort in the area, could look for other foreign investors to develop Khone Phapheng; Paksong Vegas could participate in that development if it chose to do so, but either way, according to the Prime Minister's Office, it no longer had the exclusive right to do so.  Further, on 19 December 2008, Champasak provincial authorities instructed Paksong Vegas to return the land concession it had been granted so it could be used for "another purpose," referencing the Prime Minister's 21 August 2008 notice.[119]

204.   On 30 January 2009, a meeting was held in the MPI's offices.  It was attended by all Lao agencies concerned and Paksong Vegas.  The Paksong Vegas and Casino Development Project and the Khone Phapheng Entertainment Complex Project Development were discussed.  The Tribunal will re-visit this meeting in its analysis.

205.   On 27 April 2010, the MPI terminated the PDA because Paksong Vegas had not signed a land concession agreement in accordance with Article 4 of the PDA, and construction on the project had been delayed for more than two years, which affected the "social-economic development plan of Champasak province."[120]  Termination of the PDA was re-affirmed by the Respondent on 10 April 2012.

---

[117] Notice from Champasak Provincial Office conveying denial of the proposed relocation of "higher authority". Exhibit C(S)-309.
[118] Exhibit C(S)-311.
[119] *Ibid.*, para. 76.
[120] Statement of Claim, para. 82.

### 7.2.3.  The Claimant's Argument

206. The dispute concerns the termination of the Paksong PDA and the revocation of the concomitant land concession.  For the Claimant, the actions of the Respondent constitute an expropriation under Article 4 of the BIT.  The Claimant argues that the Respondent ignores the evidence that Lao authorities had ordered Sanum to cease construction and two years later without prior notice cancelled the PDA on grounds of failing to develop the land.

207. The Claimant questions the Respondent's defence to the expropriation claim.  First, there is no contemporaneous evidence that Sanum repudiated the PDA when it proposed to relocate.  Second, the Respondent ignores the work done by Sanum.[121] Third, the contention that Sanum lacked necessary funds has never been raised before, and the Respondent has not followed the PDA's procedures to establish "financial inability".  Fourth, cancellation to avoid the Claimant's monopoly rights does not absolve the Respondent from the claim of expropriation.

### 7.2.4.  The Respondent's Argument

208. The Respondent claims that Sanum was not a ready, willing and able investor for the Paksong project.  According to the Respondent, Sanum forfeited the concession because the location was not commercially acceptable.  The Respondent explains that Paksong and Savannakhet were linked; they were part of a bargain: whoever would develop Savannakhet, an excellent commercial site, must also develop the less attractive Paksong. According to the Respondent, Paksong is in the Champasak province and, in addition to Paksong, two other locations in that province are mentioned in the record: Chong Mek and Khonephapheng.  The Respondent contends that Sanum was only interested in Chong Mek, but not in either of the other sites.  The provincial government was keen to develop the remote areas while Sanum was interested in more profitable sites; the interests of Sanum as a commercial developer and of the provincial government were not aligned.

---

[121] See slide 20 of Claimant's Opening Argument.

209.    The Respondent argues that it is impossible to read into the Paksong PDA the right claimed by Sanum to build other casinos or slot clubs.  The PDA gives Sanum the exclusive right to operate in the provinces covered by the PDA, which simply means "no one else would be allowed to build a casino or slot club in those provinces."[122]  The Respondent affirms that there has never been an additional casino or slot club.  There has not been expropriation of "monopoly rights".[123]  According to the Respondent, Mr. Baldwin's assertion that Sanum could not build at Paksong because the Government "would no longer respect its monopoly rights" is frivolous.  Mr. Baldwin refused to develop Paksong because he did not want to lose money on a project doomed to commercial failure."[124]

### 7.2.5.  The Tribunal's Analysis

210.    The issues to be addressed by the Tribunal may be formulated as follows:  Was the act of termination of the PDA an expropriatory measure or the exercise by the Respondent of its right to terminate the PDA for failure of Paksong Vegas to meet its obligations?  In addition, what weight should be given to the allegation that the procedure for termination provided for in Article 19 of the PDA was not followed?

211.    First of all, what were the rights of Sanum in Paksong Vegas?  In its Reply, the Claimant notes that "Laos does not dispute that Claimant possessed property rights through Paksong Vegas that could be subject to expropriation, most notably, the valuable monopoly rights in Champasak Province acquired pursuant to the Paksong Vegas PDA."[125]  The Respondent did not question this understanding of the Claimant in the Rejoinder or the Opening Statement at the Hearing. However, at the closing, the Respondent argued that the Claimant had no cognizable property right based on the definition of the term "Land Map" in the PDA.[126]  This definition explains that the seal of the Government Agency affixed to the land lease demonstrates "<u>conclusively that</u>

---

[122] Respondent's Rejoinder, para. 91.
[123] *Ibid.*, para. 91.
[124] *Ibid.*, para. 97.
[125] Reply, para. 133.
[126] Respondent's Closing Statement, slide 30.

the right to lease that piece of land belongs to the company."[127]  But the company as defined in the PDA means the parties to the Paksong PDA, one of which is the Claimant.

212.  Second, what is the extent of Paksong Vegas's monopoly rights in Champasak province?  As confirmed by Mr. Baldwin's testimony at the Hearing, Mr. Baldwin wanted to develop a site at Chong Mek. He agreed that the monopoly rights were limited to the Paksong development area and did not include Chong Mek, "unless the government agreed to modify this.  The way it's written right now, it does not include Chong Mek but it doesn't say we can't ask for modifications."[128]  Mr. Baldwin also confirmed that he really knew that the Government policy was not to approve a move to Chong Mek.

213.  Third, did Paksong Vegas forfeit its rights when the Claimant informed the Lao Government that it did not wish to pursue the project at Paksong?  The Claimant has explained that the proposal of 31 March 2008 remained subject to Government approval.  On 29 April 2018, the Government rejected the proposal and instructed Sanum to "follow the agreements already reached by higher authority and only do the work at Kilometer 30 in Paksong.  (According to instructions from the Government Secretariat, if the company cannot comply then the project must be placed on hold for now)."[129]

214.  The terms of the notice rejecting the proposal affirm that at the time, the Government's intention was not to terminate the PDA, but to request that the existing agreements be respected, and only if the company could not comply, to stop the project for the time being.  The Respondent has argued the Claimant's forfeiture of the rights of Paksong Vegas in this proceeding in 2014, six years later.  If this would have been the case, it would not have been necessary for the Government to terminate the PDA in 2010.

215.  Was the Respondent entitled to terminate the PDA in 2010?  Sanum has argued that it had been asked to stop work at Paksong and that was the only reason why the work was

---

[127] Underlined in red in the original. PDA, SRE-4, para. 9.
[128] Amended Transcript, 4 September 2018, p. 216, 19-22.
[129] Exhibit C(S)-309, Notice from Champasak Provincial Office to Champasak Division for Planning and Investment, dated 29 April 2008.

behind. However, the minutes of the meeting held on 30 January 2009 show that the meeting chair "cited many deficiencies of the company [Paksong Vegas] in its performance of the contract."[130]  More significantly, among the unanimous resolutions reached at this meeting, Paksong Vegas accepted that "in the past it has not carried out the Paksong Vegas project as scheduled in the contract and as it was presented to the Province."[131]  According to the minutes: "The meeting agreed to have Paksong Vegas and Casino Co., Ltd. to follow instructions in Lao Government Notice No. 1469/GS, dated 21 August 2008 and Notice No. 1887/GS, dated 23 October 2008.  The main points of discussion were: not to approve opening branches of the Casino in Paksong and other areas, but to allow casino operations only in Khone Phapheng Development Project.  The land in Paksong Development Project (KM30) is to be returned to the Government.  No exclusive rights are to be granted, and the agreement with Paksong Vegas and Casino Co., Ltd is to be revised."[132]

216.   The Tribunal observes that the Claimant admitted, at the meeting of 30 January 2009, that "it has not carried out the Paksong Vegas project as scheduled in the contract and as it was presented to the Province."  Mr. Baldwin also testified at the Hearing that no contract to build a $25 million five-star hotel with a casino and nightclub was ever signed.[133]

217.   What is the significance of the lack of notice by the Respondent to Paksong Vegas under Article 19 of the PDA?  According to Article 19, notice was required indicating the non-performance and giving 90 days to correct it. It is undisputed that the Respondent did not give notice to Paksong Vegas of non-performance of the obligations under the PDA.  But Paksong Vegas had not made the investment it had promised in the PDA within the expected timeframe as admitted by Paksong Vegas.  It had also agreed at the meeting of January 30, 2009 to operate a casino in Khone Phapheng, and "[a]s for the Paksong project, the company is happy to follow the government's guidance."[134]  As recorded in the same meeting, the Government's guidance was to

---

[130] Exhibit C(S)-320. Minutes dated 6 February 2009.
[131] *Ibid*.
[132] *Ibid.*
[133] Amended Transcript, 5 September 2018, p. 63, 4-7.
[134] Minutes dated 6 February 2009, p. 2, C(S)-320.

return the land to the Government.[135]  In the circumstances, the Tribunal finds there was no need for Paksong Vegas to be further notified.  The Respondent had been clear in that the PDA would need to be revised and Sanum had agreed to revise it.  The Claimant had not complied with the terms of the PDA and could not reasonably keep its monopoly rights indefinitely while at the same time maintaining that the development of Paksong was a losing proposition not worth a US $25 million investment.  **Mr. Baldwin confirmed at the Hearing that no contract to build a $25 million five-star hotel with a casino and nightclub was ever signed.[136]**

218.    The Tribunal finds that the Claimant lost its rights under the PDA because it breached its terms and, by its own admission, the Paksong site could not be developed.  This Claimant's admission contradicts its argument that work was being done and, if not done, was due to the Government order to stop the work.  The loss of Paksong was not an expropriation, it was termination for breach of contract.  The monopoly rights cherished by Sanum had a concomitant obligation to invest, which Sanum admits it did not fulfil.

### 7.3.  Paksan Slot Club

#### 7.3.1.  Background

219.    As told by Sanum and not disputed by the Respondent, the relevant facts are that "[s]oon after Sanum agreed to partner with ST, it discovered that there was an existing slot club in operation in the Paksan district of Bolikhamxay Province – one of the provinces in which Savan Vegas has the exclusive right to operate.  To enforce that exclusive right, ST asked the Government of Bolikhamxay Province to shut down the club, and it did so."[137]  The existence of the slot club led Savan Vegas to open its own club at the same location, the Paksan Hotel.

---

[135] Minutes dated 6 February 2009, p. 2, C(S)-320; Notice from the Prime Minister's Office to the Minister of the MPI, 21 August 2008, C(S)-311; Notice from the Prime Minister's Office to the MPI et al., 23 October 2008, C(B)-497.

[136] Amended Transcript, 5 September 2018, p.63, 4-7.

[137] Statement of Claim, para. 89.

220.  The **Ministry of Information and Culture** ("**MIC**") granted Savan Vegas a one-year license to operate a slot club in the Bolikhamxay Province on 24 October 2007.  The MIC renewed the license on 26 November 2008.

221.  After the lease of the former club expired in October 2008, Savan Vegas signed its own lease on 25 December 2008 and refurbished the space in the Paksan Hotel formerly occupied by the slot club.  The club re-opened on 25 October 2009 and the MIC renewed the slot license for another year on 27 October 2009.

222.  On 18 February 2010, the Prime Minister's Office ordered the slot club license to be cancelled: "The authorization to open an electronic gaming club granted to Savan Vegas Ltd. by the Information and Culture Department of Bolikhamxay Province is not in accordance with regulations in that it exceeds the authority of that office.  Therefore, you should stop operation of electronic gaming at Paksan Hotel.  Further, the company is no longer authorized to erect an advertising billboard in Bolikhamxay Province."[138]

223.  The license was not renewed in 2010.  On 11 March 2011, the Government ordered the MIC and the provincial Governor to close the club within three days.  The club closed on 13 March 2011. Sanum and Savan Vegas petitioned the Prime Minister to re-open the club.  The petition was denied on 19 May 2011 and Savan Vegas was ordered to comply with Notice No. 305.

### 7.3.2.  The Claimant's Argument

224.  The Claimant contends that the Respondent's closure of the Paksan slot club constitutes an unlawful taking.  In the Statement of Claim, the Claimant attributes the closure to the dissatisfaction of ST with the Claimant on whether revenues of the Paksan slot club and the concomitant tax obligations should be consolidated with those of Savan Vegas. As told by the Claimant, "[i]n a meeting they [ST] had with Sanum in the fall of 2010, ST demanded they be paid 30% of Paksan's gaming revenues, regardless of what any agreement said.  If Sanum did not agree, ST would have the club shut down … ST then proceeded to make good on their threat.  Sanum soon learned that ST had convinced

---

[138] Exhibit C(S)-326, p. 3.

officials at the MIC to issue a notice instructing Savan Vegas to close the Paksan club."[139]

225.    The Claimant also disputes the Respondent's contention that most patrons were Lao people because there is no bridge at Paksan.  The Claimant points out that there is a ferry to cross to and from Thailand. Secondly, this argument was not used to close the club as it is evident in the minutes of the Government meeting held on 11 March 2011 where the closure was decided.[140]   The minutes only refer to Notices No. 305 and 470/MCD that Savan Vegas claims not to have seen earlier. Indeed, in the case of Notice No. 305, Savan Vegas affirms that it became aware of it in this arbitration.

226.    The Claimant points out that, "prior to filing its Statement of Defense in this arbitration, Laos had never asserted that the closure of Paksan was justified by non-compliance with the Savan Vegas PDA, failure to obtain a separate Foreign Investment License, or the MIC's supposed lack of authority to issue slot club licenses.  In fact, Savan Vegas was never made aware of the existence of Notice No. 1957 until this arbitration."[141] Furthermore, the Claimant recalls that the Respondent withdrew the accusing witness statement on Lao people being allowed to gamble at the Paksan Hotel.

227.    The Claimant further argues that, "although Paksan's license had expired at the time of the club's closure, by permitting the club to continue operating without a license and by assuring Savan Vegas that its license was in the process of being renewed, the Government *de facto* extended Sanum's rights in the Paksan investment."[142]

### 7.3.3.  The Respondent's Argument

228.    In the Reply, the Claimant questions the merit of

> Laos's attempt to rely on a number of Government instruments that it claims deprived the MIC of authority to issue slot club licenses.  Notice No.1957, issued by the Prime Minister's Office on 4 November 2008, did not, as Laos now claims, require that all slot club licenses be issued by the Prime Minister's Office rather than by the MIC.  Critically, Notice No. 1957 is titled 'Solution for the slot machine business issues in Khammouan Province and

---

[139] Statement of Claim, para. 100.
[140] *Ibid*., para. 175.
[141] *Ibid*., para. 169.
[142] *Ibid*., para. 171.

Vientiane City', and it is addressed only to the governors of those areas, as well as the MIC, the MPI, and the Minister of Public Security.  Thus, on its face, it has no application to Bolikhamxay Province, where the Paksan slot club was located. Moreover, Notice No. 1957 provides that 'the Government', and not just the Prime Minister's Office, has the right to issue slot club licenses.  The MIC is undoubtedly part of the Lao Government.  As to Notice No. 545, issued by the Prime Minister in March 2008, and now claimed by Laos to 'have barred new casinos and slot clubs', this was issued after Paksan received its first operating license in 2007.[143]

229.   In the Rejoinder, the Respondent affirms that a "*de facto*" license cannot be expropriated "when the real one year license had expired."[144]  The Respondent admits that it is the first time that it argues that Savan Vegas was not authorized to operate a slot club in Paksan.  The Respondent states: "it is the first time, but the position is correct in law. A party operating outside the terms of its license and concession agreement cannot claim an illegal expropriation of an illegal business."[145]

### 7.3.4.  The Tribunal's Analysis

230.   A first issue to be addressed by the Tribunal is the disputed meaning of monopoly in the PDA. Article 9 reads as follows:

> The Company has been granted monopoly rights for its casino business operation only with the condition that the Government shall not approve and grant any other parties or entities who put up their applications for the operation of certain casino business in the two neighboring provinces close to the project development zone of the Company, namely Salavan and Champasak throughout the concession period of 50 years.
>
> However, should there have any applications submitted by any parties or entities, all those shall be made through the consent and approval of both the government and the authorized investors who have management rights."[146]

231.   The Claimant's argument that Savan Vegas' foreign investment license permitted Savan Vegas to operate gambling facilities in all three provinces where it had monopoly finds no support in the terms of the PDA.  The Claimant and ST in fact recognized the need to have a specific slot license at Paksan and applied for its renewal year after year.

---

[143] Reply, para. 168. Footnotes omitted.
[144] Rejoinder, para. 101.
[145] *Ibid.*, para. 102.
[146] PDA, Article 9, para. 24, RE-04.

On the other hand, the argument of the Respondent that the Paksan operation was illegal under the Law on Investment Promotion may be correct in law, as affirmed by the Respondent in the Rejoinder,[147] but of doubtful persuasiveness when the MIC had issued the Paksan slot club a license three times during the period 2007-2009.

232.   The Respondent has argued that the license was terminated in February 2010 and that the Claimant had operated the Paksan slot club without a license for about a year. On the other hand, the Claimant has affirmed that it was not aware of Notice No. 305 of 18 February 2010.[148] Irrespective of whether the license was terminated by order of the Prime Minister's Office, it is undisputed that the Paksan slot club continued to operate beyond the term of its license.  For the Tribunal, the key fact is that the license granted in 2009 had expired in October 2010 and had not been renewed. Monopoly rights kept competitors out but did not entitle Savan Vegas to establish and operate other gambling facilities unless those other facilities were specifically authorized.  The Claimant has not shown that Savan Vegas had a right to the license's renewal or even that it attempted to renew the license.

233.   At the time of the Paksan slot club's closure, the club was operating without a license and there is no documentary evidence that the Respondent had created any legitimate expectation in the Claimant that the license would be renewed or that it may operate *de facto* as if it had a license.  The Claimant's argument about a *de facto* license begs the question of why Sanum had applied for the license's renewal in the preceding years. The Tribunal concludes that the license expired on its own terms and had terminated when the slot club was ordered to be closed.

### 7.4.  Thakhet Casino and Hotel Resort

#### 7.4.1.  Background

234.   In 2010, Sanum started negotiations with the Committee for the Laos-Thailand Friendship Bridge III Economic Zone Development (the "SEZ" and the "SEZ Committee") for a land concession at the foot of a planned bridge to cross the Mekong

---

[147] Rejoinder, para. 102.
[148] Notice to the MIC and the governor of the Bolikhamxay Province, dated February 18, 2010, Exhibit C(S)-326, p. 3.

River.  The negotiations resulted in a MOU between Sanum and the SEZ Committee dated 20 October 2010.  The MOU contemplated a land concession to Sanum of about 90 hectares in the SEZ, payment by Sanum of $900,000 to allow the provincial government to compensate individuals occupying the land, and $400,000 to be paid upon signature of the MOU.  The MOU required Sanum to sign a land concession within 30 days and secure all necessary approvals from the central and local governments within one year prior to building on the concession land.

235.    On 4 February 2011, Savan Vegas submitted a proposal for a slot club to the Governor of the Khammouane Province and the MIC.  The proposal was supported by the Governor and, on 21 February 2011, the MIC approved the Savan Vegas's Welcome Center and Slot Club.  Shortly thereafter, on 2 March 2011, the Prime Minister's Office directed the MIC to revoke its approval because slot club licenses may only be issued "by the Government", which was interpreted by the Prime Minister to mean the Prime Minister's Office.[149]  On 29 March 2011, Sanum and Savan Vegas petitioned the Prime Minister's Office to grant permission to open the Welcome Center and Slot Club in the SEZ.  The petition was rejected in October 2011.

### 7.4.2.   The Claimant's Argument

236.    According to the Claimant, the SEZ Committee had been negotiating with Sanum a PDA and a land concession for the project, and by the end of 2011 the negotiations were near completion. But then, "the Government sent Sanum a substantially revised PDA, which removed approximately 16 hectares from the land that the SEZ Committee had previously committed to grant Sanum in the MOU." The Claimant affirms that the removal of these 16 hectares compromised the feasibility of the project because they fronted Highway 13 and the access road to the bridge.

*This space has been left intentionally blank.*

---

[149] Notice from the Prime Minister's Office to the Minister of Information and Culture, 2 March 2011, Exhibit C(B)-337.



*(Source, Claimant's Opening Presentation, Slide 23, C(B)-0092) Disputed 16 hectares colored in yellow)*

237.    According to the Claimant, the map above, which was appended to the 2010 MOU, showed Sanum's Highway 13 Frontage.  However, the Respondent notes that Sanum never made an application for a license or PDA to the MPI for the Thakhet development, as required by the Law on Investment Protection.  Instead, on 4 February 2011, Savan Vegas applied to the MIC for a license for a small slot club.  At the time, because of the order to close Paksan, Savan Vegas should have been aware that the MIC had no authority to approve gambling licenses.  In the application, Savan Vegas referred to the MOU and attached the PDA, under which Savan Vegas affirmed that it had the right to operate in three provinces.  On 21 February 2011, the MIC authorized gambling in Thakhet.  On 2 March 2011, the Prime Minister revoked the authorization and re-affirmed this decision on 7 October 2011 in view of the further request of Savan Vegas on 29 March 2011.  At the request of Sanum, the president of Sanum met with

relevant ministries on 25 November 2011, and again it was reiterated to Sanum that the authorization to operate slot machines in Khammouane Province was illegal.

238. The Claimant in the Reply points out that the SEZ Committee was appointed by the central Government, that the Government specifically instructed Sanum to negotiate the PDA and land concession agreement with the SEZ Committee, and that the 30 days to sign the land concession run as from approval by the SEZ Committee of a feasibility study, master plan, social-economic and environmental impact study.  The Claimant contends that it submitted these documents, but negotiations of the PDA fell apart because of the removal of the 16 key hectares.  The Claimant points out the changing reasons adduced by the Government to justify the removal of those hectares.  First, the Respondent had said that there was a holdout landowner who wanted more money; later, it argued that the 16 hectares were never included in the concession.

239. The Claimant affirms that at the time it was not aware of Notice No. 305, and that, in any case, this Notice does not deprive the MIC of its authority to issue slot licenses. According to the Claimant, Savan Vegas reasonably believed that the MIC was the relevant authority to which it should direct its application.  This understanding was supported by Respondent's contemporaneous actions.  For example, the Khammouane Governor wrote to the MIC a letter of support on the province's behalf.  The MIC approved the application on 21 February 2011.[150]

### 7.4.3.  The Respondent's Argument

240. The Respondent contends that the Claimant has not been able to rebut the Respondent's position that Sanum never obtained a license, a concession or a PDA from the Respondent.  The Respondent points out that in the Reply, the Claimant admits that the parties had not reached agreement on whether the 16 hectares were included in the land concession or the terms of the PDA: "it is patently clear as a matter of law that when parties do not agree on material terms during the negotiations, they do not have an

---

[150] Reply, para. 189.

- 82 -

agreement. The parties never concluded those negotiations and never signed the agreements."[151]

241. At the closing of the Hearing, the Respondent explained that the 16-hectare issue was irrelevant because the key land was next to the bridge on the side of the river rather than on the road frontage land as there would be a need to isolate the gambling area, including space for customs control.

242. As regards the slot license, the Respondent has alleged that it was obtained through bribes paid by Mr. Bouker to Mr. Boumong at the MIC.

### 7.4.4. The Tribunal's Analysis

243. It was decided in the Tribunal's ruling on the Merits of the Claimant's Second Material Breach Application that, in the Tribunal's view,

> the Claimant has not established a land entitlement that includes the disputed 16 hectares, and there is no undertaking by the Government in Section 22 to use its powers of eminent domain to expropriate the existing private owners for the financial benefit of the Claimant. Refusal to expropriate private land for the private gain of the Claimant does not constitute evidence of 'bad faith.'[152]

244. This decision was reached by the Tribunal in the context of whether the Government breached Article 22 of the Deed of Settlement by failing to negotiate the Thakhet related agreements in good faith. The Tribunal considers that the Claimants have also failed to establish rights to the remainder of the land referred to in the MOU. Sanum had 365 days from the date of the Land Concession Agreement to seek all the approvals for all investment activities described in the MOU. In turn, before the Land Concession Agreement could be signed, Sanum needed to complete a Feasibility Study, a Master Plan and a Socio-Economic and Environmental Impact Study for the Land Concession, all to be approved by the Concessioner. The Land Concession Agreement required by the MOU was never signed; it never went beyond the negotiation stage. Despite face to face negotiations over the PDA throughout the summer and fall of 2011, Sanum and

---

[151] Rejoinder, para. 105.
[152] Decision on the Merits of the Claimant's Second Material Breach Application, 15 December 2017, para. 195.

the SEZ Committee had not finalized the terms of the PDA, including the land concession.[153]   In the overall picture, whether or not Sanum had obtained a licence had no impact on the viability of its Thakhaek project.

245.   In the view of the Tribunal it is clear from the MOU that Savan Vegas could not expand to Thakhaek in the Kammouane Province without the "**final approval from all governmental authorities (central and local)**."[154]   The MOU provides for the eventuality that the approval is forthcoming and also in case it is not.[155]   Furthermore, the MOU subjects the exact location of the Concession Land to a future agreement: "Once the exact location of the Concession Land has been agreed upon, the Concessionee will confirm its acceptance of the Concession Land in writing to the Concessioner."[156]   There was never any agreement in this respect.

246.   The MOU shows that Savan Vegas' monopoly rights did not encompass a right to establish slot clubs or casinos beyond the area covered by the Savan Vegas PDA:

> If the Concessionee would like to expand the casino or slot business of Savan Vegas, which is an investment project of Sanum Investments Limited according to the Foreign Investment License no. 09507 [not readable], dated 17 August 2007 to the Concession Land to be a branch (Welcome Center) of Savan Vegas *such expansion shall be proposed, approved and agreed in writing from the Government* first before implementing such expansion.  The Khammouane Province wilfully [sic] support the expansion of Savan Vegas to the Land Concession according to the appropriate procedures and regulations.[157]

247.   As regards to the slot license, the Tribunal notes that the Respondent's witnesses from the MIC and the Government Secretariat Office have claimed that the license was issued by mistake.[158]   The Respondent has argued that the MIC had no authority to issue the license because of Notice No. 1957 of the Prime Minister and says that the license was procured by a bribe.  Leaving aside the issue of the bribes allegedly paid by the Claimants, the Tribunal observes that the license was effective for less than ten days

---

[153] Reply, para. 182; Exhibit SRE-101.
[154] MOU, clause 2.3(c).
[155] MOU, clauses 2.3(c) and (d).
[156] MOU, clause 3.1.
[157] MOU, clause 3.3.
[158] Reply, para. 316 and footnote 767: Witness Statements of Xypheng Vongpanya, at para. 7, and of Phimphone Sengthong at para. 9.

and that the revocation was justified on the lack of authority of the MIC to grant it.  The Tribunal appreciates that Notice No. 1957 refers to the Government and is not explicitly limited to the Prime Minister's office but by 2011 Sanum was fully aware that the Prime Minister's Office was the essential authority on the Claimants' gambling ventures in Laos.  The Prime Minister's Office never approved the Claimants' gambling project in Thakhaek.  The Claimants had just finished a bruising encounter with the Government over the Claimants' failure to fulfill its obligations in respect of the Paksong Hotel and Casino project.  By 2011, the Claimants had entirely failed to live up to their Paksong commitments, while pretending otherwise.  The Claimants had demonstrated themselves not to be good faith investors.

248.   In the Tribunal's view, the Claimants were seeking in bad faith (even if not by bribes) to manipulate Government officials to obtain approvals to which the Claimants were not entitled.  It is significant that the MIC licence was issued to Sanum in February 2011 by the same Minister that was ordered to cancel the Paksan license for lack of authority one year earlier in February 2010.

249.   Negotiations for the renewal of the Flat Tax Agreement had stalled by March 2011.  The Government was agitating for accountability in respect of its 20% interest in Savan Vegas.  The Claimant alleges that the 16-hectare parcel on Highway 13 was essential to the success of the Thakhaek project, yet negotiations for the 16-hectare parcel never reached agreement in the Tribunal's view.  Thus Sanum acquired no rights in Thakhaek property.  There was no Land Concession Agreement for a site on which gambling facilities *could* be built.  The other approvals that would have been required contingent on the signing of the Land Concession Agreement (which never happened) became moot.  The Thakhaek project was not expropriated. The licence was revoked for good and sufficient cause.  The project itself never came into legal existence.  The MOU provided that the Claimant's Thakhaek project could not proceed without "the final approval of, by or from all Government authorities (central and local)" which was never obtained.  The Tribunal appreciates the chagrin of the Claimant at paying US $400,000 which, in the end, did not result in a viable project but the failure cannot be attributed to any actionable fault on the part of the Government.

250.   The Tribunal concludes that there is insufficient evidence of bad faith on either side in respect of Thakhek. It was simply a commercial possibility that never reached the stage of agreement.

## 8.   COSTS

251.   The Respondent Government claims costs for the period from 23 February 2017 through 22 February 2019 in respect of lawyers' fees in the amount of US$ 1,161,611.48 and expenses of US$ 151,640.83, being in total US$1,313,252.31. These fees are exclusive of and apart from the costs sought by the Government arising out of *Lao Holdings N.V. v. The Government of the Lao People's Democratic Republic*, ICSID Case No. ARB(AF)/12/6, which was not consolidated with this case, but for the most part heard jointly with it. (The Respondent Government claims a total of $2,780,736.03 in respect of both the ICSID and PCA proceedings). By way of comparison, the Claimants indicated that if successful (and even if not wholly successful) they would be seeking $20,929,951.36 in total in respect of both the ICSID and PCA proceedings. The Claimant's claim, unlike the Respondent's claim, does include the expenses and charges of the respective Secretariats.

252.   Article 40 of the UNCITRAL Rules provides:

> 1.   The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision.
> 2.   The term "costs" includes only:
>
> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;
>
> (b) The reasonable travel and other expenses incurred by the arbitrators;
>
> (c) The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e) The legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f) Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA.

253.    Article 42 of the 2010 UNCITRAL Rules provides:

> (1) The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

> (2) The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.

254.    According to Article 42, the costs of the arbitration "shall in principle be borne by the unsuccessful party or parties" but grants the Tribunal discretionary power to apportion costs, based on what is reasonable in the circumstances of the case. While there is some variation in tribunals' practices, the prevailing approach of international investment tribunals is to order costs to follow the event.  The Claimants themselves have endorsed this principle in putting forward their own claim for the "costs and expenses of this proceeding, including attorneys' fees".[4]

255.    According to the Claimants, the quantum of their original claims if wholly successful, might have reached US $1 billion.

256.    The costs claim advanced by Sanum and LHNV include US $10,109,872.71 for legal work prior to the Settlement of 15 June 2014.  The Respondent's claim commences post-settlement, specifically from 23 February 2017 — i.e., after the date Claimant Sanum filed its Second Material Breach Application before the PCA Tribunal. From and after 23 February 2017, the two cases (PCA Case No. 2013-13 and ICSID Case No. ARB(AF)/12/6) proceeded in parallel although, as mentioned, not consolidated.[5]  Thus, after 23 February 2017, work on all written submissions, evidentiary applications, interim conferences and hearings as well as the Hearing were combined, then evenly divided as between the PCA proceedings and the ICSID proceedings. In the result, the Respondent seeks an order that the Claimant Sanum pay 50% of its legal costs, including lawyers' fees and expenses, incurred from 23 February 2017 through the present.

257.    The Claimant points out that it was successful on a number of the interlocutory matters including a defeat of the Government's jurisdictional challenges and establishment in the Second Material Breach Application, that the Government had failed in two

important aspects to honour the Settlement, namely, the establishment of a new FTA to assist in the sale of Savan Vegas, and the Government's failure to halt existing and potential criminal proceedings. These were important successes for the Claimants, but in the end, they failed to establish after years of litigation any liability on the part of the Government in respect of any of their myriad of claims of Treaty violations (as distinguished from two breaches of the 2014 Settlement Agreement, as mentioned).

258.    In the circumstances the Tribunal thinks it appropriate, in its discretion, to award the Respondent Government its costs.

### 8.1. Expenses

#### 8.1.1. Travel Expenses

259.    The Respondent's travel expenses represent travel to Singapore twice by various witnesses and the Respondent's lawyers and staff, for matters involving the Tribunal. These travel expenses also include travel to Laos, Paris, and Hong Kong for matters such as fact development, evidence gathering and document review.[159]

#### 8.1.2. Miscellaneous Services and Expenses

260.    The remainder of the Respondent's expenses relate to services and expenses required to pursue the arbitrations, some of which were incurred in-house and others by external vendors. Such services include translation services; court reporter and transcript fees; express delivery expenses; research; and trial preparation services in Singapore, such as copying, binding presentations, and creating witness and evidentiary notebooks.

261.    The Respondent's total expenses (other than legal fees) requested in this arbitration amount to US $151,640.83.[160]    This sum, taken together with legal fees of US $1,161,611.48, produces a total cost award of US $1,313,252.31.

---

[159] Respondent's Submission on Costs, para. 18.
[160] Respondent's Submission on Costs, paras. 19-20.

### 8.2. Arbitration Costs

262.   The costs of the arbitration, including the fees and expenses of the Tribunal, PCA registry fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees | |
| Dr. Rigo Sureda[161] | US $529,880.84 |
| Prof. Hanotiau[162]* | US $427,888.71 |
| Prof. Stern[163]* | US $441,258.91 |
| Travel and other expenses incurred by the arbitrators | US $90,737.66 |
| Costs of PCA registry and other assistance required by the arbitral tribunal | |
| PCA registry fees | US $155,593.00 |
| PCA registry expenses | US $23,343.89 |
| Other expenses | US $104,168.85 |
| **Total** | US $1,772,871.86 |

263.   The above costs have been paid out of the advances made by the Parties, which were not made in equal parts.  The Claimant made advance payments for a total of US $1,355,000.00 and the Respondent made advances for a total of US $465,000.00.  The Tribunal orders the Claimant Sanum to bear all the arbitration costs of the PCA proceeding, including the fees and expenses of the Tribunal and PCA.  Accordingly, the Tribunal orders the Claimant to pay the Respondent US $465,000 for the expended portion of the Respondent's advances to the PCA.

---

[161] In Euro, Dr. Rigo Sureda's fees amount to EUR 425,538.75.

[162] In Euro, Prof. Hanotiau's fees amount to EUR 339,983.60.

[163] In Euro, Prof. Stern's fees amount to EUR 350,968.81.

* The fees and expenses of Prof. Hanotiau and Prof. Stern have been equally divided between the PCA and ICSID proceedings.  The amount shown here represents the PCA portion.

**9. DISPOSITION**

264. In the Tribunal's view, the Claimants have failed to meet the evidentiary onus of establishing facts necessary to support their legal arguments. The claims are therefore dismissed.

265. The Claimant Sanum shall pay the Respondent its legal costs of US $1,313,252.31.

266. The Claimant Sanum shall bear all the arbitration costs of the PCA proceeding, including the fees and expenses of the Tribunal and PCA. Accordingly, the Claimant Sanum shall pay the Respondent US $465,000 for the expended portion of the Respondent's advances to the PCA. The PCA shall reimburse the unexpended balance of the deposit to the Claimant Sanum in the amount of US $47,128.14.

*Signature page follows.*

DATED THIS   6TH DAY OF AUGUST   2019


_____
Professor Brigitte Stern
Arbitrator

_____
Professor Bernard Hanotiau
Arbitrator

_____
Dr. Andrés Rigo Sureda
Presiding Arbitrator